1

2                          IN THE UNITED STATES DISTRICT COURT

3                          IN AND FOR THE DISTRICT OF DELAWARE

4
                                                    )
5     VANDA PHARMACEUTICALS, INC,                   )    CIVIL ACTION
              Plaintiff,                            )
6       v.                                          )    NO. 18-651-CFC
                                                    )
7                                                   )
      TEVA PHARMACEUTICALS USA,                     )
8     INC., et al.,                                 )
                                                    )
9              Defendant.                            )

10

11

12

13                              - - - -

14                          Wilmington, Delaware
                            Wednesday, March 30, 2022
15                          Bench Trial Transcript

16                              - - - -

17

18     BEFORE:   HONORABLE COLM F. CONNOLLY, Chief Judge

19

20

21

22

23

24                              Michele L. Rolfe, RPR, CRR

25

1    APPEARANCES:

2

3              SHAW KELLER LLP
               BY:  NATHAN HOESCHEN, ESQ.
4                   JOHN C. ROZENDAAL, ESQ.
                    BRYON PICKARD, ESQ.
                    DEIRDE M. WELLS, ESQ.
5                   WILLIAM H. MILLIKEN, ESQ.

6                        For Teva Pharmaceuticals

7

8              PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
               BY:  NICHOLAS GROOMBRIDGE, ESQ.
9                   ERIC STONE, ESQ.
                    JOSEPHINE YOUNG, ESQ.
10                  DANIEL KLEIN, ESQ.

11                  -and-

12             MORRIS NICHOLS ARSHT & TUNNELL, LLP
               BY:  KAREN JACOBS, ESQ.
13
                         For Vanda Pharmaceuticals
14

15             COZEN O'CONNOR
               BY:  KAUN EKINER, ESQ.
16                  BLAKE COBLENTZ, ESQ.
                    KERRY MCTIGUE, ESQ.
17                  DEREK GRETKOWSKI, ESQ.

18                       For Apotex

19

20

21

22

23

24

25

1                        - - - - -

2                    P R O C E E D I N G S

3           (REPORTER'S NOTE:  The following bench trial was held

4    in Courtroom 4B, beginning at 8:30 a.m.)

5           THE COURT:  Good morning.  We have some

6    housekeeping matters apparently.

7           MR. ROZENDAAL:  Yes.  Good morning, Your Honor.

8           Two matters that I'm aware of.  The first is the

9    issue of the closings.  We have talked about the scheduling

10   of that and I think the parties are in agreement that it

11   would be beneficial for everyone to schedule those after the

12   post trial briefing has been completed.

13          THE COURT:  I mean, we're going to see.  I might

14   have questions for you, so you should be ready.  So the

15   answer is we'll wait and see.  And I may just decide, as I

16   often do, that I'd like to hear some issues right away, so

17   okay.

18          MR. ROZENDAAL:  Understood.  I guess the

19   thinking that we had talked about yesterday is that there

20   are some legal issues that are sort of percolating up

21   through the case now that we're seeing how the evidence is

22   coming in and that it might be easier to deal with those

23   after the -- they have been --

24          THE COURT:  It may be, and it may be that you

25   submit the briefing and I just decide I don't need to have

```
 1    oral argument or I might need to.  We'll see.
 2              When's the launch?  Is that public?
 3              MR. ROZENDAAL:  I think everyone agrees that the
 4    compound patent lasts at least until December.
 5              THE COURT:  Okay.  So I have some time in this
 6    case.
 7              MR. GROOMBRIDGE:  Your Honor, the Court has
 8    until December.  I don't remember the exact date within
 9    December, but it's in the month of December.
10              THE COURT:  All right.
11              MR. ROZENDAAL:  And then the one other thing is
12    an evidentiary -- an exhibit objection that we wanted to
13    make.  So there is a -- Vanda has put on its list for use
14    with Dr. Bergmeier, their chemist, a prior art reference
15    that is the Singh, S-I-N-G-H.  It's DTX-52.
16              And that was a reference that had been relied
17    upon by defendants in part of an obviousness combination to
18    a different patent that is no longer in the case.  And so we
19    object to the use of it here on relevance grounds because we
20    don't know --
21              THE COURT:  All right.  So wait.  So your expert
22    is going to testify, apparently offer an opinion about
23    another patent that's no longer in the case?  No?
24              MR. ROZENDAAL:  No, I think their expert is
25    going to testify about a prior art reference that we had
```

1    used against a patent that is no longer in the case and we

2    don't think that's relevant to anything that is still in the

3    case.

4              THE COURT:  All right.

5              MR. ROZENDAAL:  That's the issue.

6              MR. GROOMBRIDGE:  And, Your Honor, the -- this

7    goes to Dr. Bergmeier and the question is simply -- Your

8    Honor may remember yesterday there was some -- Dr. Perni,

9    the defendant's expert, had at least some doubt about --

10    perhaps, about when Bristol-Myers Squibb had disclosed

11    publically the process.  I had asked him about that and he

12    said it was publically available and then on redirect he

13    said maybe he wasn't sure about the date.

14              And the sole purpose for this is to show that

15    BMS had made that -- a public disclosure before the priority

16    date and that that -- he's not going to talk about anything

17    else, but that was in his expert reports on the earlier

18    patents, right, to say this is a reference that discloses

19    the follow and this is the date.

20              And that's all --

21              THE COURT:  So it does seem -- I was a little

22    confused, frankly.  You're trying to bring out that BMS

23    disclosed it earlier than they did?

24              MR. GROOMBRIDGE:  Correct.

25              THE COURT:  Which normally it would be the

1    opposite, right, so I did have to say when it was coming in

2    yesterday, I'm thinking to myself, well, I'm missing

3    something big here, but I'll figure it out later on.

4                MR. GROOMBRIDGE:  Maybe it's useful if I give

5    it --

6                THE COURT:  Go ahead --

7                MR. GROOMBRIDGE:  The issue here is -- as I

8    understand their argument, it's along these lines is that

9    this aspect of the process --

10               THE COURT:  What aspect?

11               MR. GROOMBRIDGE:  The part where you take the

12   carboxamide and you react it with something to get the

13   methenamine, which is what we've all been focused on in the

14   process steps.

15               THE COURT:  Right.

16               MR. GROOMBRIDGE:  They're saying, I believe,

17   that you, Vanda, got that from BMS.  You didn't come up with

18   that yourself.

19               THE COURT:  Okay.

20               MR. GROOMBRIDGE:  Right.  And that's, in their

21   view, I think the reason why they're saying so someone from

22   BMS should be an inventor on this patent.

23               What we're saying is the priority date of this

24   patent is 2014.  That aspect of the process was out in the

25   public domain long before this.  And just because a prior

```
 1    art has then published and someone else later came along and

 2    builds something, that does not make the prior artist then

 3    an inventor.  You know, that's the law, right.

 4              You don't get to say because I made -- I created

 5    this and made it public, if you later on use it and get a

 6    patent, I'm an inventor on your patent.

 7              THE COURT:  What did you just say?

 8              MR. GROOMBRIDGE:  I'm obviously going too fast.

 9              THE COURT:  It was just the last sentence.  You

10    said "obviously something" and then I lost you.

11              MR. GROOMBRIDGE:  So in our view, if that aspect

12    of the process was something that was known in public before

13    the priority date of this patent, then it would not make BMS

14    or any other prior -- person who had published the process

15    an inventor; it would simply mean that the Vanda people have

16    taken that information and built on it.

17              THE COURT:  Okay.

18              MR. GROOMBRIDGE:  And that's why, for example,

19    there's a debate whether the normal roles are reversed.

20              THE COURT:  Right.  Okay.

21              MR. GROOMBRIDGE:  The patent holder is saying --

22              THE COURT:  Right.  I get it.  In other words,

23    your point is they're just building what's out there in the

24    art.  You're not claiming that's inventive.  That's part of

25    the process.
```

```
1              MR. GROOMBRIDGE:  Right, okay.

2              THE COURT:  Before you go, what did Ms. Platt

3    contribute to the invention?

4              MR. GROOMBRIDGE:  I believe, and it's -- I'm not

5    the expert or the -- on this --

6              THE COURT:  No, but you're lead counsel.  You

7    heard it.  What did she --

8              MR. GROOMBRIDGE:  I think what she contributed

9    is intellectual input -- basically, the way Vanda works is

10   it's working with these contract manufacturers and the

11   contract manufacturers are doing the work.  And the

12   scientists at Vanda are saying -- analyzing what they get

13   back and saying do this, do that.

14             THE COURT:  What did she do?  Other than just do

15   mathematics, what did she do?

16             MR. GROOMBRIDGE:  I think she provided guidance

17   about how they would identify these impurities.

18             THE COURT:  What kind of guidance -- I listened

19   to her deposition, like what did she do?

20             MR. GROOMBRIDGE:  I do not know the answer, Your

21   Honor.

22             THE COURT:  Yeah, well, neither do I.  All

23   right.  Let's hear from the other side.

24             MR. ROZENDAAL:  Your Honor, so I think our point

25   is, now that we know what they are planning to use it for,
```

1     our point is that in their expert's report on the topic of

2     inventorship, they never said inventorship is not a problem

3     because we didn't get this from BMS because it was somehow

4     already out in the public.  That would be an undisclosed

5     expert opinion that we would be hearing here for the first

6     time.

7               So --

8               THE COURT:  Okay.  So that's a Rule 26 argument.

9     In other words, it's -- he didn't disclose this opinion

10    before?

11              MR. ROZENDAAL:  He didn't disclose this opinion

12    before.

13              THE COURT:  All right.  So let's hear then.

14              Did you disclose it before?

15              MR. GROOMBRIDGE:  I think we disclose -- he's

16    not going to testify, Your Honor, about inventorship.  He's

17    simply going to say this is a piece of prior art that

18    discloses the following and it was publically available.

19    Now, this may all be a tempest in a teacup because, frankly,

20    the only reason we're doing this, it seemed like there was

21    some debate yesterday.  But I'd like to go back and look at

22    his expert report and see whether we think we even need it.

23              THE COURT:  I mean, here's -- how's -- what's

24    the proffer?  All he's doing is -- basically, you're having

25    him be the vehicle by which you introduce this article.

1          MR. GROOMBRIDGE:  Yes, about which he -- opined

2     in his expert reports.

3          MR. ROZENDAAL:  On a different patent that's no

4     longer in the case, never in connection with the --

5          THE COURT:  I get the opinion, right, but really

6     isn't -- isn't what we're really talking about a fact issue?

7     It's that they'll be -- if there's a prior art out there

8     that BMS [sic] disclosed this process in, unless I have to

9     do, you know, mental gymnastics to figure it out myself or I

10    need expert help, it's just a fact question whether it was

11    disclosed or not.

12          And in which case, why do you even need -- for

13    instance, if they wanted to in rebuttal, presumably, they

14    can have a fact witness come in and say, here's the article,

15    right.  And they can get the article into evidence.  Or

16    maybe they can do it on cross-examination of your witness.

17    And it's just getting the article into evidence.

18          Or is it more than that?  Is it that, no, the

19    article would require an expert to interpret it to explain

20    to me that this is BMS's procedure being disclosed, which

21    probably is the case, but --

22          MR. ROZENDAAL:  I was about to say, I don't want

23    to presume what Your Honor would or wouldn't glean but from

24    the article, without some expert elucidation it would be

25    difficult to establish what the article really teaches.  So

1    I think that's why they're trying to sneak it in with the

2    expert and he's never talked about that in connection with

3    the --

4           And I would say, look, the whole reason we're

5    doing the inventorship is we know that BMS's process

6    produced a 99.9 pure batch of tasimelteon.  So BMS had a

7    process that satisfied all the purity requirements but it

8    was confidential.  It wasn't public prior art.  And that's

9    why we're not talking about anticipation on that batch.

10           And so our point is, they did it.  You got it

11   from them and then you tried to get a patent on it later.

12   And they never said, oh, no, we didn't get it from them.  It

13   was in the prior art.  So the fact that we're being

14   confronted with this for the first time seems a little odd

15   to us, but...

16           THE COURT:  All right.  Hold on.  First of all,

17   to be clear, we're talking about which patent?

18           MR. ROZENDAAL:  '465, Your Honor.

19           THE COURT:  And your point is that BMS's

20   tasimelteon --

21           MR. ROZENDAAL:  They're --

22           THE COURT:  -- reads on Claim 1, if you accept

23   their interpretation of the reduction claim, assuming that

24   you can have two-step -- sorry -- yeah, assuming that

25   contacting and reacting is a -- is read the way the

 1    plaintiffs want to read it, which is that you can actually

 2    have two steps as opposed to one step, right?

 3                    MR. ROZENDAAL:  Correct.

 4                    THE COURT:  Your point would be BMS's

 5    tasimelteon reads on Claim 1.

 6                    MR. ROZENDAAL:  Yes.

 7                    THE COURT:  Okay.  All right.  And the only

 8    reason it's not anticipation because it -- a piece of prior

 9    art wasn't out there to be had.  But because of their

10    relationship, "their" being plaintiff's relationship with

11    BMS, they had full access to this and they knew it and

12    they've done nothing new.

13                    MR. ROZENDAAL:  Correct.

14                    THE COURT:  Right.  Okay.

15                    MR. ROZENDAAL:  And if they had told us earlier,

16    no, we didn't get it from BMS, we got it from some

17    publication, then we would have presumably a different set

18    of expert reports and a different set of evidence in front

19    of the Court.

20                    THE COURT:  All right.  And your theory is,

21    Mr. Groombridge, that BMS had made tasimelteon, but the

22    identifications of these purity specifications was done

23    solely by Vanda people and, therefore, they should be

24    credited with inventorship.

25                    MR. GROOMBRIDGE:  Yes, Your Honor, what we think

1    that Vanda brought to the party is the work which, as we

2    heard, took several years to actually figure out the

3    identity and structures of these materials.  And I think

4    there may be a difference of opinion -- with BMS, as I think

5    the evidence has established, never did.

6              And so I think there's also a dispute between

7    the parties about what would actually be necessary in order

8    to be -- to have invented this.  Does it involve knowing the

9    structures of the things or does it not, right?

10             But one way or another, in our view, the

11   process, or at least the aspect of the process that BMS was

12   using, that is recited in the claim, was out in the public.

13   And Vanda -- that doesn't make BMS an inventor.

14             THE COURT:  Did BMS invent tasimelteon?

15             MR. GROOMBRIDGE:  Yes.

16             THE COURT:  What in Claim 1 did BMS not invent?

17             MR. GROOMBRIDGE:  The identification of the

18   impurities.

19             THE COURT:  Anything else?

20             MR. GROOMBRIDGE:  There's nothing that I'm

21   thinking of right now, Your Honor.

22             THE COURT:  I mean, I know we have had a lot of

23   testimony and I'm going to show how ignorant I am in a sense

24   that I can only digest so much when I listen to all of this.

25             But going back 30,000 feet, how is it inventive

1     to identify an impurity in a chemical?

2                  MR. GROOMBRIDGE:  So, as I think we saw

3     yesterday, Your Honor, the guidelines, for example,

4     recognize that there may be impurities for which it's simply

5     not feasible to identify them because it's a challenge.  And

6     that is what the Vanda people were working on, was -- and

7     BMS had worked for years and have been unable to do this.

8     And the -- or they had tried, but in our view, they either

9     couldn't do it or got it wrong.

10                 And what -- knowing the structure of the

11     impurities has great value because what it does is it makes

12     it much easier to control your process.  Also makes it

13     easier to know that these things are not going to poison

14     someone.  You can look at it, you can test it, for example,

15     synthesize it, run it through the process, see if it has

16     negative effects.

17                 And in our view, that's why FDA was saying to

18     both Teva and Apotex, you need to -- these impurities are

19     reported in the literature.  You need to manage your process

20     to make sure that you're controlling for them and that was

21     only possible because Vanda had identified them.

22                 And so, there is, in this field of making a

23     commercial-grade pharmaceutical, tremendous value to knowing

24     what it is that could be produced as potentially toxic

25     byproduct.  And that's what Vanda was doing and that's

1    what -- certainly, Ms. Platt was involved in that.  And

2    that's what the other two inventors were also working on and

3    it was --

4               THE COURT:  But if the overall aggregate

5    impurities is so small that the FDA has already said it's

6    not going to affect anyone's health, how does it contribute

7    to anything in any way?

8               MR. GROOMBRIDGE:  Well, the only reason the FDA

9    could say that about these impurities was because Vanda had

10   identified them and shown to FDA that they would not do

11   that.  In other words, when the FDA said that, it had the

12   benefit of the work that Vanda had done that's embodied in

13   this patent.

14              THE COURT:  Was there tasimelteon on the market

15   before this patent issued?

16              MR. GROOMBRIDGE:  No, and the entire -- well,

17   before the patent issued it may have been, but it wasn't on

18   the market before --

19              THE COURT:  I thought it was on the market

20   before.

21              MR. GROOMBRIDGE:  The patent was -- I mean, the

22   patent was filed in 2014, and I don't remember -- I believe

23   tasimelteon was launched that year, right.

24              But the work that underlies the patent was done

25   by Vanda as part of the claim to get the process of

1  tasimelteon to the point it could be FDA approved.  In other

2  words, the work that's described in the patent is a direct

3  result, came from what the folks at Vanda did in order to

4  get this to a point where it was FDA approvable; and that's

5  why the patent even exists.

6          THE COURT:  If I conclude at the end of this

7  trial that Ms. Platt is not an inventor, do I even need to

8  get into any of this?

9          MR. GROOMBRIDGE:  Well, Your Honor, they have

10  not argued invalidity based on that Ms. Platt is not an

11  inventor.

12          THE COURT:  Well, they've argued invalidity

13  based on lack of inventorship.

14          MR. GROOMBRIDGE:  And, in fact, this was an

15  issue that we covered in the meet and confer.

16          THE COURT:  Who's the "we?"  Not me, right?

17          MR. GROOMBRIDGE:  No, no, that counsel covered.

18          That what they've argued, and we specifically

19  asked, are you saying that the patent is invalid because the

20  Vanda inventor should not be on it, or are you saying that

21  it's invalid because they should be on it but also someone

22  from BMS should be on it, and the answer is, there's a

23  missing coinventor.

24          Now, another issue that always comes up when we

25  talk about these things, Your Honor, is that inventorship is

```
 1    correctable; so that if it turns out that Ms. Platt was not
 2    an inventor of this, Vanda could simply go to the patent
 3    office and say, please revise the patent and take her off.
 4              You know, the whole purpose of the inventorship
 5    rules is to prevent -- is to not have patents be held
 6    invalid because there's been a mistake in putting someone
 7    on, you know.  And so, if Your Honor were to conclude that
 8    she's not an inventor, it would be correctable.
 9              But, frankly, had they made the argument that
10    it's not -- it's invalid because she shouldn't be an
11    inventor, we would have presented a very different case.  We
12    would have called her here and said, what did you do, right?
13    Like, what did you do?  Right?  That was never put in issue.
14    And, frankly, we thought, you know, it doesn't matter.  No
15    one is arguing there's a problem, right?
16              What they did was take a series of snippets of
17    her deposition that seemed to create the impression that she
18    did nothing.
19              THE COURT:  And it did that, that's for sure.
20              MR. GROOMBRIDGE:  And if they had -- but even if
21    that were true, right, that's a correctable problem.  Had
22    they said to us, we think you've got a problem with your
23    patent because she's not an inventor, one of the things we
24    could have done would have been to go to the patent office
25    and simply say, just take her off, right.
```

1                    THE COURT:  But then under that theory, you

2      could just go back and give credit to BMS.

3                    MR. GROOMBRIDGE:  I think that's probably right,

4      Your Honor, because remember BMS has effectively licensed

5      all the rights in tasimelteon to Vanda.  So that even if

6      some individual at BMS were an inventor, right, then BMS

7      would be contractually obligated to help us fix the problem.

8                    And so the -- in our view, I mean, this is part

9      of what's wrong with the inventorship argument, is at the

10     end of the day, right, it doesn't change anything because

11     this product was essentially sold by BMS to Vanda with all

12     of the rights around it.  And if BMS has some of those, then

13     they came to Vanda in that contract.

14                   MR. ROZENDAAL:  Your Honor, may I respond?

15                   THE COURT:  Sure.

16                   MR. ROZENDAAL:  So, first of all, I think the

17     record will show that tasimelteon was FDA approved before

18     the priority date of the '465 patent.  So the suggestion

19     that the '465 patent somehow contributed to the ultimate FDA

20     approval I don't think is borne out by the chronology of

21     events.

22                   Second of all, the hypothesis that BMS was

23     somehow trying to identify these impurities and worked on it

24     and couldn't do it, I don't think there's any evidence in

25     the record to support that.  I think the evidence in the

1    record is that BMS succeeded in making extraordinarily pure

2    tasimelteon and that nobody at BMS or the FDA or anywhere

3    else cared what the tiny fractions of impurities were in it.

4        Then when Vanda got the product, I think the

5    testimony was pretty clear that Vanda said to two contract

6    manufacturers, Shasun and Formosa, hey, make this stuff.

7    And in the course of making it, they produced HPLC

8    chromatograms that showed impurities, and Ms. Platt

9    essentially said to them, hey, Formosa, what's in this peak

10   in the chromatogram?  And then it was characterized.

11       I think that was the extent of her contribution.

12       Mr. Groombridge is correct that the focus of our

13   improper inventorship argument is on the omission of the BMS

14   inventors and although it is theoretically possible that

15   that is something that could be corrected, if they could

16   find the right inventors and agree to put them on the patent

17   some day, unless and until they do that the patent is

18   invalid.

19       Now, this is all, of course, on top of the fact

20   that we think the patent is invalid is obvious anyway,

21   right, because we don't think the -- rummaging, as I said in

22   the opening, rummaging in the dustbin of history and sort of

23   seeing what impurities had already been removed from the

24   process we don't think is something that patentable because

25   the idea of coming up with highly pure tasimelteon is an

1    obvious thing to do.

2                But that's the outline of the argument.

3                THE COURT:  All right.  So then let's go back,

4    then, to the issue that gave rise to all of this.  But this

5    is very helpful.

6                So we had, you know, equivocal or ambiguous

7    testimony yesterday about, well, when did, actually, BMS

8    publically disclose this, right?  That's a fair

9    characterization, right?

10               MR. GROOMBRIDGE:  I think so, Your Honor, yes.

11               MR. ROZENDAAL:  I would agree with that, Your

12   Honor.

13               THE COURT:  So the question is, do we want to

14   get clarity on that point?  And so -- I forgot already.

15   Mr. Groombridge, you're proposing to, on cross-examination

16   of their expert, bring this --

17               MR. GROOMBRIDGE:  No, on direct.

18               THE COURT:  You're bringing your expert in

19   rebuttal.

20               MR. GROOMBRIDGE:  Yes.

21               THE COURT:  And she or he?

22               MR. GROOMBRIDGE:  He.

23               THE COURT:  He is then going to be asked to

24   identify an article that, according to him, disclosed the

25   process by which BMS made this molecule --

1              MR. GROOMBRIDGE:  Yes, the --

2              THE COURT:  -- or compound, whatever you want to

3    call it?

4              MR. GROOMBRIDGE:  Yes, that's correct.  And

5    simply say, this is from BMS and it discloses this -- a

6    process with tasimelteon that includes a reduction of

7    carboxamide methenamine.

8              And, frankly, Your Honor, this wasn't -- we were

9    surprised it was even a dispute; we learned about it this

10   morning, and --

11             THE COURT:  Wait.  There was a dispute that you

12   could do this, you mean?

13             MR. GROOMBRIDGE:  Yeah, that there was an

14   objection to this.

15             MR. ROZENDAAL:  Well, the exhibit was disclosed

16   a day late, so...

17             THE COURT:  Right.

18             MR. STONE:  Your Honor, if I may, the witness

19   for BMS who testified about this, Dr. Perni, testified on

20   his redirect examination that he didn't know when it was

21   disclosed.  At his deposition he had admitted that this

22   reference is, in fact, BMS.  We learned in redirect that

23   this was an issue.

24             So our requirement is that we should disclose

25   two days in advance.  We disclosed one day in advance here

1    because it happened yesterday.  We didn't know the day

2    before that this was going to be an issue.

3              MR. ROZENDAAL:  Your Honor, I'm not objecting on

4    the basis of timeliness.  I'm explaining that the reason why

5    this dispute didn't surface earlier is because there was a

6    late disclosure.

7              THE COURT:  Right.

8              MR. GROOMBRIDGE:  And, Your Honor, frankly, the

9    way we see the evidence is this, right, the burden is on

10   them.  It's clear and convincing evidence.  If the evidence

11   is, in fact, as we heard it, to be at best equivocal -- I

12   mean, on cross-examination Dr. Perni said unequivocally yes,

13   this was in the public domain, the BMS process was in the

14   public domain before the priority date of this patent.  On

15   redirect examination he said, well, maybe I'm not so sure

16   what the date was, right.

17             That, in our view, couldn't possibly be clear

18   and convincing evidence, and I'm not sure that it's even --

19   you know, it requires it.  But we thought we would rather

20   have clarity around this issue because if it turns into a

21   dispute in the posttrial briefing, right, we 'd just rather

22   have the record, the facts laid out so Your Honor has them.

23             And that is what prompted us to say, let's, you

24   know, let's just make this clear, right.

25             Now, in our view, if there be a lack of clarity,

1    that then inures to our benefit because the burden is on

2    them, it's clear and convincing standard.  So we are -- we

3    could simply say, look, I mean, if we're not going to get

4    into this, then what we have at most is testimony that at

5    some point the BMS process became public and we don't know

6    when.  And that can't possibly support an assertion --

7         THE COURT:  Except their theory is not, as I

8    understand it, the BMS procedure became public.  Their

9    theory is that -- well, it's that it didn't become public.

10   That's the problem.

11        MR. GROOMBRIDGE:  Exactly, is that it didn't

12   become public and that BMS gave it -- got it to Vanda,

13   right, and that the reason that they are inventors is

14   because of this important piece of nonpublic information

15   that they created.

16        MR. ROZENDAAL:  But, Your Honor, the law is

17   clear if they got it from our inventors, quite apart from

18   the fact that they --

19        THE COURT:  I don't know who the "they" is.

20        MR. ROZENDAAL:  Sorry.  If Vanda received the

21   relevant process information from BMS, in confidential

22   circumstances so that it was not public and then that later

23   became public, that doesn't detract from the fact that

24   Vanda's -- the origin of the idea for Vanda was the

25   confidential disclosure from BMS which, I think, requires

1    BMS to be credited with the contribution to the invention

2    because the conception came from BMS.

3              Essentially the BMS people were de facto

4    coinventors because the Vanda people took their process and

5    evaluated it.  You know, you can imagine if it was in a

6    single company, if BMS had kept it, right, the process

7    people would develop it, they'd say, here's the product, why

8    don't you, you know, analytical chemists go find out if

9    there's any impurities in here, and oh, while you're at it,

10   why don't you tell us what they are, that would be all

11   together.

12             And the same thing happened here.  It's just

13   that in the interim, this product was transferred to Vanda

14   under confidential circumstances.  And under those

15   circumstances where Vanda is drawing on the prior work done

16   by BMS, coinventorship status is warranted.  Quite apart

17   from the fact of whether that later became public.

18             Now, of course if Your Honor construes the

19   claims so that it has to be done in one step, then this is

20   not an issue that we'll have to decide.

21             THE COURT:  Yeah, but I might want to address

22   multiple issues.  I mean, that's always a discretionary call

23   on the judge's part what to do.

24             MR. ROZENDAAL:  Of course.  I just wanted to

25   observe that this --

```
 1                THE COURT:  Right.  I mean, but what it also
 2   sounds -- is it basically uncontested that there was this
 3   disclosure, or is your expert going to say, that wasn't a
 4   disclosure of BMS's process?
 5                MR. ROZENDAAL:  I don't know exactly what our
 6   expert would say about it if he were to be asked about it,
 7   Your Honor.
 8                THE COURT:  Did you bring out on direct that BMS
 9   had not disclosed this publically?
10                MR. ROZENDAAL:  I don't think that was a
11   specific question that was asked.
12                THE COURT:  Mr. Groombridge, do you recall?
13                MR. GROOMBRIDGE:  I believe they did not, Your
14   Honor.  They did not touch this at all.
15                THE COURT:  See, and then -- and then you
16   brought out on cross, you raised the issue for the first
17   time on cross, and the witness said, essentially, I don't
18   know when.
19                MR. GROOMBRIDGE:  Well, I think on cross the
20   witness said, yes, it was publically available.  The witness
21   said on direct, it's my opinion that the BMS people were
22   inventors.  But --
23                THE COURT:  Right.  And then you brought out on
24   cross that BMS had publically disclosed this information
25   before the priority date.
```

```
 1              MR. GROOMBRIDGE:  Correct.

 2              THE COURT:  Unequivocally.

 3              MR. GROOMBRIDGE:  Unequivocally.

 4              THE COURT:  I don't remember it, but --

 5              MR. GROOMBRIDGE:  Right.

 6              MR. ROZENDAAL:  But then when he was asked, why

 7    did you say that?  He said, well, I think that at some point

 8    the IND becomes public but I don't know if that happened or

 9    when it happened, essentially, in substance, on redirect.

10              THE COURT:  Okay.  Right.

11              MR. ROZENDAAL:  So what he did not say is, oh,

12    there's this prior art reference that reveals the process,

13    right.  He pointed to a regulatory document that he said he

14    thought at some time might have become public.

15              MR. GROOMBRIDGE:  But, Your Honor, at his

16    deposition --

17              THE COURT:  I know.  But, I mean, in fairness,

18    we don't have sur -- we don't have re-re -- or recross,

19    right.  I mean, that's -- and if that would have been

20    occasioned, but that's the way the system works and that's

21    the way trial is set up.

22              MR. GROOMBRIDGE:  Exactly, Your Honor, but had

23    he said to me on cross, I think that it did not become

24    public, I would have impeached with the deposition, but he

25    candidly said it did.
```

```
 1                    THE COURT:  Right.  Well, then impeachment would
 2      have been allowed to use for substantive purposes or just to
 3      attack his credibility?
 4                    MR. GROOMBRIDGE:  I think just to attack his
 5      credibility.
 6                    THE COURT:  So you got it even better.
 7                    MR. GROOMBRIDGE:  Exactly, yeah.
 8                    THE COURT:  Right.  Well --
 9                    MR. GROOMBRIDGE:  And --
10                    THE COURT:  Go ahead.
11                    MR. GROOMBRIDGE:  One other point is had we gone
12      down that path --
13                    THE COURT:  What do you mean had you gone
14      down -- what path?
15                    MR. GROOMBRIDGE:  Well, so, for example, on
16      cross, if Dr. Perni had said, no, it was not made public --
17                    THE COURT:  Yeah, but he didn't.
18                    MR. GROOMBRIDGE:  Yeah, no.  But at that point,
19      we could have offered the documents and said, here it is.
20      It's because he simply said yes, I agree with that, there
21      was no need to get into details about it.
22                    THE COURT:  Yeah, this is the thing about a
23      bench trial, right.  I mean, Mr. Rozendaal isn't
24      contradicting as a factual matter anything he's saying.  So
25      how does it not influence me, right?  It's impossible to
```

1    remove this from my brain.  All right?

2              MR. GROOMBRIDGE:  Yes.

3              THE COURT:  It makes me inclined to just say

4    since you admit it was not disclosed in the expert's report,

5    it's a Rule 26 issue and it can't come in.  And Mr. Stone is

6    demonstratively upset about that.

7              MR. STONE:  I don't think we haven't admitted it

8    was not disclosed in his expert report, I was basically

9    trying to figure this out.

10             And the reason for that, Your Honor, our

11   colleague, Ms. Young, who will be doing the examination, and

12   the witness, happened to not be here; they are working at

13   the office this morning.  So I was trying to get the answer

14   to this question.

15             THE COURT:  Okay.

16             MR. STONE:  The fact that this prior art

17   reference discloses the process, I believe, is in the expert

18   report.  It is not disclosed in the context of, did BMS

19   invent those steps because that didn't become an issue until

20   yesterday.

21             THE COURT:  Got it, got it.

22             MR. STONE:  But the fact of the document and it

23   being the process I believe is in the expert report.

24             THE COURT:  All right.  Well, so listen.  If

25   it's in the expert report, right, it comes in.

```
 1                    Mr. Rozendaal, right?

 2                    MR. ROZENDAAL:  Well, it's in the expert report

 3    disclosed in the context of a different legal argument about

 4    a different --

 5                    THE COURT:  It could be, but if what's in the

 6    report is there's this article, and the article discloses

 7    BMS's process, then it's -- it doesn't matter what context

 8    it's in.

 9                    MR. ROZENDAAL:  Can I just have one second, Your

10    Honor.

11                    It does not say it's BMS's process.

12                    THE COURT:  Well, we're arguing.  But I said if.

13    In other words, my point would be, why don't we wait and

14    see?  Let's get -- they get to look at the report and you

15    get to look at the report.  Because if the report states

16    there's an article and the article disclosed BMS's

17    process --

18                    MR. ROZENDAAL:  It's not going to say that, Your

19    Honor.

20                    THE COURT:  All right.  Well -- but I said if,

21    then it comes in.

22                    MR. ROZENDAAL:  Right.

23                    MR. STONE:  I think --

24                    THE COURT:  And if it doesn't say that, we'll

25    have to figure it out.
```

1          MR. STONE:  I think the issue is that it says

2     there's an article that discloses the process.  What was

3     later admitted in deposition is, oh, that's a BMS article.

4     The article was being discussed for was the process known.

5     It was actually their argument that the process was known.

6          At deposition, their witness admitted yes,

7     that's a BMS -- the authors of this article work at BMS;

8     yes, it's a BMS article.  On redirect, he suddenly didn't

9     remember when that had happened, which is why we want to

10    simply offer it to say, here's the answer.  Here's the

11    article, these are BMS people, that's the date.

12          MR. ROZENDAAL:  That is a mischaracterization of

13    his testimony yesterday, Your Honor.  What he said was, I

14    thought it was public because of some regulatory filing

15    which may or may not have become public some day, which has

16    nothing to do with this article.

17          So the suggestion that he was somehow clarifying

18    his redirect testimony I don't think is accurate.

19          THE COURT:  Okay.

20          MR. GROOMBRIDGE:  Your Honor, would it be

21    helpful if both sides looked at the expert reports and

22    see if we can --

23          THE COURT:  Yeah.  When is this person going to

24    testify?

25          MR. STONE:  He's the last witness of the day.

DIRECT EXAMINATION - JONATHAN EMENS

1    MR. GROOMBRIDGE:  He's the last witness of the

2    day --

3    THE COURT:  All right.  So yeah, why don't we

4    look at it.

5    MR. GROOMBRIDGE:  And he's several hours off in

6    the future.

7    THE COURT:  Okay.  All right.

8    MR. GROOMBRIDGE:  Thank you, Your Honor.

9    THE COURT:  All right.  Hold up one second.

10    Go ahead then.  Thank you.

11    MR. MILLIKEN:  Good morning, Your Honor.

12    Defendants call their next witness, Dr. Jonathan Emens.

13    And, Your Honor, while they are getting set up,

14    I understand that the parties have agreed not to dispute the

15    qualifications of the experts in this case, and so we would

16    tender Dr. Emens as an expert in the field of the diagnosis

17    and treatment of sleep disorders, including the fields of

18    circadian physiology, circadian rhythm sleep disorders, and

19    Non-24 Hour Sleep/Wake Disorder.

20    JONATHAN EMENS, having been called on the part

21    and behalf of the Defendant as a witness, being first duly

22    sworn under oath, testified as follows:

23    DIRECT EXAMINATION

24    BY MR. MILLIKEN:

25    Q.    Good morning, Dr. Emens.  Could you please introduce

DIRECT EXAMINATION - JONATHAN EMENS

1    yourself to the Court.

2    A.    Yeah, my name is Dr. Jonathan Emens.

3    Q.    And Dr. Emens, have you prepared some demonstratives

4    to assist with your testimony today?

5    A.    I have.

6    Q.    And can you explain what's displayed here on DTX-5.2?

7    A.    Just a general overview of what I hope to cover in my

8    testimony, just a quick overview of my credentials, summary

9    of my opinions, briefing on the state of the art, and then

10   my opinions on the invalidity.

11   Q.    Okay.  And so first, just a bit on your credentials.

12         What are your current positions?

13   A.    I'm currently the Deputy Director of Mental Health at

14   the VA Portland Health Care System.  I'm also an associate

15   professor in the pharma-psychiatry in our academic affiliate

16   Oregon Health and Science University and also Department of

17   Medicine at OHSU.  So I do teaching of fellows and

18   residents.  And I also work as a physician in the VA

19   treating sleep disorders.

20   Q.    And could you briefly summarize your educational

21   background, please.

22   A.    I got my undergraduate degree at Oberlin College.

23   Medical school at the University of Massachusetts.  And then

24   I did my internship and psychiatric residency at Oregon

25   Health & Science University.

DIRECT EXAMINATION - JONATHAN EMENS

1    Q.      And are you a member of any professional

2    organizations?

3    A.      Yes.  I'm a distinguished fellow in the American

4    Academy -- sorry, the American Psychiatric Association.  I'm

5    a member of the Oregon Physicians Psychiatric Association

6    [sic].  I'm also a fellow in the American Academy of Sleep

7    Medicine and a member of the Sleep Research Society.

8    Q.      And do you have any research experience in the field

9    of circadian physiology?

10   A.      I do.

11   Q.      Could you briefly summarize that experience?

12   A.      Yeah, so I have over 30 years of experience and

13   research in circadian physiology in Non-24.  So that started

14   in laboratory of Dr. Charles Czeisler about 30 years ago at

15   Brigham and Women's Hospital at Harvard Medical School.

16           I then went to Oregon where I worked in the

17   laboratory of Dr. Alfred Lewy and Dr. Robert Sack, who were

18   the first -- who showed that melatonin could entrain

19   individuals with Non-24.  And they also -- Lewy invented the

20   dim light melatonin onset that we've heard a little bit so

21   far in this case.

22           I was on the task force for the treatment of

23   circadian rhythm sleep disorders by the American Academy of

24   Sleep Medicine.  And I have and continue to do federally

25   funded research on circadian physiology and circadian rhythm

DIRECT EXAMINATION - JONATHAN EMENS

1  sleep disorders including Non-24.

2  Q.    And just to be clear, you mentioned your work

3  Dr. Charles Czeisler.  You understand that he's offering

4  some opinions in this case also on behalf of Vanda, correct?

5  A.    I do.

6  Q.    And have you published any articles or other written

7  materials on the topics of circadian rhythm sleep disorders

8  and Non-24, specifically?

9  A.    Yeah, so I've published over 20 research articles on

10 Non-24 and circadian physiology in general.  And I'm also

11 the author of the American Academy of Sleep Medicine's

12 practice parameters for the treatment of Non-24.

13 Q.    Okay.  Thank you, Dr. Emens.

14        At a high level, what issues were you asked to

15 analyze as a part of your work on this case?

16 A.    So I was asked to assess the validity of patents to

17 treat patients with the drug tasimelteon.

18 Q.    And have you formed any opinions on the validity of

19 those patents?

20 A.    I have.

21 Q.    And have you prepared a slide summarizing those

22 opinions?

23 A.    I have.

24 Q.    And I'm going to get to the details of your opinions

25 in a bit, but first just a few preliminaries.  What, if

DIRECT EXAMINATION - JONATHAN EMENS

1    anything, did you review in forming your opinions on the
2    validity of these patents?
3    A.      So, I looked at the relevant patents, the prosecution
4    histories, of course, the literature in the field, other
5    expert reports.  And in particular, Dr. Greenblatt's
6    opinions on drug-drug interactions.  And then I have also
7    been in the court so I have used the testimony of other
8    people in this case.
9    Q.      And did you rely on Dr. Greenblatt's opinions in
10   forming your own opinions regarding the obviousness of the
11   method of treatment patents that have to do with drug-drug
12   interactions?
13   A.      I did.
14   Q.      And why did you rely on Dr. Greenblatt's opinions in
15   that regard?
16   A.      So he's an expert in pharmacology and in particular
17   the cytochrome P450 enzyme drug interaction that we have
18   heard a lot about that.  So I relied on him about those
19   drug-drug interactions as it relates to tasimelteon.
20   Q.      Thank you.  Let's talk a bit now about the patents.
21   Could you tell us, just at a high level, what the first
22   three patents the RE '604, the '829 and the '910 patent
23   cover?
24   A.      Yeah.  So they cover a method of treating the
25   circadian rhythm sleep disorder Non-24 by giving

DIRECT EXAMINATION - JONATHAN EMENS

1    tasimelteon.  And the '829 and the '910 patent also are a

2    method of treating Non-24 with tasimelteon but include the

3    provision of discontinuing certain CYP, either inducers or

4    inhibitors, before you start the tasimelteon.

5    Q.    And what about the fourth patent that you analyzed,

6    the '487?

7    A.    So that, again, is a method of treating Non-24 with

8    tasimelteon, but has a stipulation of doing so without food.

9    Q.    And in forming your opinions about the validity of

10   the patents, did you use the viewpoints of a person of

11   ordinary skill in the art as of January 2012?

12   A.    I did.

13   Q.    And you've prepared a slide, DDX-5.9, showing those

14   qualifications?

15   A.    Yes.

16   Q.    And you are aware Dr. Czeisler has offered a somewhat

17   different definition of a person of ordinary skill in the

18   art?

19   A.    I am.

20   Q.    Do you qualify as a person of skill in the art under

21   both your own definition and Dr. Czeisler's definition?

22   A.    I do.

23   Q.    Great.  I'd like now to talk a little bit about the

24   state of the art as of January 2012.

25         So, first, a little bit of terminology.  We've

DIRECT EXAMINATION - JONATHAN EMENS

1    heard some about these terms already this week, but could

2    you briefly describe what a circadian rhythm is.

3    A.      Yeah, so very simply, a circadian rhythm is a

4    spontaneously generated, meaning it's an endogenous rhythm,

5    in a wide variety of physiological and behavioral rhythms.

6            So if you think about your heart generates a

7    beat-to-beat rhythm of a periodicity of about a second, you

8    also have a pacemaker in your brain that generates a rhythm

9    with a periodicity of about 24 hours.

10   Q.      And could you give us some examples of circadian

11   rhythms.

12   A.      Yeah.  So we've heard about some of these, the

13   hormones cortisol and melatonin have an endogenous circadian

14   rhythm.  Core body temperature does.  And most importantly

15   for this case, the propensity for sleep and wakefulness has

16   an endogenous rhythm too.

17   Q.      Okay.  And what is a circadian rhythm sleep disorder?

18   A.      Again, I think, very simply, a circadian rhythm sleep

19   disorder is just a mismatch between these endogenous drives

20   for sleep and wakefulness and the desire or required times

21   for sleep and wakefulness.

22   Q.      And could you give us some examples of circadian

23   rhythm sleep disorders.

24   A.      Yeah.  So I have up on the slide here things like jet

25   lag, which I think most of us are familiar, as well as

DIRECT EXAMINATION - JONATHAN EMENS

1    Non-24, which is the issue at hand.

2    Q.    And have you prepared a demonstrative with sort of a

3    schematic explaining some of these disorders?

4    A.    I have.

5    Q.    And could you explain to the Court, please, what the

6    bars on this schematic represent.

7    A.    Yeah, so these represent the circadian drive for

8    sleep.

9    Q.    Do they represent the actual timing of sleep?

10   A.    No.

11   Q.    Why is that?

12   A.    Well, because we can attempt to be awake or be asleep

13   in opposition to our circadian drive for wake and sleep.

14   Q.    So just to recap what you've been saying, is it fair

15   to say that people with circadian rhythm disorders are

16   presumed to have circadian rhythms that are misaligned for

17   their desired times for sleep and wakefulness and other

18   things?

19   A.    Yes, that's correct.

20   Q.    So we have here at the bottom Non-24.  Can you

21   explain briefly what Non-24 is.

22   A.    Yeah.  So Non-24 in totally blind individuals is a

23   result of not getting that resetting effect on their 24-hour

24   biological clock from light.  They've lost that light input,

25   so to speak, into that pacemaker or clock in their brain.

DIRECT EXAMINATION - JONATHAN EMENS

1           And as a result, they can't stay synchronized

2    or, as we've heard, entrained in the 24-hour day.  And so,

3    for example, if I had a biological day length of 24 hours

4    and 30 minutes long, then I would have this tendency for all

5    of these rhythms that are under the control of the clock,

6    sleep, wake propensity, all these hormones, core body

7    temperature, would all have this tendency to drift about

8    30 minutes later on average every day.

9           And so that's what we see at the bottom of this

10   slide, this progressive drifting to the right and this

11   propensity for sleep.  And, so, again, that's what the bars

12   are representing.

13   Q.     And in the literature on this topic, has Non-24 been

14   referred to by another name?

15   A.     Yes, free-running disorder.

16   Q.     So as of January 2012, did researchers and clinicians

17   in this field know how to treat circadian rhythm sleep

18   disorders?

19   A.     They did.

20   Q.     And how were such disorders treated?

21   A.     So to treat a circadian rhythm sleep disorder, you

22   really have two choices.  You can give a sedative hypnotic

23   medication to help people sleep when their body is trying to

24   wake them up, and you can give them an alerting medication

25   when their endogenous rhythm for wakefulness is trying to

DIRECT EXAMINATION - JONATHAN EMENS

1    wake them up.

2            And your second option is to give an agent to

3    reset the timing of the biological clock.

4    Q.    If you chose the option to giving an agent to reset

5    the timing of a biological clock, how does that treat the

6    circadian rhythm sleep disorder?

7    A.    So using the example of Non-24 that I gave before, if

8    my timing of my clock is moving about 30 minutes later every

9    day, we would call that a phase delay.  It's a tendency to

10   move to a later time.  And so by giving an agent that would

11   reset the clock, it would shift the clock, say, an

12   equivalent 30 minutes earlier to counteract that tendency to

13   move later.

14           And then that result is I wouldn't drift at all.

15   And so that phase shift, that resetting of the clock, is the

16   mechanism by which I have achieved this entrainment or this

17   synchronization.

18   Q.    Before January 2012, were there drugs that were known

19   to reset the biological clock?

20   A.    There were.

21   Q.    Can you give us some examples.

22   A.    Tasimelteon and melatonin.

23   Q.    And did those of skill in the art know the biological

24   mechanism by which this resetting effect happens?

25   A.    They did.

DIRECT EXAMINATION - JONATHAN EMENS

1    Q.    And could you explain that mechanism, please?

2    A.    Yeah.   They bind to the melatonin 1 and melatonin 2

3    receptors that are often abbreviated as MT 1 and MT 2.

4    Q.    And you mentioned earlier you could treat circadian

5    rhythm disorders by either, on the one hand administering

6    sedatives, hypnotics, on the other hand administering a

7    resetting agent.

8              Are there any drugs that do both?

9    A.    Certainly, yes, there are.

10   Q.    Could you give us some examples.

11   A.    Yeah, so tasimelteon would be an example of such a

12   drug.

13   Q.    Okay.  Dr. Emens, you've read Dr. Czeisler's and

14   Dr. Lockley's expert reports in this case, right?

15   A.    I have.

16   Q.    And are you aware that, in their opinion, the prior

17   art is extremely conflicting and confusing and points in

18   different directions when it comes to sort of what was known

19   about how to treat Non-24 with melatonin and tasimelteon?

20   A.    I am.

21   Q.    And do you agree with their position on that?

22   A.    I do not.  I strongly disagree with that position.  I

23   think the prior art was very clear that melatonin was an

24   accepted and effective way of entraining the biological

25   clock in people with Non-24.

DIRECT EXAMINATION - JONATHAN EMENS

1    Q.      And do you understand that you're not going to have

2    an opportunity to take the stand to respond to Dr. Czeisler

3    and Dr. Lockley about the state of the art after they have

4    testified?

5    A.      I do.

6    Q.      Okay.  And --

7            THE COURT:  And why is that?

8            MR. MILLIKEN:  Because according to the order of

9    proof in the pretrial order, to the extent Dr. Emens is

10   called as part of sort of a reply case, it would be limited

11   to the topic of secondary considerations.

12           THE COURT:  Are the plaintiffs similarly limited

13   when it comes to -- they're not going to have any

14   noninfringement, for instance, rebuttal; is that right?

15           MR. MILLIKEN:  I don't believe that there's any

16   opportunity for, in effect, reply testimony on infringement.

17           MR. GROOMBRIDGE:  That's the order of proof,

18   that's correct.

19           THE COURT:  Okay.  You all agreed to it?  All

20   right.

21   BY MR. MILLIKEN:

22   Q.      So I'd like the Court to hear why you disagree with

23   Dr. Czeisler and Dr. Lockley on these issues.

24           Have you prepared a couple of timelines showing

25   the development of melatonin and tasimelteon, respectively,

DIRECT EXAMINATION - JONATHAN EMENS

1  for the treatment of circadian rhythm disorders and Non-24,

2  specifically?

3  A.     I have.

4  Q.     Okay.

5           MR. MILLIKEN:  Your Honor, I want to preview

6  that these timelines contain a lot of information and we're

7  going to be introducing quite a bit of evidence, but this is

8  really critically important material for our obviousness

9  combinations.  And I'm going to move through it efficiently.

10  I just wanted the Court to be aware.

11  BY MR. MILLIKEN:

12  Q.     All right.  Let's start with a melatonin timeline.

13           Just to orient us, at what point in time did

14  those in this field start studying biological resetting

15  effects of melatonin?

16  A.     So in the early 1980s.  So 1983, actually, was the

17  first demonstration in animals that melatonin could reset

18  the biological -- the 24-hour biological clock and cause

19  entrainment.

20  Q.     All right.  Let's look at the first reference

21  displayed on your timeline.

22           Could you turn, please, to JTX-139 in your

23  binder.

24  A.     Yes, I'm there.

25  Q.     And do you recognize this document?

DIRECT EXAMINATION - JONATHAN EMENS

1    A.    I do.

2    Q.    And what is JTX-139?

3    A.    So this is a research paper by Deacon and Arendt from

4    1995.

5    Q.    And did you rely on this paper in forming your

6    opinions?

7    A.    I did.

8              MR. MILLIKEN:  Your Honor, I move JTX-139 into

9    evidence.

10             MR. GROOMBRIDGE:  No objection.

11             THE COURT:  All right.  It's admitted.

12             (JTX-139 admitted into evidence.)

13   BY MR. MILLIKEN:

14   Q.    Dr. Emens, what is the subject of the Deacon and

15   Arendt paper?

16   A.    It's about the phase shifting or resetting of the

17   clock effects of melatonin.

18   Q.    And what do Deacon and Arendt conclude about those

19   effects?

20   A.    So they conclude two things.  One, that melatonin is

21   able to phase shift or reset the circadian rhythm pacemaker.

22   And, two, it would, therefore, be useful in the treatment of

23   circadian rhythm sleep disorders such as Non-24.

24   Q.    Okay.  Let's move to the next reference.  Could you

25   turn in your binder, please, to JTX-147.

DIRECT EXAMINATION - JONATHAN EMENS

1   A.      Yes, I'm there.

2   Q.      Do you recognize this document?

3   A.      I do.

4   Q.      And what is this?

5   A.      This is a research paper from -- by Lockley and

6   colleagues from the year 2000.

7   Q.      And did you rely on this paper in forming your

8   opinions?

9   A.      I did.

10              MR. MILLIKEN:  Your Honor, I move JTX-147 into

11  evidence.

12              MR. GROOMBRIDGE:  No objection.

13              THE COURT:  It's admitted.

14              (JTX-147 admitted into evidence.)

15  BY MR. MILLIKEN:

16  Q.      What year was the Lockley paper published?

17  A.      2000.

18  Q.      And what was the subject of this study?

19  A.      So this was a study, again, administering melatonin

20  to individuals with Non-24.  And it demonstrated that it

21  could entrain them or, again, synchronize these patients to

22  the 24-hour day.

23  Q.      Okay.  Let's move now to the next reference.  Could

24  you turn in your binder to JTX-148, which I think should be

25  the next document.

DIRECT EXAMINATION - JONATHAN EMENS

1    A.      Yes.

2    Q.      Do you recognize this?

3    A.      Yes, I do.

4    Q.      And what is this?

5    A.      So this is a paper by Robert Sack and colleagues in

6    the New England Journal of Medicine.

7    Q.      And did you rely on this paper in forming your

8    opinion?

9    A.      I did, indeed.

10           MR. MILLIKEN:  Your Honor, I move JTX-148 into

11   evidence.

12           MR. GROOMBRIDGE:  No objection.

13           THE COURT:  All right.  It's admitted.

14           (JTX-148 admitted into evidence.)

15   BY MR. MILLIKEN:

16   Q.      And what year was the Sack paper published?

17   A.      Also in 2000.

18   Q.      Could you please summarize the results in the Sack

19   paper.

20   A.      Yes.  This was a very exciting paper for us in the

21   field.  Bob Sack and Al Lewy showed, again, that you could

22   administer melatonin to individuals with Non-24, reset their

23   clock and successfully entrain them to the 24-hour day.

24           And so its publication in the New England

25   Journal of Medicine really highlighted the significance of

DIRECT EXAMINATION - JONATHAN EMENS

1    that finding.

2    Q.    Thank you, Dr. Emens.  I'd now like to move to a

3    series of articles on which you're listed as an author.  And

4    I'd like to consider these in a group, but let's first

5    quickly go through them individually.

6              Could you turn in your binder to DTX-154.

7    A.    Yes.

8    Q.    Do you recognize DTX-154?

9    A.    I do.

10   Q.    And what is it?

11   A.    It's a paper by Lewy et al.

12   Q.    From what year?

13   A.    2001.

14   Q.    Could you now turn to JTX-123.

15   A.    Yes, I am there.

16   Q.    And do you recognize this document?

17   A.    I do.

18   Q.    What is it?

19   A.    It's a paper by Lewy and Emens et al from 2002.

20   Q.    And if you could turn to DTX-155.

21   A.    Yes, I am there.

22   Q.    Do you recognize this document?

23   A.    I do.

24   Q.    What is it?

25   A.    It's a paper by Lewy and Emens et al from 2004.

DIRECT EXAMINATION - JONATHAN EMENS

1    Q.      And, finally, if you could turn to DTX-156.

2    A.      Yes, I'm there.

3    Q.      And do you recognize this document?

4    A.      I do.

5    Q.      What is it?

6    A.      So this is, again, a paper by Lewy and Emens et al

7    from the year 2005.

8    Q.      And did you rely on these four papers in forming your

9    opinions?

10   A.      I did.

11            MR. MILLIKEN:  Your Honor, I move DTX-154,

12   DTX-155, DTX-156 and JTX-153 into evidence.

13            MR. GROOMBRIDGE:  No objection.

14            THE COURT:  All right.  They're admitted.

15            (JTX-DTX-154 admitted into evidence.)

16            (JTX-155 admitted into evidence.)

17            (JTX-156 admitted into evidence.)

18            (JTX-153 admitted into evidence.)

19   BY MR. MILLIKEN:

20   Q.      Could you describe at a high level what these four

21   Lewy papers are about, Dr. Emens.

22   A.      Yeah, so these are really about refining our

23   treatment of Non-24 with melatonin treatment.  And,

24   specifically, a lot around optimization of dose.

25            So, in essence, one of the main things we

DIRECT EXAMINATION - JONATHAN EMENS

1    discovered was that there was an optimal therapeutic window

2    for administering melatonin.  So, obviously, if you give too

3    low a dose, your chances of being successful in entraining

4    goes down.  And also, if you give too high a dose your

5    chance of being successful was also dramatically reduced.

6    So there was a therapeutic window.

7                    And, in fact, what was interesting in the Sack

8    2000 paper that I called out especially, one of the patients

9    they were not able to entrain, and by optimizing that dose,

10   we were actually able to entrain that seventh individual.

11   Q.     And what was, sort of, the overall takeaway from

12   these four -- these four papers on which Dr. Lewy is the

13   lead author?

14   A.     Yeah, so the overall conclusion was that melatonin

15   can successfully cause sufficient phase shifts to entrain

16   individuals with Non-24 conclusively.

17   Q.     Thank you.  Let's now move to the --

18                    THE COURT:  You said sufficient what?

19                    THE WITNESS:  Phase shifts.

20                    THE COURT:  Okay.  I just wanted to make sure we

21   had it.

22                    THE WITNESS:  Sorry.

23   BY MR. MILLIKEN:

24   Q.     Let's now move to the next item in the timeline.

25   Could you turn in your binder please to JTX-146.

DIRECT EXAMINATION - JONATHAN EMENS

1    A.      Yes.  Yes I'm there.

2    Q.      And do you recognize this document?

3    A.      I do.

4    Q.      What is this?

5    A.      So this is a research paper by Hack.

6    Q.      And did you rely on Hack in forming your opinions?

7    A.      I did.

8           MR. MILLIKEN:  Your Honor, I move JTX-146 into

9    evidence.

10          MR. GROOMBRIDGE:  No objection, Your Honor.

11          THE COURT:  All right, it's admitted.

12          (JTX-146 admitted into evidence.)

13   BY MR. MILLIKEN:

14   Q.      What year was the Hack study published?

15   A.      2003.

16   Q.      And what was Hack studying?

17   A.      So they were using the a low dose formulation of

18   melatonin like we had, 0.5 milligrams of melatonin, to,

19   again, cause entrainment in individuals, blind individuals

20   with Non-24.

21   Q.      And what did Hack conclude about administering

22   0.5 milligrams melatonin to blind individuals with Non-24?

23   A.      So, first, they said this will be effective in

24   causing entrainment.  And, therefore, they thought it would

25   be a good treatment for Non-24 because its treating and

DIRECT EXAMINATION - JONATHAN EMENS

1    correcting, as they say here, highlighted the underlying

2    circadian disorder itself.

3    Q.    All right.  Let's move now to the next item in the

4    timeline.  Could you turn, please, to DTX-39 in your binder.

5    A.    Yes, I'm there.

6    Q.    And do you recognize this document?

7    A.    I do.

8    Q.    What is it?

9    A.    So this is a review article by Skene and Arendt from

10    the year 2007.

11    Q.    And did you rely on this paper in forming your

12    opinions?

13    A.    I did.

14            MR. MILLIKEN:  Your Honor, I move DTX-39 into

15    evidence.

16            MR. GROOMBRIDGE:  No objection.

17            THE COURT:  All right.  It's admitted.

18            (JTX-39 admitted into evidence.)

19    BY MR. MILLIKEN:

20    Q.    Dr. Emens, you mentioned this is a review article.

21    What's it reviewing?

22    A.    So it's reviewing all the literature on the use of

23    melatonin to treat Non-24, circadian rhythm sleep disorders;

24    and the blind refers to Non-24.

25    Q.    And what does this review article conclude about the

DIRECT EXAMINATION - JONATHAN EMENS

1    treatment of Non-24?

2    A.    So I think they are very clear.  They say melatonin

3    is the treatment of choice for the treatment of this

4    disorder, for the treatment of Non-24.

5    Q.    Okay.  Let's go to the last item in the melatonin

6    timeline.

7              Could you turn, please, to JTX-94 in your

8    binder.

9    A.    Yes.  I'm there.

10   Q.    Do you recognize this document?

11   A.    I do.

12   Q.    And what is JTX-94?

13   A.    This is also a review article, written in this case

14   by Ferguson, et al, from the year 2010.

15   Q.    And did you rely on this document in forming your

16   opinions?

17   A.    I did.

18              MR. MILLIKEN:  Your Honor, I move JTX-94 into

19   evidence.

20              MR. GROOMBRIDGE:  No objection.

21              THE COURT:  It's admitted.

22              (JTX-94 admitted into evidence.)

23   BY MR. MILLIKEN:

24   Q.    So you mentioned this is another review article.

25   What's Ferguson reviewing?

DIRECT EXAMINATION - JONATHAN EMENS

1    A.      So the melatonin and melatonin agonists more broadly

2    for the treatment of insomnia.

3    Q.      And just to confirm, what is a melatonin agonist?

4    A.      So it's something that's going to bind to the

5    melatonin receptors we discussed earlier.

6    Q.      And what does Ferguson say about melatonin agonists

7    and their use to treat circadian rhythm sleep disorder?

8    A.      So they say that melatonin's ability to cause phase

9    shifts is well known, as highlighted up at the top, and they

10   point out that melatonin has been used to treat circadian

11   rhythm sleep disorders.  And they say that the other

12   agonists kind of reviewed here also all appear to be

13   effective in the treatment of circadian rhythm sleep

14   disorders.

15   Q.      And what does Ferguson conclude about the evidence in

16   regards to the use of melatonin specifically?

17   A.      So that melatonin specifically has strong evidence

18   that it should be effective for the treatment of circadian

19   rhythm sleep disorders.

20   Q.      So to sum up our melatonin timeline, could you --

21   could you summarize what a person of skill in the art would

22   have known about the use of melatonin to treat Non-24 by

23   January of 2012?

24   A.      So they would have been very clear that melatonin is

25   an effective entraining totally blind individuals with

DIRECT EXAMINATION - JONATHAN EMENS

1    Non-24.  That would have been very, very clear.  And, in

2    fact, the first American Academy of Sleep Medicine practice

3    parameters that are highlighted on the screen there clearly

4    recommended that melatonin and the doses of 0.5 to

5    10 milligrams have been shown to entrain blind people with

6    Non-24, and that's what they recommended.

7    Q.    Was there any debate at the time about the optimal

8    dosing and timing of administration of melatonin?

9    A.    Sure.  I mean, I think there's, even to this day, I

10   suppose, some debate about exactly, precisely what dose you

11   might use within that relatively narrow range.  But both

12   then and now there's no doubt and no debate as to whether

13   melatonin is an effective treatment for this disorder.

14   Q.    And could you turn, just briefly, in your binder to

15   be DTX-37.

16   A.    Yes, I'm there.

17   Q.    And is this the American Academy of Sleep Medicine

18   practice parameters that you were just discussing?

19   A.    It is.

20   Q.    And did you rely on this document in forming your

21   opinions?

22   A.    I did.

23           MR. MILLIKEN:  Your Honor, I move DTX-37 into

24   evidence.

25           MR. GROOMBRIDGE:  No objection.

DIRECT EXAMINATION - JONATHAN EMENS

1      THE COURT:  All right.  It's admitted.

2      (DTX-37 admitted into evidence.)

3  BY MR. MILLIKEN:

4  Q.    All right.  Now that we have a timeline for the use

5  of melatonin to treat circadian rhythm sleep disorders, I'd

6  like to do the same thing but for tasimelteon.

7           So to start off with, what is tasimelteon?

8  A.    So it's a synthetic melatonin agonist.

9  Q.    And when you say "synthetic," what do you mean?

10  A.    Manmade.

11  Q.    All right.  Let's look at the first reference in the

12  timeline, which is already admitted into evidence.

13           Could you turn, please, to JTX-12?

14  A.    Yes, I'm there.

15  Q.    And do you recognize this document?

16  A.    I do.

17  Q.    What is it?

18  A.    It's a patent issued to Catt.

19  Q.    And did you rely on this in forming your opinions?

20  A.    I did.

21  Q.    We've heard quite a bit about this patent in the last

22  couple of days, so I'll just ask you this:  Does Claim 1 of

23  the Catt patent cover tasimelteon?

24  A.    Yes.

25  Q.    And does Claim 14 of the Catt patent cover methods of

DIRECT EXAMINATION - JONATHAN EMENS

1    using tasimelteon to treat circadian rhythm disorders?

2    A.    Yes, as highlighted there, it does.

3    Q.    And you're reading from Claim 14, correct?

4    A.    Yes, Claim 14.

5    Q.    Okay.  Let's move to the next document in the

6    timeline.  Could you turn, please, to JTX-91.

7    A.    Yes, I'm there.

8    Q.    Do you recognize this document?

9    A.    I do.

10   Q.    What is it?

11   A.    This is a paper by Vachharajani and colleagues.

12   Q.    And did you rely on this paper in forming your

13   opinions?

14   A.    I did.

15            MR. MILLIKEN:  Your Honor, I move JTX-91 into

16   evidence.

17            MR. GROOMBRIDGE:  No objection.

18            THE COURT:  It's admitted.

19            (JTX-91 admitted into evidence.)

20   BY MR. MILLIKEN:

21   Q.    When was the Vachharajani paper published?

22   A.    2003.

23   Q.    And I see it refers here in the title to BMS 214778.

24   What's that?

25   A.    Tasimelteon.

DIRECT EXAMINATION - JONATHAN EMENS

1    Q.       Broadly speaking, what's that paper about?

2    A.       So it's study of the pharmacokinetics and metabolism

3    of tasimelteon as the article alludes to.

4    Q.       And was that in human or animals?

5    A.       So these were animal studies.  And in general, what

6    they conclude here, what I have highlighted in the abstract,

7    was that they really concluded that based on the fact that

8    it's acting on the melatonin receptors, they thought this

9    should be useful for the treatment of what they call

10   disruption of circadian rhythms, which would be a circadian

11   rhythm sleep disorder.

12   Q.       Thank you.  Let's move to the next item.

13            Could you turn, please, to DTX-41.

14   A.       Yes, I'm there.

15   Q.       And do you recognize this document?

16   A.       I do.

17   Q.       What is it?

18   A.       So this is a patent issued for -- to Vanda.

19   Q.       All right.  Is it a patent or a patent application?

20   A.       Excuse me, patent application.

21   Q.       And did you rely on this document in forming your

22   opinions?

23   A.       I did.

24            MR. MILLIKEN:  Your Honor, I move DTX-41 into

25   evidence.

DIRECT EXAMINATION - JONATHAN EMENS

1                MR. GROOMBRIDGE:  No objection, Your Honor.

2                THE COURT:  It's admitted.

3                (DTX-41 admitted into evidence.)

4    BY MR. MILLIKEN:

5    Q.      Who's the applicant on this patent application?

6    A.      Vanda Pharmaceuticals.

7    Q.      And when was it published?

8    A.      2007.

9    Q.      The summary of the Invention section of the '244

10   Publication talks about something called MA-1.  Do you see

11   that?

12   A.      I do.

13   Q.      What's MA-1?

14   A.      That's tasimelteon.

15   Q.      And at a very high level, what does the '244

16   Publication say about tasimelteon?

17   A.      So it says that it will bind to melatonin receptors

18   and has chronobiotic activity; meaning, again, it can reset

19   the time of your clock and cause entrainment.  And

20   specifically at doses of about, as we have highlighted

21   there, 20 to 50 milligrams when administered about half an

22   hour before bedtime.

23   Q.      And does the '244 Publication say anything about

24   circadian rhythm sleep disorders in particular?

25   A.      Yes, it does.  So it talks about being administered

DIRECT EXAMINATION - JONATHAN EMENS

1    specifically to treat a circadian rhythm sleep disorder;

2    again, when administered about a half an hour before bedtime

3    in a dosage of 20 milligrams to about 50 milligrams.

4    Q.    And you're reading here from the claims of the '244

5    Publication; is that correct?

6    A.    I am.

7    Q.    If we move to the next item, could you turn, please,

8    to PTX-816, which is already in evidence.

9    A.    Yes, I'm there.

10   Q.    Do you recognize this document?

11   A.    I do.

12   Q.    What is it?

13   A.    So it's a research paper by Rajarantnam and

14   colleagues from 2009.

15   Q.    And did you rely on this document in forming your

16   opinions?

17   A.    I did.

18   Q.    At a very high level, what does Rajaratnam describe?

19   A.    It describes Phase 2 and Phase 3 studies that

20   demonstrate that tasimelteon can reset the timing of the

21   biological clock; again, cause a phase shift, and improve

22   sleep in response to a shifting of five hours of the timing

23   of sleep and wakefulness.

24   Q.    What doses of tasimelteon did Rajarantnam study?

25   A.    They tried 10, 20, 50, and 100 milligrams.

DIRECT EXAMINATION - JONATHAN EMENS

1    Q.      And which dose resulted in the biggest phase shift

2    among those four?

3    A.      The 100-milligram dose.

4    Q.      Would they suggest to a person skilled in the art

5    that lower doses wouldn't be effective in treating circadian

6    rhythm sleep disorders?

7    A.      No.

8    Q.      Why not?

9    A.      Well, you can see in Figure 2, highlighted in green,

10   that the dose of 20 milligrams of tasimelteon caused over an

11   hour shift to an earlier time of the biological clock.  So,

12   again, a phase advance shift of over an hour.

13   Q.      And would that be enough to treat a disorder like

14   Non-24?

15   A.      It would be able to treat anyone with a disorder like

16   Non-24.  You would never really need a shift of more than an

17   hour, and so it would be a sufficient shift to treat any

18   individual with Non-24.

19   Q.      All right.  Let's move to the next item in the

20   timeline.

21           Could you turn, please, to DTX-16?

22   A.      Yes, I'm there.

23   Q.      Do you recognize this document?

24   A.      I do.

25   Q.      What is it?

DIRECT EXAMINATION - JONATHAN EMENS

1  A.    So, again, this is a review article; in this case by

2  Hardeland from the year 2009.

3  Q.    Did you rely on Hardeland in forming your opinions?

4  A.    I did.

5        MR. MILLIKEN:  Your Honor, I move DTX-16 into

6  evidence.

7        MR. GROOMBRIDGE:  No objection.

8        THE COURT:  It's admitted.

9        (DTX-16 admitted into evidence.)

10 BY MR. MILLIKEN:

11 Q.    Does this Hardeland 2009 article talk about the

12 Rajarantnam studies that we just discussed?

13 A.    It does.

14 Q.    And what conclusions does Hardeland draw based on its

15 review of the tasimelteon literature?

16 A.    So it concludes that, like I have highlighted on the

17 left, tasimelteon can phase shift the circadian clock, and

18 it should be useful in the treatment of circadian rhythm

19 sleep disorders.

20        And Hardeland goes on to conclude that this

21 would be expected based on the fact that it's a melatonergic

22 drug.  So Hardeland is not at all surprised that it would be

23 useful in that regard.

24 Q.    All right.  Thank you, Dr. Emens.  Let's move to the

25 next item.

DIRECT EXAMINATION - JONATHAN EMENS

1              Could you turn in your binder, please, to

2    DTX-419.

3    A.      Yes, I'm there.

4    Q.      Do you recognize this document?

5    A.      I do.

6    Q.      What is it?

7    A.      So this is a web page from clinicaltrials.gov.

8    Q.      And what is this web page from clinicaltrials.gov

9    describing?

10   A.       It's describing a Phase 3 trial of tasimelteon to

11   treat totally blind individuals with Non-24.

12              MR. MILLIKEN:   Your Honor, I move DTX-419 into

13   evidence.

14              MR. GROOMBRIDGE:   Your Honor, on this one, we

15   may have an objection.

16              THE COURT:  All right.

17              MR. GROOMBRIDGE:   The question is, what is it

18   being offered for and specifically whether it's being

19   offered for the truth.

20              And the issue here, Your Honor, is we would have

21   no objection to Dr. Emens testifying about the content of

22   it, but if he intends to testify to the publication of it or

23   if there's going to be an attempt to say that it was

24   published on a particular date, because it says that in the

25   document, we think that's hearsay, we think there's a lack

DIRECT EXAMINATION - JONATHAN EMENS

 1    of foundation.

 2              And so it really depends on the purpose for

 3    which the defendants are offering it.

 4              MR. MILLIKEN:  Your Honor, I can --

 5              THE COURT:  Just give me a second.

 6              MR. MILLIKEN:  I'm sorry.

 7              THE COURT:  So I guess I'm a little confused by

 8    the objection because if there's a dispute about the date of

 9    the publication, then there should be a 402 objection.  I

10    mean, should -- this should be totally irrelevant unless

11    it's established that it's prior art.

12              MR. GROOMBRIDGE:  Correct, Your Honor.  And if

13    they intend to offer some other form of evidence proving the

14    date, so be it.  But what we would be objecting to is an

15    effort to introduce a document and then have Dr. Emens

16    testify that it's prior art because of the date that it says

17    on its face.

18              THE COURT:  So I get that, but, I mean, isn't

19    the --

20              MR. GROOMBRIDGE:  And --

21              THE COURT:  You said you didn't mind him

22    testifying about the truth of the matter asserted in the

23    document, but it'd be irrelevant unless it's prior art,

24    right?

25              MR. GROOMBRIDGE:  That's our view, Your Honor.

DIRECT EXAMINATION - JONATHAN EMENS

1   It would have to be proven to be prior art.  And it is

2   irrelevant unless such proof comes.  They may have some

3   means by which they think they're going to put that in and I

4   think it up, but absent that, we think it's irrelevant.

5              THE COURT:  Mr. Milliken.

6              MR. MILLIKEN:  Well, Your Honor, as an initial

7   matter, because this is a federal government website, the

8   Court can take judicial notice of the fact that it says it

9   was posted on July 15th, 2010, but I can also ask Dr. Emens

10  some foundational questions concerning the public

11  availability of the document.

12             THE COURT:  All right.  Let's do that.

13             MR. GROOMBRIDGE:  Again, Your Honor, we would

14  object to that because there's never been anything in his

15  expert report about it and it's an undisclosed opinion.

16             MR. MILLIKEN:  That's not -- that's not correct.

17             THE COURT:  Don't talk over each over, please.

18             MR. GROOMBRIDGE:  I think he has no -- he has no

19  basis to testify to this, and it's not something that was in

20  his expert report.

21             THE COURT:  Is the document in his expert

22  report?  Is it cited in his expert report?

23             MR. GROOMBRIDGE:  It is, and he talks about

24  the -- what it says, right, and he talks about the date on

25  its face, but he doesn't say, and here's why I know it was

DIRECT EXAMINATION - JONATHAN EMENS

1    available publically.

2            THE COURT:  Well, I don't know that I have ever

3    seen that in an expert report; have you?  Is it in your

4    expert reports?  Do they authenticate that they confirm

5    firsthand that the date of an article is the correct date?

6            MR. GROOMBRIDGE:  Typically no, Your Honor,

7    because typically the expert is talking merely about what

8    would be the effect of the disclosure of the article.

9            THE COURT:  Right.

10           MR. GROOMBRIDGE:  If there be a dispute, and in

11   this case there is, about when this was published, then

12   some -- you could imagine another expert saying, or someone

13   saying, here's what I did to verity what --

14           THE COURT:  So I can imagine that.  Was, during

15   discovery, it articulated by you or your side that there was

16   a dispute about when this particular article was published?

17           MR. GROOMBRIDGE:  Yes, Your Honor.  We have

18   never conceded that this is prior art.  And, in fact, Your

19   Honor may recall --

20           THE COURT:  No, I won't recall.

21           MR. GROOMBRIDGE:  Well, they went to the Wayback

22   Machine and got a declaration about this.  So they were

23   clearly on notice that -- and it's listed in the pretrial

24   order as an open issue because they were -- there was a

25   dispute as to whether this qualifies as prior art.  And they

DIRECT EXAMINATION - JONATHAN EMENS

1    would not have obviously went to the Wayback Machine and got

2    a declaration about that.

3                THE COURT:  What exactly is a "Wayback Machine"?

4                MR. GROOMBRIDGE:  So the Wayback Machine, Your

5    Honor, is an archive of all -- that takes snapshots on the

6    Internet and has a vast -- any website you wanted.  If you

7    want to find out if something was on the Internet at a

8    particular time, you could go to them and they will tell

9    you.

10               THE COURT:  Is it a private entity that

11   maintains that?

12               MR. GROOMBRIDGE:  I think it's a nonprofit, Your

13   Honor.  I think it's a private nonprofit based in Texas.

14   And you can go there, and this often comes up in patent

15   cases for all the reasons that one would imagine, and find

16   out when was this on the Internet.  And, in fact, we do have

17   such a document here.  In our view, it's not early enough to

18   be prior art, but it's not the date that is on the face of

19   this document.

20               THE COURT:  Okay.

21               MR. MILLIKEN:  Your Honor, Dr. Emens does

22   explain in his expert reports how he knows that this was

23   available in July of 2010.  Whether it's necessary or not,

24   it's there.

25               THE COURT:  All right.  Well, Mr. Groombridge

DIRECT EXAMINATION - JONATHAN EMENS

1    says it isn't.  Can you show me the report?

2              MR. MILLIKEN:  Sure.  May I approach?

3              THE COURT:  Sure.  Well, why don't you just

4    identify the paragraph so he can look at it while I am

5    looking at it.

6              MR. MILLIKEN:  It's Paragraph 84 of the

7    January 31st, 2020, report.

8              THE COURT:  All right.  For starters, this is a

9    Phase 3 clinical trial conducted -- oh, by Vanda?

10             MR. MILLIKEN:  Correct, Your Honor.

11             THE COURT:  So this is their clinical trial to

12   get tasimelteon approved.

13             MR. MILLIKEN:  It is.

14             THE COURT:  Okay.

15             Why don't we excuse the witness, do you mind?

16   And I think we would exclude any other person in the

17   courtroom who might be a factual witness with respect to the

18   authenticity of this document.

19             (Witness was excused and left the courtroom.)

20             THE COURT:  So why don't you both look in the

21   courtroom -- just for the record, there's a lot of people in

22   the courtroom.  So I'm going to have counsel look because if

23   there is a person in the courtroom, then they could not

24   later on testify with respect to the authenticity of this

25   document if they remain in the courtroom.  That includes

DIRECT EXAMINATION - JONATHAN EMENS

1    lawyers, paralegals, or anybody else.

2            All right.  Let's establish a couple of

3    predicate facts that would be relevant for me to consider

4    the admissibility of the document at issue.

5            MR. MILLIKEN:  Your Honor, might I say one

6    thing?

7            So we discussed this document on a meet and

8    confer, and I understood that they had no objection to its

9    admissibility as evidence.  I understand there is an

10   objection about the separate question of whether it

11   qualifies as prior art, but plaintiff's counsel represented

12   to me that there was no objection to the document's

13   admissibility.

14           THE COURT:  So, and I kind of agree.  I mean,

15   he's already kind of done that in court, right?  My point

16   was, what I understood Mr. Groombridge's objection was, hey,

17   we dispute whether this is actually prior art because of the

18   date of its publication, but you can have your witness go

19   testify about it.

20           But see, this is an example where you guys need

21   to do a better job, frankly, of being cognizant of the time

22   that goes on with the Court.  It's a public resource that's

23   limited.  So I'm not going to allow for the adducement of

24   evidence, testimonial evidence, about some document that may

25   have no bearing on this case.  All right?

DIRECT EXAMINATION - JONATHAN EMENS

1            So that's why -- so then I pressed

2    Mr. Groombridge because basically what he's saying, okay,

3    you know what, I'll let Milliken bring this out, but then

4    I'm going to argue this is totally irrelevant, right?  So

5    there's really a threshold argument whether under Rule 402

6    this should be admitted at trial at all.

7            Now, it may be well and good for you guys just

8    to bring it in, but I've got limited time.  I've tried to

9    impress this upon you.  Okay?  So we need to resolve it.

10   And even though we're taking all this time, I'd rather

11   resolve it now than when you all brief it, and then three

12   months from now, I have got to figure out what occurred at

13   10:00 on March 30th and remember all this argument and

14   decide whether I should even be considering this.

15            MR. MILLIKEN:  Understood.

16            THE COURT:  Now, to that end, what I'm trying to

17   figure out is what's really going on here.  All right.

18   Because this appears to be, on the face of it -- and, again,

19   for the record, it's DTX- -- what's being designated

20   DTX-419.1, which appears to be a printout from the Internet,

21   from a government Internet site, based on the bottom left

22   corner of the pages of the document, it appears to reflect

23   information about a study that the document says is dated

24   July 13, 2010.

25            On the upper left corner of the first page,

739
DIRECT EXAMINATION - JONATHAN EMENS

1  actually of all pages of the document -- and for the record,

2  it's a five-page document -- is the date 12/27/2019.  And at

3  least on the first page of the top of the document, there

4  are dates ranging from May 21, 2013, to October 15, 2014.

5  So there's a lot of dates in the document.

6          Now, the document, though, on its face

7  identifies Vanda as the sponsor/collaborator of the study.

8  And apparently there's a disclosure, I just saw.  Was it

9  paragraph 80- -- what was it?

10         MR. MILLIKEN:  84.

11         THE COURT:  -- 84 which cites a document -- at

12  least I'm told it cites a document, I guess there might be a

13  debate about that -- and describes it as reflecting results

14  of a Phase 3 clinical trial event.  Right?

15         MR. MILLIKEN:  Just to clarify, it's the

16  protocol from the Phase 3 clinical trial.  It does not

17  contain the results because the trial had not been conducted

18  yet.

19         THE COURT:  Fair enough.  So it's the protocol.

20  Thank you for that correction.

21         All right.  So a part of me wants to say, well,

22  how is this even in dispute, but I don't know the history of

23  it.

24         MR. MILLIKEN:  Your Honor, if I could, and

25  Dr. Emens was going to testify about this, but if I could

DIRECT EXAMINATION - JONATHAN EMENS

1    explain sort of how clinicaltrials.gov works, I think that

2    might shed some light on the question.

3              THE COURT:  Sure.

4              MR. MILLIKEN:  So companies that are pursuing

5    FDA approval for a drug have to submit their clinical trial

6    protocols and results to clinicaltrials.gov.  Clinical trial

7    protocols go through lots of changes as the trial proceeds.

8              THE COURT:  And is the website run by FDA?

9              MR. MILLIKEN:  I believe it's run -- it is a

10   federal government website.  I'm not positive that FDA is

11   the relevant entity, but it is a US government website.

12             THE COURT:  Okay.

13             MR. MILLIKEN:  What happens is each time the

14   company updates the protocol, they submit the updated

15   version, and clinicaltrials.gov logs these different

16   versions of the protocol in something that is called the

17   history of changes section of the protocol, and it has

18   hyperlinks.  So it will say, like, July 15th, 2010, you

19   know, protocol, and then, you know, say September 2010,

20   update XYZ.  And you can click on those hyperlinks to see

21   what the protocol looks like on any given date.

22             And so what we're relying on is the very first

23   version of the protocol which says, on the face of the

24   document, that it was submitted on July 13th, 2020 -- or

25   excuse me, 2010 and that it was posted on July 15th, 2010,

DIRECT EXAMINATION - JONATHAN EMENS

1    which is 18 months before the priority date of the patent.

2              THE COURT:  All right.  Now, how did you find

3    this document?

4              MR. MILLIKEN:  It's on the clinicaltrials.gov

5    website.

6              THE COURT:  If I went on it right now and I

7    pressed, would I get this document?

8              MR. MILLIKEN:  Yes.

9              THE COURT:  Okay.

10             MR. MILLIKEN:  You would have to go to the

11   History of Changes section and click the July 2010 version,

12   but yes.

13             THE COURT:  So if push came to shove, you could

14   have a paralegal get on the stand and say -- well, I'm

15   assuming a paralegal, but I don't know who found the

16   document -- who actually did, do you know?  Do you know who

17   actually pulled this document up?  Was it Mr. Rozendaal?

18             MR. MILLIKEN:  Your Honor, I think that it was

19   probably our cocounsel from Winston & Strawn who are no

20   longer involved in the case, if I had to guess, but I don't

21   know that for sure.

22             THE COURT:  Did you have anybody from your firm

23   in the last 24 hours or week do this to see if they could do

24   it?

25             MR. MILLIKEN:  I did it last night.

DIRECT EXAMINATION - JONATHAN EMENS

1          THE COURT:  Okay.  All right.

2          Mr. Groombridge.

3          MR. GROOMBRIDGE:  So, Your Honor, first of all,

4     we have no objection to Dr. Emens testifying what's in that

5     Paragraph 84 of his expert report, but that simply says he

6     went and looked at the website.  It doesn't say anything

7     about how clinicaltrials.gov operates.  And that would be an

8     undisclosed opinion.

9          THE COURT:  No, no.  See, that's what I'm

10    getting at.  That's a fact, right?  So if they want to lay

11    the predicate, they're going to be able to, I think, unless

12    you object.  See, that's why I want to know what the real

13    dispute is.  And I'm a little -- because, frankly, I talked

14    about how I generally like these two firms and you're pretty

15    reasonable people.  And so I want to know if there's

16    something going on.

17          Like, in other words, is this just -- and you

18    have every right to do it under the rules, right, but it is

19    a bench trial and I gave you too much time, and the question

20    is -- you think that this document was not posted as of

21    July 15, 2010?

22          MR. GROOMBRIDGE:  Oh, we think -- first of all,

23    it says "estimate," and we think it's not clear that it was.

24          They went to the Wayback Machine, and the date

25    that the Wayback Machine gave them was March 7th, 2011.

DIRECT EXAMINATION - JONATHAN EMENS

1    That was the earliest date they could find.  And if that's

2    right, it's not prior art.

3                MR. MILLIKEN:  Your Honor, could I say one thing

4    about the Wayback Machine?

5                THE COURT:  Well, you can.  See now, this --

6    this might be a really legitimate question about

7    authentication, which you could have factual testimony.  You

8    could have some witness come in and basically say what you

9    just did, that I found the document, and I guess we could go

10   from there.

11               Now I guess maybe we're going to open the door

12   to then we have to have testimony about what the Wayback

13   Machine does and all that.

14               MR. GROOMBRIDGE:  Again, Your Honor, we put them

15   on notice in the pretrial phase of the case that we did not

16   concede that this was prior art or that it had been

17   publically available.  They did go to the Wayback Machine

18   and got this declaration.  They didn't do anything else.

19   They could have gone to clinicaltrials.gov or something like

20   that, but --

21               THE COURT:  So they've got a declaration from

22   Wayback.

23               MR. GROOMBRIDGE:  Yes.

24               THE COURT:  Okay.

25               MR. MILLIKEN:  The way the Wayback Machine

DIRECT EXAMINATION - JONATHAN EMENS

1    works, Your Honor, is that it crawls the Internet and it

2    captures websites as they exist at a particular point in

3    time.

4                    THE COURT:  Right.

5                    MR. MILLIKEN:  But it doesn't do this

6    constantly.  So you might have a capture from X month of one

7    year and then, you know, March of the next year and then

8    September of the next year.

9                    It just so happens that the earliest date that

10   the Wayback Machine crawled this particular page was in

11   March of 2011.  So that's the earliest Wayback capture that

12   we have.

13                   But if you compare that capture to what it says

14   was the operative version as of that date, they match up.

15                   THE COURT:  Wait, wait.  I lost you there.

16                   MR. MILLIKEN:  Okay, sorry.

17                   So there's this record of the history of changes

18   so you can see what the protocol looked like at any given

19   time.

20                   THE COURT:  Including right now?

21                   MR. MILLIKEN:  Including right now.

22                   THE COURT:  So if I went on the website right

23   now, you're saying I could pull up this page.

24                   MR. MILLIKEN:  Yes.

25                   THE COURT:  And by "the website," I mean the

DIRECT EXAMINATION - JONATHAN EMENS

1    government website.

2              MR. MILLIKEN:  The government website, which we

3    think is self-authenticating because it's a US government

4    website.

5              THE COURT:  All right.  And what do you say to

6    that, Mr. Groombridge?

7              MR. GROOMBRIDGE:  What we say is it's our

8    understanding -- and, again, it's not our burden to prove

9    any of this -- but it's our understanding that it takes

10   clinicaltrials.gov some amount of time to process these

11   things and put them up on the website.  And sometimes that

12   happens quickly and sometimes it takes quite a long time.

13             THE COURT:  But that would suggest that the last

14   update posted would be the late date; that July 15, 2010,

15   would be the latest it was posted, that it would have came

16   in much earlier.

17             MR. GROOMBRIDGE:  The problem is that the

18   content changes over time and you can't be sure that what

19   you're looking at -- as Your Honor sees on this one, it has

20   a whole lot of dates on it, and you cannot --

21             THE COURT:  Right.  But if I could pull it up on

22   the web right now and I could pull up this exact same sheet,

23   that would suggest that this was posted by the government no

24   later than July 15th of 2010.

25             MR. GROOMBRIDGE:  Your Honor, the very version

DIRECT EXAMINATION - JONATHAN EMENS

1    that they're relying on and Dr. Emens proposes to testify

2    about includes, as one of the references, a paper that was

3    published in 2015.  This can't be the format in which it

4    existed in 2010.

5              That's at the bottom of page 20 -- 419.3 and

6    carrying up over to the top of 419.4.

7              MR. MILLIKEN:  Your Honor, if I --

8              THE COURT:  Just a moment.  Where is this,

9    Mr. Groombridge?

10             MR. GROOMBRIDGE:  On the bottom of 419.3, at the

11   very bottom, there is a section headed References.

12             THE COURT:  Oh, yes.

13             MR. GROOMBRIDGE:  And then there's a paper which

14   is actually the set and reset studies in the Lancet.  And if

15   one turns over to the top of the next page, one can see the

16   date there, 2015.

17             And so whatever this is, it can't be a snapshot

18   of what was on the Internet in 2010.

19             MR. MILLIKEN:  Your Honor, presumably the reason

20   for that is that this 2015 paper is what published the

21   results of this clinical trial protocol, and so it's

22   appended to the end of the document.  But if you look just

23   above the part that Mr. Groombridge is pointing you to,

24   where it says Contacts/Locations, and it says Central

25   Contacts, this study is not yet recruiting, the study hadn't

DIRECT EXAMINATION - JONATHAN EMENS

1  started yet.

2              This is -- if you click on the July 2010 version

3  on the History of Changes that shows the protocol as it was

4  submitted to the government website -- as it was required to

5  be submitted the government website under FDA regulations,

6  this is the version you get.

7              And if Your Honor logs on to the website right

8  now, you would see the same thing.

9              THE COURT:  What you claim is this document

10  labeled DTX-419.1 through 5 was posted on the website of the

11  clinicaltrials.gov site maintained by the government of the

12  United States as of what date?

13              MR. MILLIKEN:  It was posted as of July 15th,

14  2010, is what it says.  And to be clear --

15              THE COURT:  Just hold on.  Well, go ahead.

16              MR. MILLIKEN:  So that is the content of the

17  protocol.  This -- this website was accessed in 2019, as it

18  says, on the top left-hand corner.

19              What I'm saying is --

20              THE COURT:  Wait, where are you -- yes.  It was

21  accessed in 2019, right.

22              MR. MILLIKEN:  Right.  So I'm saying that the

23  version that --

24              THE COURT:  I just want to -- what you want it

25  to be evidence of is what somebody would have seen had they

DIRECT EXAMINATION - JONATHAN EMENS

1    gone on the website as of July 15, 2010.

2              MR. MILLIKEN:  Precisely, Your Honor.

3              THE COURT:  Right, that's the point.  So that's

4    what you're trying to establish that this reflects.

5              MR. MILLIKEN:  Correct.

6              THE COURT:  Okay.  I just don't like

7    Mr. Groombridge's objection because I don't think, you know,

8    there's any point having anybody testify about this unless

9    it's first established that it's authentic.  Under Rule 901:

10   For that to be satisfied, you have to have evidence

11   sufficient to support a finding that the matter in question

12   is what its proponent claims.

13             And you claim this is what a person would have

14   seen on the clinicaltrials.gov website as of July 15, 2010.

15   You haven't done that yet, and you've not tried.  So I'll

16   hold you to your burden, and you can try to lay a foundation

17   to do that.

18             I have to say the fact that there appears on its

19   face to be an article that's dated 2015 calls into doubt, in

20   my mind, that this is a fair and accurate reflection of what

21   was on a website as of July 15th, 2010.

22             You can go lay the foundation and see if you can

23   get that in.

24             MR. MILLIKEN:  And if I may, Your Honor, in

25   addition to laying the foundation with Dr. Emens, I'd submit

DIRECT EXAMINATION - JONATHAN EMENS

1    that under 902(b)(2), a US government website is a source

2    whose accuracy cannot reasonably be questioned, and the

3    Third Circuit has, in fact --

4              THE COURT:  That's not the issue.  The issue is

5    whether or not this document reflects what was on that

6    website as of July 15, 2010.  That's the issue.  So in other

7    words, to satisfy 902, if you had a witness come in -- and

8    I'm sure -- I'll bet you somebody could easily do this, and

9    they could say, I pulled DTX off the Internet, the

10   clinicaltrials.gov Internet on December 27th, 2019, that

11   would come in.  There's no question, I think, and I would

12   hold, under Rule 902, that this document could be admitted.

13   It meets 901 because at the top of the page there's the date

14   12/27/2019 -- and I don't even have an objection -- I'm sure

15   I wouldn't have an objection for that -- that this would

16   come in.

17             The question is whether this shows, "this" being

18   DTX-419, what a person would have seen had they gone on the

19   website on July 15th of 2010.  That's the challenge.

20             And it is especially challenging because there's

21   an article that's dated 2015 in the document.

22             Now, you might have a person who can explain all

23   this, but it's incumbent upon you to do that in the face of

24   an objection.  All right.

25             MR. MILLIKEN:  Well, our understanding is that

DIRECT EXAMINATION - JONATHAN EMENS

1    they are not -- they're not objecting to the admissibility

2    of the --

3                THE COURT:  Well, he is and he isn't.  I mean, I

4    was going to say, I don't think he framed the objection

5    properly, but the effect of what he's objected to does it

6    because he said, I don't think you -- I can consider it

7    for -- as prior art.  And he said, the reason why I can't

8    consider it as prior art is because, essentially, there's no

9    proof that this is what someone would have seen on the

10   website on July 15, 2010.  That's what he said.

11               And he was okay to let my time be wasted by

12   having your witness opine on, like, the substance of it, but

13   I'm not okay with that.

14               But what his objection really is, is it goes to

15   the authenticity of the document because he's saying it

16   can't be considered for prior art.  His whole objection that

17   you can't consider it as prior art is based on the lack of

18   authenticity, I think.

19               MR. GROOMBRIDGE:  Correct, Your Honor.

20               THE COURT:  I mean, he may not have cited the

21   rule, but -- well, I mean, I'm not making the objection up

22   for him.  I know, Mr. Milliken, you're kind of frustrated by

23   that.  I mean, I think I've just narrowed the scope of

24   the -- or and cited the relevant federal rule, but he did

25   object on the -- for the substance of what I just

DIRECT EXAMINATION - JONATHAN EMENS

1    articulated, and you've got to show it.

2                And here's the thing.  At the end of the day,

3    you'd have to show it to me because I'm not going to have

4    the briefing.  I mean, we're going to have all this.  Under

5    the way Mr. Groombridge launched the objection, I would have

6    sat here, listened to your witness testify about the content

7    of this, and then we would have gotten to the posttrial

8    briefing and Mr. Groombridge would have said, you can't

9    consider this, it's not prior art.  And then we would be,

10   essentially, adjudicating this issue of authenticity.

11               So we may as well adjudicate it now.

12               MR. MILLIKEN:  Well, so -- I apologize if this

13   is not responsive to Your Honor's point, but if the

14   objection is essentially one of relevance premised on the

15   document not actually having been publically available

16   before the critical date --

17               THE COURT:  No, that's not -- so that's not --

18   well, he didn't object on relevance grounds, although to me

19   it is.

20               MR. MILLIKEN:  Well, I understood that to be

21   sort of Your Honor's concern.  And if we're talking about

22   the merits of the public availability issue, then I point

23   the Court to the Federal Circuit's decision in *Jazz*

24   *Pharmaceuticals versus Amneal Pharmaceuticals*, 895 F.3d 1347

25   at 1355, and that's from the Federal Circuit in 2018, which

DIRECT EXAMINATION - JONATHAN EMENS

1    recognized the public availability of the document that was

2    posted on a US government website.

3                THE COURT:  So, look, I'll tell you what.  Does

4    somebody have the case?  You can hand it up.

5                But let's just be clear.  I'm pretty confident

6    what that case is addressing is a situation where somebody

7    pulled something from a website on a certain date and there

8    was a question as to the authenticity of what was pulled.

9    But I'm going to guess it was not disputed that the question

10   was whether the website, as of the date it was pulled, was

11   authenticated.

12               But let me look.  What page is this?

13               MR. MILLIKEN:  1355 is the relevant page.

14   Actually, I apologize, Your Honor.

15               THE COURT:  It's all right.

16               MR. MILLIKEN:  If you look at 1358 to 1359, it's

17   discussing meeting minutes, transcript, and slides of an

18   open-to-the-public FDA meeting that was published on the

19   FDA's website.

20               THE COURT:  Right.

21               MR. MILLIKEN:  And it notes that there was --

22   the FDA published a notice in the Federal Register that had

23   a hyperlink to a public FDA website, and it also --

24               THE COURT:  Okay.  Wait, hold up.  Show me in

25   the document where that is.

DIRECT EXAMINATION - JONATHAN EMENS

1          MR. MILLIKEN:  I apologize, Your Honor, I gave

2    you my copy.

3          THE COURT:  No problem.  All right.  Hold on.

4    Just give me a second.

5          MR. MILLIKEN:  Okay.  So if you look at 1358.

6          THE COURT:  Yeah.

7          MR. MILLIKEN:  There's a paragraph that begins

8    on the left-hand column, and it talks about how -- in this

9    case there was a notice that was published in the Federal

10   Register and it says there was a -- this was an appeal from

11   the board -- a PTAB decision, and it says:  There was a

12   board finding that persons of ordinary skill would have been

13   familiar with the Federal Register or they would have been

14   motivated to look at those notices.

15          The second reason that the Court gives in the

16   right hand --

17          THE COURT:  Okay.  That's irrelevant as far as

18   I'm concerned.  I mean, I think that was easily demonstrated

19   here, and I doubt it's going to be contested, that somebody

20   could have gone on this website and pulled this.

21          All right, go ahead.

22          MR. MILLIKEN:  The second reason it says is

23   that:  The ACA materials were available online for a

24   substantial amount of time before the critical date.

25          And here, that amount of time was two months.

DIRECT EXAMINATION - JONATHAN EMENS

1  Here --

2              THE COURT:  Wait, wait.  Where -- what are you

3  talking about that period of time was two months?

4              MR. MILLIKEN:  So the point that the Federal

5  Circuit is making here is that the document was available

6  online two months before the relevant date that it would

7  need to be publically available to make it prior art.

8              THE COURT:  Yeah.

9              MR. MILLIKEN:  And my point here is that this

10  government website says it was published on -- or it was

11  posted online in July 2010, which is six months before the

12  date it would have needed to be publically available to

13  qualify as --

14              THE COURT:  And I think the question is what was

15  published as of July 15th, 2010.  That's the question.

16              Do you believe that -- if you turn to Page 5 of

17  the document, really Page 4, at the very end, do you believe

18  that the citations there, and in particular The Lancet 2015,

19  October 31st article, do you think that was published on the

20  website as of July 15, 2010?

21              MR. MILLIKEN:  No, I do not think that the

22  citation --

23              THE COURT:  Okay.  So then how am I to know what

24  was published before July 15, 2010, and what was published

25  after July 15, 2010, when I look at the document?

DIRECT EXAMINATION - JONATHAN EMENS

1              MR. MILLIKEN:  I think the simplest route, Your

2    Honor, would be for the Court itself to take judicial notice

3    of the clinicaltrials.gov website --

4              THE COURT:  I can do that.  I'm willing to do

5    that.

6              MR. MILLIKEN:  -- and they way the history --

7    the website itself explains how the History of Changes

8    section works.  There's literally a tab that you can click

9    where it explains --

10             THE COURT:  Then you've got to do all that.  I

11   mean, look.  I will take judicial notice that there's a

12   clinicaltrials.gov website, and I'm willing to probably take

13   judicial notice of facts about that if you want to show them

14   to me, right.

15             That's not the debate.  I think the debate is

16   what in this document was posted and when.

17             And you are purporting to bring this in, as I

18   understood it, as a document that showed what was on the

19   website as of July 15th, 2010, and I excused all the

20   witnesses that might attest to whether that was factually

21   true or not to find out, do I really have a dispute here

22   that's worth me spending time on.

23             And when Mr. Groombridge points to the fact that

24   there's an article dated 2015 in the printout, that suggests

25   to me that there really could be an issue about what was in

DIRECT EXAMINATION - JONATHAN EMENS

1    the public realm, what was on the website as of July 15th,

2    2010.

3              I'm trying to get to the bottom of that.

4              MR. MILLIKEN:  Understood, Your Honor.  And if I

5    could give just a little bit of background.

6              Originally what we were going to use was a

7    different exhibit, DTX-42, in which we essentially went

8    through all the history of changes, compiled them all

9    together to show how the protocol -- to show the contents of

10   the protocol and then evidentially the study results at each

11   successive point; and that was a much longer document.

12             The plaintiffs objected.  They said it's

13   improper, that it's a compilation of a document, but if you

14   want to use just the version that Dr. Emens relied on, which

15   is this expert, just these pages, they said they didn't have

16   an objection to that.

17             And I feel a little bit like I'm being

18   sandbagged here --

19             THE COURT:  And you might be.

20             MR. MILLIKEN:  -- for that reason because I

21   specifically asked plaintiff's counsel when I move this into

22   evidence, are you going to object, and they said no.

23             THE COURT:  Yeah.  And so I do have some empathy

24   for you, and it goes back to, like, that's why my reaction

25   to the nature of the objection, right, which I thought

DIRECT EXAMINATION - JONATHAN EMENS

1   didn't really make sense.  It's like you can go spend time

2   and have the guy testify about the substance of this, but

3   it's not prior art.

4              MR. MILLIKEN:  And if I may, Your Honor, the

5   sort of -- the nature of having to print material off a

6   website means that, you know, the thing that ends up on the

7   page, it's going to have, you know, the date that the

8   website was accessed, it's never going to be an absolutely

9   perfect representation of what was on the --

10             THE COURT:  Well, you say that, and this is

11  actually where I don't know enough to know whether that's

12  true or not.  Because the way you described Wayback and the

13  hyperlinks suggested to me that, no, the hyperlink is, it's

14  going to tell you what the page looked like way back when.

15  That's the way I interpret it.

16             And I've got to tell you, but for the 2015

17  article, I don't know that this would even be an issue.  But

18  it raises, in my mind, a concern about, well, what was

19  really on the website.

20             MR. MILLIKEN:  Your Honor, on that point, I

21  think that it is -- it has to be clear that this wasn't

22  something from 2015 because, as I pointed out, if you go

23  above, it says, The study is not yet recruiting, which means

24  the study hadn't started.  And the study was done in 2013.

25  That's how Vanda got FDA approval.

DIRECT EXAMINATION - JONATHAN EMENS

1          And so it cannot be the case that the contents

2     of this protocol is what some -- was what the protocol

3     looked like post-2015 because the study was over then and

4     the results were already available.

5          THE COURT:  Where is this in the pretrial report

6     spotted as an issue?

7          MR. STONE:  Your Honor, I believe the document

8     is called Statement of Additional Matters, but give us one

9     moment to grab a copy of it.

10         MR. MILLIKEN:  I believe the Statement of

11    Additional Matters, I think that's specific to the Wayback

12    declaration issue, not the kind of broader issue of the

13    public admissibility of the clinicaltrials.gov --

14         THE COURT:  Well, let's start here.

15         MR. STONE:  Your Honor, that's because we

16    thought that's what the debate was.

17         THE COURT:  Okay.  Where is it?

18         MR. STONE:  A colleague is going to bring a copy

19    of it.

20         It's Exhibit 15, Your Honor, to the pretrial

21    order in Paragraph 2.  And some context may be helpful -- I

22    can see the Court is reading.  I'll wait.

23         THE COURT:  All right, Mr. Stone, I have read

24    it.  Let me just ask you this, though.

25         What -- you say the deadline for close of fact

DIRECT EXAMINATION - JONATHAN EMENS

1  discovery is July 30, 2021, yet defendants did not disclose

2  until today the date the pretrial order was due to Court --

3            MR. STONE:  Last month.

4            THE COURT:  -- that they had this declaration.

5            Now, under what RFP or what -- what was it that

6  required them to disclose this declaration for the public

7  nature or any fact to establish the public nature of the

8  clinical trial's posting?  Why were they required to

9  disclose that?

10            MR. STONE:  In response to their invalidity

11  contentions, we had disclosed that we don't think this is

12  prior art.

13            THE COURT:  Right.

14            MR. STONE:  Then one of our experts opined that

15  it may not be prior art.

16            Frankly, in response to that expert report, had

17  they gone and gotten a declaration, I don't think we would

18  have said it was untimely.  We went all the way through this

19  case having said we don't think that's prior art and they're

20  having said, essentially, what they said today, it says

21  July 15, 2010, and now we are saying, and it also says 2015.

22  At which time we -- on the day of the pretrial order, they

23  said, we're going to have a declaration to clear this up,

24  and I remember, with apologies, writing that paragraph

25  rather hurriedly on the date the pre-trial order was due.

DIRECT EXAMINATION - JONATHAN EMENS

1              Well, we just found out they had the

2      declaration -- their exhibit list said "declaration."  But

3      that was all it said.

4                   THE COURT:  Right.

5                   MR. STONE:  I don't know who that is.

6              Then what happened is they produced a

7      declaration from the Wayback Machine which says -- and, you

8      know, the Wayback Machine could have come back and said,

9      this is a snapshot of the website as it existed July 15,

10     2010, and I don't think we would be standing here.  Instead,

11     it came back and said, this is a snapshot of what existed on

12     the website in early 2011, which is too late for them --

13                  THE COURT:  Right.

14                  MR. STONE:  -- which is why they are not

15     offering the declaration because it doesn't help them.

16             And so where we are right now is we've told them

17     forever that you haven't proven up that this is prior art.

18     They, at the last minute, decided they would get a

19     declarant.  It apparently did not work out for them very

20     well because it didn't prove it was prior art, and here we

21     are.

22             I take the Court's point that our objection

23     could easily have been that has no business being in the

24     courtroom.  Part of the other issue is that they are

25     technically offering that word on that document -- I mean, I

DIRECT EXAMINATION - JONATHAN EMENS

1    guess it is three words -- to prove the truth of the matter

2    asserted.  It's a hearsay objection.

3              To Your Honor's point, it is also a government

4    website.  If it were integral, it had nothing unusual about

5    it, I would not be standing up in front of the Court and

6    saying, how do we know that's true.  But there is reason to

7    believe that it isn't, namely it has something impossible on

8    it, and we've put this to them for years.

9              THE COURT:  Okay.  Mr. Milliken?

10             First of all, do you agree -- or I should say do

11   you dispute that in June of 2021 Vanda filed -- or served on

12   you objections and responses to the defendant's first set of

13   interrogatories regarding the '510, '511, '465, and '744

14   patents, and stated, quote:  Furthermore, defendants have

15   not established the public nature of the alleged clinical

16   trials reference or that the information disclosed in

17   defendant's alleged reference was actually contained in

18   whatever was originally posted to clinicaltrials.gov,

19   unquote?

20             MR. MILLIKEN:  I don't disagree with that.  They

21   also disputed the public availability of a lot of our other

22   prior art.

23             THE COURT:  I mean, what am I going to do,

24   right?  I've got this issue before me, they've disputed it.

25             MR. MILLIKEN:  Understood.

DIRECT EXAMINATION - JONATHAN EMENS

1          Your Honor, if I -- on the Wayback point, the

2    Wayback declaration captures the protocol as it existed in

3    March 2011, which is also before the priority date of the

4    patent.

5          THE COURT:  Actually, hold on.  Maybe you should

6    just give me the declaration.  Is that --

7          MR. GROOMBRIDGE:  We'd be happy to, Your Honor.

8          MR. MILLIKEN:  The Wayback declaration, Your

9    Honor?

10         THE COURT:  Sure.

11         MR. MILLIKEN:  I would point out that this

12   version which actually captured the web page in March of

13   2011 does not have the 2015 article, and so it doesn't

14   present the same.

15         THE COURT:  All right.  So I'll read the

16   declaration, which, for the record, is marked DTX-410.1.

17   And it's got an exhibit attached to it, but I don't have the

18   cover sheet.  Yes, I do.  Sorry, now I see it.

19         Well, all right.  I guess I'm a little confused.

20   So there's an explanation in this affidavit which was given

21   by apparently Nathaniel Frank-White.  And he says in

22   paragraph six of the declaration:  Attached hereto as

23   exhibit A are true and accurate copies of screenshots of the

24   Internet archive's records of the achieved files for the

25   URLs and the dates specified in the attached cover sheet of

DIRECT EXAMINATION - JONATHAN EMENS

1    each print out.

2                So then I've got what appears to be the printout

3    of a website, but I don't see the cover sheet telling me the

4    dates.

5                Can somebody explain this to me?

6                MR. GROOMBRIDGE:  Yes, Your Honor.

7                THE COURT:  In fairness, let's have Mr. Milliken

8    explain it to me since he's the proponent of it.

9                MR. GROOMBRIDGE:  Certainly, Your Honor.

10               THE COURT:  Mr. Milliken, as I'm looking at it,

11   what it says on the front page of the website, and it

12   appears to be a screenshot of the clinicaltrials.gov

13   website.  So I don't have a cover sheet, but it says it was

14   last updated February 23rd, 2011.

15               MR. MILLIKEN:  Correct, Your Honor.  So that

16   would have been the most recent -- you know, the updates

17   happen every few months.

18               THE COURT:  Right.

19               MR. MILLIKEN:  That would have been as of when

20   that was captured which I believe was March 2011.

21               THE COURT:  Oh, now I see it.  On the upper

22   right-hand it says March 7, 2011, so that was when it was

23   supposedly captured, correct?

24               MR. MILLIKEN:  Correct, according to the

25   Wayback --

DIRECT EXAMINATION - JONATHAN EMENS

1           THE COURT:  Now, is March 7, 2011, before the

2    priority date?

3           MR. MILLIKEN:  It is, Your Honor.

4           THE COURT:  So, okay.

5           MR. GROOMBRIDGE:  So, Your Honor, it's before

6    the priority date but it's less than a year before the

7    priority date, which means it can't be 102(b) prior art.

8    And before -- in the recent weeks we had an elaborate meet

9    and confer about -- when we saw this, we said this is not

10   early enough to be 102(b) prior art, are you now arguing

11   that it's now 102(a) prior art?  Which could be -- if it's

12   less than a year prior -- things that are less than year

13   prior can under certain circumstances qualify as 102(a) art.

14           And we went back and forth about that because we

15   said that would change the proofs that were being presented.

16   102(a) prior art is has the ability to swear behind and

17   prove an earlier date --

18           THE COURT:  I'm sorry.  I always get -- I know

19   you patent lawyers know swear behind; what does that mean

20   again?

21           MR. GROOMBRIDGE:  I'm sorry, Your Honor.  So

22   there's a couple of things about Section 102(a) that are

23   different from 102(b).  If something is 102(b) prior art,

24   it's prior art for all time.  You can't remove it.

25           But if it's 102(a) prior art, you can prove the

DIRECT EXAMINATION - JONATHAN EMENS

1    inventors had it before that date.  And the other thing

2    about 102(a) is it has to be work in the words of the

3    statute by another.  And this isn't by another because it's

4    Vanda's own work.

5              And so we said we don't think this qualifies as

6    102(a) prior art and we had an elaborate meet-and-confer.

7    And, eventually, they said we're not relying on it for that.

8    We're relying on it for 102(b).

9              THE COURT:  Okay.  Mr. Milliken, are you relying

10   on this for 102(b) purposes?

11             MR. MILLIKEN:  We're relying on the 2010 version

12   as 102(b) prior art.  That's the version that Dr. Emens

13   relied on in his expert reports.

14             THE COURT:  So that's not this version?  When I

15   say "this," for the record, that's not the

16   clinicaltrials.gov's screenshot that was attached to the

17   affidavit of Nathaniel Frank-White?

18             MR. MILLIKEN:  That was the March 2011 -- as it

19   existed, March 2011, which was the February 2011 version.

20             THE COURT:  Okay.

21             MR. MILLIKEN:  That's not the version Dr. Emens

22   relied on.

23             THE COURT:  Oh, I got that, but you handed me up

24   this Vanda thing thinking it would help.  Well, maybe I

25   asked for it.  I don't know.

DIRECT EXAMINATION - JONATHAN EMENS

1          MR. MILLIKEN:  But, Your Honor, I would point

2     out that under 102(a), Mr. Groombridge is quoting the used

3     by other -- or, you know, by another portion of the statute.

4     It also says:  Or patented or described in a printed

5     publication before the invention thereof.

6          And, so, our point -- I think that even under

7     102(a), that document that you have in your hand that's

8     appended to the Wayback declaration, that would qualify as

9     102(a) prior art --

10          THE COURT:  Right.  But he's just said you guys

11    are not proffering it as 102(a), you're only proffering it

12    as under 102(b).

13          MR. MILLIKEN:  The declaration corroborates that

14    the contents of the protocol, just the steps that Vanda was

15    doing as part of this protocol, that declaration

16    corroborates that that information was, in fact, available

17    before the priority date.

18          THE COURT:  Yes.

19          MR. MILLIKEN:  That was the purpose of the

20    Wayback declaration, to show that these --

21          THE COURT:  But you're not trying to get in this

22    screenshot.  That's part of the Wayback declaration.

23          MR. MILLIKEN:  Agreed.  But Your Honor can rely

24    on documents that are not in evidence in concluding that the

25    contents of the protocol are as they're reflected in

DIRECT EXAMINATION - JONATHAN EMENS

1    DTX-419.  And I would also point out --

2              THE COURT:  Hold on.  Let's go step by step

3    before you get to the "also."

4              Okay.  The exhibit attached to the Frank-White

5    affidavit reflects a screenshot taken March 7th of 2011 from

6    the clinicaltrials.gov website.  The screenshot itself says

7    that the website had last been updated on February 23, 2011.

8              So I do think that the screenshot is probative

9    of what the website looked like as of February 23, 2011.

10   And, in fact, frankly, I'd be willing to accept it unless

11   somebody wants to impeach the Wayback declarant, okay.  So

12   that gets me there.

13             Now, I don't understand how this declaration or

14   screenshot tells me or gives me confidence about what the

15   clinicaltrials.gov website looked like before February 23,

16   2011.  So you said it does, so tell me how.

17             MR. MILLIKEN:  I think I can explain that, Your

18   Honor.

19             So as I was describing earlier,

20   clinicaltrials.gov has this thing called history of changes

21   and it's essentially a list of hyperlinks that is the list

22   of the various versions of the protocol as they were posted.

23   And so the idea is, say I've got one that's July 2010 and

24   then the next is September 2010.  I can click on the

25   July 2010 hyperlink and it will tell me what the protocol on

DIRECT EXAMINATION - JONATHAN EMENS

1    the website looked like --

2              THE COURT:  As of the hyperlink date?

3              MR. MILLIKEN:  -- until it was next updated in

4    September 2010.

5              THE COURT:  Okay.

6              MR. MILLIKEN:  And the reason the Wayback

7    declaration corroborates what I just said is if you look

8    at -- what's appended to the Wayback Machine and then

9    compare it to what you get, if you click on the

10   February 2011 update in the history of changes, it's going

11   to be the same.

12             THE COURT:  Okay.  All right.  So then I think

13   we're back to kind of where I started, which is, so if you

14   have a witness come in and explain, I pulled whatever

15   document they want to say from the hyperlink on the

16   clinicaltrials.gov and this is what I get, I mean, at that

17   point is there even an objection to it coming in?

18             MR. GROOMBRIDGE:  I think there would be, Your

19   Honor.

20             THE COURT:  Okay.

21             MR. GROOMBRIDGE:  Because I think what

22   Mr. Milliken is saying is that if you look at the

23   February 23rd -- or February 23rd, 2011, version on the

24   website, what you see is something that looks like this,

25   like what's appended to the screenshot.  We don't dispute

DIRECT EXAMINATION - JONATHAN EMENS

1    that, right.  That's fine.

2                    Our problem is that the version that they want

3    to rely on plainly represents a mixture of information that

4    was available in 2010 and information that was not available

5    in 2010.

6                    THE COURT:  Right.

7                    MR. GROOMBRIDGE:  And they have never -- as

8    Mr. Stone said, for years we have told them that this was an

9    issue and they have never attempted to separate out those

10   things and to prove up what was there.

11                   And now, you know, here we are in trial and, you

12   know, the music has stopped.

13                   THE COURT:  All right.

14                   MR. MILLIKEN:  Your Honor, can I make one

15   additional point?

16                   THE COURT:  Yes.

17                   MR. MILLIKEN:  So, in addition to the Wayback

18   declaration --

19                   THE COURT:  I don't know how the Wayback

20   declaration helps you at all.

21                   MR. MILLIKEN:  Okay.

22                   THE COURT:  So maybe if you want -- if you're

23   telling me it does help you, tell me how, because I don't

24   see it.

25                   MR. MILLIKEN:  Well, let me try this.  There is

DIRECT EXAMINATION - JONATHAN EMENS

1    another document on the exhibit list that is an e-mail from

2    one of the named inventors in which Vanda employees are

3    saying are -- and this is from August 2010.  Vanda employees

4    are saying:  Our clinicaltrials.gov posting has been updated

5    to reflect that we are recruiting.  And it attaches a

6    receipt from Vanda's submission to the clinicaltrials.gov

7    website.

8              And so, that clearly shows that Vanda did, in

9    fact, submit this protocol in --

10             THE COURT:  What protocol?

11             MR. MILLIKEN:  The Hetlioz Phase 3 trial

12   protocol.

13             THE COURT:  What version of it?

14             MR. MILLIKEN:  The first version.

15             THE COURT:  All right.  I'm just going to -- at

16   this point, I'm just going to step back and I'm going to

17   just apply the rules of evidence.  And you can adduce

18   whatever you think you need to adduce to authenticate

19   whatever document you want to get in and I'll rule on the

20   admissibility of it when it's teed up for me.

21             I don't know the whole history, the

22   back-and-forth with the parties.  I do know that as of

23   June 2021, your side was put on notice that there were

24   issues as to the authenticity of any document that you would

25   want to put in.

DIRECT EXAMINATION - JONATHAN EMENS

1          And so it's incumbent upon you to satisfy the

2     rules of evidence to get them into evidence.  I don't know

3     whether you're going to be able to lay the necessary

4     foundation to accomplish that or not.

5          It may be that because of the back-and-forth

6     between the parties, you mentioned some longer exhibit, I

7     think Exhibit 42 or something, it may be that you want --

8     that there was at least misunderstanding or something said

9     that caused you to reasonably believe that you were going to

10    be able to get DDX-419 in as evidence of prior art.

11         And so if you want to have time to gather

12    yourself and figure out how you're going to get it

13    introduced, I'm willing to give you that time.

14         And I can't stress enough that Vanda -- its

15    objection, the way it articulated it at the beginning, was

16    unfortunate.  Because the real issue ultimately goes to

17    establishing that the purported screenshot was the

18    screenshot as of July 15, 2010.  That is the issue.

19         And I would have had to resolve it whether they

20    articulated it today as an authentication objection or a

21    relevance objection.  Because my recollection is what

22    Mr. Groombridge said was, well, just want to note for the

23    record, the witness can testify about the substance of this,

24    but not lay -- but not testify that this substance was on

25    the website as of a certain date.  Which I take is really an

DIRECT EXAMINATION - JONATHAN EMENS

1  authentication objection.

2          And however way you construe it, the issue I

3  think is very clear why it needs to be resolved.  And I'm

4  going to resolve it now.  I'm not going to wait until

5  post-trial briefing to resolve it.

6          MR. MILLIKEN:  At the risk of repeating myself,

7  Vanda's counsel explicitly represented to me that there was

8  no evidentiary objection.  But I understand.

9          THE COURT:  And that's why I kind of -- I feel

10  for you.  You know what I mean?  But we got to resolve it

11  now.  We're not going to be able to resolve it in post-trial

12  briefing, right.

13          And I'm not going to -- I don't want to sit here

14  for another couple of hours listening to this -- all this

15  testimony about this website when it turns out we don't

16  really know whether this website looked like it did in

17  July of 2010.

18          MR. MILLIKEN:  If I could, Your Honor, clarify

19  the role that this document plays in our invalidity case,

20  just in case it's helpful.

21          So on the RE604 patent, we have two obviousness

22  combinations.  Neither one of them uses this document.  The

23  reason that we use this document as a conditional argument

24  for anticipation, our point is that the -- let me try to

25  explain.  I'm sorry.

DIRECT EXAMINATION - JONATHAN EMENS

1          So the clinical trial protocol for the Hetlioz

2     Phase 3 trial discloses administering 20 milligrams of

3     tasimelteon an hour before bedtime to blind Non-24 patients.

4     That's what they were studying.  That is also what our

5     labels say.  It says:  Administer 20 milligrams tasimelteon

6     an hour before bedtime to blind Non-24 patients.

7          They are taking the position that that label

8     necessarily induces infringement of the claimed method.

9          So, in other words, if you do those four things,

10    20 milligrams tasimelteon an hour before bedtime to blind

11    Non-24 patients, you're going to get the entraining and

12    maintaining limitations.  And our point is, if that is

13    correct, then this protocol that was publically available in

14    July 2010 which discloses those same mechanical steps,

15    that's got to anticipate.  Because as Mr. Rozendaal --

16              THE COURT:  Are those the only limitations of

17    the claim?

18              MR. MILLIKEN:  So it's the four that I mentioned

19    plus entraining the patient to the 24-hour and maintaining

20    that --

21              THE COURT:  Right.

22              MR. MILLIKEN:  And it's an example, as

23    Mr. Rozendaal said in his opening of the principle that that

24    which infringes, if it comes after the patent, anticipates

25    if it comes before the patent.  And that's the reason the

DIRECT EXAMINATION - JONATHAN EMENS

 1    document is in the case.

 2                MR. GROOMBRIDGE:  And, Your Honor --

 3                THE COURT:  Just give me a second, please.

 4                MR. MILLIKEN:  Are you looking for the patent,

 5    Your Honor?

 6                THE COURT:  Yes.

 7                MR. MILLIKEN:  It's JTX-1.  It should be at the

 8    front of the binder.

 9                THE COURT:  Okay.  So I appreciate the

10    importance of it.  It's pretty important.

11                MR. MILLIKEN:  We believe it's important.

12                THE COURT:  I could see why.

13                MR. GROOMBRIDGE:  Your Honor, I just wanted to

14    note that we do not agree with the argument -- that the

15    argument is correct.  It's something that the parties

16    dispute as to what would be the legal consequences if this

17    is what -- at the time of this study, nobody knew whether it

18    entrained and, so --

19                THE COURT:  Nobody knew what?

20                MR. GROOMBRIDGE:  Nobody knew whether

21    tasimelteon would entrain.  That was the purpose of the

22    study.  And so, the argument that it discloses entrainment,

23    we disagree with.

24                THE COURT:  Okay.

25                (Discussion held off the record.)

DIRECT EXAMINATION - JONATHAN EMENS

1           THE COURT:  All right.  So Mr. Milliken, so it

2  is very important, I get it.  And I think you should do your

3  best to lay whatever foundation you need to lay to establish

4  that whatever screenshot you want to put in front of me was,

5  in fact, posted on the clinicaltrials.gov website as of the

6  day that the witness says the screenshot was posted.  Okay.

7  That's incumbent upon you, it seems to me, and that's where

8  we are.

9           Do you want -- is that something you need time

10 to put together?

11          MR. MILLIKEN:  If Your Honor wouldn't mind.

12          THE COURT:  I'm happy to do it, because I think

13 it's very important.  And I don't have the wherewithal or

14 knowledge to arbitrate the back-and-forth.

15          But in fairness to Vanda, I will say this, I

16 mean, this was definitely a live issue.  It was a live issue

17 as of the submission of the pretrial report.  I vaguely --

18 was there some mention of it at the pretrial conference?  My

19 recollection is there was mention of it and then we'll go

20 and try to resolve it, something like that.

21          MR. STONE:  Your Honor, you're exactly right.

22 The reason for that is that in the pretrial order we wrote

23 about a declaration --

24          THE COURT:  You didn't have it.

25          MR. STONE:  Correct.  I stood at this lectern

DIRECT EXAMINATION - JONATHAN EMENS

1    because we saw the screenshot attached to it as not helping

2    them.  It's within the one-year period for 102(b).  What we

3    said was we don't need to depose the declarant from the

4    Wayback Machine.  We're not disputing that that is, in fact,

5    true.

6                    THE COURT:  Right.

7                    MR. STONE:  And so what I had said was there

8    wasn't going to be a fight about the declaration itself.

9    And, in fact, as Your Honor has pointed out several times

10   today, there isn't.  That is a true and correct copy of

11   whatever the Wayback Machine had in March of 2011.  We don't

12   dispute that.

13                   THE COURT:  Okay.

14                   MR. STONE:  But we didn't waive the objection

15   that they haven't proven what was available in July of 2010,

16   Your Honor is exactly right that that's the issue.

17                   THE COURT:  All right.

18                   Mr. Milliken, what do you need?

19                   MR. MILLIKEN:  Just one moment, Your Honor.

20   Would 15 minutes be all right?

21                   THE COURT:  Yes, that's fine.  Okay.  We'll

22   break for 15 minutes.  We'll come back at 11:15.

23                   (Recess taken.)

24                   THE COURT:  Have a seat.

25                   Mr. Milliken.

DIRECT EXAMINATION - JONATHAN EMENS

1          MR. MILLIKEN:  Thank you, Your Honor.  This was

2    the version that was disclosed to the plaintiffs and there

3    was an objection, but I'd like to lay a foundation for it.

4          THE COURT:  This is an exhibit that -- have I

5    seen it before?

6          MR. MILLIKEN:  No, I'm about to hand a copy up

7    to Your Honor.

8          THE COURT:  Okay.

9          MR. MILLIKEN:  May I approach to put one at the

10   witness stand?

11         THE COURT:  Go ahead, yes.

12         MR. MILLIKEN:  Thank you.

13         THE COURT:  All right.  So there's an objection

14   to this exhibit?

15         MR. GROOMBRIDGE:  Your Honor, we don't object if

16   Mr. Milliken wants to attempt to lay a foundation for this.

17         THE COURT:  Okay.

18         MR. MILLIKEN:  So I think we're ready for

19   Dr. Emens.

20         THE COURT:  All right.  Bring him back in.

21         (Whereupon, Dr. Emens retook the stand and

22   testified as follows:)

23         THE COURT:  All right.  You remain under oath.

24   Have a seat.

25         THE WITNESS:  Thank you.

DIRECT EXAMINATION - JONATHAN EMENS

1          MR. MILLIKEN:  May I proceed, Your Honor?

2          THE COURT:  Yes, please.

3    BY MR. MILLIKEN:

4    Q.     Dr. Emens, do you see laid on top of your binder on

5    the witness stand is a document that says DTX-42 at the

6    bottom right-hand corner?

7    A.     I do.

8    Q.     Do you recognize this document?

9    A.     I do.

10   Q.     Is this a compilation of updates from the clinical to

11   the Hetlioz clinical trial protocol from the

12   clinicaltrials.gov website?

13   A.     Yes, it is.

14   Q.     Okay.  I'd like you to -- so, first of all, on the

15   cover of the document, could you read the title of this

16   study, please?

17   A.     Yeah, it's:  Efficacy and Safety of Tasimelteon

18   Compared With Placebo in Totally Blind Subjects With

19   Non-24-Hour Sleep-Wake Disorder.

20   Q.     Could you flip over to page 7.

21   A.     Yes.

22   Q.     Do you see about, I don't know, halfway down the page

23   there it says:  Publications automatically indexed to this

24   study by clinicaltrials.gov identifier, and it says NCT

25   number?

DIRECT EXAMINATION - JONATHAN EMENS

1   A.      Yes.

2   Q.      And then do you see that there's a citation to -- it

3   looks like a publication?

4   A.      Yes, I do.

5   Q.      And what publication is that?

6   A.      So this is the result of the set and reset trials

7   that was published in The Lancet in 2015.

8   Q.      Okay.

9   A.      The results of the Phase 3 trial.

10  Q.      Okay.  Could you now turn to DTX-49.2.

11  A.      Is that in my binder?

12  Q.      No, sorry.  It's the document you were just looking

13  at.  It's just page 9.

14  A.      Okay.

15  Q.      42.9.  I'm sorry.  I misspoke.

16  A.      Okay.  That's why I was confused.  Okay.  Yes, I'm

17  there.

18  Q.      Do you see it says study NCT, and then there's a

19  bunch of numbers?

20  A.      Yes, I do.

21  Q.      And then what is the date listed on this study?

22  A.      July 13th of 2010.

23  Q.      And then if you go down a little bit, do you see an

24  entry that says "first submitted"?

25  A.      I do.

DIRECT EXAMINATION - JONATHAN EMENS

1    Q.    What's the date listed there?

2    A.    July 2nd of 2010.

3    Q.    And then below that it says:  First submitted that

4    met QC criteria.

5    A.    Yeah, July 13th, 2010.

6    Q.    And then below that it says "first posting"?

7    A.    Yes, July 15th of 2010.

8    Q.    Okay.  Could you go now to DTX-42.11.

9    A.    Yes, I'm there.

10   Q.    And take a look at the bottom of that page.

11   A.    Yes.

12   Q.    And you see there's a citation to a Lockley article?

13   A.    Yes.

14   Q.    Is this the Lockley article that was automatically

15   indexed to the clinical trial protocol?

16   A.    Yes, it is.  It's the same Lancet 2015 article.

17   Q.    All right.  Could we now go to DTX-42.13.

18   A.    Yes.

19   Q.    You see, again, it has the study number and it says

20   "on date" below that about a third of the way down the page?

21   A.    Yes.

22   Q.    What's the date there?

23   A.    August 26th of 2010.

24   Q.    And then if you look down about two-thirds of the

25   way, there's a line that says:  Last update posted.

DIRECT EXAMINATION - JONATHAN EMENS

1              Do you see that?

2    A.    Yes.

3    Q.    What's that date?

4    A.    August 27th of 2010.

5    Q.    And then if you move to DTX-42.16.

6    A.    Yes.

7    Q.    Do you see a reference to a Lockley 2015 article?

8    A.    I do.

9    Q.    And is this the Lockley 2015 article that was

10   automatically indexed to this study --

11   A.    It was -- is.

12              MR. GROOMBRIDGE:  Your Honor, we object in

13   this -- this doesn't seem like it's foundation, and there's

14   nothing about automatic indexing in his expert report.  He's

15   obviously just used the words, but --

16              THE COURT:  I know you already let one in, you

17   know that.

18              MR. GROOMBRIDGE:  Yes, I did.

19              But none of this is in -- to the extent he's

20   just going through reading the documents, that's fine.  But

21   the -- there's nothing in the expert report about how the

22   website works, which is where this seems to be going.

23              THE COURT:  Okay.  So the objection is what?

24   Foundation or --

25              MR. GROOMBRIDGE:  Foundation and untimely

DIRECT EXAMINATION - JONATHAN EMENS

1    disclosure.

2              THE COURT:  I guess it's sustained.  I don't

3    guess.  It is sustained.

4    BY MR. MILLIKEN:

5    Q.    All right.  Could you go back, Dr. Emens, to

6    DTX-42.9.

7    A.    Yes, I'm there.

8    Q.    And I believe that you testified that this is the

9    first version of the protocol that was posted in July 2010;

10   is that right?

11   A.    Yes.

12             MR. GROOMBRIDGE:  Objection, Your Honor.  Again,

13   foundation that this witness has no basis to testify whether

14   this was or wasn't posted.

15             THE COURT:  Well, the question actually asked:

16   I believe you testified that this is the first version.  I

17   don't know if he did or not.

18             So, I think he actually has a basis to testify

19   about what he testified about, right?  That's actually the

20   question that's pending.

21             So that objection is overruled.

22   BY MR. MILLIKEN:

23   Q.    Dr. Emens, have you visited clinicaltrials.gov

24   recently?

25   A.    I have.

DIRECT EXAMINATION - JONATHAN EMENS

1          MR. MILLIKEN:  With the Court's permission,

2    could we bring up clinicaltrials.gov on the screen?

3          THE COURT:  You mean live?

4          MR. MILLIKEN:  Yes.

5          THE COURT:  Yes.

6          MR. MILLIKEN:  Mr. Brooks, could we pull up a

7    web browser, please.

8          Could you type in www. -- oh, you're already

9    there.

10   BY MR. MILLIKEN:

11   Q.     And, Dr. Emens, the condition that we're talking

12   about here is Non-24, right?

13   A.     Mm-hmm.

14         MR. MILLIKEN:  Could we search Non-24 in

15   condition or disease.

16         And click on Non-24-Hour Sleep-Wake Disorder and

17   click "search."

18         Then could we scroll down.

19   BY MR. MILLIKEN:

20   Q.     Dr. Emens, do you see trial record number five?

21   A.     I do.

22   Q.     Is that the Hetlioz Phase 3 trial that we've been

23   discussing for the last little bit?

24   A.     It is.

25         MR. MILLIKEN:  Could we click on that hyperlink,

DIRECT EXAMINATION - JONATHAN EMENS

1    please, Mr. Brooks.

2    BY MR. MILLIKEN:

3    Q.      When you visited clinicaltrials.gov recently,

4    Dr. Emens, did you click on the part that says:  How to read

5    a study record?

6    A.      I did.

7              MR. MILLIKEN:  Could you click on that,

8    Mr. Brooks.

9    BY MR. MILLIKEN:

10   Q.      And did you further click on the part that says:

11   Historical Views of Records?

12   A.      I did indeed.

13             MR. MILLIKEN:  Could we click on that, please,

14   Mr. Brooks.

15   BY MR. MILLIKEN:

16   Q.      Could you read what it says under Historical Views of

17   Records?

18             MR. GROOMBRIDGE:  Objection, Your Honor.  Again,

19   this is --

20             THE COURT:  When you say "again," this is the

21   first, so we're not on again.

22             Go ahead.

23             MR. GROOMBRIDGE:  I'm sorry.

24             But this seems to be an attempt to go into the

25   workings of clinicaltrials.gov, none of which is in his

DIRECT EXAMINATION - JONATHAN EMENS

1    expert report.  So we object to it as untimely disclosure

2    and prejudicial because we're seeing this now for the first

3    time in open court.

4             THE COURT:  Well, first of all, is it your

5    position that he did not even use the words

6    "clinicaltrials.gov" in his expert report?

7             MR. GROOMBRIDGE:  In his report, the sum total

8    of the disclosure is in Paragraph 84 where he said:  I have

9    reviewed the summary of this clinical trial as published at

10   the public website clinicaltrials.org in July 2010 which is

11   available in the History of Changes section of the

12   clinicaltrials.gov website called NCT 01163032.

13            And that's what he says.  He doesn't go into any

14   explanation of how it works or what these things mean or how

15   one may arrange or retrieve information or how the website

16   is maintained.  None of that was addressed.  It's simply

17   saying, I looked at the website.

18            And, you know, plainly, as Your Honor has seen

19   now repeatedly, this is -- has been a dispute at issue for

20   two years in the case, and we think it's untimely and

21   prejudicial to now be confronted with this at, you know, in

22   real time at trial.

23            MR. MILLIKEN:  Your Honor, his expert report

24   clearly states that he relied on the History of Changes

25   feature of clinicaltrials.gov, and this goes to --

DIRECT EXAMINATION - JONATHAN EMENS

1    THE COURT:  Can you show me that?

2    MR. MILLIKEN:  I believe that I may have handed

3    my copy to Your Honor.  It's in Paragraph 84 of his

4    1/31/2020 expert report.

5    THE COURT:  The pending question is:  Could you

6    read what it says under Historical Views of Records.

7    I'm going to overrule the objection, but let's

8    see -- I mean, just because of that specific question.  I'm

9    going to go question by question and we'll see.

10   BY MR. MILLIKEN:

11   Q.    You may answer the question, Dr. Emens.

12   A.    Yeah, I'll read under Historical View of Records.  It

13   says:  You can access the historical view of each record by

14   clicking on the History of Changes link near the bottom of

15   the full text view of each record.  Historical views show

16   you when a record is updated and how it was changed.

17   Q.    Okay.

18   MR. MILLIKEN:  Could we go back, Mr. Brooks, to

19   the previous tab -- sorry.  It looked like it opened a new

20   tab.  Yes, correct.

21   Could we now scroll all the way down towards the

22   bottom of the page.

23   BY MR. MILLIKEN:

24   Q.    Do you see there, Dr. Emens, where it says History of

25   Changes?

DIRECT EXAMINATION - JONATHAN EMENS

1    A.      Yeah.  Yes.

2    Q.      When you visited clinicaltrials.gov recently, did you

3    click on History of Changes?

4    A.      I did, indeed.

5              MR. MILLIKEN:  Could you click on that,

6    Mr. Brooks.

7              And then if you could scroll up, please.

8    BY MR. MILLIKEN:

9    Q.      When you visited History of Changes recently,

10   Dr. Emens, which version of the protocol did you click on?

11   A.      So the earliest one, the one at the top.  Submitted

12   date of July 13th of 2010.

13   Q.      Okay.

14             MR. MILLIKEN:  Could we click on that, please.

15   BY MR. MILLIKEN:

16   Q.      And I'd like you, if you could, to look at DTX-49.2

17   that you have in front of you and see if you could compare

18   it to what we have on the screen that you got in the

19   July 2010 version in the History of Changes record.

20             MR. GROOMBRIDGE:  Your Honor --

21             MR. MILLIKEN:  For the record, it's 42.9.  I

22   misspoke again.

23             MR. GROOMBRIDGE:  I'd like to renew the

24   objection.

25             THE COURT:  Well, when you say "renew," what's

DIRECT EXAMINATION - JONATHAN EMENS

1    the objection?

2              MR. GROOMBRIDGE:  The objection is that this

3    is -- it's an untimely disclosure, not in his expert report,

4    and it's prejudicial given the circumstances here.

5              THE COURT:  What's not in his expert report?

6              MR. GROOMBRIDGE:  The sole disclosure in his

7    expert report is the statement that I read earlier, Your

8    Honor, saying that he's reviewed this, which is available in

9    the History of Changes section of the current

10   clinicaltrials.gov website.  That's it.  That's all he said.

11   He didn't get into any explanation of it or how it works or

12   what is the significance of different links within the

13   section of the website.  Or, indeed, comparing different

14   versions, none of that is in here.

15             THE COURT:  What are you referring to?  Are you

16   referring to Paragraph 84 of your report?

17             MR. MILLIKEN:  Are you asking me?

18             THE COURT:  No, I'm asking Mr. Groombridge.

19             MR. GROOMBRIDGE:  Yes, Your Honor, I'm referring

20   to Paragraph 84.

21             THE COURT:  All right.  Okay.

22             So here's -- for the record, Paragraph 84 reads

23   as follows:  Phase 3 clinical trial that was disclosed

24   publically in July 2010 plan to administer 20 milligrams of

25   tasimelteon or placebo daily to Non-24 patients for a

DIRECT EXAMINATION - JONATHAN EMENS

1    six-month period.  The patients were given tasimelteon or

2    placebo one hour prior to bedtime.  The initial primary

3    outcome measure was subjective average total nighttime sleep

4    measured in weeks 3 to 6.

5             In other words, the study sponsors were looking

6    to see if tasimelteon was efficacious in the treatment of

7    Non-24 by assessing changes in total nighttime sleep in

8    Non-24 patients.

9             A secondary outcome measure was stabilization of

10   phase relationship between circadian melatonin rhythm and

11   the timing of sleep.

12            I reviewed the summary of this clinical trial as

13   published at the public website clinicaltrials.org in July

14   of 2010, which is available in the History of Changes

15   section at the current clinicaltrials.gov website for this

16   study called NCT 01163032.

17            Clinicaltrials.gov identifier:  NCT 01163032,

18   and then the title in quotes, "Efficacy and Safety of

19   Tasimelteon Beyond Compared With Placebo in Totally Blind

20   Subjects With Non-24-Hour Sleep-Wake Disorder," July 15,

21   2010.

22            All right.  So what this is doing is offering an

23   opinion about the content of the clinical trial as it

24   existed in July of 2010.

25            And so I think his testimony is admissible on

DIRECT EXAMINATION - JONATHAN EMENS

1    the subject matter of the clinical study as it existed as of

2    July 2010.

3              And now we are, as I understand it, trying to

4    get into evidence a document that -- or a website that

5    memorializes what the study looked like as of July 2010.

6              And its a factual question, that does not

7    necessarily require an expert opinion to adduce in court

8    what is an exhibit which accurately reflects what the

9    clinical trial data looked like as of July 2010.

10             I think that's the issue that we're grappling

11   with right now.  I think it's fair game for the witness to

12   be asked questions to put into evidence that exhibit.

13             Before I decide its authenticity or whether I'd

14   admit it, I'll permit cross-examination.  All right.

15             MR. MILLIKEN:  Thank you, Your Honor.

16   BY MR. MILLIKEN:

17   Q.    Dr. Emens, this version of the clinical trial

18   protocol that we're looking at on the screen, what date does

19   this say at the top?

20   A.    Submitted date is July 13, 2010.

21   Q.    And is this the version of the clinical trial

22   protocol that you relied on in your invalidity analysis in

23   this case?

24   A.    It is.

25   Q.    Okay.  If you could now look down and compare what

DIRECT EXAMINATION - JONATHAN EMENS

1    you have in front of you DTX-42.9 to what's displayed here

2    on the screen.

3              And if you could take a look specifically at the

4    Brief Title, is the Brief Title the same in both documents?

5    A.    It is.

6              MR. MILLIKEN:  And if we scroll down just a bit.

7    BY MR. MILLIKEN:

8    Q.    The first submitted date, is that the same?

9    A.    It is.  They're both July 2nd of 2010.

10   Q.    And a little bit further down you see the last update

11   posted.  Is that the same?

12   A.    Yeah, they are both July 15th of 2010.

13             MR. MILLIKEN:  And then if we could go down a

14   little bit more to where it says Brief Summary.

15   BY MR. MILLIKEN:

16   Q.    Could you compare the text in the Brief Summary

17   section and let me know if that's the same?

18   A.    They are the same.

19   Q.    Take your time, but if you could also take a look at

20   the Detailed Description section that's on the screen and

21   compare it to what you have in the document in front of you

22   and let me know if that's the same.

23   A.    They are the same.

24             MR. MILLIKEN:  And then could we scroll down a

25   little bit more to the Arms and Interventions section.

DIRECT EXAMINATION - JONATHAN EMENS

1    BY MR. MILLIKEN:

2    Q.    Could you compare the Arms and Interventions section

3    that's on the screen with the document you have in front of

4    you at DTX-42.10?

5    A.    They are the same.

6    Q.    All right.

7              MR. MILLIKEN:  And then if you could scroll

8    down, Mr. Brooks, down to the very end.

9    BY MR. MILLIKEN:

10   Q.    And do you see on the screen, Dr. Emens, underneath

11   References it says:  Links and available IPD/Information,

12   but it's otherwise blank?

13   A.    Yes.

14   Q.    And then do you see on DTX-42.11, underneath

15   References, there's a citation to the Lockley 2015 article

16   that we were looking at earlier?

17   A.    Yes, I do see that.

18   Q.    Do you think that that citation to the 2015 Lockley

19   article was there in 2010 when this clinical trial protocol

20   was first posted on the website?

21             MR. GROOMBRIDGE:  Objection, Your Honor, calls

22   for speculation.

23             THE COURT:  Sustained.

24   BY MR. MILLIKEN:

25   Q.    This Lockley 2015 article that is listed, that goes

CROSS-EXAMINATION - JONATHAN EMENS

1   from DTX-42.11 to DTX-42.12, is that the same Lockley

2   article that DTX-42.7 states is, quote:  Automatically

3   indexed to the study by clinicaltrials.gov identifier NCT

4   number?

5   A.     Yes, it's same Phase 3 outcome study that was

6   published in The Lancet in 2015.

7                MR. MILLIKEN:  Your Honor, I offer DTX-42 into

8   evidence.

9                MR. GROOMBRIDGE:  Your Honor, may we

10  cross-examine briefly?

11               THE COURT:  Yes.

12                       CROSS-EXAMINATION

13  BY MR. GROOMBRIDGE:

14  Q.     Good morning, Dr. Emens.

15  A.     Good morning.

16  Q.     I guess good afternoon.

17               Do you have DTX-42.9 -- 42 in front of you,

18  DTX-42?

19  A.     DTX-42.1?

20  Q.     The first page is DTX-42.1.  So the whole exhibit, I

21  think, is DTX-42.

22  A.     Yes, I do.

23  Q.     Could you turn to DTX-42.9, please?

24  A.     Yes, I'm there.

25  Q.     And when you were being asked foundational questions,

CROSS-EXAMINATION - JONATHAN EMENS

1    one of the things you were asked was, what was the date

2    first posted.

3                   Do you remember that?

4    A.    Yes.

5    Q.    And you said July 15, 2010, correct?

6    A.    Correct.

7    Q.    After that it says "estimate."  Correct?

8    A.    Yes.

9    Q.    And, in fact, several of the dates that you testified

10   about just now say "estimate" after them, do they not?

11   A.    Yes.

12   Q.    Now, is this document in front of us, DTX-42, the

13   document, and specifically 42.9 -- Pages 9 through 12, the

14   document on which you have based your opinions about the

15   so-called clinical trial reference throughout your work on

16   this case?

17   A.    Yes.

18   Q.    Thank you.

19            MR. GROOMBRIDGE:  Nothing further for now, Your

20   Honor.

21            We would object to the admission of -- on the

22   basis --

23            (Discussion between counsel held off the

24   record.)

25            MR. GROOMBRIDGE:  So, Your Honor, we object on

CROSS-EXAMINATION - JONATHAN EMENS

1    the basis of relevance in that the -- if it can't be shown

2    when it became publically available in the form that we're

3    looking at here, then it doesn't qualify as prior art.  And

4    it is, therefore, not germane to the dispute.

5            THE COURT:  All right.

6            MR. MILLIKEN:  May I respond to that, Your

7    Honor?

8            THE COURT:  Sure.

9            MR. MILLIKEN:  Your Honor, what we're looking at

10   on the screen is a self-authenticating US government website

11   that states that this version of the protocol was posted on

12   July 15, 2010, 18 months before the priority date of the

13   patent.  And what we -- what I have just done is laid a

14   foundation for the proposition that the contents of DTX-42,

15   going from Pages 9 to 12, the contents of the protocol

16   accurately reflects what is on the self-authenticating US

17   government website.

18           THE COURT:  So basically what we have here is

19   the application of the transitive property.  If this looks

20   like 42 and because he's read them and he compared the

21   substance and they're identical, therefore he can testify

22   and we can admit Exhibit 42.  Right?

23           MR. MILLIKEN:  That's correct, Your Honor.

24           THE COURT:  And you want me to take judicial

25   notice of the website.

DIRECT EXAMINATION - JONATHAN EMENS

```
 1              MR. MILLIKEN:  Correct, Your Honor, and I think

 2     that's supported by Third Circuit precedence, and I'm happy

 3     to provide you a cite.

 4              THE COURT:  All right.  I'm going to admit it on

 5     that basis.

 6              All right, go ahead.

 7                        DIRECT EXAMINATION

 8     BY MR. MILLIKEN:

 9     Q.     Okay.  Let's get back to tasimelteon, shall we.

10              So --

11              THE COURT:  One of the more unusual evidentiary

12     questions I have ever had, that's for sure, and I don't know

13     if there's an appeal issue or not, but -- and I do think

14     this could have been made a lot easier.  There could have

15     been steps -- and, of course, I wasn't involved in figuring

16     all this out pretrial, but you were on notice, in fairness

17     to Vanda, that this was an issue.

18              But I will also say, and the case law is very,

19     very clear, the burden imposed by 901 is not very high; and

20     that also is the reason why I'm going to exercise my

21     discretion and let this in.

22              MR. MILLIKEN:  Thank you, Your Honor.

23     BY MR. MILLIKEN:

24     Q.     So Dr. Emens, just to confirm before we move on, did

25     you rely on the July 2010 version of the Hetlioz Phase 3
```

DIRECT EXAMINATION - JONATHAN EMENS

1    trial protocol in forming your opinions?

2    A.    Yes.

3    Q.    What was the administration protocol for the

4    treatment arm of this study?

5    A.    It was an administration of 20 milligrams of

6    tasimelteon by mouth over a six-month period of time.

7    Q.    And when did the patients take the tasimelteon?

8    A.    So, if you can look at that, they took the

9    melatonin -- the tasimelteon prior to bedtime.

10   Q.    Okay.  And I apologize if you said this already, but

11   what condition did these patients have?

12   A.    They were blind individuals with Non-24.

13   Q.    All right.  Let's now go back to your binder, and if

14   you could turn, please, to DTX-20.

15             THE COURT:  And, actually, while you're looking

16   at that, Doctor, I just want to also, just to make sure the

17   record is complete, I found particularly probative on my

18   decision to allow the exhibit to be introduced the automatic

19   referral language on the website, which, in my mind,

20   indicates that what happens is when you access the website

21   at times, the studies, i.e., the 2015 study, for example, is

22   automatically attached to the website when it's accessed.

23             And also on the cross-examination of the witness

24   prior to my decision to allow the exhibit to be introduced,

25   there was really nothing to cast doubt on the fact that all

DIRECT EXAMINATION - JONATHAN EMENS

1    the other substance in Exhibit 42 is consistent with what's

2    on the website as accessed by the historic link; that the

3    purpose of the link is precisely to allow people to be able

4    to access historical versions of these clinical trials; and

5    the website's maintained by United States government.  All

6    right.

7              So now the record, I hope, is complete as to why

8    I allowed all this information.  All right.

9              MR. MILLIKEN:  Thank you, Your Honor.

10   BY MR. MILLIKEN:

11   Q.    Dr. Emens, do you recognize DTX-20?

12   A.    I do.

13   Q.    What is this?

14   A.    This is a review article by Lankford from 2011.

15   Q.    And did you rely on Lankford in forming your

16   opinions?

17   A.    I did.

18             MR. MILLIKEN:  Your Honor, I move DTX-20 into

19   evidence.

20             MR. GROOMBRIDGE:  No objection.

21             THE COURT:  All right.  It's admitted.

22             (DTX-20 admitted into evidence.)

23   BY MR. MILLIKEN:

24   Q.    Dr. Emens, you mentioned that this was a review

25   article.  What is Lankford reviewing?

DIRECT EXAMINATION - JONATHAN EMENS

1    A.      So Lankford is reviewing the use of tasimelteon to

2    treat insomnia.

3    Q.      And does Lankford talk about the Rajarantnam studies

4    we were discussing this morning?

5    A.      Yes, indeed it does.  It summarizes both the Phase 2

6    and Phase 3 Rajarantnam studies that we talked about

7    earlier.

8    Q.      And does Lankford say Non-24 specifically?

9    A.      Yes.  Specifically it notes that there is an ongoing,

10   as we have highlighted there on the left, Phase 3 trial of

11   tasimelteon in blind people of Non-24 assessing how

12   effective tasimelteon in a dose of 20 milligrams would be.

13   Q.      And is that the Phase 3 trial described in the

14   clinical trials reference we were just looking at?

15   A.      It is.

16   Q.      Does Lankford say anything about tasimelteon's

17   potential in treating circadian rhythm sleep disorders?

18   A.      Yeah.  So as I've highlighted on the right, Lankford

19   talks about how tasimelteon has a high affinity for the MT-1

20   and MT-2 receptors that we've talked about in a way that's

21   similar to melatonin.

22          And as he next says:  Tasimelteon should

23   therefore be especially well suited for the treatment of

24   circadian rhythm sleep disorders of which Non-24 is one.

25   Q.      Okay.  All right.  Thank you, Dr. Emens.

DIRECT EXAMINATION - JONATHAN EMENS

1          And that takes us to the conclusion of our

2   tasimelteon timeline.

3          I'm going to skip through claim construction

4   because of a stipulations the parties reached to streamline

5   the proceedings, and I'd like to go straight to the asserted

6   claims.

7          Could you explain what's displayed here on

8   DDX-5.55?

9   A.     Yes, these are the relevant patents of the case.

10  Q.     All right.  Let's start with Claim 3 of the RE604

11  patent.

12         Could you briefly summarize your opinions

13  regarding the validity of Claim 3?

14  A.     Yeah.  So Claim 3 of RE604 would be invalid as

15  obvious over the combination of the Lankford, Hack, and '244

16  Publication references, as well as obvious over the

17  Hardeland, Hack, and '244 Publication.

18         And it -- again, if the Court were to -- again,

19  this is what has been explained to -- by the lawyers to me,

20  but if the Court were to accept the infringement argument

21  that Vanda has stated, then it would also be anticipated by

22  clinical trials.

23  Q.     All right.  Let 's talk about obviousness first.

24         As it's -- as the legal standard has been

25  explained to you by the attorneys, what things do we need to

DIRECT EXAMINATION - JONATHAN EMENS

1  consider when we evaluate whether a claim is obvious?

2  A.    So it was explained to me that I have to consider the

3  scope and the content of the prior art; what a person of

4  ordinary skill in the art, what their level of skill would

5  actually be; and then the differences, if any, between the

6  prior art and whatever is being claimed in the invention,

7  any secondary considerations for non-obviousness as well, if

8  there are any.

9  Q.    And then if we're talking about a claim that's

10  allegedly obvious in light of more than one prior art

11  reference, is there anything else that we have to consider?

12  A.    Yeah.  I was asked to consider whether there would be

13  motivation to combine these references and whether I would

14  have a reasonable expectation of success if I did so.

15  Q.    All right.  Let's get into the claims in a little bit

16  more detail.

17         Now, in analyzing Claim 3 of the RE604, did you

18  also consider the limitations found in claims 1 and 2?

19  A.    Yes.

20  Q.    And it looks like you've done some color-coding of

21  the claim here on the slides.  Could you explain what that

22  color-coding represents.

23  A.    Yeah, so it's breaking up the different limitations

24  separately by color.

25  Q.    And before we get into your obviousness opinions, I'd

DIRECT EXAMINATION - JONATHAN EMENS

1    like to ask you a question about this first limitation.

2            Do you see that phrase in the first limitation

3    "daily sleep period of approximately 7 to 9 hours"?

4    A.    Yes.

5    Q.    Could you explain in your opinion how a person of

6    skill in the art would interpret this phrase.

7    A.    Yeah.  So this has been talked about.  And I think a

8    person of skill in the art would assume that this means a

9    person was mostly asleep.  Again, has been referred to

10   earlier, they may briefly wake up, but that they would

11   awaken after a period of mostly sleep.

12   Q.    And do you understand that Vanda's experts have

13   offered a different interpretation of this phrase?

14   A.    I do.

15   Q.    And what is that interpretation, as you understand

16   it?

17   A.    That it would be a 7 to 9-hour period of sleepiness,

18   increased sleepiness.

19   Q.    And why, in your view, is your interpretation the

20   plain and ordinary meaning of that phrase as it would be

21   understood by a person of skill in the art?

22   A.    Because it's described as a period of sleep after

23   which you awaken and not a period of sleepiness after which

24   you arise and get out of bed.

25            So I think the commonsense meaning of that would

DIRECT EXAMINATION - JONATHAN EMENS

1    be that I'd actually slept for some portion of that time.

2    There's a common phrase used in sleep medicine, "sleep

3    opportunity."  They could have used that phrase.  That's

4    commonly used, but they didn't.  It's a period of sleep.  So

5    I think the commonsense interpretation would be that they

6    slept.

7    Q.     Thank you, Dr. Emens.

8             I'd now like to talk about how the prior art

9    combinations that you summarized for us earlier apply to

10   Claim 3 of the '604 patent.

11            Let's begin with Lankford, Hack and the '244

12   Publication.

13            Does this combination of references teach or

14   suggest the first limitation of Claim 1?

15   A.     It does.  Both Lankford, Hack and the '244

16   Publication do so.

17   Q.     All right.  Let's begin with Lankford.  What in

18   Lankford teaches or suggests the first limitation?

19   A.     So Lankford clearly says that it's going to be used

20   for the treatment of blind individuals with Non-24-Hour

21   Sleep/Wake Disorder using the drug tasimelteon.

22   Q.     And does Lankford contain any other disclosures that

23   would teach or suggest the concept of entrainment?

24   A.     Yeah, it points out that tasimelteon has already been

25   proven to be a circadian phase-resetting drug.  And, again,

DIRECT EXAMINATION - JONATHAN EMENS

1    as I talked about earlier, resetting phase, resetting the

2    time of the circadian pacemaker's mechanism by which you

3    achieve entrainment.

4    Q.    And just for the record, the cull out of the slide

5    that you've been reading from here, is it DTX-20.6?  Is that

6    right?

7    A.    Yes.

8    Q.    Let's move on to Hack now.  What in Hack teaches or

9    suggests the first limitation of Claim 1 of the '604 patent?

10   A.    So Hack clearly states that they were studying blind

11   individuals with free-running circadian rhythms.  In other

12   words, they have the disorder Non-24.  And that they were

13   attempting to entrain them to the sleep-wake cycles, it

14   says, highlighted at the end there.

15   Q.    And were they successful in entraining them to a

16   24-hour sleep-wake cycle?

17   A.    They were.

18   Q.    And the cull out on the slide you have here is from

19   JTX-146 page 1; is that right?

20   A.    Yes.

21   Q.    Does Hack show whether the patients in its study

22   experienced a daily sleep period of approximately 7 to

23   9 hours?

24   A.    They did.  They showed that compared to the placebo,

25   those who were on melatonin got 6.6 hours of sleep, plus or

DIRECT EXAMINATION - JONATHAN EMENS

1    minus 1.1 hours, standard deviation.  So that would

2    certainly be approximately 7 to 9 hours.

3    Q.    And you culled out on the slide here Table 3 at Page

4    6 of JTX-146; is that correct?

5    A.    Yes.

6    Q.    Okay.  Finally, what in the '244 Publication teaches

7    or suggests the first limitation of Claim 1?

8    A.    So it discusses regulating circadian rhythms,

9    including the sleep-wake cycle, which, again, by regulating

10   circadian rhythms we would be resetting them.  Which I would

11   take to mean the mechanism by which you achieve entrainment

12   for the treatment of a circadian rhythm disorder.  Again, of

13   which Non-24 is.

14   Q.    All right.  Let's -- or, sorry.  For the record, you

15   culled out portions of the '244 Publication from DTX-41.2

16   and 41.25; is that correct?

17   A.    Yes.

18   Q.    Let's now move on to the second limitation to

19   maintaining this 24-hour sleep-wake cycle.

20            Is this limitation found in your first

21   combination of references?

22   A.    It is.  It's found both in Hack and the '244

23   Publication.

24   Q.    And where is it found in Hack?

25   A.    So, Hack is clear that chronic usage of the drug is

DIRECT EXAMINATION - JONATHAN EMENS

1    necessary to remain entrained to the 24-hour day, so that's

2    clearly there.

3    Q.    And you're reading here from JTX-146, Page 2?

4    A.    Yes.

5    Q.    And what about the '244 Publication?  Where does that

6    teach or suggest maintaining the limitation?

7    A.    So it states that to avoid relapse, that treatment

8    needs to continue for some time, which I would say is

9    synonymous with maintaining the treatment.

10   Q.    And you're reading here from Pages 5 and 6 of DTX-41?

11   A.    Yes.

12   Q.    All right.  Now, on to the third limitation, orally

13   administering 20 milligrams of tasimelteon.

14          Is this limitation found in your combination?

15   A.    It is, both in the Lankford and the '244 Publication.

16   Q.    Okay.  Where is it in Lankford?

17   A.    So as we have highlighted here, Lankford is, again,

18   disclosing that Phase 3 trial in blind individuals with

19   Non-24.  And clearly points out that the trial is going to

20   be looking at 20 milligrams of tasimelteon.

21   Q.    And you're reading here from DTX-20.6?

22   A.    Yes.

23   Q.    All right.  How about the '244 Publication?  Where

24   does that disclose the dosing limitation?

25   A.    In two points that we've highlighted here, both

DIRECT EXAMINATION - JONATHAN EMENS

1    talking about administering MA-1, which is, again, is

2    tasimelteon in the dose range of 10 to 100 milligrams.  But

3    then also it is specifically in the second highlighted area

4    administering a dose of 20 milligrams.

5    Q.    And any reason why you'd pick 20 milligrams over the

6    other possible doses that are disclosed there?

7    A.    Yeah.  The idea is that you'd want the lowest

8    effective dose that's not going to give you side effects.

9    Or at least minimize side effects.

10   Q.    And, for the record, you've culled out here the

11   claims of the '244 that are at DTX-41.25; is that right?

12   A.    Correct.

13   Q.    Now, let's look at the fourth and final of Claim 1.

14   And it looks here on the slide like you've highlighted both

15   that limitation and the additional limitation of Claim 3 in

16   green.

17         Could you explain why that is.

18   A.    Yes.  Because they are both addressing administration

19   relative to bedtime.

20   Q.    Okay.  Are these limitations found in your prior art

21   combination?

22   A.    Yeah, both found in Lankford and if we go back in the

23   '244 publication.

24   Q.    And where is the limitation regarding the timing of

25   the administration found in Lankford?

DIRECT EXAMINATION - JONATHAN EMENS

1    A.    So in Lankford, it's stated multiple -- points in

2    time that it's being administered 30 minutes prior to

3    bedtime in the three places that you can see highlighted on

4    the left.

5    Q.    And is this discussing the tasimelteon insomnia

6    trials?

7    A.    Yes.

8    Q.    And you're reading here from DTX-20.5; is that right?

9    A.    Correct.

10   Q.    What about the '244 Publication?  Where does that

11   disclose the timing of administration?

12   A.    So, again, two locations here where it discusses

13   administering MA-1, again, which is tasimelteon, 30 minutes

14   for 0.5 hours prior to bedtime.

15   Q.    And does it specify a dose there?

16   A.    Yes, at the bottom it also specifies at the

17   20-milligram-per-day dosage.

18   Q.    And it looks like on the slide you culled out

19   DTX-41.10, 25 and 26; is that right?

20   A.    Yes, that is correct.

21   Q.    All right.  Finally, let's tackle Claim 2.

22         Does your combination of prior art disclose that

23   the patient receiving treatment is totally blind?

24   A.    It does.

25   Q.    And which references disclose this limitation?

DIRECT EXAMINATION - JONATHAN EMENS

1    A.      Both Lankford and the Hack publication.

2    Q.      Where does Lankford disclose this limitation?

3    A.      So, again, in Lankford, we see the description of the

4    ongoing, at that point in time, Phrase 3 trial tasimelteon

5    in blind people with no light perception at two different

6    points in time, at two different points in the article.

7    Again, that's synonymous with totally blind individuals.

8    Q.      And you're reading here from DTX-20.6; is that right?

9    A.      Yes.

10    Q.      And where does Hack disclose the totally blind

11    limitation?

12    A.      So they clearly state that it is blind subjects who

13    are being studied as highlighted in purple on the left.

14    Q.      And you called out a portion from Page 1 of JTX-146;

15    is that right?

16    A.      I have.

17    Q.      So to sum up, in your opinion, Dr. Emens, does the

18    combination of Lankford, Hack and the '244 collectively

19    disclose or suggest each limitation of the Claim 3 of the

20    RE604 patent?

21    A.      It does.

22    Q.      All right.  I'd now like you to put yourself in the

23    mindset of a person of skill in the art before January 2012.

24         So would such a person have been motivated to

25    combine these three references to arrive at the invention

DIRECT EXAMINATION - JONATHAN EMENS

1    that's claimed in Claim 3?

2    A.      Most definitely.

3    Q.      And could you explain to the Court why that is.

4    A.      Yes.  So starting on the left, we have the Hack

5    publication that tells me that melatonin can entrain

6    individuals with Non-24.  So I know melatonin can achieve

7    the desired treatment effect.

8            Then I have Lankford and the '244 Publication

9    telling me that I have a drug, tasimelteon, that's acting on

10   the same types of receptors, melatonin receptors.  They

11   point out that it has the exact same mechanism and the

12   action; namely, it can reset the timing of the biological

13   clock.  It can cause these phase shifts.  And furthermore

14   that it can cause entrainment.

15           And, finally, that it would probably be an

16   effective treatment for, as they point out there, numerous

17   circadian rhythm sleep disorders, such as Non-24.  So I

18   think they have a really clear motivation to want to combine

19   them.

20   Q.      And so having combined these references -- I think

21   you touched on this a bit in your previous answer.

22           But having combined these references, would a

23   person of skill in the art have had a reasonable expectation

24   of success in arriving at the invention of Claim 3?

25   A.      Yeah, definitely.  I mean, Lankford kind of really

DIRECT EXAMINATION - JONATHAN EMENS

1    spells it out for us, as highlighted on the left.  You know,

2    Lankford talks about how tasimelteon should be especially

3    well suited for the treatment of circadian rhythm disorders.

4    And, again, the '244 Publication similarly says it should be

5    effective in treating sleep disorders.

6    Q.    Would Lankford's disclosure of the ongoing Phase 3

7    trial on tasimelteon in totally blind Non-24 patients have

8    had any impact on the person of skill in the art's

9    expectation of success?

10   A.    Oh, yeah, clearly.  I mean, if someone is going to be

11   spending the time and money to do a big Phase 3 trial, all

12   that effort, as well as money, then that would say to me,

13   and to a person of ordinary skill in the art, that clearly

14   there was a reasonable expectation that they are going to

15   succeed.  Otherwise, I don't think they would have invested

16   the time and money in the Phase 3 trial.

17   Q.    Thank you, Dr. Emens.

18         Let's now move to the second combination of

19   prior art that you mentioned.  And that is Hardeland, Hack

20   and the '244.  Since we've already gone through those last

21   two references, I'd like to focus just on Hardeland and what

22   it tells us.

23   A.    Sure.

24   Q.    So, first, does Hardeland teach or suggest the

25   entraining limitation of the '604 patent?

DIRECT EXAMINATION - JONATHAN EMENS

1   A.      It does.

2   Q.      And where is that?

3   A.      So you can see highlighted here it states that

4   tasimelteon is acting on melatonin receptor agonist and can

5   phase shift a circadian rhythm, which, again, as I have

6   pointed out, is the mechanism by which you would cause

7   entrainment.  And he further kind of culls out the fact that

8   this would make it suitable for treating circadian rhythm

9   sleep disorders such as Non-24.

10  Q.      And you've culled out a portion of the document on

11  the slide here that's DTX-16.1; is that right?

12  A.      That's correct.

13  Q.      All right.  What about the 20-milligram dose?  Does

14  Hardeland disclose this limitation?

15  A.      Hardeland also discloses the 20-milligram dose, yes.

16  Q.      And where is that?

17  A.      Clearly stated, as we have highlighted here,

18  Hardeland states that:  Effective doses of tasimelteon were

19  in that 20- to 50-milligram range.  So that's clearly

20  disclosed.

21  Q.      And you have a cull out here from page 7 of DTX-16;

22  is that right?

23  A.      Yes.

24  Q.      And, finally, as to the timing limitation, does

25  Hardeland disclose administering tasimelteon a half hour to

DIRECT EXAMINATION - JONATHAN EMENS

1    an hour and a half before a patient's targeted bedtime?

2    A.    It does.

3    Q.    And where does Hardeland disclose those limitations?

4    A.    So Hardeland describes the trials looking at

5    administration of tasimelteon 30 minutes before bedtime is

6    highlighted on the left.

7    Q.    And you have a cull out here from Page 6 of DTX-16;

8    is that right?

9    A.    I do.

10   Q.    So in summary, does the combination of Hardeland,

11   Hack and the '244 Publication collectively teach or suggest

12   each limitation of Claim 3 of the '604 patent?

13   A.    They do.

14   Q.    And would a person of ordinary skill in the art have

15   been motivated to combine these references to arrive at the

16   claimed invention?

17   A.    Certainly.

18   Q.    And why is that?

19   A.    Similar to the reasons I already described, again,

20   just to reiterate a little bit, we know from Hack that

21   melatonin can entrain blind individuals with Non-24.  '244

22   Publication and Hardeland tell me I have a drug,

23   tasimelteon, that binds in a way similar to melatonin, can

24   cause those same phase shifts as melatonin, and can be

25   useful for entrainment, which, again, is what Hack had shown

DIRECT EXAMINATION - JONATHAN EMENS

1    with melatonin.

2              And so, clearly, there would have been

3    motivation to combine these references.

4    Q.    And the Hardeland reference, does that cite Vanda's

5    '244 patent publication?

6    A.    Yeah, sorry.  That's highlighted starting WO from

7    DTX-16.7.  That's the '244 Publication.  Exactly.

8    Q.    And having combined these three references, would a

9    person of skill in the art have had a reasonable expectation

10   of success in arriving at the invention of --

11   A.    Yes.  Again, as I've stated before but now talking

12   about Hardeland, Hardeland points out quite explicitly that

13   tasimelteon should be useful for treating circadian rhythm

14   sleep disorders explicitly.  As well as, and, again, this is

15   important, other types of entrainment difficulties.

16             So Hardeland calls out that it would be useful

17   for entrainment specifically.  And what's interesting is

18   that Hardeland says you would expect this based on the fact

19   that it's a melatonin (inaudible), meaning it's a melatonin

20   agonist.  So Hardeland is clearly not surprised here by

21   that.

22             And also on the left, Hardeland concludes that,

23   again, tasimelteon should be appropriate for phase shifting

24   the circadian clock and resetting the time after the 24-hour

25   biological clock.  And, therefore, should be useful in the

DIRECT EXAMINATION - JONATHAN EMENS

1    treatment of circadian rhythm sleep disorders.  And then as

2    I stated before, the '244 culls out that it should be

3    effective in treating sleep disorders.

4    Q.    And these passages of Hardeland that you have been

5    discussing that you culled out on the slides, those are

6    DTX-16, pages 7 and 8; is that right?

7    A.    Correct.

8    Q.    That takes care of obviousness on the '604 patent.

9    So I will now move on to anticipation.

10          I think you briefly summarized your anticipation

11   position earlier.

12          So I'd just like to confirm, this clinical

13   trials reference, is that the Phase 3 trial protocol for

14   Hetlioz that we were looking at earlier?

15   A.    Yes.

16   Q.    And that is DTX-42, I believe.

17   A.    Yes.

18   Q.    All right.  Based on what you understand from the

19   attorneys, what does it mean for a claim to be anticipated?

20   A.    Yeah.  So what was explained to me is that a claim

21   can be anticipated if every limitation in the claim can be

22   found in just a single example of the prior art.  And, you

23   know, like I put it here at the bottom and what was

24   discussed earlier, again, what was explained to me is this

25   concept that if something that comes after the patent is

DIRECT EXAMINATION - JONATHAN EMENS

1    infringing, that same claim, if it came -- if it came prior

2    to the issuance of the patent would be anticipatory or

3    anticipate.

4    Q.    Okay.  Let's move to the claims.  For a moment I'd

5    like to set aside the limitations in the preamble and just

6    look at the next one, which is treating a Non-24 patient by

7    administering 20 milligrams of tasimelteon.

8          Does the clinical trials reference disclose this

9    limitation?

10   A.    Yeah, so the clinicaltrials.gov from 2010 that talks

11   about Non-24 Sleep-Wake Disorder highlighted in yellow to

12   correspond to what's in the RE604 Claim 1.

13   Q.    And does it disclose the 20-milligram dose?

14   A.    It does.  So, again, highlighted in blue on the left

15   from clinicaltrials.gov from 2010 discloses 20 milligrams

16   tasimelteon, again, the same as the RE604 patent, again,

17   highlighted in blue on the right.

18   Q.    And just for clarity for the record, you've been

19   looking at the title and the arms and interventions section

20   of the clinical trial protocol; is that right?

21   A.    Yes.

22   Q.    Now, moving on to the timing limitation, does

23   clinical trials disclose administering the tasimelteon half

24   an hour to an hour and a half before the targeted bedtime?

25   A.    Yeah.  So back in 2010, clinical trials highlighted

DIRECT EXAMINATION - JONATHAN EMENS

1    in green on the left clearly states that tasimelteon placebo

2    is going to be administered about an hour prior to bedtime.

3    Q.     And are you reading there from the detailed

4    description section of the clinical trial protocol?

5    A.     Yes.

6    Q.     And, finally does the clinical trial protocol

7    disclose that the patients were totally blind?

8    A.     Yes, it's in the title.  So in clinicaltrials.gov, it

9    states in purple totally blind subjects, again, the same as

10   in Claim 2 of the RE604 patent.

11   Q.     All right.  I'd now like to go back to what we

12   skipped, the preamble of Claim 1.

13          Were you present in the courtroom on I believe

14   it was Monday when Dr. Combs testified?

15   A.     I was.

16   Q.     And did you hear him give the opinion that if you

17   give tasimelteon as directed in the Hetlioz label it will

18   lead to the practice of Claim 3 of the '604 patent?

19   A.     Yeah.  He stated that if you're prescribing

20   tasimelteon, you would know that it would necessarily be

21   resulting in treatment.

22   Q.     If the Court were to accept that position, would you

23   conclude that the remaining limitations of the claim, the

24   ones that are in the preamble, are disclosed by the clinical

25   trials reference?

DIRECT EXAMINATION - JONATHAN EMENS

1    A.      Yes, definitely.  So in other words, if, again, what

2    comes after the patent on the right here, the label, is

3    going to necessarily infringe on the patent in terms of

4    entrainment, then clinicaltrials.gov tells you to do the

5    exact same thing and, therefore, would anticipate what's in

6    the patent.

7    Q.      And so, just for clarity of the record, do the

8    clinical trials referenced in the Hetlioz label both

9    disclose Non-24 Sleep-Wake Disorder?

10   A.      Yeah, they both, again, in blue 20-milligram dose of

11   tasimelteon, yes.

12   Q.      And do they both disclose administering at a half

13   hour to an hour and a half before bedtime?

14   A.      Yes.  In the green, they both talk about

15   approximately an hour prior to bedtime.

16   Q.      And do they both disclose that the patients were

17   totally blind?

18   A.      Again, in purple, both disclose that these were

19   totally blind patients.

20   Q.      That takes care of our first and by far longest

21   patent.  So let's now move to the next one, the '829 patent.

22          Dr. Emens, could you summarize your invalidity

23   opinions on Claim 14 of the '829 patent?

24   A.      Yeah.  As invalid as obvious over the combination of

25   Lankford, Hack, the '244 publication and Hardeland, as well

DIRECT EXAMINATION - JONATHAN EMENS

1   as obvious over the combination of Hardeland, Hack, and the

2   '244 publication.

3   Q.      And in analyzing the validity of Claim 14 of the '829

4   patent, did you also consider the limitations of Claim 13?

5   A.      I did.

6   Q.      And so Claim 14, does it have anything in common with

7   Claim 3 of the RE604 patent that we were just looking at?

8   A.      Yeah.  So you can see highlighted in yellow, they

9   both discuss the treating of individuals with Non-24 and

10  also in blue using tasimelteon at a dose of 20 milligrams.

11  Q.      And so those limitations that are common to the two

12  patents, why would those have been obvious in view of the

13  two combinations of prior art references that you've set

14  forth?

15  A.      So for the same reasons I already explained about

16  Claim 3 of the RE604 that would be obvious.

17  Q.      And does Claim 14 of the '829 patent add anything

18  that's not in Claim 3 of the '604 patent?

19  A.      Yes.  So it adds that prior to starting treatment of

20  tasimelteon, that you would discontinue treatment with a

21  strong CYP1A2 inhibitor, such as Fluvoxamine.

22  Q.      And what did you rely on in concluding that this

23  additional limitation would have been obvious in light of

24  the two combinations of prior art references that you've set

25  forth?

DIRECT EXAMINATION - JONATHAN EMENS

1    A.    So obvious over Lankford, Hack, the '244 publication

2    and Hardeland, as well as obvious over this combination of

3    Lankford, Hack and the '244 publication.

4    Q.    And regarding this additional limitation that

5    requires discontinuing a strong CYP1A2 inhibitor before you

6    administer tasimelteon, what did you rely on to conclude

7    that that additional limitation would have been obvious as

8    well?

9    A.    So I relied on the report of Dr. Greenblatt.  Again,

10   given his expertise in pharmacokinetics and CYP3A4-related

11   drug interactions, and I relied on his report.

12   Q.    Let's now move to our next patent, the '910, and

13   specifically Claim 4.

14         Could you summarize your conclusions on the

15   validity of Claim 4 of the '910?

16   A.    Yeah.  Obvious over the combination of Lankford,

17   Hack, the '244 Publication, Pandi-Perumal, as well as

18   obvious over Hardeland, Hack, the '244 Publication and,

19   again, Pandi-Perumal.

20   Q.    All right.  Let's do something similar with this

21   claim.  Does Claim 4 of the '910 patent have anything in

22   common with Claim 3 of the RE604 patent that we were just

23   looking at?

24   A.    It does.

25   Q.    And what are those commonalities?

DIRECT EXAMINATION - JONATHAN EMENS

1   A.      Again, using the same color-coding scheme, Claim 4 of

2   the '910 patent talks about the treatment of Non-24, which

3   is, again, seen in the RE604 patent, and also in yellow on

4   the left.  It talks about treating these individuals using a

5   20-milligram dose of tasimelteon, both in blue for both of

6   these, and that these would be totally blind individuals;

7   and highlighted in purple, light-perception impaired I take

8   to be synonymous with blind.

9           And, finally, the administration time is the

10  same in the Claim 4 of the '910 patent.  It's once daily

11  before target bedtime.  Again, we see that in Claim 3 of the

12  RE604 patent.  Administered half an hour to an hour and a

13  half before bedtime, or in the Claim 1, once daily before

14  targeted bedtime; highlighted, again, in green.

15  Q.      And so these limitations that are common to both

16  patents, why would those limitations have been obvious in

17  light of the prior art combinations that you've described

18  for us today?

19  A.      Yeah, again, for the same reasons of why I stated

20  earlier why Claim 3 of the RE604 would have been obvious.

21  Q.      And does Claim 4 of the '910 patent add anything

22  that's not in Claim 3 of the RE604 patent?

23  A.      Yeah.  So it specifies prior to treating with

24  tasimelteon that you want to discontinue Rifampin, which is

25  a CYP3A4 inducer, to avoid that particular drug-drug

DIRECT EXAMINATION - JONATHAN EMENS

1  interaction.

2  Q.    And what did you rely on in concluding that this

3  additional limitation of Claim 4 is invalid in light of your

4  two obviousness combinations?

5  A.    Again, I really relied on Dr. Greenblatt's report

6  based on his expertise as a pharmacologist.

7  Q.    All right.  That gets us to our last patent, the '487

8  patent.  I'd like to begin with obviousness.

9        Could you summarize your opinions on the

10  obviousness of Claim 5 of the '487 patent?

11  A.    Yeah.  So it would be obvious over the combination of

12  Lankford, Hack, and the '244 Publication, as well as the

13  combination of Hardeland, Hack, and the '244 Publication.

14  Q.    And are those the same two combinations that you used

15  when you were discussing Claim 3 of the RE604 patent?

16  A.    They are.

17  Q.    And analyzing the validity of Claim 5 of the '487

18  patent, did you also look at Claims 1 and 4?

19  A.    I did.

20  Q.    All right.  Does Claim 5 have any similarities to

21  Claim 3 of the RE604 patent?

22  A.    Yeah.  So as we saw before, Claim 5 of the '487

23  patent, similar to Claim 3 of the RE604 patent, in yellow

24  both are talking about treating individuals with the

25  circadian rhythm disorder, Non-24.

DIRECT EXAMINATION - JONATHAN EMENS

1    They both talk about administering a dose of

2    tasimelteon of 20 milligrams daily, in blue.

3    Q.    And does Claim 5 add anything that's not in Claim 3

4    of the RE604 patent?

5    A.    Yes, it adds you would be administering tasimelteon

6    without food.

7    Q.    So this additional limitation requiring that the

8    tasimelteon is administered without food, in your opinion

9    would that have been obvious?

10   A.    Yes.

11   Q.    And could you explain to the Court why that is?

12   A.    So I relied on the Court's claim construction, so

13   that "without food" means patient had no food within

14   30 minutes of getting the tasimelteon.  And since the

15   tasimelteon, as you can see highlighted in orange, the MA-1

16   is being administered 30 minutes prior to bedtime, I think

17   the likelihood -- it's more likely than not that they

18   wouldn't have had any food on board.

19        I mean, they, in essence, have two choices.  It

20   could be administered with food at that time of the evening

21   or it could be administered without food.  And I think it's

22   more likely that they would have been administered without

23   food.

24   Q.    And you culled out a portion from the -- I believe

25   the '244 Publication at DTX-41.10 that talks about

DIRECT EXAMINATION - JONATHAN EMENS

1    administering 30 minutes prior to bedtime; is that right?

2    A.    I did, yes.

3    Q.    So to sum up, do the two combinations of Lankford,

4    Hack, and the '244 Publication, and Hardeland, Hack, and the

5    '244 Publication collectively disclose each limitation of

6    Claim 5 of the '487 patent?

7    A.    They do.

8    Q.    And finally on to our last issue, let's go to written

9    description.

10          To start with, as the standard has been

11   explained to you by the lawyers, what do you understand the

12   written description requirement to mean?

13   A.    Yeah.  So in lay terms what was explained to me was

14   that an inventor has to give you enough detail to know that

15   you had possession of the invention; in other words, that

16   you actually invented what you're claiming to invent.

17   Q.    Okay.  So let's -- I'd like first to just focus on

18   the right side of the slide, which is the actual language of

19   Claim 5.

20          So in your opinion, does Claim 5 of the '487

21   patent require that administering tasimelteon without food

22   be better at treating Non-24 than administering it with

23   food?

24   A.    No.

25   Q.    Why not?

DIRECT EXAMINATION - JONATHAN EMENS

1   A.      Because it does haven't any -- it doesn't say

2   anything about that.  It doesn't say anything about being

3   more effective if you give it without food.  It's not in the

4   patent.

5   Q.      And were you in the courtroom when Dr. Polymeropoulos

6   testified?

7   A.      I was.

8   Q.      And did you hear him suggest that Vanda invented a

9   method of administering tasimelteon without food that's more

10  effective at treating Non-24 than if you were to administer

11  it with food?

12  A.      I did.

13  Q.      So if the Court were to conclude that Claim 5

14  incorporates this notion of improved efficacy in treating

15  Non-24 with tasimelteon without food versus treating Non-24

16  with tasimelteon with food, would that have any implications

17  for your opinions on the validity of Claim 5?

18  A.      Yes.

19  Q.      And what are those implications?

20  A.      It would be invalid for a lack of written

21  description.

22  Q.      And could you explain why that is?

23  A.      Yeah.  There's no data in the patent, or I think

24  anywhere, to suggest that administering tasimelteon without

25  food is any more effective for the treatment of Non-24 than

DIRECT EXAMINATION - JONATHAN EMENS

1    administering it with food.

2            MR. MILLIKEN:  And Mr. Brooks, could we switch

3    off the slides and pull up -- I believe it's JTX-5.

4            And if we could just make that a little bit

5    bigger if possible.

6    BY MR. MILLIKEN:

7    Q.    And JTX-5, is this the '487 patent that we were just

8    discussing, Dr. Emens?

9    A.    Yes, it is.

10   Q.    And does the '487 patent -- you can just flip through

11   in your binder.  How long is it?

12   A.    It's really just two pages back and front.  I mean --

13   well, I guess if you include -- I guess four pages total.

14   Q.    Okay.  And does it have any study results in there,

15   in the specification of the patent?

16   A.    Yeah.  It talks about the effects of administering

17   tasimelteon to sighted healthy individuals with or without

18   food.

19   Q.    Okay.

20           MR. MILLIKEN:  And then, Mr. Brooks, if we could

21   go to Page 3 of this document.

22           And if we could blow up the background of the

23   Invention section.

24   BY MR. MILLIKEN:

25   Q.    You see there where it says US Patent Application

DIRECT EXAMINATION - JONATHAN EMENS

1   Publication Number 2013/0197076?

2   A.      Yes.

3   Q.      And I don't expect you to remember the number, but

4   does it sound right that this is the patent application

5   publication that corresponds to the RE604 patent that we

6   were talking about earlier?

7   A.      Yes.

8   Q.      And does that patent specification contain the

9   results of the SET and RESET studies that Vanda did?

10  A.      No.

11  Q.      I'm sorry, this is -- we're talking now about the

12  RE604 patent.

13  A.      Oh, sorry, sorry.  I'm mixing this up with the '244.

14          Yes, it does.

15  Q.      And those SET and RESET studies, did those studies

16  study the effect of administering tasimelteon with food

17  versus without food?

18  A.      No.

19  Q.      What would you need to do to figure out tasimelteon

20  is more effective at treating Non-24 when administered

21  without food than it is administered with food?

22  A.      You know, you'd really have to do a head-to-head

23  trial.  So you'd have to kind of do the study where you gave

24  the tasimelteon to a group of patients with Non-24 with food

25  and have some matched patients or crossover to the same

DIRECT EXAMINATION - JONATHAN EMENS

1  patents where you then give it with and without food and see

2  if one is more likely to cause treatment success than the

3  other.

4  Q.     Thank you very much, Dr. Emens.

5              MR. MILLIKEN:  I pass the witness, Your Honor.

6              THE COURT:  All right.  Do you think we should

7  break for lunch?

8              MR. GROOMBRIDGE:  Sure, Your Honor.  Half an

9  hour?

10             THE COURT:  Half an hour works then.  All right.

11 We'll be back in half an hour, thank you.

12             You may step down.  And the witness is not on

13 cross yet so he can speak with counsel.  Thank you.

14             (Recess taken.)

15             MR. MILLIKEN:  Your Honor, one housekeeping

16 matter.  I was advised, I neglected to move JTX-5 into

17 evidence, which is the '487 patent.  I understand there's no

18 objection.

19             MR. GROOMBRIDGE:  Not surprisingly, Your Honor,

20 we're certainly happy to have that in evidence.

21             THE COURT:  It's admitted.

22             MR. MILLIKEN:  Thank you, Your Honor.

23             (JTX-5 admitted into evidence.)

24                      CROSS-EXAMINATION

25 BY MR. GROOMBRIDGE:

CROSS-EXAMINATION - JONATHAN EMENS

1    Q.    Dr. Emens, good afternoon again.

2    A.    Good afternoon.

3    Q.    I'd like to start with a paper that you wrote.

4    Let's put up -- can you open the white binder, please, and

5    you should find, first of all, there's a copy of your

6    deposition and the next thing should be PTX-005.

7    A.    Yes, I'm there.

8    Q.    And that's a review article titled:  Diagnosis and

9    Treatment of Non-24-Hour Sleep-Wake Disorder in the Blind;

10   correct?

11   A.    Yes.

12   Q.    And there are two authors and you're the first one,

13   correct?

14   A.    Yes.

15   Q.    And the other author is someone named Charmane

16   Eastman, who is also a well-known researcher in your field,

17   correct?

18   A.    Yes, she is.

19   Q.    And, in fact, I believe we have heard she was one of

20   the people on the advisory committee that recommended

21   approval of tasimelteon, correct?

22   A.    Oh.  Yes, I have to admit I don't know for sure that

23   she was on the advisory committee, but I'll definitely take

24   your word for it.

25   Q.    And is this an article that you wrote in 2017

CROSS-EXAMINATION - JONATHAN EMENS

1    summarizing things that were known in the field and how the

2    field had developed over time?

3    A.     Yes.

4              MR. GROOMBRIDGE:  Your Honor, we would offer

5    PTX-5 into evidence.

6              MR. MILLIKEN:  No, objection.

7              THE COURT:  All right.  It's admitted.

8              (PTX-5 admitted into evidence.)

9              MR. GROOMBRIDGE:  Put up Page 5, please.

10             Start by enlarging that text, please.

11   BY MR. GROOMBRIDGE:

12   Q.     And just -- Dr. Emens, just in case this is an

13   important thing, there may have been some question about the

14   prevalence of Non-24.  Here, in the beginning of the

15   abstract, you say that it's a disorder occurring in 55 to

16   70 percent of totally blind individuals.  Is that right?

17   A.     Yes.

18   Q.     And is that information generally accurate?

19   A.     Yes.

20   Q.     Now, moving down you say:  Orally administered

21   melatonin and the melatonin agonist tasimelteon have been

22   shown to entrain (synchronize) the circadian clock,

23   resulting in improvements in nighttime sleep and daytime

24   alertness.

25             Is that correct?

CROSS-EXAMINATION - JONATHAN EMENS

1    A.      Yes.

2    Q.      And is that an accurate statement?

3    A.      Yes.

4    Q.      And other than melatonin -- let me withdraw that.

5            You used the phrase in your direct examination a

6    "synthetic melatonin agonist," and I'd like to talk about

7    that a little bit.

8            Now, just to lay the groundwork here, does an

9    agonist mean a drug that causes a certain re- -- hits a

10   receptor in the body and causes a reaction?

11   A.      It means a chemical, either endogenous or exogenous,

12   that would act on that receptor, yes.

13   Q.      Thank you.  And that's a very good point.

14           Melatonin is what we call endogenous because the

15   body itself makes melatonin, correct?

16   A.      Well, actually, melatonin can be both exogenous and

17   endogenous.

18   Q.      And that's partly what I'm trying to get at here.

19           So we can have endogenous melatonin, which is

20   melatonin made by the body itself, correct?

21   A.      Yes.

22   Q.      And we could have exogenous melatonin, which would be

23   melatonin that someone took, right, and that's how it got

24   into their body, correct?

25   A.      Oh, yes.

CROSS-EXAMINATION - JONATHAN EMENS

1   Q.      And it's exogenous melatonin that we've been talking

2   about and you were talking about in your direct examination

3   as a treatment for Non-24, correct?

4   A.      Yes.

5   Q.      And melatonin the molecule is not a synthetic

6   melatonin agonist, as you used the term, correct?

7   A.      Just to make sure I understand, do you mean

8   endogenous who produced melatonin molecules, or...

9   Q.      Well, when you said -- I think I heard you say, you

10  talked about a synthetic melatonin agonist?

11  A.      Yes.

12  Q.      Does that mean something other than melatonin itself?

13  A.      It means a melatonin that is -- something that's

14  manufactured as opposed to what's made in the body.

15  Q.      Now, prior to 2012, had any molecule other than

16  melatonin itself been shown to entrain the circadian clock

17  and thereby resulted in improvements to nighttime sleep and

18  daytime alertness?

19  A.      In Non-24?

20  Q.      In Non-24.

21  A.      No.

22  Q.      And so when you were writing this article, the only

23  ones that had been shown to have that ability were melatonin

24  and tasimelteon, correct?

25  A.      Yes.

CROSS-EXAMINATION - JONATHAN EMENS

1   Q.      And prior to the publication of the results of the

2   SET and RESET studies, had it ever been shown in the field

3   that tasimelteon could entrain Non-24 patients?

4   A.      Not prior to the publication of the results of the

5   trial, no.

6   Q.      And now am I right that the reason that you spent

7   some time on your direct examination going through what we

8   might be able to call the melatonin prior art is because in

9   your opinion, that provides a meaningful teaching to the

10  skilled person that they could apply to the use of

11  tasimelteon; is that fair?

12  A.      Yes.

13  Q.      And in terms of dosage, is it -- can we read across

14  from a particular dose of milligrams of melatonin to have an

15  idea of what kind of dose of tasimelteon we should give

16  someone?

17  A.      As you and I talked about in my deposition, it's not

18  necessarily a one-to-one correlation.

19  Q.      Is there -- I'm sorry, did you finish?

20  A.      Yeah, no.  Please go ahead.

21  Q.      Is there any correlation at all?

22  A.      I apologize for hesitating.

23          There's no, say, dose response curve for the

24  resetting effects of tasimelteon that I could compare to,

25  say, what we constructed for melatonin in quite the same

CROSS-EXAMINATION - JONATHAN EMENS

1    way.  So it's hard to kind of answer that question.

2              I mean, I think, to be fair, I think you're

3    right that I suppose we can make some inferences from one

4    dose to the other, but since they're different molecules,

5    it's hard to kind of make a milligram, say, equivalent

6    comparison, if that makes sense.

7    Q.    And I think you previously said to me that for some

8    categories of drugs, like --

9    A.    We talked about opiates.

10   Q.    Opiates, yes.

11             That you could figure out how much of a standard

12   like morphine they were equivalent to, correct?

13   A.    Exactly, yes.

14   Q.    And that way you could, from one opiate to another,

15   you could say, well, if X milligrams of this one works, then

16   I know that probably Y milligrams of this one will work.

17             Is that fair?

18   A.    Yes.

19   Q.    But that's not possible between melatonin and

20   tasimelteon, correct?

21   A.    Yeah, the studies haven't been done.

22   Q.    And even as of today, no study has been done that

23   would make that possible, correct?

24   A.    No head-to-head trials comparing the two, yes.

25   Q.    Now, Dr. Emens, you're familiar, very familiar, with

CROSS-EXAMINATION - JONATHAN EMENS

1    the concept of a phase response curve for melatonin, are you

2    not?

3    A.    Yes.

4    Q.    And you have, yourself, published quite a bit about

5    that, correct?

6    A.    I have published not experiments and constructing

7    response curves, but definitely I have talked about these

8    response curves, yes.

9              MR. GROOMBRIDGE:  And let's go, if we could, to

10   Page 4 of Exhibit 5.

11             THE WITNESS:  Yes, I am there.

12   BY MR. GROOMBRIDGE:

13   Q.    By the way, I should have asked at the beginning, but

14   what is the purpose of a so-called review article?

15   A.    Well, it's really to kind of synthesize the state of

16   the field, you know, what's the current knowledge base.

17   Q.    And in this review article, is the intended audience

18   researchers and treating physicians in your field?

19   A.    Yes, I think it's fair to say both.

20             MR. GROOMBRIDGE:  And if we go to Page 4, let's

21   enlarge the text in the lower left-hand corner, please.

22   BY MR. GROOMBRIDGE:

23   Q.    And when you use the term "PRC," it means phase

24   response curve, correct?

25   A.    Yes.

CROSS-EXAMINATION - JONATHAN EMENS

1    Q.      And in Figure 1, we'll come to that in a moment, but

2    it says:  These PRCs illustrate the striking fact that the

3    same dose of melatonin can have opposite effects on the

4    circadian clock, depending on the biological time of

5    administration.

6              And that's accurate, correct?

7    A.      Oh, yes.

8    Q.      And, you go on to say that -- that melatonin

9    administered in the afternoon and early evening resets the

10   clock to an earlier hour.  It advances it, correct?

11   A.      Correct.

12   Q.      And when we say "reset the clock," you're talking

13   about the master body clock, right?

14   A.      Yes.

15   Q.      And by contrast, if we take melatonin in the morning,

16   it would have the opposite effect; it would delay the clock,

17   correct?

18   A.      Yes.

19   Q.      And people in your field have plotted this out

20   graphically, right?

21   A.      Yes.

22              MR. GROOMBRIDGE:  If we take this down and put

23   up Figure 1.

24   BY MR. GROOMBRIDGE:

25   Q.      That's what Figure 1 shows, correct?

837

CROSS-EXAMINATION - JONATHAN EMENS

1    A.      Yes, that's exactly what it shows.

2    Q.      Depending on when I take the melatonin, it will

3    either pull my rhythm forward or push it backward, correct?

4    A.      Yes.  And I would say when I take it relative to my

5    body clock, not to clock hour.

6    Q.      And "body clock" meaning the intrinsic circadian

7    rhythm?

8    A.      Yes, correct.

9    Q.      And as Figure 1 shows, the exact phase response curve

10   would also vary depending upon the dose that has been given,

11   would it not?

12   A.      Yes.  In this case there were slight differences when

13   Drs. Eastman and Burgess administered 0.5 versus 3

14   milligrams in the phase response curves that they got.  They

15   were pretty similar, though, but slight differences.

16   Q.      And would tasimelteon also have an effect whereby it

17   can either pull the clock forward or push it backward

18   depending upon time of administration?

19   A.      I would expect that, yes.

20   Q.      But even as of today, no one has actually ever

21   published that, correct?

22   A.      Correct.

23   Q.      Even as of today, there has never been, in the

24   literature, a phase response curve for tasimelteon?

25   A.      That's definitely correct, yes.

CROSS-EXAMINATION - JONATHAN EMENS

1    Q.      Now, let me ask, would you agree that -- that a

2    lot -- many years of work was spent by your people in the

3    field trying to establish whether melatonin could affect

4    so-called phase shifts in human beings?

5    A.      Yeah.  I mean, I would -- many years, that work

6    really is in the '80s and early '90s.  So, you know, maybe

7    over a decade period of time, people were demonstrating that

8    melatonin could cause phase shifts, so that might be many

9    years.

10                  MR. GROOMBRIDGE:  Let's look at Page 5, please.

11                  And let's enlarge the first paragraph under

12   section heading 5.

13   BY MR. GROOMBRIDGE:

14   Q.      And this is headed:  Initial Demonstration of

15   Melatonin Treatment of Non-24 and Concept of Spillover,

16   correct?

17   A.      Yes.

18   Q.      And we'll come to spillover in a minute, but that's

19   something that you have written about fairly extensively; is

20   that correct?

21   A.      Yes, that's correct.

22   Q.      And here, reviewing the history, you say that:

23   Melatonin was shown to be capable of entraining free-running

24   rats in 1983, correct?

25   A.      Correct.

839

CROSS-EXAMINATION - JONATHAN EMENS

1    Q.      All right.  But nonetheless, it took another 17 years

2    until it was shown that it was capable of entraining the

3    circadian rhythm of blind human beings, correct?

4    A.      Yes, that's correct.

5    Q.      And you mentioned, you see there it's commonly

6    accepted that there were two publications that came out very

7    close in time that --

8    A.      Yes.

9    Q.      -- that showed that, correct?

10   A.      Yes.

11   Q.      And one of them -- I think you talked about both of

12   them in your direct examination, did you not?

13   A.      I did.

14   Q.      And one of them is a paper in which the first author

15   is Dr. Lockley, correct?

16   A.      Yes.

17   Q.      And the Court will be hearing from Dr. Lockley very

18   soon, I think.

19           And the other one is a paper in which the first

20   author is someone called Dr. Sack, correct?

21   A.      That's correct.

22   Q.      And Dr. Sack was a researcher in the institution

23   where you now work, correct?

24   A.      Yes, that's correct.

25   Q.      And it was a big deal in your field when those two

CROSS-EXAMINATION - JONATHAN EMENS

1    papers came out, was it not?

2    A.    Yes, definitely.

3    Q.    Dr. Sack's paper was in the New England Journal of

4    Medicine and attracted a lot of attention.

5    A.    Yes, definitely.

6    Q.    And over the years, Dr. Lockley's paper has attracted

7    a lot of attention too; is that right?

8    A.    Yes, I would say so.

9    Q.    Now, would you agree, then, looking at that history

10   that a skilled person would have known that merely because a

11   particular molecule can entrain animals such as rats, it

12   doesn't necessarily follow that it can entrain human beings?

13   A.    Yes, I'd agree.  Just because it can entrain one

14   species doesn't guarantee that it would entrain other

15   species.

16   Q.    And the -- and now I'd like to talk a little bit

17   about spillover.

18              MR. GROOMBRIDGE:  Let's take that down, please.

19              And, Mr. Weir, let's enlarge the last paragraph

20   on the right-hand side.

21   BY MR. GROOMBRIDGE:

22   Q.    Do you see here where -- you're talking about the

23   fact here that sometimes a larger dose of melatonin is less

24   effective than a smaller dose at entraining people, correct?

25   A.    Correct.

CROSS-EXAMINATION - JONATHAN EMENS

1    Q.      And you have hypothesized that the reason for that is

2    that the melatonin remains present in the body long enough

3    that it's still there when you reach the delay part of the

4    phase response, correct?

5    A.      Yes, that's exactly correct.

6    Q.      And so, one of the things that follows from that is

7    it matters significantly if one wishes to achieve

8    entrainment how much of the drug is administered, correct?

9    A.      Yes, definitely dose affects whether you would expect

10   to get spillover, exactly true.

11   Q.      And, similarly, it matters when the drug is

12   administered, correct?

13   A.      Yes.

14   Q.      And that's because the closer in time one is to the

15   crossover point from advance to delay on the phase response

16   curve, the more likely that it will end up having delay

17   effects, correct?

18   A.      Yes.  And just to clarify, when we're talking about

19   when you said "time," again, biological time, not clock

20   hour.

21   Q.      Correct, right.

22           And for any given individual, we -- particularly

23   someone with Non-24, we may not know how their internal

24   circadian time matches the rest of the world's clock time,

25   correct?

CROSS-EXAMINATION - JONATHAN EMENS

1    A.    Exactly, yes.

2    Q.    Without doing some form of evaluation, it's probably

3    not possible to know that, correct?

4    A.    Yeah, you would have to do an assessment of circadian

5    phase.  You'd have to measure, in other words, what time it

6    was in their body.

7    Q.    And the term that -- did you coin the term

8    "spillover"?

9    A.    It was coined in an article in 2002 that Al Lewy and

10   I wrote together so I would think we'd give credit to Al

11   Lewy.

12   Q.    Perhaps you're being modest, Doctor, but certainly

13   you were one of the authors on the paper that brought this

14   term into the field?

15   A.    Yes, I was.

16   Q.    And here when talking about that you say:  Higher

17   doses can spill over onto the wrong portion of the melatonin

18   PRC.

19         Do you see that?

20   A.    I do.

21   Q.    And you said that you can, in fact, get a dose that's

22   high enough that it's incapable of producing the phase shift

23   necessary for entrainment, correct?

24   A.    Yes.

25   Q.    And that's because there would be so much of the

CROSS-EXAMINATION - JONATHAN EMENS

1    agent, in this case the melatonin, present that you would

2    never reach a point where it was not active in the phase

3    delay part of the curve, correct?

4    A.    Well, if you had a high enough dose, you would be

5    getting both kind of helpful phase advances and unhelpful

6    phase delays, as we were talking about before, and they

7    counteract each other.

8    Q.    They counteract each other, right?

9    A.    Exactly.

10   Q.    And that's what you are talking about when you say in

11   Exhibit 5, that you're talking about the net amount of

12   resetting, correct?

13   A.    Precisely, yes.

14   Q.    And what you're saying is I get a big positive amount

15   when the patient takes this and I'm on the advance part of

16   the curve, but then I get a pretty big negative effect on

17   the delay side of the curve and the overall result is a very

18   small or no shift, correct?

19   A.    Exactly.

20   Q.    Let's go to Page 6, please.  Let's enlarge the

21   paragraph under the Section 5.2.

22        Here you're talking about entrainment with

23   melatonin at the correct time; is that right?

24   A.    Yes.

25   Q.    And you say:  One unique feature of treating Non-24

CROSS-EXAMINATION - JONATHAN EMENS

1    is the fact that it is important to not just stop the clock

2    from free running, but to entrain it at the proper time

3    relative to the desired time for sleep.

4             Correct?

5    A.    Yes.

6    Q.    And if we look at that, when you say "unique

7    feature," what you mean there is that this is different from

8    treating other circadian rhythm disorders, correct?

9    A.    Well, to be fair, for other circadian rhythm sleep

10   disorders you would also want to entrain -- I mean reset

11   their clock to the proper time, too.  So if someone had,

12   say, delayed sleep phase disorder, so their clock is set too

13   late, it's not just a point of resetting them earlier.  I

14   want to set them earlier enough to get them to the correct

15   time.

16   Q.    For example, if I look at, say, jet lag, someone who

17   is suffering from jet lag, what I want to do is pull them on

18   to the right time, but once I've done that, I don't need to

19   worry about them staying there, correct?

20   A.    So that's -- yeah, it would be a different point in

21   terms of maintenance versus putting them to the right time.

22   Q.    And by the way --

23            MR. GROOMBRIDGE:  You can take that down,

24   Mr. Weir --

25            THE COURT:  By the way, I just want to -- I

CROSS-EXAMINATION - JONATHAN EMENS

1    should tell all witnesses, but I'm looking at a display

2    here.  So if I'm looking at you and looking down here, just

3    so you understand why I'm not -- I'm staring at something,

4    actually.

5            THE WITNESS:  Thank you.

6    BY MR. GROOMBRIDGE:

7    Q.    Doctor, in this article, and this is published in

8    2017, did you call into question the fact that even at that

9    point it might, in your opinion, be that 20 milligrams was

10   not the best dose of tasimelteon in order to treat Non-24?

11   A.    Yes.

12   Q.    And you said in this article that -- that you're

13   positive that perhaps 10 milligrams would be the better

14   dose, correct?

15   A.    Can you point me to where you're --

16   Q.    I certainly can.  Let's go to Page 8 and let me know

17   when you've got that.

18   A.    I'm there.

19   Q.    And you see there's a section here "Tasimelteon for

20   the Treatment of Non-24"?

21   A.    Yes.

22   Q.    And let's just take a look at that.  At the very

23   bottom, in fact, the last half line of the left-hand column,

24   you start talking about the SET trial, right?

25   A.    Yes.

CROSS-EXAMINATION - JONATHAN EMENS

1    Q.      And then you go on talking about that in the upper

2    column.

3                MR. GROOMBRIDGE:  And Mr. Weir, let's see if we

4    can get those up on the screen, please.

5    BY MR. GROOMBRIDGE:

6    Q.      And here you're talking about SET and RESET.

7    A.      Yes.

8    Q.      And you note that in the SET trial, tasimelteon

9    entrained 8 out of 40 or 20 percent of the patients after

10   four weeks of treatment, correct?

11   A.      Yes.

12   Q.      And you say the RESET trial, that it entrained

13   50 percent of the patients after 12 to 18 weeks, correct?

14   A.      Yes.

15   Q.      And you go on to refer to some data suggesting that

16   after seven months of tasimelteon treatment, 59 percent of

17   people would be entrained, correct?

18   A.      Yes.

19   Q.      And so would it be fair to conclude that in order to

20   know how good a particular molecule is at entraining blind

21   people, one of the things that could be important is how

22   long the course of treatment was?

23   A.      Yes.

24   Q.      And is that partly because, for any given individual,

25   it may depend upon how long it takes until the drug is, in

CROSS-EXAMINATION - JONATHAN EMENS

1    your words, hitting the right time of their internal cycle?

2    A.    Yes, exactly.

3    Q.    So if I'm someone with a tau, an internal circadian

4    rhythm that's only a little bit over 24 hours, it'll take me

5    a relatively long time, could be several months, to cycle

6    around the clock?

7    A.    Indeed, yes.

8    Q.    And if I start being treated for Non-24, be it with

9    melatonin or tasimelteon, I may not entrain until weeks or

10   months into the treatment when finally the time of day when

11   I'm taking the drug hits the right part of my internal

12   circadian rhythm, correct?

13   A.    Yes, you're exactly right.

14   Q.    And just --

15          MR. GROOMBRIDGE:  We can take that down here.

16   BY MR. GROOMBRIDGE:

17   Q.    One more thing I'd like to look at before we move on.

18   I think it's only one more thing.

19          Let's go to Page 9, please.

20          MR. GROOMBRIDGE:  And Mr. Weir, let's enlarge

21   the last paragraph in this section.

22   BY MR. GROOMBRIDGE:

23   Q.    And at the end of this you say:  The peak

24   concentration of tasimelteon was cut to about half when

25   taken with a high-fat meal.

CROSS-EXAMINATION - JONATHAN EMENS

1                    Correct?

2    A.      Yes.

3    Q.      And what you're talking about there is one of the

4    publications that reported the effects of Vanda's work on

5    so-called -- the food effect study; isn't that right?

6    A.      Yes.

7    Q.      And you then go on to propose:  This might be a way

8    to reduce the dose and allow it to be taken earlier without

9    causing too much sleepiness.

10                   Correct?

11   A.      Yes.

12   Q.      What you're saying there is that tasimelteon itself

13   can act as soporific, right, in addition to its circadian

14   rhythm resetting properties?

15   A.      Exactly, yes.

16   Q.      And so if I take it at an hour before a target

17   bedtime, that may not matter too much because I'm planning

18   on going to bed, correct?

19   A.      Oh, are you asking me whether there wouldn't be a

20   food effect?

21   Q.      Terrible question.  Let me try again.

22   A.      Sorry.

23   Q.      One of the things that you've posited is that in at

24   least some circumstances it's preferable to use a lower

25   dose, for example, of melatonin that can be given earlier in

CROSS-EXAMINATION - JONATHAN EMENS

1   the day so it won't compromise the patient's ability to

2   engage in activities of daily living, like driving, for

3   example.

4            Is that fair?

5   A.    Yes.

6   Q.    All right.  And here what you're saying is that by

7   analogy or -- you might be able to do the same thing with

8   tasimelteon and to take a smaller dose earlier in the day,

9   by taking advantage of the so-called food effect; is that

10  fair?

11  A.    Yes.

12  Q.    I would like to now move on and go through some of

13  the melatonin art and I'm going to try to keep it to a

14  minimum, but hopefully we can not be too onerous here.

15           I'd like to go now to look at a document called

16  PTX-283.

17           And can you turn to that.  Should be the next

18  item in the binder.

19  A.    Yes, I'm there.

20  Q.    And are you familiar with this publication?

21  A.    Yes, I haven't looked at it recently, but I do know

22  of it.

23  Q.    It's an older publication from 1991, is it not?

24  A.    Yes.

25  Q.    And it's by Dr. Sack and Dr. Lewy and a number of

CROSS-EXAMINATION - JONATHAN EMENS

1    other colleagues at the institution at which you now

2    practice, right?

3    A.    Yes.

4              MR. GROOMBRIDGE:  Your Honor, at this point, we

5    offer Plaintiff's Exhibit 283 into evidence.

6              MR. MILLIKEN:  No objection.

7              THE COURT:  It's admitted.

8              (Plaintiff's Exhibit 283 admitted into

9    evidence.)

10             MR. GROOMBRIDGE:  And let's just -- Mr. Weir,

11   please put up the title and we'll enlarge the title

12   information.  Let's get the header as well so we have the

13   date, please.

14   BY MR. GROOMBRIDGE:

15   Q.    Again, just make sure we're all on the same page,

16   this is a publication titled "Melatonin Administration to

17   Blind People:  Phase Advances and Entrainment."

18             Doctor, what's a phase advance?  Is that the

19   concept we were talking about, for example, with jet lag

20   where we pull the circadian rhythm forward?

21   A.    Yeah, it refers to shifting what time it is in your

22   body.  So if I wanted to measure what time it was in your

23   body, although there's been a lot of talk about the dim

24   light melatonin onset.  And so a phase advance would be

25   shifting the timing of when my melatonin rises to an earlier

CROSS-EXAMINATION - JONATHAN EMENS

1   time.  And all the rhythms are thought to be yoked together

2   so they would all shift to an earlier time.  And that would

3   be a phase advance.  Exactly.

4   Q.    And I could have a phase delay where all the rhythms

5   get pushed to a later time, correct?

6   A.    Yes, exactly.

7   Q.    And those two together, phase advance and phase

8   delay, collectively would be termed "phase shifting"?

9   A.    Yes.

10  Q.    And would you agree that the ability of a particular

11  drug to phase shift is a necessary but not sufficient

12  condition for it to be able to entrain?

13  A.    That is correct.

14  Q.    And would you agree that in this paper, Dr. Sack and

15  his colleagues report that they were able to produce --

16  well, let me withdraw that.  Let us look at it in fairness

17  to you.

18          Let's go to Page 10, please.

19          MR. GROOMBRIDGE:  Mr. Weir, when you get there,

20  let's enlarge the second full paragraph here, please.  The

21  one beginning -- no, second full paragraph, third paragraph.

22  There we go.

23  BY MR. GROOMBRIDGE:

24  Q.    And here Dr. Sack and his colleagues say:  Although

25  we were able to produce robust phase advances in four of our

CROSS-EXAMINATION - JONATHAN EMENS

1    five subjects, we were not able to entrain them.

2              Would you agree that a person of skill would

3    know that it may be possible to produce a phase advance, but

4    not possible to achieve entrainment?

5    A.    Yes.

6    Q.    Let's go on to -- let's go to -- move on.  I think

7    it's two tabs in the binder.  And let's get to JTX-123,

8    which is already in evidence.

9    A.    Yes, I'm there.

10   Q.    And this is one of the papers you talked about on

11   your direct examination, is it not?

12   A.    Correct.

13             MR. GROOMBRIDGE:  Let's put that up, Mr. Weir,

14   when you get a chance.  And let's enlarge the title.

15   BY MR. GROOMBRIDGE:

16   Q.    And you're the second author on this paper, right?

17   A.    Correct.

18   Q.    And you published it in 2002?

19   A.    Yes.

20   Q.    And here you say:  Low, but not high, doses of

21   melatonin entrained a free-running blind person with a long

22   circadian period.

23             Were the low doses 0.5 milligrams or

24   thereabouts?

25   A.    Yeah.  0.5 milligrams was successful in entraining

CROSS-EXAMINATION - JONATHAN EMENS

1    the one individual I talked about earlier in this article.

2    Q.    And the high doses you tried here were 10 and

3    20 milligrams?

4    A.    10 and 20, correct.

5    Q.    And let's go to Page 5 of the document where you talk

6    about that.

7          MR. GROOMBRIDGE:  And let's enlarge the last ten

8    lines or so, please, Mr. Weir.

9    BY MR. GROOMBRIDGE:

10   Q.    Here you're positing, again, that spill over is the

11   culprit, correct?

12   A.    Yeah, this is where we first proposed the idea of

13   spill over.

14   Q.    And what you're saying is that in instances where you

15   couldn't achieve entrainment, you hypothesized the larger

16   melatonin dose the more likely it will spill over into the

17   wrong zone of the PRC; is that right?

18   A.    That is correct, yeah.

19   Q.    And a skilled person in the field would have known of

20   your work saying that perhaps you need a lower dose rather

21   than a higher dose if what you wish to do is entrain; fair?

22   A.    Yes.  I think the one qualification I might say is

23   that within a particular range.  So in other words, they

24   would have known, hey, as you get higher, you would get

25   smaller phase shifts, and as you got lower, you would also

CROSS-EXAMINATION - JONATHAN EMENS

1    potentially get lower phase shifts.  So on either end of

2    that window.  So not necessarily too low and not necessarily

3    too high as well.

4    Q.    Very fair point.

5          It's quite possible you could end up with too

6    low of a dose?

7    A.    Exactly, yes.

8    Q.    And let's turn now to the next item in the book,

9    which should be JTX-146.  And this also is already in

10   evidence.

11         Doctor, do you have that?

12   A.    I do.

13   Q.    And is this the so-called Hack paper?

14   A.    It is.

15   Q.    And this is one of the references that you rely on in

16   your obviousness combinations, is it not?

17   A.    It is.

18   Q.    And just so we're clear, this talks about entrainment

19   of people with Non-24, correct?

20   A.    Yes, totally blind people with Non-24.

21   Q.    And I think you said this in your direct, but just so

22   we're clear, when it says free-running circadian rhythms of

23   blind subjects, that's a terminology that refers to Non-24?

24   A.    Yes.

25   Q.    And is it correct that that terminology used to be

CROSS-EXAMINATION - JONATHAN EMENS

1    more common, but now Non-24 has displaced it somewhat?

2    A.    Yes.

3    Q.    This was published in 2003; is that correct?

4    A.    Yes.

5    Q.    And there's no mention of tasimelteon in this paper,

6    is there?

7    A.    No.

8    Q.    Let's just go, please, to Page 6.

9              MR. GROOMBRIDGE:  And Mr. Weir, let's enlarge

10   Table 3, which appears on the lower right.

11   BY MR. GROOMBRIDGE:

12   Q.    Now, Dr. Emens, one of the things you talked about in

13   your direct examination was this table, and specifically the

14   line about total night sleep duration; fair?

15   A.    Yes.

16   Q.    And you -- what you showed here was that the subject

17   taking placebo in this instance and -- the subjects had a

18   mean of 5.99 hours of sleep per night, correct?

19   A.    Yes.

20   Q.    And subjects taking melatonin had a mean of 6.64

21   hours of sleep per night, correct?

22   A.    Correct.

23   Q.    And you were pointing to this in reference to your

24   opinions about a daily sleep period of approximately 7 to

25   9 hours being obvious, correct?

CROSS-EXAMINATION - JONATHAN EMENS

1    A.      Correct.

2    Q.      Now, this doesn't tell you anything about how much

3    these subjects would have slept had they been taking

4    tasimelteon, correct?

5    A.      No.

6    Q.      And as with dosage, there would be no way to tell

7    from sleep results attributable to taking melatonin how that

8    might be translated to sleep results from taking

9    tasimelteon; do you agree?

10   A.      I would agree, yes.

11   Q.      Let's look at the next page.

12           MR. GROOMBRIDGE:  And let's enlarge the text on

13   the lower right.

14   BY MR. GROOMBRIDGE:

15   Q.      Here you're talking about --

16   A.      This isn't --

17   Q.      -- dose effect --

18   A.      This isn't my paper.

19   Q.      I'm sorry?  I'm sorry.  You're right.  This is

20   Dr. Hack and Dr. Lockley.  I'm sorry.

21   A.      Just to clarify, sorry.  I didn't mean to interrupt.

22   Q.      No, not at all.

23           The -- here Dr. Hack and her colleagues are

24   talking about dose effects, correct?

25   A.      Can you point again to where you're looking?

CROSS-EXAMINATION - JONATHAN EMENS

1    Q.    Yeah.  If we look, one explanation for the lack of a

2    clear dose-dependent effect.  In the middle of the text we

3    have on the screen.

4    A.    I see that, yes.

5    Q.    And would you agree with the statement in the Hack

6    paper that melatonin pharmacokinetics are known to vary

7    greatly between individuals?

8    A.    Yes.

9    Q.    And this talks about the melatonin -- the number and

10   sensitivity of melatonin receptors, correct?

11   A.    Yes, it's saying -- it's speculating that there might

12   be differences there.

13   Q.    And the melatonin receptors, would you agree that

14   there are two receptors in the body that are called

15   melatonin receptors?

16   A.    There are two melatonin receptors that are relevant

17   for our discussion about entrainment, the MT1 and the MT2

18   receptors.

19   Q.    Being a scientist, you're being very precise.

20         Fair to say that there are other receptors in

21   the body to which melatonin may bind, but we don't think

22   they are important for the subjects that you're talking

23   about here?

24   A.    Correct, yes.

25   Q.    But there are two that melatonin -- two melatonin

CROSS-EXAMINATION - JONATHAN EMENS

1    receptors that melatonin itself binds to, correct?

2    A.    Yes.

3    Q.    And they're conventionally called MT 1 and MT 2?

4    A.    Yes.

5    Q.    And is it correct that it's still not fully

6    understood what role those play, which of the two is

7    important for which physiological result?

8    A.    Yes, I think it's fair to say there's still some

9    debate.  I mean, there's some thought that maybe the MT 1

10   receptors play a greater role in phase shifting.  MT 2 maybe

11   plays a greater role in promotion of non-REM sleep.

12             But, yes, that, again, is getting a little bit

13   outside my wheelhouse there.  But, yes, I would agree with

14   you.

15   Q.    But even as of today in 2022, that's still something

16   that people in your field are researching, correct?

17   A.    Yes.

18   Q.    And it has been the subject of research for at least

19   20 years, correct?

20   A.    Yes.

21   Q.    And one of the differences between tasimelteon and

22   melatonin is they have what's called "different affinities"

23   for these two receptors, correct?

24   A.    Correct.

25   Q.    And they don't just have different absolute

CROSS-EXAMINATION - JONATHAN EMENS

1    affinities, they have different relative affinities,

2    correct?

3    A.      Yes.

4    Q.      So tasimelteon binds more strongly to MT 2 and less

5    strongly to MT 1, correct?

6    A.      Yes, I believe that's correct.

7    Q.      But by contrast, melatonin binds more strongly to MT

8    1 and less strongly to MT 2?

9    A.      Yes, I believe that's correct.

10   Q.      And that information has been known in the field for

11   quite some time, certainly before 2012, correct?

12   A.      Yes.

13   Q.      Now I'd like to turn on in the book.  I think this

14   is -- let's go to JTX-127, which should be -- I guess it's

15   two tabs further along.

16   A.      Yes, I'm there.

17   Q.      And -- I'm sorry.  Let's go to JTX-94.  Should be the

18   next one after what we were just looking at.  It's the

19   Ferguson paper.

20          Let me know when you've gotten there.

21   A.      Yes, I'm there.

22   Q.      And this is one of the exhibits that's in evidence

23   and you testified about this on your direct examination,

24   correct?

25   A.      Yes, correct.

CROSS-EXAMINATION - JONATHAN EMENS

1          MR. GROOMBRIDGE:  So Mr. Weir, let's put up the

2     document and enlarge the title and the abstract.

3     BY MR. GROOMBRIDGE:

4     Q.     And this was a review article published in 2010,

5     correct?

6     A.     Correct.

7     Q.     And it's, in essence, Dr. Ferguson and

8     Dr. Rajarantnam and another colleague reviewing the state of

9     the field at this point, correct?

10    A.     Yes.

11    Q.     So if we will, it's sort of a snapshot of the state

12    of the art in 2010?

13    A.     Agreed.

14    Q.     And are they talking about various melatonin

15    agonists, not just melatonin itself?

16    A.     Yes.

17         MR. GROOMBRIDGE:  And let's take that down.  And

18    enlarge, please, if we could, Mr. Weir, the top two

19    paragraphs in the right-hand column.

20    BY MR. GROOMBRIDGE:

21    Q.     Now, would you agree that as of this point there was

22    a relative lack of substantive research into the mechanisms

23    by which melatonin receptor agonists effect sleep?

24         Is that a statement you would agree with?

25    A.     Yes, I think that's a fair statement.

CROSS-EXAMINATION - JONATHAN EMENS

1   Q.      And would you agree that the development of melatonin

2   agonists and the growth in research surrounding their

3   actions raises -- raised at that time -- some challenging

4   questions?

5   A.      Yes.

6   Q.      And if we go --

7              MR. GROOMBRIDGE:  Let's go to Page 3, please.

8   Mr. Weir, let's enlarge Figure 1.

9   BY MR. GROOMBRIDGE:

10  Q.      And here we see the structures of four molecules,

11  right?

12  A.      Yes.

13  Q.      And there's melatonin itself in the upper left,

14  correct?

15  A.      Correct.

16  Q.      And tasimelteon in the upper right?

17  A.      Correct.

18  Q.      And then there are two other manmade, engineered,

19  melatonin agonists, correct?

20  A.      Yes.

21  Q.      And one of those is something called agomelatine?

22  A.      Yes.

23  Q.      And the other one is something called ramelteon,

24  right?

25  A.      Yes.

CROSS-EXAMINATION - JONATHAN EMENS

1    Q.      And along with tasimelteon, these were drugs,

2    engineered molecules, that were intended for use in

3    circadian rhythm applications, correct?

4    A.      Circadian rhythm applications but also in the

5    treatment of depression in the case of agomelatine.

6    Q.      Is that because there is a relationship or at least

7    some correlation between circadian rhythm disorders and

8    depression?

9    A.      Well, agomelatine is a little bit more complicated in

10   that the sense is that it's both a melatonin agonist, but

11   has like a serotonin uptake inhibition as well.  So these

12   are the SSRIs we think of as common antidepressants.

13           So I think the short answer to your question is,

14   yes, there is certainly a connection that I have published

15   on the connection between circadian rhythms and mood

16   disorders.  But in the case of agomelatine specifically,

17   there's more to it than just that.

18   Q.      And we can agree that neither agomelatine nor

19   ramelteon has ever been demonstrated to be capable of

20   achieving entrainment in Non-24 sufferers?  Is that fair?

21   A.      That's correct.

22   Q.      Now, as this article reports, ramelteon is capable of

23   phase shifting, is it not?

24   A.      It is.

25   Q.      And is agomelatine capable of entrainment?

CROSS-EXAMINATION - JONATHAN EMENS

1  A.      I'm unaware of any studies showing that it can cause

2  entrainment.

3  Q.      Fair enough.  Let's turn to the next page, Page 4,

4  and just look at what the folks in the paper said about

5  that.

6          MR. GROOMBRIDGE:  Let's enlarge the paragraph

7  under the heading "Agomelatine's Chronobiotic Properties."

8  BY MR. GROOMBRIDGE:

9  Q.      And you see there, Doctor, your point is well taken.

10 It says:  In preclinical studies, agomelatine was shown to

11 entrain the rhythm of running activities in rats, fair?

12 A.      Fair.

13 Q.      But it's never been shown to be capable of entraining

14 human beings; is that right?

15 A.      Yes, that's correct.

16 Q.      Let's just look.

17         MR. GROOMBRIDGE:  Take that down and let's go to

18 Page 5, please.

19         And let's look at the -- Table 1 that appears in

20 the lower part of the page.

21 BY MR. GROOMBRIDGE:

22 Q.      And Doctor, is this a kind of summary of what was

23 known in the art as of 2010 about these engineered molecules

24 that were intended to be melatonin receptor agonists?

25 A.      Yes.

CROSS-EXAMINATION - JONATHAN EMENS

1   Q.      And so we see, for example, that ramelteon in rats

2   could hasten re-entrainment of rats; is that right?

3   A.      Yes.

4   Q.      And the various results reported either rats or

5   humans for the various molecules in this category, right?

6   A.      Correct.

7   Q.      And while it mentions entrainment or re-entrainment

8   for ramelteon and agomelatine, it does not mention

9   entrainment for tasimelteon; fair?

10  A.      Yes, it only mentions the 2- to 3-hour phase advance

11  with tasimelteon.

12  Q.      And what it's referring to there is the work that was

13  published in what we've been calling the Rajaratnam paper,

14  right?

15  A.      Yes, The Lancet paper.

16  Q.      And, again, that was one of the things that you

17  talked about in your direct examination, was it not?

18  A.      Correct.

19  Q.      And the -- and maybe now is a convenient time to go

20  to that.  So if we skip forward in the book, one, two,

21  three, four tabs, we'll come to PTX-816, The Lancet

22  Rajaratnam paper.

23  A.      Yes.

24          MR. GROOMBRIDGE:  Mr. Weir, that's in evidence,

25  so please put that up.

CROSS-EXAMINATION - JONATHAN EMENS

1    BY MR. GROOMBRIDGE:

2    Q.    Again, what we have here is the cover page of the

3    particular edition of The Lancet, in which this was

4    published in 2009, correct?

5    A.    Correct.

6    Q.    And The Lancet would -- is a well-known medical

7    journal published in England, correct?

8    A.    Correct.

9    Q.    And each edition, like many journals, contains

10   various learned articles, correct?

11   A.    Yes.

12   Q.    And each edition, they pick out one they think is

13   specifically significant to refer to on the cover; fair?

14   A.    Yes.

15   Q.    And in this instance, they decided, the editors, that

16   the Rajaratnam article was the one they were going to put on

17   the cover, right?

18   A.    Yes.

19   Q.    And they said:  Football teams and many others will

20   welcome the effects of the melatonin agonist tasimelteon on

21   transient insomnia, right?

22   A.    Yes.

23   Q.    And the reason that football teams, in English soccer

24   team --

25   A.    Yes.

CROSS-EXAMINATION - JONATHAN EMENS

1    Q.    The reason they're talking about football teams is

2    because this is relating to jet lag and this is the sports

3    players who spend a lot of time frequently moving around on

4    planes, right?

5    A.    Yes.

6    Q.    And if we look at the actual paper itself, you refer

7    to something in this paper on your direct examination, I

8    think.  And so let's go to page 7.

9    A.    Yes, I'm there.

10   Q.    And I'd like to start with the paragraph that ends on

11   the bottom of page 7 and goes on two lines of page 8.

12             MR. GROOMBRIDGE:  Mr. Weir, let's see --

13   BY MR. GROOMBRIDGE:

14   Q.    This is talking about the doses that the

15   Rajaratnam -- the paper, the researchers in the Rajaratnam

16   paper investigated, correct?

17   A.    That's correct.

18   Q.    And they were looking at the use of tasimelteon to

19   treat transient insomnia, such as jet lag, correct?

20   A.    Yes.

21   Q.    And they tested four dosage levels, correct?

22   A.    Correct.

23   Q.    And those were 10 milligrams, 20 milligrams,

24   50 milligrams and 100 milligrams, correct?

25   A.    Correct.

CROSS-EXAMINATION - JONATHAN EMENS

1   Q.      And in this -- reporting their results they talk

2   about DLMO 25 percent, correct?

3   A.      Correct.

4   Q.      And that's what you mentioned DLMO, correct?

5   A.      Yes.

6   Q.      And that's an acronym here for dim light melatonin

7   onset?

8   A.      Yes.

9   Q.      And what that means, perhaps I'll get this

10  oversimplified, but there's a point when about maybe 1 to

11  2 hours before sleepiness when the body starts to produce

12  melatonin endogenously, correct?

13  A.      I would be just slightly more precise.  I would say

14  we start to make melatonin endogenously a few hours before

15  lights out, which, in our case, is typically associated with

16  bedtime.  But it may seem like I'm splitting hairs, but I'm

17  not.  It's actually an important point.  It's the timing of

18  the clock relative to the main time -- for us sighted people

19  it is light.

20  Q.      Right.  By all means, you're not splitting hairs.

21          During the daytime the pineal gland in the brain

22  is not secreting melatonin, fair?

23  A.      Yes.

24  Q.      And there comes a point triggered by what is

25  abbreviated here as dim light, which it begins to secrete

CROSS-EXAMINATION - JONATHAN EMENS

1    melatonin; fair?

2    A.    Well, the dim and dim light melatonin onset refers to

3    the samples are collected in dim light because light will

4    suppress your melatonin levels.  It'll hide your body's own

5    production.  I like to think of that onset of melatonin a

6    little bit as kind of the beginning of your biological

7    night.  It's a great way of think of it in lay terms.  It's

8    kind of a marker of what time your body thinks it is, when

9    it thinks the beginning of the biological night is starting.

10   Q.    And the level of endogenous melatonin is going to

11   climb like that --

12   A.    Yes.

13   Q.    -- during the nighttime and then it's going to start

14   to ebb away, and when it gets low enough, our body will say,

15   no, I should wake up, right?

16   A.    So, again, at the risk of splitting hairs, it'll go

17   up and, like you said, it will stay up across the night and

18   then it will be decline.  I don't know if I would infer

19   causality necessarily from when the melatonin levels go down

20   that causes me to wake up, however.

21         Again, I like to think of melatonin a little bit

22   slightly less as a sleep hormone and more as a marker of

23   what time it is in your body.

24   Q.    And it's sometimes been referred to as the hormone of

25   darkness, correct?

CROSS-EXAMINATION - JONATHAN EMENS

1    A.      Yes, exactly.

2    Q.      So if there's circulating endogenous melatonin in

3    your body, broadly speaking, during the hours of darkness?

4    A.      During the hours that your body thinks are the

5    biological night.

6    Q.      Again, fair enough.

7    A.      Yes, which, again, for us is typically the hours of

8    when it's dark.

9    Q.      And --

10   A.      And we don't produce it during the hours when it is

11   light.  And that is entrainment.  We're producing our

12   melatonin at the same time roughly from day-to-day, both the

13   onset and when our levels are elevated.

14   Q.      And that's the synchronization with the external

15   light and dark day is that because the brain has been reset

16   or cued by light, it's keeping that release of endogenous

17   melatonin synchronized with nighttime, correct?

18   A.      Yes, at the approximate time each day.  We have this

19   tendency to drift a little bit later because most of us our

20   day length is longer than 24 hours.  We get a little bit of

21   evening light exposure.  That's also going to shift us a

22   little bit later.

23           But we also get some morning light exposure that

24   shifts us earlier and that result is that we, basically,

25   most of us, stay roughly at the same place day to day.  And

CROSS-EXAMINATION - JONATHAN EMENS

1    that's entrainment.

2    Q.    That's what it means to be entrained, correct?

3    A.    Exactly, yes.

4    Q.    So here looking back at the Rajaratnam paper, these

5    researchers having tested 10 milligrams, 20 milligrams,

6    50 milligrams and 100 milligrams, they reported that,

7    although there was a dose response relation, only

8    tasimelteon shifted DLMO 25 percent significantly earlier

9    than did placebo, correct?

10   A.    Correct.

11   Q.    And this is measuring phase shifting, if you will,

12   right?

13   A.    Exactly, a resetting of the 24-hour biological clock.

14   Q.    Mr. Stone reminds me that I skipped a number.

15         But what they are reporting here is that, of the

16   four doses they looked at, the only one that had a

17   statistically significant phase shifting effect was

18   100 milligrams, correct?

19   A.    Yes.

20   Q.    And I'd like to look at the --

21         MR. GROOMBRIDGE:  You can take that down,

22   Mr. Weir, and let's put up the figure.  In particular, the

23   part -- the bar chart in figure two, just the bar chart that

24   appears immediately above the text we're looking at.

25   BY MR. GROOMBRIDGE:

CROSS-EXAMINATION - JONATHAN EMENS

1    Q.    And you mentioned this in your direct examination,

2    did you not?

3    A.    I did.

4    Q.    And in your direct -- I don't think you had the

5    figure up, but you talked about a green bar here, right?

6    A.    Yes.

7    Q.    And that's tasimelteon 20 milligrams?

8    A.    Yes.

9    Q.    And you talked about how much that was able to -- in

10   these results, to effect phase shifting, right?

11   A.    Yes.

12   Q.    Now, we can agree that that's approximately 1 hour,

13   correct?

14   A.    Yes, I think it's slightly more than one hour, but,

15   yes.

16   Q.    But in this one the placebo shifted -- that achieved

17   a phase shift of 0.5 hours, correct?

18   A.    Yes.

19   Q.    In the text we just looked at, what the authors are

20   telling us is that there's no statistically significant

21   difference between the white bar, the blue bar, the green

22   bar, and the yellow bar, correct?

23   A.    Yes.

24   Q.    The only one that has statistically significant

25   effect is the red bar for 100 milligrams, right?

CROSS-EXAMINATION - JONATHAN EMENS

1    A.      Yes.

2                MR. GROOMBRIDGE:   Thank you.  We can take that

3    down.

4                Let me go back, if we would, let's go back one

5    tab in the book.  And I apologize for jumping around, but we

6    should find there DTX-16, which is in evidence.

7    BY MR. GROOMBRIDGE:

8    Q.      And this is the Hardeland paper, which is one of the

9    references in your obviousness combination.

10   A.      Yes.

11   Q.      And this, too, is a review article, is it not?

12   A.      It is.

13   Q.      Would you --

14               MR. GROOMBRIDGE:   And we can put the

15   introductory information up on the screen, if you will,

16   Mr. Weir.

17   BY MR. GROOMBRIDGE:

18   Q.      And what is going on here is Dr. -- or Mr. Hardeland

19   is collecting up the information that's available about

20   tasimelteon as of the date of this, which is 2009; is that

21   fair?

22   A.      Yes.

23   Q.      And would you agree there's no mention of Non-24 in

24   the Hardeland paper?

25   A.      It does not specifically address Non-24.

CROSS-EXAMINATION - JONATHAN EMENS

1    Q.    Okay.  And if we go to Page 7, DTX-16.7, I'd like to

2    look at some of the -- some of the statements here that you

3    culled out in your direct examination.

4              MR. GROOMBRIDGE:  And let's enlarge in text on

5    the left at the bottom, please.

6    BY MR. GROOMBRIDGE:

7    Q.    And in your slides you, I think, culled this out,

8    correct?

9    A.    Yes.

10   Q.    I think it was Slide 93.

11   A.    Yes.

12   Q.    And you said:  The most effective doses for

13   tasimelteon were in the range of 20 to 50 milligrams per

14   day.

15             Correct?

16   A.    Correct.

17   Q.    And then -- and what's going on in this section of

18   the article is that Dr. Hardeland is talking about doses for

19   the various engineered molecules that were available in

20   development as melatonin receptor agonists, correct?

21   A.    Correct.

22   Q.    And so, for example, he says something called

23   Circadin is 2 milligrams per day.

24   A.    Yes.

25   Q.    And Circadin is an extended release form of

CROSS-EXAMINATION - JONATHAN EMENS

1    melatonin, right?

2    A.    It is.

3    Q.    So that some people had felt that one of the

4    limitations of melatonin itself is that it has a short

5    half-life in the body; fair?

6    A.    Fair, yes.

7    Q.    Once you take it, it does whatever it's going to do

8    and then it's metabolized or cleared out of the body

9    quickly, right?

10   A.    Yes.

11   Q.    And there was a hypothesis that if you could make an

12   extended release version of it, it might have some

13   beneficial effect, right?

14   A.    Yes.

15   Q.    And that was Circadin.

16   A.    Yes.

17   Q.    And while we're on the point, the -- at the top of

18   the next page it says for ramelteon the recommended dose is

19   8 milligrams, correct?

20   A.    Yes.

21   Q.    And now just looking, the 20 to 50 milligrams, that

22   is for -- not for phase shifting, correct?

23   A.    Yeah.  I think they are talking there about kind of

24   the direct soporific effects.

25   Q.    And if we take that down and go back and look at some

CROSS-EXAMINATION - JONATHAN EMENS

1    of the texts just above it, under the heading Current

2    Opinion, what they say there is that:  Tasimelteon

3    substantially shortened sleep onset latency, LNA and LPS,

4    especially at doses of 20 to 50 milligrams per day.

5                 Do you see that?

6    A.    I do.

7    Q.    But then they go on when they talk about phase

8    shifting, they say it rapidly phase shifted the circadian

9    system at 100 milligrams per day.

10                Do you see that?

11   A.    And it goes on to say:  And presumably at smaller

12   amounts as well.

13   Q.    Although these lower doses have not been tested,

14   correct?

15   A.    Yeah, correct.

16   Q.    And so what Dr. Hardeland is saying is that for phase

17   shifting, there's evidence to suggest that 100 milligrams

18   works; presumably lower ones would, but we have no evidence

19   of that.  Fair?

20   A.    No, I would disagree with that.

21   Q.    You think he's a little more affirmative in -- that

22   the idea that lower doses might work?

23   A.    I think that -- no, what I was disagreeing with, I

24   think, specifically is the idea that we have -- I think you

25   said there was no -- he's saying that there's no evidence

CROSS-EXAMINATION - JONATHAN EMENS

1    that lower doses would work and I think we do have some

2    evidence to suggest that lower doses would work.

3    Q.    Let's move on and try to come to wrap things up here.

4         Let's move on in the book to DTX-41, which is

5    the Non-24 application you mentioned, I think?

6    A.    Yes.

7    Q.    And this is also one of the items that you rely on in

8    your obviousness combinations; correct?

9    A.    Yes, indeed.

10   Q.    And would you agree with me there was likewise no

11   mention of Non-24 in this patent application?

12   A.    Yes.  Not specifically, yes.

13   Q.    And would you agree with me that the -- that this

14   article also says that -- not article, patent application,

15   says that a 100-milligram dose of tasimelteon is considered

16   the lowest effective dose for phase shifting?

17   A.    Well, they talk about administering 10 to

18   100 milligrams.  They actually give a dose range.  I'm

19   specifically looking at the Summary Invention on DTX-41.3.

20   Q.    Let's turn, if we could, to page 18 of this exhibit.

21        MR. GROOMBRIDGE:  And let's put up there the

22   paragraph that's numbered 11.1.2.1.

23        I'm sorry, Page 19.  Page 19 of the exhibit,

24   Mr. Weir.  And let's put up this paragraph here.

25   BY MR. GROOMBRIDGE:

1  Q.      And here, they're talking again about DLMO

2  25 percent, correct?

3  A.      Yes.

4  Q.      And that's phase shifting, correct?

5  A.      Specifically it's phase, not phase shifting.  DLMO

6  refers to the actual phrase.

7  Q.      Correct.

8          And they then go on to say that -- the MA-1

9  means tasimelteon here, correct?

10 A.      Correct.

11 Q.      So they say:  The tasimelteon 100-milligram dose is

12 considered the lowest effective dose for DLMO shift since it

13 was the first dose with a statistically significant P-value

14 in the ANOVA with contrasts.

15          Correct?

16 A.      Yes, correct.

17 Q.      Now, let's turn to the next item in the book, and we

18 should find DTX-20, also in evidence, which is the Lankford

19 paper.

20          Do you have that?

21 A.      Yes.  I am there.

22 Q.      This is another one of the references that you rely

23 on in your obviousness combinations, correct?

24 A.      Yes.

25 Q.      And the -- and there's no mention of entraining in

CROSS-EXAMINATION - JONATHAN EMENS

1    this Lankford paper, is there?

2    A.    Yes, I think that's fair.  I mean, it talks about the

3    ongoing Phase 3 trials, as I talked about, but I don't

4    know -- I don't think -- I think you're correct.  I don't

5    think the word "entraining" is mentioned.

6    Q.    And it talks about the fact that the trial is going

7    on, correct?

8    A.    Exactly, yes.

9    Q.    And Lankford was someone who was associated with

10   Vanda, correct?

11   A.    Yes, apparently.

12   Q.    And just while we have this, can you confirm for me

13   that, according to the document, it was published in May of

14   2011?

15   A.    Yes.

16   Q.    And the -- now, you talked about -- when you're

17   talking about reasonable expectation of success, you said

18   that, I think, the fact that a Phase 3 trial was going on

19   indicated to you that there must be a reasonable expectation

20   of success.

21              Is that a fair statement?

22   A.    Yes, yes.

23   Q.    Okay.  And is it your view that the mere fact that

24   someone is willing to go to the trouble of doing a Phase 3

25   trial means that there must be a reasonable expectation of

CROSS-EXAMINATION - JONATHAN EMENS

1   success?

2   A.      Oh, I don't know if I would go so far to say there

3   must be a reasonable expectation of success, but I think it

4   would be an element, you know, that I would combine with

5   other things to decide whether a person of ordinary skill in

6   the art would have a reasonable expectation of success.

7           So I would be combining different pieces of the

8   prior art, I think, including things like Lankford, to kind

9   of come to kind of a more gestalt opinion as to whether a

10  POSA would think there would be reasonable expectations of

11  success.

12  Q.      So the mere fact of a clinical trial is not by itself

13  enough to have a reasonable expectation of success in your

14  opinion.

15  A.      Probably not in isolation, no.

16  Q.      And the -- now, in your slides, did you cull out

17  information about time of administration of tasimelteon?

18  A.      Yes.

19  Q.      Now, was that time of administration with reference

20  to something other than the then-ongoing clinical trial in

21  Non-24?

22  A.      Yes.

23  Q.      And the times that you talked about were for earlier

24  trials that had been done in -- one in healthy volunteers,

25  one in transient insomnia patients, and one in chronic -- or

CROSS-EXAMINATION - JONATHAN EMENS

1   primary insomnia patients, correct?

2   A.      Correct.

3   Q.      And Lankford says nothing about the time of

4   administration that was to be employed in the then-ongoing

5   SET trial, fair?

6   A.      That is fair.

7   Q.      Now, let's move on in the binder to the next item,

8   which is --

9               THE COURT:  What was that exhibit you just put

10  up?

11              MR. GROOMBRIDGE:  Oh, I'm sorry.  It's DTX-20,

12  Your Honor, and it's already in evidence.

13              THE COURT:  Okay.

14  BY MR. GROOMBRIDGE:

15  Q.      Let's move to the next item in the book, which I

16  think will be our friend DTX-419, our clinical trials

17  document.

18  A.      Yes, I'm there.

19  Q.      And the -- is there anything in this, in the text of

20  this document, that refers to a daily sleep period of

21  approximately 7 to 9 hours?

22  A.      No.

23  Q.      Now, let's go on two more items in the tab here, and

24  we should find JTX-003 which is the '829 patent in this

25  lawsuit.

CROSS-EXAMINATION - JONATHAN EMENS

1          Do you have that, Doctor?

2    A.    Yes, sorry, I'm there.

3    Q.    And this is the so-called DDI patent that relates to

4    inhibitors of the enzyme CYP1A2.  Fair?

5    A.    Fair.

6    Q.    And let's go to Page 10, please.  Look at the figures

7    there.

8          Looking at Figure 5, does that show a map of the

9    metabolic pathways by which tasimelteon is broken down in

10   the body?

11   A.    Yes.

12   Q.    Would you agree with me that this was not publically

13   known as of January 2012?

14         MR. MILLIKEN:  Your Honor, I object as outside

15   the scope of the direct because he didn't testify about the

16   drug-drug interaction issues specifically.

17         We're going to rely on Dr. Greenblatt's opinion

18   for that.

19         THE COURT:  Okay.

20         MR. GROOMBRIDGE:  Your Honor, he testified to an

21   opinion that this patent was invalid.  And in our view, that

22   would make it fair to explore what's missing from the prior

23   art.

24         THE COURT:  I'm going to overrule the objection.

25   BY MR. GROOMBRIDGE:

REDIRECT EXAMINATION - JONATHAN EMENS

1    Q.      Doctor, would you agree with me that the information

2    that's shown in Figure 5 of the '829 patent was not known in

3    the prior art to the '829 patent?

4    A.      I don't know.

5    Q.      One last question.  Would you agree with me that

6    melatonin, it was known that melatonin was almost

7    exclusively -- almost exclusively metabolized by CYP1A2?

8    A.      Yes, that's correct.

9              MR. GROOMBRIDGE:  That completes my questions.

10             THE COURT:  Any redirect?

11             MR. MILLIKEN:  I have just briefly, Your Honor.

12             Mr. Brooks, could we pull up DTX-41,

13   specifically at page 23.

14             And, actually, could we go one page further.  I

15   apologize.

16             And then could we zoom in on that final bullet

17   point.

18                     REDIRECT EXAMINATION

19   BY MR. MILLIKEN:

20   Q.      Dr. Emens, do you recall testifying in your direct

21   examination about this line from the '244 Publication

22   stating that an oral dose of about 20 to about 50 milligrams

23   tasimelteon is effective in treating sleep disorders?

24   A.      Correct.

25   Q.      And then do you recall further talking about in your

REDIRECT EXAMINATION - JONATHAN EMENS

1   direct how the '244 Publication claims methods of treating

2   circadian rhythm sleep disorders with, among others, the

3   other doses 20 milligrams?

4   A.      Yes, I do.

5   Q.      Based on those disclosures, would a person of

6   ordinary skill in the art as of January 2012 have had

7   concerns about a deleterious spill over effect with a dose

8   of 20 milligrams tasimelteon?

9   A.      No.

10  Q.      Could you explain why that is?

11  A.      Yeah.  I mean, if you look at, say, the Rajaratnam

12  paper, for example, 20 milligrams caused a phase shift.  So

13  if 20 milligrams causes spill over, whatever spill over it

14  caused wasn't enough to negate the phase shift that it

15  caused.

16          In other words, spill over is an explanation you

17  make afterwards to explain the magnitude of the phase shift

18  you got.  So we would have known that 20 milligrams of

19  tasimelteon could cause a phase shift and maybe there is

20  spill over and -- but, again, that has nothing to

21  necessarily do with the demonstrated magnitude of the phase

22  shift that we actually see.

23          MR. MILLIKEN:  And could we now go back,

24  Mr. Brooks, to, I believe it may be DTX-41.19.

25          Yes.  And then could we blow up 11.1.2.1.

REDIRECT EXAMINATION - JONATHAN EMENS

1   BY MR. MILLIKEN:

2   Q.      And Dr. Emens, do you recall Mr. Groombridge pointing

3   you to this paragraph when he was asking you questions?

4   A.      Yes.

5   Q.      And he pointed you specifically to this line about

6   the 100-milligram dose being considered the lowest effective

7   dose for DLMO shift?

8   A.      Yes.

9   Q.      And is that based on the data from the Rajaratnam

10  paper we have been discussing?

11  A.      It is.

12              MR. MILLIKEN:   Could we pull up PTX-816, please.

13              And specifically go to Page 7 and zoom in on

14  that bar chart on the right-hand side that we were looking

15  at earlier.

16  BY MR. MILLIKEN:

17  Q.      And I believe you agreed in your conversation with

18  Mr. Groombridge that 100 milligrams tasimelteon was the only

19  dose that showed a statistically significant phase shift

20  versus placebo; is that right?

21  A.      Yes.

22  Q.      Now, the desire -- the --

23              MR. MILLIKEN:   Let's actually -- instead of me

24  trying to ask this question, let's go back, please, to

25  Page 2 of this document, Mr. Brooks, and look at the Methods

REDIRECT EXAMINATION - JONATHAN EMENS

1    section.

2    BY MR. MILLIKEN:

3    Q.      And you see there it says:  In a Phase 3 study, 411

4    healthy individuals from 19 US sites --

5    A.      Yes.

6    Q.      -- who had transient insomnia induced in a sleep

7    clinic by a five-hour advance of the sleep-wake schedule?

8    A.      Yes.

9    Q.      And so what does that language about the five-hour

10   advance, what does that tell you about Rajarantnam's

11   results?

12   A.      So for both the Phase 2 and the Phase 3 trials in

13   Rajarantnam, they advance sleep time dramatically, a full

14   five hours.  Because as we discussed before, that's a nice

15   model for something like jet lag from New York to London.

16           So that's a really big phase shifting.  I don't

17   need to shift a full five hours to treat, say, something

18   like Non-24.  At the most, I'm only going to need an hour

19   phase shift which the 20-milligram dose gave me.

20           And, again, I would say I'm not looking, as I

21   was saying earlier, at these in isolation.  I know from

22   Rajarantnam, hey, I can get a 20-milligram phase shift, and

23   I know from clinical trials that that's actually what they

24   chose in their clinical trial of Non-24.

25           And a person of ordinary skill would have had

1    access to all of that.

2    Q.    Thank you, Dr. Emens.

3          Finally, did anything Mr. Groombridge asked you

4    on cross-examination cause you to change any of your

5    opinions in this case?

6    A.    No, definitely not.

7          MR. MILLIKEN:  Thank you, Your Honor.

8          Nothing further.

9          THE COURT:  All right.  I have two questions.

10         So, Dr. Emens, did they introduce your CV?  Did

11   they ask to put your CV into evidence?

12         THE WITNESS:  No, we just put some stuff on the

13   slide.

14         THE COURT:  So you met Dr. Czeisler in medical

15   school; is that right?

16         THE WITNESS:  No, I met him in between my

17   undergraduate and my medical school.  And then I also

18   briefly worked in his lab during medical school actually.

19         THE COURT:  All right.  And then you went out to

20   Oregon.

21         THE WITNESS:  Correct.

22         THE COURT:  And did you go there under tutelage

23   of Dr. Sacks?

24         THE WITNESS:  So Dr. Sack --

25         THE COURT:  Or Sack, sorry.

1    THE WITNESS:  That's okay.  He did train me in

2  sleep medicine and I also worked with him and Alfred Lewy in

3  their joint laboratory as well near the end of my residency.

4    THE COURT:  Did you pick your residency based on

5  your interest in sleep issues?

6    THE WITNESS:  Yeah, partially.  I mean, I knew

7  Al Lewy and Bob Sack were doing work similar to what I was

8  interested in, I liked the program, but that was definitely

9  a piece of it.

10    THE COURT:  What do you call the doctors that

11  operate in that field?  Like when you go to a conference,

12  what's the -- or when you're at a cocktail party and

13  somebody says, what do you do, what do you say you

14  specialize in?

15    THE WITNESS:  Well, I'll say I specialize in

16  sleep medicine.  That's the clinical part of what I do.  So

17  I treat patients.  But I'd also consider myself a researcher

18  in circadian physiology.  So I kind of wear two different

19  hats.

20    THE COURT:  All right.  So sleep medicine, how

21  big is that field?

22    THE WITNESS:  Sleep medicine is fairly big.  I

23  mean, I don't know -- it's gotten much bigger than it was,

24  say, 30 years ago.

25    THE COURT:  Like, out of how many sleep centers

1    that you would say are in the country, you know, that

2    universities or centers that have prestigious sleep centers;

3    what do you think the number is?

4              THE WITNESS:  I would say any major academic

5    institution is going to have a sleep clinic, and you'll find

6    sleep clinics -- free-standing sleep clinics all over this

7    country.  So there's many sleep providers all over this

8    country.

9              THE COURT:  All right.  Dr. Sack, is that a

10   notable name in the field?

11             THE WITNESS:  Yes.  I mean, he's published

12   multiple times in the New England Journal of Medicine on

13   sleep-related issues.  Circadian sleep-related issues

14   specifically.

15             THE COURT:  Is he still alive?

16             THE WITNESS:  He is.

17             THE COURT:  Have you ever testified as an

18   expert?

19             THE WITNESS:  No, never.

20             THE COURT:  How did you get to be retained here?

21   And I don't mean -- I don't want your private discussions

22   with counsel, but do you -- and maybe you don't know.  Were

23   you just called out of the blue or --

24             THE WITNESS:  Yeah, they called me up, yes.

25             THE COURT:  What's the definition of sleep?

1              THE WITNESS:  That's a great question.

2              So sleep is a reversible state of decreased

3    responsivity to environmental stimuli, right?  So you would

4    distinguish that from, say, coma.

5              So in a coma I have a decreased response to

6    environmental stimuli but it's not a reversible state.

7              THE COURT:  So you're giving the definition of

8    sleep.

9              So go ahead, say it again.

10             THE WITNESS:  Yeah.  So it is a reversible state

11   of decreased response to environmental stimuli.  So you're

12   unconscious, but I'm distinguishing it from a state like a

13   coma that is an irreversible state of decreased response to

14   environmental stimuli.

15             THE COURT:  All right.  And then the definition

16   of being awake?

17             THE WITNESS:  Well, that I would say, just in

18   terms of being the opposite, that would be consciousness, my

19   ability to interact with my environment and respond to

20   environmental stimuli.

21             THE COURT:  Are they binary?  So in other words,

22   like, I either have COVID or I don't have COVID.  Am I

23   either asleep or I'm not asleep?  I mean, how do doctors

24   think of it?

25             THE WITNESS:  Oh, so this is an even better

1     question.

2               So they are not totally binary.  So, for

3     example, there's some sensor reprocessing that's happening

4     during sleep, and there's this phenomenon of, at least shown

5     in the animals, of local sleep, where you could do a

6     high-density EEG.  So I'm looking at the entire brain, and I

7     can look at your brain waves and on that basis determine if

8     you're awake or asleep.  And you might see one area of the

9     brain looking like it's asleep while the rest of the brain

10    looks like it's awake.

11              So I think to call it totally binary is hard to

12    do.

13              And if you'll indulge me, at the extreme, if you

14    look at marine mammals, so dolphins breath air and yet they

15    live in the ocean.  And they sleep just like we do, yet the

16    ocean is not full of dead dolphins.  And so what they've

17    evolved is this idea of biphasic sleep.  So there's two

18    hemispheres of their brain.  One hemisphere might be awake

19    while the other is asleep, and then they trade off.

20              So that would be an extreme version of it, not

21    really being that binary that you're asking about.

22              THE COURT:  Now there's been a slew of articles

23    introduced in this trial that refer to sleeping.

24              THE WITNESS:  Yes.

25              THE COURT:  All right.  So would an artisan of

1    ordinary skill read "sleeping" to mean somebody who is in a

2    state of unconsciousness?

3                THE WITNESS:  Yes.

4                THE COURT:  Or is it not binary and it's

5    something they're half asleep, to use a Joe Six-Pack term?

6    Or, you know, what would an artisan of ordinary skill

7    understand if he or she were in a conversation about someone

8    who was asleep?

9                THE WITNESS:  They would assume that they were

10   asleep, meaning they are unconscious, but, again, it's a

11   reversible state.  That's what they would understand it.

12               And the prior art really has two main ways of

13   measuring that.  Many of the prior art will just ask people.

14   So Dr. Polymeropoulos was talking about on Monday these were

15   sleep diaries.  Remember he talked about they would call in.

16   They would just tell you whether they were awake or asleep.

17               Some of the studies, like Bob Sack's study in

18   the New England Journal.  What Bob did is he measured brain

19   waves, eye movements, muscle tone to more objectively

20   measure sleep.

21               THE COURT:  So if I'm drowsy, am I asleep?

22               THE WITNESS:  You may have momentary -- if

23   you're drowsy, because of the nature of sleep and the

24   amnestic properties just before you fall asleep, you might

25   fall asleep and not even know it.

1        I observed at least two individuals asleep in

2   the courtroom on Monday.  And they will remain unnamed,

3   but -- and they might not even have known that they were

4   asleep.  You know, that head-bobbing effect, right, where

5   measuring brain waves they might look like they've fallen

6   asleep, and as they are falling, they have that reflex to

7   awaken themselves.

8        THE COURT:  Okay.  But that means that they were

9   drowsy, but within that drowsiness they had a period, it

10  might have been instantaneous, but of sleep?

11       THE WITNESS:  What we would call sleep.

12       THE COURT:  What an artisan would call sleep?

13       THE WITNESS:  What an artisan would call sleep.

14       THE COURT:  Now, if I am sleepy, am I asleep?

15  Or would an artisan treat sleepy along the lines of being

16  drowsy?

17       THE WITNESS:  That's being drowsy.  So

18  sleepiness is not sleep.  And that's the kind of distinction

19  I think I try to make in my direct.

20       THE COURT:  So is it possible to be mostly

21  asleep?

22       THE WITNESS:  Yes, over a period of time, I

23  could have the majority of my time be sleep.

24       THE COURT:  Okay.  But you're dividing the time

25  between asleep and awake.  It's just -- when you say "mostly

1    asleep" it sounds like you mean for the defined period, more

2    often than not, I'm asleep.

3                    THE WITNESS:  I'm asleep.  And so there's this

4    measure called "sleep efficiency."  So out of my total time

5    in bed, let's say I'm in bed 10 hours and 5 hours of it is

6    sleep.  I'm unconscious and unresponsive.  My sleep

7    efficiency would be 50 percent, half of my time asleep and

8    half of my time would be awake.

9                    THE COURT:  And you think an artisan of ordinary

10   skill would have that understanding?

11                   THE WITNESS:  Yes, definitely.

12                   THE COURT:  Okay.  Thank you.  You can step

13   down.

14                   THE WITNESS:  Thank you.

15                   THE COURT:  Can somebody put up DTX-20 on the

16   screen, please.  They can zero in on the calendar.  You see

17   that, right below, keep going down about one-third of the

18   way down.  Right there.

19                    I do want to note for the record that

20   Mr. Groombridge asked without objection if the witness could

21   tell when this article was published, published online on

22   May 9th of 2011 and it was not objected to.  Just want it to

23   be noted.

24                    And I'm not faulting Mr. Groombridge at all for

25   the objections he lodged, but I do think it's somewhat

1    ironic.

2              MR. GROOMBRIDGE:  Yes, Your Honor, but in our

3    view there's a material difference between this and the

4    other one.  That's why we weren't --

5              THE COURT:  Well, there is and there isn't.  But

6    like I said, it was not a frivolous objection by any stretch

7    and it should have been addressed pretrial.  Not by your

8    side.

9              At the same time, I think the real issue is does

10   the Court -- should the Court have a comfort level, a

11   confidence level, that what it's looking at is, in fact,

12   what it is purported to be.  Anyway.

13             All right, next.

14             MR. ROZENDAAL:  Your Honor, we've come to a

15   pause in our case because our next witness, Dr. Greenblatt,

16   will not be available until tomorrow.  And so by agreement

17   with the plaintiff, for which we are grateful, they will be

18   presenting some of their other case now.

19             THE COURT:  Okay.  Great, thank you very much.

20             And then we're going to try to do claim

21   construction?

22             MR. STONE:  I believe so, Your Honor.

23             THE COURT:  All right.

24             MR. GROOMBRIDGE:  Yes, Your Honor.  We have two

25   witnesses --

DIRECT EXAMINATION - STEVEN LOCKLEY

1          THE COURT:  Today?  And how long are they going

2     to be?

3          MR. STONE:  Dr. Lockley will probably be on for

4     a half an hour.  And I'm going to in a moment ask if we can

5     take a two-minute break because Dr. Lockley is responding to

6     what Dr. Emens just said.  And I may be able to cut some of

7     it, given the cross.

8          THE COURT:  That sounds good anyway.  I think

9     the Court Reporter could use a break.

10          So let's come back, we'll start right at 3:15,

11     thanks.

12          (Recess taken.)

13          THE COURT:  Mr. Stone.

14          MR. STONE:  Thank you, Your Honor.  Vanda, as

15     the beginning of its rebuttal case, calls Dr. Steven Lockley

16     to the stand.

17          THE COURT:  All right.

18          MR. STONE:  Your Honor, we took the liberty of

19     putting the binders around so we don't lose time.

20          THE COURT:  Thank you.

21          STEVEN LOCKLEY, having been called was affirmed

22     and testified as follows:

23                    DIRECT EXAMINATION

24     BY MR. STONE:

25     Q.    Good afternoon, Dr. Lockley.  Would you please

1   introduce yourself to the Court.

2   A.      Yes.  Hello.  My name is Dr. Steven Lockley and I

3   work at the Brigham and Women's Hospital and Harvard Medical

4   School in Boston.

5   Q.      And what do you do there?

6   A.      I'm a researcher.  I do research on circadian rhythms

7   and sleep.

8   Q.      If you would, please, tell the Court what your

9   educational background is.

10  A.      I received a bachelor's degree in biology in 1992 and

11  a PhD in biological sciences in 1997.

12  Q.      Where did you do your PhD?

13  A.      At the University of Surrey in the UK.

14  Q.      And under whom did you study when you got your PhD?

15  A.      That was Josephine Arendt.

16  Q.      And for the court reporter, Dr. Arendt spells her

17  name A-R-E-N-D-T?

18  A.      Correct.

19  Q.      And who is Josephine Arendt?

20  A.      She's a preeminent researcher especially in

21  melatonin, circadian rhythms, and was the first person to

22  give melatonin to people for a range of different circadian

23  disorders.

24  Q.      What are you known for in the field?

25  A.      I think several areas.  One would be studying

DIRECT EXAMINATION - STEVEN LOCKLEY

1    circadian rhythms in blind people and then also looking at

2    the effects of light on the ability to shift circadian

3    rhythms.

4    Q.    I think one of the things that might be common ground

5    in this case between the parties is that melatonin, the

6    hormone, has under certain circumstances been shown to

7    entrain the circadian rhythm; is that fair?

8    A.    Yes.

9    Q.    Who was the first person to demonstrate that

10   melatonin could entrain the circadian rhythm?

11   A.    There were two papers in 2000, one that I coauthored

12   and one that Dr. Sack authored.

13   Q.    Fair to say that you and Dr. Sack are among the

14   handful of people who are at the front of research in this

15   field?

16   A.    Yes.

17   Q.    Did you play any role in the SET and RESET studies?

18   A.    Yes, I did.

19   Q.    What was your role?

20   A.    The Brigham and Women's Hospital was one of the sites

21   and I was the principal investigator for those trials.

22   Q.    I think you said just that Brigham was one of the

23   sites.  In the second you said hospital.  Did you mean in

24   the set and reset studies?

25   A.    Yes.

DIRECT EXAMINATION - STEVEN LOCKLEY

1    Q.      Thank you.

2            And sort of an off-the-wall question, do you do

3    work with NASA?

4    A.      I do, yes.

5    Q.      What do you do?

6    A.      A range of things.  We've done quite a few studies to

7    understand how light can reset astronauts when they go to

8    space station or travel across the planet.

9    Q.      The sun rises every 90 minutes in space?

10   A.      That's right, as you circle the earth, yeah.

11   Q.      Were you here for Dr. Emens's testimony?

12   A.      I was.

13   Q.      And did you see that one of the things he described

14   was the chronology of what he and Mr. Groombridge called the

15   melatonin art.

16   A.      Yes.

17   Q.      Actually, it occurs to me before I go on.

18           MR. STONE:  Your Honor, we've agreed that the

19   experts are qualified, but I offer Dr. Lockley as an expert

20   in circadian rhythm science and studies of the blind.

21           MR. COBLENTZ:  No objection.

22           THE COURT:  All right.

23   BY MR. STONE:

24   Q.      Have you prepared today for us a slide of the

25   opinions that you'll be offering in response to Dr. Emens's

DIRECT EXAMINATION - STEVEN LOCKLEY

1   opinions?

2   A.    Yes, I have.

3   Q.    And is this PDX-8.2 a summary of the opinions you'll

4   be offering today?

5   A.    Yes.

6   Q.    And tell the Court what they are, please.

7   A.    Today, I was going to talk about the attempts to try

8   and entrain blind patients with melatonin and

9   inconsistencies in the circadian phase shifting versus

10  entrainment responses.

11  Q.    Have you prepared a slide summarizing what those

12  inconsistencies, as you use that term, are?

13  A.    Yes.

14  Q.    Why don't we look at 8.3, PDX 8.3.

15        And Dr. Lockley, if you would, walk the Court

16  through what it is you're talking about here.

17  A.    So I'm going to cover the literature before 2000

18  which showed that melatonin couldn't, in fact, entrain the

19  clock at that time.  And then talk about some of the reasons

20  why the spill over effect that we've heard a bit about and

21  the variation in the clock time of treatment and the

22  circadian time of treatment.

23  Q.    And then what is the final point that you're making,

24  sir?

25  A.    I'm making the point here there's really been no

DIRECT EXAMINATION - STEVEN LOCKLEY

1    systematic or large-scale trials to answer these questions.

2    We still don't really know the answers, for example, to how

3    to time or what doses to use for melatonin.

4    Q.    When was the first reported attempt to entrain the

5    circadian rhythm using melatonin?

6    A.    That was in 1988.

7    Q.    And who was the principal author on that paper?

8    A.    That was Professor Arendt.

9    Q.    Were you there at the time?

10   A.    No, no.

11   Q.    Okay.  Dr. Emens put up a chronology of melatonin.

12         Was this 1988 paper on it?

13   A.    No.

14   Q.    Why don't we -- I can't remember whether PTX-490 is

15   in evidence so why don't we turn to PTX-490 in your binder.

16   A.    Yes, I see it.

17   Q.    On the left side you see an article about hemorrhagic

18   pancreatitis?

19   A.    Yes.

20   Q.    We won't be talking about that.

21   A.    Good.

22   Q.    And on your right is an article "Synchronization of a

23   Disturbed Sleep-Wake Cycle in a Blind Man By Melatonin

24   Treatment."

25         Do you see that there?

DIRECT EXAMINATION - STEVEN LOCKLEY

1    A.      I do, yes.

2    Q.      Is that the 1988 Arendt paper that you were referring

3    to?

4    A.      It is.

5            MR. STONE:  I offer PTX-490.

6            MR. COBLENTZ:  No objection.

7            THE COURT:  It's admitted.

8            (PTX-490 admitted into evidence.)

9            MR. STONE:  And --

10   BY MR. STONE:

11   Q.      Dr. Lockley, what are you describing in here?

12   A.      This is a summary of that Arendt paper.  This is the

13   first attempt to entrain a blind person with a 5-milligram

14   dose of melatonin given at 11:00 p.m.  And while there's

15   evidence that his sleep pattern stabilized, there's no

16   evidence of entrainment.  And that was measured with

17   multiple markers of entrainment, including melatonin,

18   cortisol and temperature measurements.

19   BY MR. STONE:

20   Q.      That was melatonin, cortisol and temperature

21   measurements?

22   A.      Yes.

23   Q.      What was the dose that was given in that paper?

24   A.      This was 5 milligrams.

25   Q.      Now, there was testimony on Dr. Emens's examination

DIRECT EXAMINATION - STEVEN LOCKLEY

1    and then by the Court about Dr. Sack.

2               You're familiar with Dr. Sack, correct?

3    A.    Yes, I am.

4    Q.    Did Dr. Sack do any of the early efforts to entrain

5    patients using melatonin?

6    A.    Yes, he did.

7    Q.    Let me ask you to look in your binder at the exhibit

8    that is PTX-283.

9    A.    Yes.

10   Q.    What is that?

11   A.    This is a paper from Dr. Sack and colleagues in 1991

12   with an attempt to entrain blind people with melatonin.

13               MR. STONE:  I offer PTX-283.

14               MR. COBLENTZ:  No objection.

15               THE COURT:  It's admitted.

16               (PTX-283 admitted into evidence.)

17               MR. STONE:  Thank you, Your Honor.  Mr. Weir,

18   can we go to PDX 8.6.

19   BY MR. STONE:

20   Q.    What do see here about the Sack 1991 paper?

21   A.    This is a summary of their work.  They report

22   studying six blind individuals.  Gave them 5 milligrams of

23   melatonin at the time at 10:00 p.m.  And they were able to

24   show a phase advance, but, again, did not show entrainment

25   of the clock in any of these individuals.

DIRECT EXAMINATION - STEVEN LOCKLEY

1    Q.      Dr. Lockley, is it true that anything that can

2    advance the phase can also entrain?

3    A.      No.

4    Q.      Okay.  Are we going to come back to that later in

5    your testimony?

6    A.      Yes, we will.

7    Q.      Now, Dr. Emens told us and then you told us that

8    there were two studies in the year 2000 that were the first

9    that showed successful entrainment using melatonin; is that

10   right?

11   A.      Yes.

12   Q.      And I believe that your study is already in evidence

13   as JTX-147, but can you just look behind the next tab in the

14   binder and confirm that that's your study.

15   A.      That is, yes.

16   Q.      All right.

17              MR. STONE:  Mr. Weir, can we have PDX 8.7.

18   BY MR. STONE:

19   Q.      And the authors of this article are Lockley, that's

20   you, correct?

21   A.      Yes.

22   Q.      A doctor whose last names is Skene, S-K-E-N-E.  Her

23   first name is Deborah?

24   A.      Yes, that's right.

25   Q.      And the last author is Josephine Arendt, your

DIRECT EXAMINATION - STEVEN LOCKLEY

1    supervisor for your PhD?

2    A.      Correct.

3              MR. STONE:  Your Honor, I don't know whether it

4    has come up in prior trials, the significance of first and

5    last author.  I was going to ask him but if you've got that,

6    I'll move on briefly.

7    BY MR. STONE:

8    Q.      What's the significance of being the first or last

9    author?

10   A.      The first author is the person doing the day-to-day

11   work who has led the study, led the analysis.  And the last

12   author is usually the senior author, the head of it.

13   Q.      And is that why this paper is referred to as Lockley,

14   because you're the first author?

15   A.      That's correct, yes.

16   Q.      And what are we seeing here in PTX-8.7 summarizing

17   this article?

18   A.      So, again, this is a summary of our study where we

19   give melatonin to seven totally blind men with Non-24.

20   Again, a 5 milligram melatonin dose given at 9:00 p.m. and

21   all of them at the same time.

22              And we were able to show that the melatonin

23   could entrain three of the seven subjects.  It phase

24   advanced a fourth, but it did not entrain the remaining

25   three individuals.

DIRECT EXAMINATION - STEVEN LOCKLEY

1   Q.      Were you able at the time to determine why melatonin

2   entrained some people but not others?

3   A.      We didn't have direct evidence from this trial

4   because we only had those one set of results.  But we

5   hypothesized that we gave the melatonin at the wrong part of

6   the phase response curve.  We accidentally timed it where it

7   wouldn't necessarily cause an advance.  It would cause a

8   delay.

9   Q.      Is it fair to assume that as a sighted person, you

10  can tell when my phase advance and phase delay curves are by

11  knowing what time it is?

12  A.      No.  I'd need to measure your clock.  I could

13  estimate if you were sighted, by I couldn't tell precisely.

14  Q.      How about a blind person?  How does one determine

15  where they are in their curve?

16  A.      You would have no idea.  They can be anywhere in that

17  24-hour cycle.  You really need to measure it to know where

18  their clock is.

19              MR. STONE:  Forgive me, Your Honor, this may be

20  disjointed.  I'm trying to not cover what was covered in the

21  last witness.

22  BY MR. STONE:

23  Q.      One of the other references that Dr. Emens talked

24  about is a reference we have been calling Hack.

25              Is that right?

DIRECT EXAMINATION - STEVEN LOCKLEY

1   A.      Yes.

2   Q.      Let me ask you to look at JTX-146, which is two tabs

3   or one tab forward in the binder.

4   A.      Yes.

5   Q.      The first author -- well, it's in evidence.

6           MR. STONE:  So Mr. Weir, can we see PDX-8.9.

7   BY MR. STONE:

8   Q.      The first author on the Hack paper is Lisa Hack,

9   correct?

10  A.      That's right.

11  Q.      Who is the second author on it?

12  A.      I am.

13  Q.      Tell us what we're looking at in the summary of the

14  Hack and Lockley paper.

15  A.      In this study of ten totally blind with Non-24 we

16  gave a smaller dose, 0.5-milligram dose of melatonin.

17  Again, at 9:00 p.m.  And we had very mixed result in this

18  study.  We showed that four subjects entrained immediately,

19  two additional subjects entrained after 3 to 4 weeks of

20  treatment.  One person phase advanced and the others weren't

21  able to be entrained.

22  Q.      Dr. Emens referred to this in his direct examination

23  as having shown entrainment.

24          What is the significance of the fact that four

25  out of the ten people in the study, in fact, did not

DIRECT EXAMINATION - STEVEN LOCKLEY

1    entrain?

2    A.      Well, we were able to show entrainment but only in

3    some individuals.  And so both in this study and my previous

4    one, we didn't show entrainment in everyone, and we don't

5    really understand why.

6    Q.      Did you and your colleagues offer some thoughts in

7    this paper as to what the dose effect might be?

8    A.      Yes, we did.

9              MR. STONE:  Why don't we go to the next slide,

10    Mr. Weir, 8.10.

11    BY MR. STONE:

12    Q.      Dr. Lockley, what are we seeing here?

13    A.      This is an excerpt from that paper where we say that

14    a lower dose of melatonin would be preferable to a higher

15    dose to reduce long-term side effects.  You would want to

16    give a lower dose of the drug if it worked as well as a

17    higher dose.

18    Q.      And do we now know that there is another reason that

19    one might want to give a lower dose of melatonin besides

20    side effects?

21    A.      Yes, we do.

22    Q.      And what's the reason?

23    A.      That's spill over effect and spill over hypothesis.

24    Q.      We're going to come to that shortly although in less

25    depth than we might have.

DIRECT EXAMINATION - STEVEN LOCKLEY

1          MR. STONE:  Can we have the next slide, please,

2    8.11.

3    BY MR. STONE:

4    Q.     Dr. Lockley, are these data that appear in your Hack

5    and Lockley paper?

6    A.     They are, yes.

7    Q.     Why don't you walk the Court through what it is that

8    we're looking at here.

9    A.     So these are data from four of the ten individuals

10   illustrating the variability and the different responses.

11   And we've seen the disorder of Non-24 is characterized by

12   this progressive delay, the shifting later of, in this case,

13   melatonin and cortisol.

14          So you can see before treatment this individual

15   was running later and later.  Then when they were given

16   melatonin, you can see that they entrained.  This line

17   becomes vertical.  They lock on, they stay entrained until

18   they stop treatment, and then they go off again.

19          So this is an example of entrainment.

20          In this individual, we entrained after a lag,

21   and so they are nonentrained before, but they stay

22   nonentrained for several weeks until they then lock on and

23   entrain with a lag.  And this happened in two people.

24          This individual had a shortened period, so they

25   were not entrained before.  They stayed nonentrained, but

DIRECT EXAMINATION - STEVEN LOCKLEY

1  you can see the slope of this line is different but not

2  vertical.  So they still had a nonentrained period of 24.45.

3  Then they reverted.

4           And in this individual, again, there was no

5  effect of the melatonin at all on entrainment.  You can see

6  that the rhythm just keeps on going later and later and

7  later and treatment has never failed.

8  BY MR. STONE:

9  Q.     Now, one of the things you told us was discussed in

10 this paper was a recommendation to consider lower doses of

11 melatonin, correct?

12 A.     Yes.

13 Q.     Did subsequent studies then explore lower doses in

14 using melatonin to entrain?

15 A.     Yes, not in our laboratory but in Dr. Lewy's

16 laboratory.

17 Q.     Why don't we go to the next slide, PDX 8.12.

18           Is this a chart that you prepared of some of the

19 papers that were looking during this period at lower

20 melatonin doses?

21 A.     Yes.

22 Q.     What do we see here?

23 A.     So we can see a series of fairly small studies

24 showing that, first of all, three patients could entrain

25 with a 0.5-milligram dose.  Then more patients with 0.5 and

1    one even with 0.05-milligram dose.

2              Then a series of case studies of ten individuals

3    with lots of different doses that we used, all

4    individualized in the patients, from very small doses of

5    20 micrograms up to .3 milligrams.

6              And then this series of cases of individuals

7    that we heard about earlier who could not be entrained with

8    20 milligrams, could not be entrained with 10 milligrams but

9    could be entrained with a 0.5 and later 0.3 milligram dose.

10             So there's a lot of variability in the success

11   of these doses as you get smaller.

12   Q.    In all of the melatonin art that existed prior to the

13   beginning of 2012, the priority date, was there ever an

14   example of anybody being entrained using 20 milligrams of

15   melatonin?

16   A.    No.

17   Q.    You have mentioned a couple of times and Dr. Emens

18   talked about the spill over effect.  I don't want to cover

19   the ground already covered, but I do want to start here.

20   Would you turn to JTX-123.  It's in your binder.

21   A.    Yes.

22   Q.    Do you recognize this to be a paper that

23   Mr. Groombridge discussed with Dr. Emens during his

24   cross-examination in which the authors included Dr. Lewy and

25   Dr. Emens and Dr. Sack?

DIRECT EXAMINATION - STEVEN LOCKLEY

1   A.      Yes.

2   Q.      I'm told Mr. Groombridge forgot to offer it into

3   evidence.

4              MR. STONE:  So I offer JTX-123.

5              MR. COBLENTZ:  No objection.

6              THE COURT:  It's admitted.

7              (JTX-123 admitted into evidence.)

8              MR. STONE:  Go to the next slide, PDX 8.15.

9   BY MR. STONE:

10  Q.      Dr. Lockley, are these sections that you selected to

11  call out of the Lewy and Emens paper?

12  A.      Yes.

13  Q.      Tell us what we're looking at in the top box.

14  A.      So this summarizes the results I just mentioned where

15  an individual could not be entrained to a 20-milligram dose

16  of melatonin, but could now be entrained to a lower dose of

17  0.5 milligrams.

18  Q.      You used the articulation to "be entrained to a

19  dose."

20             Is it also sometimes said "entrained by a dose"?

21  A.      Yes, there's no difference.

22  Q.      Okay.  So you're giving a dose of 20 milligrams, it's

23  not resulting in entrainment.  You're giving a dose of a

24  half a milligram, it is resulting in entrainment?

25  A.      Correct.

DIRECT EXAMINATION - STEVEN LOCKLEY

1  Q.      All right.  And what is the middle box telling us?

2  A.      So this shows one of the reasons that Lewy and

3  colleagues proposed why 20 milligrams did not entrain

4  because of the spill over effect.  The idea that if you have

5  a higher dose of melatonin, it hangs around the body longer

6  and spills over into the wrong zone of that phase response

7  curve either reducing the advance you're trying to achieve

8  or sometimes abolishing it.

9  Q.      And PRC is an abbreviation for phrase response curve?

10  A.      Correct.

11  Q.      Have you prepared a demonstrative exhibit for the

12  Court to just lay out simply what that looks like?

13  A.      I have, yes.

14  Q.      All right.  And I'm pulling up PDX-8.16.

15          I want to come back to something we dealt with

16  earlier in the trial, which is the side by side presentation

17  of the same data, which I will confess seems baffling to me.

18          Could you explain why one presents it this way?

19  A.      We usually double-plot the data.  It's just for ease

20  of illustration so you can see the cycle go on and on.

21          So this is just the same cartoon of a phase

22  response curve plotted next to each other.

23  Q.      And at any given point in the curve -- I think I have

24  a laser pointer -- if one administers melatonin in this

25  instance at 9:00 p.m., what is the -- or anywhere before

DIRECT EXAMINATION - STEVEN LOCKLEY

1    1:00 a.m., what is the effect on the curve?

2    A.      That would phase advance the clock or shift the clock

3    earlier.

4    Q.      And if one administers melatonin after 1:00 a.m.,

5    what effect would that have?

6    A.      That would cause a delay shift or shift the clock

7    later.

8    Q.      And if we look at 8.17, you've prepared something for

9    us that talks about a small discreet dose at 1:00 p.m.

10            Why don't you tell us about that.

11   A.      So this is to try to help understand the spill over

12   effect.

13            And so if we were to give a small dose of

14   melatonin at about 1:00 p.m. in this example, and it lasted

15   in the circulation for only about 12 hours, shown by the

16   next slide, you would see that we would only be giving

17   melatonin coincident with this phase advance part of the

18   PRC.

19            And so giving it at this time would cause an

20   advance, and as it remained in circulation, it would still

21   continue to cause an advance because it's a lower dose and

22   would be cleared within this 12-hour example.

23   Q.      And what happens if we give a larger dose?

24            We're now on PDX-8.18.

25   A.      So this is an example of what would happen with a

DIRECT EXAMINATION - STEVEN LOCKLEY

1    higher dose given at the same time, but now this dose,

2    because it's higher, lasts in the circulation for longer.

3    And so we would get potentially this initial advance, but it

4    would be undone because of this spill over of the melatonin

5    into the phase delay part of the PRC which would either

6    reduce the advance achieved by giving it here, the right

7    side, or abolish it if it counteracted the advance.

8    Q.    And could you sum up for the Court what your second

9    bullet on this slide explains.

10   A.    Yeah.  So the spill over effect explains why it's

11   important to give the proper dose of melatonin at the proper

12   time because you want to give the smaller doses to get that

13   discreet time queue so it doesn't spill over, but also give

14   it at the proper time to cause the phase advance that we

15   need for Non-24-Hour people with a clock longer than 24.

16   Q.    One of the things -- I'm going to skip ahead in the

17   interest of time.

18        One of the things that Dr. Emens and

19   Mr. Groombridge discussed on cross-examination is the

20   different reports in the melatonin art about the clock time

21   of treatment, 9:00 p.m. as measured by the clock on the

22   wall, and the circadian time of treatment and what time is

23   it for that blind person when you give it.

24   A.    Yes.

25   Q.    Were you here for that discussion?

DIRECT EXAMINATION - STEVEN LOCKLEY

1    A.      I was, yes.

2    Q.      Did you hear Dr. Emens to have said that only the

3    circadian time matters, the person's internal time, not the

4    clock on the wall time.

5    A.      Yes, I did hear that.

6    Q.      Do you agree with that?

7    A.      No.

8    Q.      Why not?

9    A.      Because we want to also make sure we give it at a

10   time where the potential sleepiness effects of melatonin

11   don't interfere with the patient's lifestyle.

12   Q.      Would you want to entrain someone to become sleepy

13   every day at 10:00 a.m.?

14   A.      No, no, no.

15   Q.      So is it therefore important to know what time you

16   are trying to entrain them to?

17   A.      Yes.  You want to give it at the right circadian time

18   to cause the shift you're trying to achieve, but also the

19   clock time that doesn't interfere with their lifestyle and

20   make them sleepy at the wrong time of day.

21   Q.      And is the time of treatment one of the things that

22   varies in the melatonin art?

23   A.      Yes.

24   Q.      Why don't we look at -- let's look at Slide PDX-8.21.

25           Dr. Lockley, what are you representing here?

DIRECT EXAMINATION - STEVEN LOCKLEY

1   A.      So this is a summary of those main studies we've

2   talked about earlier, showing the variability in the timing.

3            In our studies, we gave it a fixed clock time of

4   9:00 p.m. at the correct circadian phase, or we tried to, in

5   everyone.  Sack also did something similar in the earlier

6   studies, but in later studies you can see the timing changed

7   to either about an hour before bedtime, one to two hours

8   before bedtime, and at very varying sets of times in the

9   2005 period anywhere from 5:00 p.m. to 1:00 a.m.

10  Q.      But by the time of the priority date in this case,

11  was it understood when exactly to give melatonin for

12  purposes of entrainment?

13  A.      No, and it still isn't.

14  Q.      I'm sorry, did you say it still isn't?

15  A.      It still isn't, no.

16  Q.      Let's talk about circadian time of treatment.

17           Just to be clear, what does that refer to?

18  A.      So this is the time according to the internal

19  biological clock, the internal clock time of circadian.

20  Q.      And why does that matter in terms of when one

21  administers it?

22  A.      The circadian time refers -- it goes back to the

23  phase response curve.  It's the PRC which describes the

24  impact of giving it at the right circadian time when we're

25  trying to advance, for example.

DIRECT EXAMINATION - STEVEN LOCKLEY

1   Q.     Now, you told us earlier -- I'm going to skip ahead,

2   forgive me -- that there were no systematic or large-scale

3   clinical trials.

4          Do you remember saying that?

5   A.     Yes.

6   Q.     All right.  Is the fact -- withdrawn.

7          Was the fact that the melatonin art was

8   conflicting actually discussed in the melatonin art itself

9   prior to the priority date?

10  A.     Yes, it was.

11  Q.     If you would turn in your binder to DTX-39, this is a

12  document that was put into evidence with Dr. Emens.  And

13  it's a paper by Dr. Deborah Skene, S-K-E-N-E, and

14  Dr. Arendt, your mentor.

15         Do you recognize this article?

16  A.     I do, yes.

17  Q.     Dr. Emens said that the article described that there

18  was, at that point in 2007, a consensus that melatonin could

19  entrain.

20         Do you recall hearing him say that?

21  A.     Yes.

22  Q.     Does the article talk as well about what else remains

23  to be understood?

24  A.     Yes, it does.

25  Q.     Why don't you tell us what we're looking at here,

DIRECT EXAMINATION - STEVEN LOCKLEY

1   please.

2   A.    So here's an excerpt from that paper saying that

3   further studies are needed, first of all, to work out what

4   the minimum effective dose is because the right dose was

5   certainly not decided by then, and what the ideal dosing

6   regime may be, how to give it, is it every day, every second

7   day, and even the formulation, the type of melatonin used.

8           And then some of the reasons why people don't

9   entrain:  Is that because of individual differences in the

10  internal clock time or individual differences in how they

11  process melatonin?

12          And so it certainly wasn't decided by 2007 how

13  to give melatonin and what was best.

14  Q.    Has there been subsequent research into -- well,

15  withdrawn.

16          Let me ask you to look at JTX-149 in your

17  binder.  It's the second-to-last document.

18  A.    Yes.

19  Q.    This is an article entitled:  Clinical Practice

20  Guideline For the Treatment of Intrinsic Circadian Rhythm

21  Sleep-Wake Disorders, and then it has several other words in

22  the title.

23          Do you see that there?

24  A.    I do.

25  Q.    And this is from 2015, so it's after the priority

DIRECT EXAMINATION - STEVEN LOCKLEY

1    date, correct?

2    A.    Yes.

3    Q.    Dr. Emens is one of the authors of this article?

4    A.    Yes.

5                MR. STONE:  I offer JTX-149.

6                MR. COBLENTZ:  No objection.

7                THE COURT:  It's admitted.

8                (JTX-149 admitted into evidence.)

9    BY MR. STONE:

10   Q.    One of the things that appears in this article is the

11   following Figure 6, and you'll see there that it's referring

12   to your Lockley paper in 2000, the Hack and Lockley paper in

13   2003, and the Sack paper from 2000.

14               Do you see that there?

15   A.    I do.

16   Q.    What is this article saying about those papers?

17   A.    So it's summarizing the art in using melatonin to

18   entrain or to treat blind people with Non-24, and there are

19   only three studies that they could consider because the

20   associated numbers are sufficient at controlling the study,

21   and those are two of the papers from the Arendt lab, the

22   Lockley and Hack, and then the one Sack paper from 2000.

23               And they, in these recommendations, say that

24   melatonin should be strategically timed but give a range of

25   times.  They talk about either 9:00 p.m. or one to two hours

DIRECT EXAMINATION - STEVEN LOCKLEY

1    before bedtime.  And so there's very little prior evidence

2    to make a clinical recommendation.

3              And, again, there's still no clarity on how to

4    time melatonin or what dose to give.

5    Q.    Let's look at one last document.  If you could turn

6    to JTX-139, it's the last document in the binder, and it is

7    in evidence through Dr. Emens.

8              Do you recognize this to be a paper by Steven

9    Deacon and Josephine Arendt?

10   A.    Yes, I do.

11   Q.    And this is from 1995; is that right?

12   A.    Correct.

13   Q.    Have you prepared a chart talking about some of the

14   conclusions from this article?

15   A.    I have, yes.

16   Q.    Why don't we look at PDX-8.28.

17             This article concluded that a single dose of

18   melatonin could shift the circadian clock, correct?

19   A.    That's correct.

20   Q.    That's a phase advance?

21   A.    That's right.

22   Q.    What are you then showing us with the next table,

23   please?

24             And to be clear, this table is not something

25   excerpted from the document; you created this.

DIRECT EXAMINATION - STEVEN LOCKLEY

1   A.      I created this, yes.

2   Q.      All right.  Please continue.

3   A.      So this summarizes the results of the study.  They

4   were able to find a dose response; meaning that the more

5   melatonin you gave, the bigger the phase shift achieved.

6   And so a 0.05 dose achieved about a .36-hour shift; a 5

7   milligrams dose as much as 1.43.

8              Now if I were to try and take these phase

9   shifting data to predict what would happen for entrainment

10  in a blind person, theoretically, there should be this

11  translation.  Meaning I can shift by .36 hours with a 0.05

12  dose, I should be able to entrain someone within a period of

13  24.36.  I should be able to shift by this much per day.

14  Q.      Let me pause you there for a moment.

15             And the way you would do that is if the

16  melatonin shifts by .36 hours, you'd give it everyday, and

17  it would counteract someone whose tau is 24.36?

18             That's the theory?

19  A.      That's correct.  That's the theory.

20  Q.      Keep going.

21  A.      And so if we use a 5-milligram dose, you'd predict

22  that someone with a period as long as 25.43 could be

23  entrained by giving that 5-milligram dose every day.

24  Q.      How does 25.43 as a tau relate to the actual blind

25  population?

DIRECT EXAMINATION - STEVEN LOCKLEY

1    A.    There isn't anyone with a tau who has been measured

2    to be that long.  I believe the longest in the literature is

3    25.1.

4    Q.    Okay.  So now please continue.

5    A.    So these predictions don't hold, however.  So you

6    can't take the phase shifting data from a single dose and

7    then know anything about whether that will entrain these

8    periods.  Because 24.7 hours was recited as the longest

9    period that either the 5- or 10-milligram dose should be

10   entrained where, theoretically, it should be as long as

11   25.43.

12          The smaller dose to .5 should be limited to

13   around 24.69 but, in fact, has been shown to entrain

14   somewhat with a 24.9-hour clock.

15          And the 5-milligram dose should be able to

16   entrain every blind person, theoretically, because, as I

17   said before, no one has been shown to even have a period

18   this long.

19          Of course that's not true.  In our 5-milligram

20   studies, only three out of the seven patients were

21   entrained.

22   Q.    So what does one take away from the melatonin art

23   regarding the relationship between the ability of a

24   substance to phase shift and the ability of it to entrain?

25   A.    You can't draw inference from phase shift to

DIRECT EXAMINATION - STEVEN LOCKLEY

1    entrainment.  You need to shift to cause entrainment, but

2    the amount of shift you get with a single dose does not tell

3    you how much you need to entrain.

4    Q.    Have you prepared a chart for the Court that

5    summarizes the melatonin art in terms of dosage and time of

6    administration?

7    A.    I have, yes.

8    Q.    I'm pulling up PDX-8.29.

9         And without going through each line, what do we

10   see here?

11   A.    So this summarizes much of the work we've talked

12   about today.  So summarizing the range of doses here

13   anywhere from very small doses of 0.02 milligrams all the

14   way to 20 milligrams, and the range of timings, bedtime all

15   the way down to around 5:00 p.m.

16        So there's a lot of variability in the research.

17   Q.    And in the history of this melatonin art, how many

18   times -- well, how many times was 20 milligrams of melatonin

19   shown to entrain?

20   A.    Never.

21   Q.    And have you prepared as a last slide a summary of

22   your opinions?

23   A.    I have, yes.

24   Q.    Why don't you walk the Court through what that is.

25   A.    So, briefly, the melatonin art provides conflicting

CROSS-EXAMINATION - STEVEN LOCKLEY

1    information as to the appropriate dose of melatonin.  Doses

2    as low as 0.05 milligrams and as high as 10 milligrams have

3    been shown to entrain in some people, but .5, 5 and 10

4    sometimes fails to entrain.

5              The one person studied with 20 milligrams of

6    melatonin did not entrain.  The high doses of melatonin may

7    not entrain due to the spill over effect hanging around

8    essentially too long and confusing the brain.  And there's

9    lots of variability in the studies as to the appropriate

10   clock time or circadian time to either start treatment -- to

11   start treatment to initiate treatment.

12             And the study looking at the phase shifting

13   effects of a single dose cannot tell you whether melatonin

14   can entrain or what dose to use to entrain.

15             MR. STONE:  I thank you for working with me to

16   shorten this, and I pass the witness, Your Honor.

17             THE COURT:  All right.  Cross.

18             MR. COBLENTZ:  We have cross binders to pass up.

19             May I approach, Your Honor.

20             THE COURT:  Yes.

21                         CROSS-EXAMINATION

22   BY MR. COBLENTZ:

23   Q.     Good afternoon, Dr. Lockley.

24   A.     Hello.

25   Q.     You do not have a medical degree; isn't that correct?

CROSS-EXAMINATION - STEVEN LOCKLEY

1    A.    No.  I have a PhD.

2    Q.    And you have never diagnosed a patient with Non-24;

3    is that correct?

4    A.    Correct.

5    Q.    And you are not licensed to treat or prescribe

6    medication; is that correct?

7    A.    Correct.

8    Q.    And you never treated a patient in a clinical setting

9    with tasimelteon; is that correct?

10   A.    Correct.

11   Q.    Now, if we can go to JTX-147 in your binder.

12         MR. COBLENTZ:  And Mr. Brooks, if you could pull

13   that up on the screen.

14   BY MR. COBLENTZ:

15   Q.    This is a paper you discussed in your direct that you

16   authored in the year 2000; isn't that correct?

17   A.    Yes.

18   Q.    And if we look at the end of the abstract here on the

19   first page, over in the right-hand column, we see that this

20   paper says that:  These results show for the first time that

21   daily melatonin administration can entrain free-running

22   circadian rhythms in some blind subjects assessed using

23   reliable physiological markers of the circadian rhythm.

24         Is that what that says?

25   A.    Yes.

CROSS-EXAMINATION - STEVEN LOCKLEY

1    Q.     And if we go to Page 5 of JTX-147, this is part of --

2    if you look at the right-hand column before the

3    acknowledgments, this is part of the discussion section of

4    the paper; is that correct?

5    A.     Yes.

6    Q.     And you state here:  In summary, the present study

7    shows that the first demonstration of entrainment of

8    free-running blind subjects by melatonin treatment assessed

9    using reliable physiological markers of the circadian

10   system.

11          Isn't that correct?

12   A.     Yes.

13   Q.     Now I'd like to go to JTX-148.

14          And this is the -- a paper by Robert Sack from

15   2000; is that correct?

16   A.     Yes.

17   Q.     And you considered this paper as part of your

18   opinions; is that correct?

19   A.     I did, yes.

20   Q.     Now, if we look at the abstract here in the Methods

21   section, we see it states here that:  We performed a

22   crossover study involving seven totally blind subjects who

23   had free-running circadian rhythms.

24          Do you see that?

25   A.     Yes.

CROSS-EXAMINATION - STEVEN LOCKLEY

1    Q.       And then it says:  The subjects were given

2    10 milligrams of melatonin or placebo daily, one hour before

3    their preferred bedtime, for three to nine weeks.

4              Is that correct?

5    A.       Yes.

6    Q.       Now, if we go down to the Conclusion section of the

7    abstract, they state that:  The administration of melatonin

8    can entrain circadian rhythms in most blind people who have

9    free-running rhythms.

10             Is that correct?

11   A.       Yes, that's what it says.

12   Q.       Now, I'd like to go to Page 5 of JTX-148 and

13   specifically look down at the Discussion section of the

14   paper, and it's the second sentence in the Discussion

15   section that I want to focus on.

16             And here the Sack paper says:  Our results

17   indicate that phase-advancing effects of melatonin are of

18   sufficient magnitude to entrain free-running circadian

19   rhythms in most blind persons who have such rhythms.

20             Do you see that?

21   A.       I do.

22   Q.       Now, I'd like to -- now, this particular paper, it

23   was published in the New England Journal of Medicine; is

24   that correct?

25   A.       Yes.

CROSS-EXAMINATION - STEVEN LOCKLEY

1   Q.    That's a peer-reviewed publication?

2   A.    That's correct.

3   Q.    It is a well-respected publication?

4   A.    It is.

5   Q.    Now I'd like to go to JTX-146.

6         Now JTX-146, this is the Hack paper that you

7   discussed in your direct examination; is that correct?

8   A.    Yes.

9   Q.    And you're an author on this paper, correct?

10  A.    I am.

11  Q.    Now look at the abstract here, the very first

12  sentence, it says:  Exogenous melatonin (0.5 to

13  10 milligrams) has been shown to entrain the free-running

14  circadian rhythms of some blind patients.

15        Is that correct?

16  A.    Some blind subjects.

17  Q.    I'm sorry.  I think I did that in your deposition,

18  too.  Let me read that again.

19        So it says:  Exogenous melatonin (0.5 to

20  10 milligrams) has been shown to entrain the free-running

21  circadian rhythms of some blind subjects.

22        Did I read that correctly?

23  A.    Correct.

24  Q.    Now, if we go to Page 2 of JTX-146, and I want to

25  look at the second paragraph, now the first part of this

1    paragraph, it talks about early studies before 2000 using

2    melatonin to entrain free-running rhythms.

3              Is that correct?

4    A.    Where are you referring to?

5    Q.    If we look at the papers that talk about Sack 1991

6    down below, 1995, Arendt 1997, Sack and Lewy 1997?

7    A.    Yes.

8    Q.    Now, the next sentence after those says:  In

9    contrast, several recent studies have re-examined the

10   ability of melatonin to entrain free-running rhythms in

11   totally blind people and found that entrainment could be

12   achieved following daily oral melatonin treatment with

13   5 milligrams.

14             Do you see that?

15   A.    Yes.

16   Q.    And there it cites that Lockley 2000 paper that we

17   just went over with; is that correct?

18   A.    Yes.

19   Q.    And then it says 10 milligrams, and it cites that

20   Sack 2000 paper.

21             Do you see that?

22   A.    Yes.

23   Q.    And then after that it has the 0.5-milligram doses,

24   and it cites the Lewy 2001 paper; is that correct?

25   A.    Yes.

CROSS-EXAMINATION - STEVEN LOCKLEY

1    Q.    And the Lewy -- Dr. Lewy worked with Dr. Sack; is

2    that correct?

3    A.    Yes.

4    Q.    Now, if we go to Page 5 of JTX-146, and we look at

5    the Discussion section, which is in the right-hand column,

6    it says here that:  The present results show that

7    appropriately timed, low-dose melatonin (0.5 milligrams) can

8    entrain free-running circadian rhythms in most blind people.

9          Do you see that?

10   A.    Yes.

11   Q.    And then it says:  This finding confirms and extends

12   a previous report of entrainment of three free-running blind

13   people with 0.5 milligrams melatonin.

14         Do you see that?

15   A.    Yes.

16   Q.    And that cites the Lewy 2001 paper; is that correct?

17   A.    Yes.

18   Q.    And that's the other lab that was working on this,

19   the Sack lab; is that correct?

20   A.    Correct.

21   Q.    Now I'd like to go to DTX-39.  This is a paper by

22   Dr. Skene and Dr. Arendt; is that correct?

23   A.    Yes, it's a review.

24   Q.    And that was going to be my next question, so thank

25   you.

CROSS-EXAMINATION - STEVEN LOCKLEY

1          This is a review article; is that correct?

2    A.    Yes.

3    Q.    And in the abstract of this particular review

4    article, we see there's a sentence that says:  Daily

5    administration.

6          Do you see where I'm at?

7    A.    Yes.

8    Q.    And it says:  Daily administration of exogenous

9    melatonin is the current treatment of choice for this

10   so-called non-24 h sleep/wake disorder.

11         Do you see that?

12   A.    Yes.

13   Q.    And it says after that, it says:  Melatonin has been

14   shown to correct the underlying circadian rhythm abnormality

15   as well as improve sleep and reduce daytime napping.

16         Do you see that?

17   A.    Yes.

18   Q.    Now, if we go to Page -- DTX-39.3.  And we look at

19   the Treatment section here.

20         Let me know when you're there.

21   A.    I have a DTX-39, but that's the Skene and the --

22   Q.    Yes, so we're in the same reference.  We're looking

23   at Page 3 of that reference.

24   A.    Sorry, I was confused with the .3.  Yes.

25   Q.    And it says in the second paragraph there, it says:

CROSS-EXAMINATION - STEVEN LOCKLEY

1    Appropriately timed, exogenous melatonin has been shown to

2    advance or, more controversially, delay the timing of the

3    circadian clock.

4              Do you see that?

5    A.    Yes.

6    Q.    It says:  Melatonin's phase shifting effect

7    presumably occurs by means of receptors in the SCN (not

8    MT-1, possibly MT-2) although this has yet to have been

9    definitely proven.

10             Do you see that?

11   A.    Yes.

12   Q.    In recent years, this phase shifting effect of

13   melatonin has been employed successfully to entrain totally

14   blind people with free-running circadian rhythms.

15             Do you see that?

16   A.    Yes.

17   Q.    And it cites to a 29 and a 30; is that correct?

18   A.    Yes.

19   Q.    And if we go to DTX-39.5, Reference 29 is that

20   Lockley 2000 paper; is that correct?

21   A.    Yes.

22   Q.    And then Reference 30 is the Sack 2000 paper; is that

23   correct?

24   A.    Yes.

25   Q.    Now, if we go to DTX-39.3, I want to go back to where

CROSS-EXAMINATION - STEVEN LOCKLEY

1    we just were in the treatment section, and there's a

2    sentence that says:  In our studies.  It says:  In our

3    studies, entrainment by melatonin has occurred by the

4    ability of melatonin to phase advance the circadian clock.

5            Do you see that?

6    A.    Yes.

7    Q.    And, again, it cites to the Reference 29 and then 31.

8            Do you see that?

9    A.    Yes.

10   Q.    Now, if we go to DTX-39.5, you see that, again,

11   Reference 29 is the Lockley 2000 paper and Reference 31 is

12   the Hack paper; is that correct?

13   A.    Yes.

14   Q.    Now I'd like to go back to DTX-39.3 and look at the

15   bottom of the Treatment paragraph.

16            And you see it says:  Recent research.

17            Do you see that?

18   A.    Yes.

19   Q.    And it says:  Research has been directed at

20   determining the minimum effective dose of melatonin for

21   entrainment.

22            Do you see that?

23   A.    Yes.

24   Q.    And then it says:  Melatonin at a daily dose of

25   0.5 milligrams has been shown to effectively entrain

CROSS-EXAMINATION - STEVEN LOCKLEY

1    free-running rhythms in blind people before.

2              Do you see that?

3    A.    Yes.

4    Q.    Now, I'd like to go to DTX-331.

5              Let me know when you're there.

6    A.    Yes, I'm there.

7    Q.    Now, this is an e-mail chain, and I'd like to focus

8    on --

9              MR. COBLENTZ:  Go to DTX-331.3.

10             If we blow up the bottom e-mail.

11             So for the record, I think this was offered

12   already into evidence.

13             MR. STONE:  And if it hasn't, I have no

14   objection to it.

15             THE COURT:  All right.

16   BY MR. COBLENTZ:

17   Q.    And this is an e-mail sent on June 1st of 2012 from a

18   Gabrielle Thibodeau to you and copying Marlene Dressman.

19             Do you see that?

20   A.    Yes.

21   Q.    And the subject is:  Sleep 2012 posters for review.

22             Do you see that?

23   A.    Yes.

24   Q.    And Ms. Thibodeau asking you to review Word versions

25   of, I guess, drafts of these posters; is that correct?

REDIRECT EXAMINATION - STEVEN LOCKLEY

1    A.      Well, both.   The Word version and the PowerPoint

2    version, yes.

3    Q.      If we go to DTX-331.2, and we see here that you

4    respond to Ms. Thibodeau on June 5th of 2012.

5            Do you see that?

6    A.      Yes.

7    Q.      And if we go to the third paragraph of your e-mail,

8    you state here:   None of them acknowledge that melatonin can

9    entrain the circadian rhythms of blind people (Lockley, et

10   al, 2000, and Sack et al, 2000) which is what led to the

11   thinking that tasi might be effective.

12           Do you see that?

13   A.      Yes.

14   Q.      And you say:   It's hard to shy away from that fact

15   even though I understand why.

16           Do you see that?

17   A.      Yes.

18   Q.      Now, Dr. Lockley, in your direct examination, you do

19   not provide any analysis of whether the asserted claims of

20   the patents-in-suit were obvious or not obvious, correct?

21   A.      Correct.

22           MR. COBLENTZ:   I have nothing further.

23           THE COURT:   Redirect?

24           MR. STONE:   Very briefly, Your Honor.

25                   REDIRECT EXAMINATION

REDIRECT EXAMINATION - STEVEN LOCKLEY

1    BY MR. STONE:

2    Q.    I can't leave that hanging there.

3          Could you turn to DTX-331, please?

4    A.    Yes.

5    Q.    This e-mail exchange between you and Ms. Thibodeau

6    and Ms. Dressman, the subject line is:  Sleep 2012 posters

7    for review.

8          Right?

9    A.    Yes.

10   Q.    What posters were you talking about?

11   A.    There are, I think, five posters that they sent me to

12   be presented at the -- the annual sleep meeting in 2012.

13   Q.    And what would those posters have been reporting on?

14   A.    They would have been a range of results -- I can't

15   tell from this e-mail, but they would have been different

16   aspects of the SET and RESET trials.

17   Q.    But just to zoom out, since this is the first time

18   this has come up, this is about posters about the SET and

19   RESET work?

20   A.    Correct.

21   Q.    And you reply at 12:26 in the morning?

22   A.    Yes, it looks like it.

23   Q.    And you write in the first paragraph:  Sorry this is

24   so late.  I had a grant deadline.

25          Do you see that there?

1    A.    I do, yes.

2    Q.    You then provide, you know, a page and a half of

3    comments?

4    A.    Yes.

5    Q.    Okay.  So you said:  None of them acknowledge that

6    melatonin can entrain the circadian rhythms of blind people,

7    citing your paper and Sack.

8          Right?

9    A.    Yes.

10   Q.    Which is what leads to the thinking that tasimelteon

11   might be effective.

12         Do you see that?

13   A.    Yes.

14   Q.    And you say:  It's hard to shy away from that fact

15   even though I understand why.

16   A.    Yes.

17   Q.    Why?  Why did you think they might be shying away

18   from that fact?

19   A.    Well, they completed a study of their drug and wanted

20   to promote the effects of that drug at the meeting.

21              MR. STONE:  No further questions.

22              THE COURT:  All right.  Thank you very much.

23              THE WITNESS:  Thank you.

24              MR. GROOMBRIDGE:  Vanda's next witness will be

25   Dr. Steven Bergmeier, again.  He testified about invalidity

1  in the infringement part of the case and will now rebutting

2  on --

3          THE COURT:  Okay.

4          MR. STONE:  Your Honor, we had left open this

5  morning the evidentiary question about the prior BMS study

6  because Ms. Young wasn't here, and we were going to look at

7  the expert report.  We may need to start with that if they

8  are still objecting to it.

9          THE COURT:  Okay.  What do we have to address?

10          MR. STONE:  Where we were this morning is that

11  we would like to show the witness a prior art publication

12  that we maintain discloses BMS's process steps.

13  Mr. Rozendaal had objected to our doing so and had raised

14  the issue.

15          We had talked about where it arose in the expert

16  reports.

17          THE COURT:  Right.

18          MR. STONE:  They had at the time of the reports

19  been asserting that it was prior art and invalidated this

20  patent.  And they've dropped that obviousness combination

21  and despite having argued that it invalidated the prior

22  art -- the patent as prior art, they now contend that we

23  haven't shown that it is prior art.  And the issue was

24  whether this expert can testify to the fact that it is prior

25  art.

1          THE COURT:  All right.  Hold up.

2          What do you say to that, Mr. Rozendaal?

3          MR. ROZENDAAL:  Your Honor, I think that the

4  issue -- so we have since this morning had a chance to look

5  at the report.  There are what appear to be two

6  self-contradictory statements in the report at paragraphs --

7          THE COURT:  Actually, what I want you to respond

8  to is what Mr. Stone said.  Because one thing I don't know

9  is why don't you just introduce their prior contentions as

10  admissions.

11          MR. ROZENDAAL:  Well --

12          THE COURT:  I mean, if it's what you say it is,

13  and that's why I wanted Mr. Rozendaal to address

14  specifically what Mr. Stone just said, I mean, if you're on

15  record, even in the context of another patent in this case

16  asserting that this is prior art, why doesn't that just end

17  it?

18          MR. ROZENDAAL:  What we have not asserted and

19  what they have not asserted is that this preference

20  represents the process used by BMS, and that's nowhere in

21  anyone's report on either side.

22          And that is -- that is the sticking point, Your

23  Honor, because they have told us that that is what they want

24  to use this for.

25          THE COURT:  I see.

1          MR. STONE:  If the prior art discloses the

2   process, it actually doesn't matter if it came from Dunkin'

3   Donuts.  If the prior art --

4          THE COURT:  I think what they are saying, the

5   way I interpret it, it goes to my question about, am I going

6   to need expert help to know is the prior art question

7   disclosing the BMS process.

8          MR. STONE:  Fair enough.  And let me separate

9   that into two pieces:  The process and is it BMS's.  Because

10   you might need expert testimony to say, that's a lot of

11   chemistry symbols, is that the process.

12          THE COURT:  Right.

13          MR. STONE:  You might also need -- this document

14   does say word "BMS" on it.

15          THE COURT:  Okay.

16          MR. STONE:  On the BMS issue, their expert,

17   Dr. Perni, conceded at his deposition that those people

18   worked at BMS at the time.  We can profer that if we have

19   to.

20          THE COURT:  On whether it's a process, you want

21   him to say, okay, now -- and so then it's very important is

22   it in the report.  Okay.  So then show me where it is in the

23   report.

24          MS. YOUNG:  Your Honor, we have Dr. Bergmeier's

25   response to Dr. Perni's report as PTX-793.  I can pass that

1    up to you.

2                    THE COURT:  All right.

3                    MR. ROZENDAAL:  Is that the September 29th

4    report?  I don't have the PTX number.  I'm sorry.

5                    THE COURT:  Is it in this white notebook that

6    was just handed to me?  Because I don't see it.

7                    MS. YOUNG:  It is not, Your Honor.  I did not --

8                    THE COURT:  Okay.  Now are you all comfortable

9    discussing this in front of the doctor?

10                   Okay.

11                   MR. ROZENDAAL:  Actually, Your Honor, I prefer

12   if we could --

13                   THE COURT:  Yeah, maybe it would be better, just

14   to be safe.  I'm sorry I had to have you walk you up here,

15   but you can take a walk back.  Thank you.

16                   (Witness left the room.)

17                   Okay.  So where is it in the report?

18                   MS. YOUNG:  So, Dr. Bergmeier's report on Page

19   24, Paragraph 62 is where he starts responding to

20   Dr. Perni's arguments that Singh BMS's article was prior

21   art.

22                   THE COURT:  Paragraph what?

23                   MS. YOUNG:  Paragraph 62 is where it begins.

24                   THE COURT:  All right.  Let me look at it.

25                   Okay.  What is the name of the prior art?  Is

1    Singh the prior art?

2              MS. YOUNG:  Singh is the prior art.

3              THE COURT:  So the question is whether he gets

4    to talk about Singh?

5              MS. YOUNG:  Yes, that's correct, Your Honor.

6              THE COURT:  Okay.  Well, so far he gets to talk

7    about Singh, at least something; so what is it specifically

8    he wants to say about Singh?

9              MS. YOUNG:  So, specifically, what he wants to

10   say about Singh is it discloses the reducing and

11   propylinating steps that are in Claim 1.

12             THE COURT:  Okay.  Where is that?

13             MS. YOUNG:  So if you turn to Page 7 of his

14   report, Paragraph 70.

15             THE COURT:  Okay.

16             MS. YOUNG:  Dr. Bergmeier states in his report

17   that Singh does disclose the contacting and the reacting

18   steps.  Even though he says it discourages their use based

19   on the disclosures within Singh.

20             THE COURT:  Okay.

21             MR. ROZENDAAL:  Then in Paragraph 72 he says it

22   does not disclose those steps.

23             MS. YOUNG:  I respectfully disagree about that

24   interpretation.  That is talking about upstream reactions

25   and whether or not that had implications downstream.

```
 1                   MR. STONE:  Your Honor, I would also add that
 2      the first --
 3                   THE COURT:  Whoa, whoa, whoa.  Stop.  Stop all
 4      of you.  I mean, I got to take my time and read this.  I
 5      mean, they don't look like -- it looks like in 70 he's
 6      saying one thing and 72 he's not, I got to read it.
 7                   Give me a chance, please.
 8                   Okay.  So here's how I read it, this is very
 9      funny for the public.  Here's what Paragraph 70 says:
10                   Dr. Perni alleges that Singh discloses the
11      contact and reacting steps of Claim 1 of the '465 patent.
12      Singh does disclose as -- he means Singh "discloses," I'm
13      assuming there.  Singh does disclose the contacting and
14      reacting steps.
15                   So stop there, score one for Mr. Rozendaal.
16                   But it continues:  "...and explicitly
17      discourages their use."
18                   Now it still discloses it, right?
19                   MS. YOUNG:  Right, that is our position.
20                   MR. STONE:  I think score one for our side.
21                   Their expert says it discloses it, we say it
22      does.  I think that it, to be fair, score one for our side.
23                   THE COURT:  Sorry, what?  I missed you now.  Now
24      I'm --
25                   MR. STONE:  We may be turned around, Your Honor.
```

1            Dr. Perni, in the first sentence, is

2    Mr. Rozendaal's expert.

3            THE COURT:  Yeah.

4            MR. STONE:  Mr. Rozendaal's expert alleges that

5    Singh, the piece we're talking about, discloses the

6    contacting and reacting steps.  Our expert then agrees.

7            THE COURT:  That's what I'm saying, he agrees

8    with him.

9            MR. STONE:  You said score one for him, I think

10   at this point we're winning.  At this point they are both

11   agreeing -- I may be misunderstanding Your Honor, but at

12   this point both experts agree it's in the prior art in

13   Singh.  I know where the Court is going with the

14   contradiction, but you had said at this point score one for

15   his side.  I think at this point score one for our side.

16   They say it's in the prior art and we agree.

17           THE COURT:  Okay.  Yes, I have got the parties

18   reversed.

19           So then he says:  It does disclose it, which

20   would be mean he gets to talk about it's disclosed.  But

21   explicitly discourages their use.

22           Now, then on page -- ten lines down or so he

23   writes:  "Neither Singh nor ICH Q3A Guideline disclose this

24   limitation."

25           MS. YOUNG:  And to put that in context, it's

```
 1    with regard to --
 2                THE COURT:  I'm not finished.
 3                MS. YOUNG:  I'm sorry.
 4                THE COURT:  So he discusses it.
 5                Now the objection is that he doesn't -- I mean,
 6    he does discuss it.
 7                MR. ROZENDAAL:  Yes, I think it's fair to say he
 8    does discuss it.  He does not say anything about it being
 9    from BMS or about BMS or anything having to do with BMS.
10                THE COURT:  All right.
11                MR. ROZENDAAL:  I think as long as we're clear
12    that he's not going to say anything at all about that, then
13    in light of what we're seeing here in the report I think --
14                THE COURT:  Right.  But here's the thing, he
15    gets to discuss what was disclosed, right.
16                So he gets to discuss, for instance -- and how
17    -- I don't think I could ever understand all this stuff, but
18    for instance that:  Singh goes on to recommend an asymmetric
19    cyclopropanation process, which does not involved
20    (IR,2R)-2-(2,3-dihydrobenzofuran-4-yl)cyclopropane
21    carboxamide or
22    (IR,2R)-2-(2,3-dihydrobenzofuran-4-yl)cyclopropyl)
23    methanamine.
24                He gets to discuss that and whatever else is
25    disclosed and maybe he even can explain it to me so I can
```

1    understand what it means.  So he gets to talk about it.

2              Now, so there's no mention of BMS in this

3    Paragraph 70, there's no mention of BMS in Paragraph 71,

4    there's no mention of it in Paragraph 72, so he can't opine,

5    based on these three paragraphs, anything about BMS.

6              MS. YOUNG:  I agree, Your Honor.

7              The issue is that we did not realize that they

8    were going to allege that Singh was not a BMS publication

9    because we thought we were in agreement about that.

10             THE COURT:  Wait.  That Singh was not -- okay.

11             MS. YOUNG:  Because we had understood that there

12   was no dispute between the parties that the Singh authors

13   were working at BMS and it was a BMS paper.

14             MR. ROZENDAAL:  I am not certain what basis

15   there was for that supposition, but in any event --

16             THE COURT:  Is this the paper that somebody did

17   bring out; did you bring out in examining some witness that

18   Singh was associated with BMS?

19             MS. YOUNG:  So Mr. Groombridge when examining

20   Dr. Perni asked whether or not the BMS work was publically

21   disclosed.  And he said yes; consistent with his deposition.

22             In redirect, Ms. Wells elicited testimony that

23   caused some confusion, so then it became unclear whether or

24   not the work was public.

25             THE COURT:  My point is, though, was there

1  questioning about the Singh article or was it just a general

2  statement that Mr. Groombridge put to Dr. Perni on cross and

3  he said, yeah.

4          MS. YOUNG:  That's right.  It was a general

5  statement because he said, yeah, we decided -- I believe it

6  was decided not to go forth in the interest of time, but it

7  is in the cross binder.

8          If it would be helpful --

9          THE COURT:  When was Singh published?

10          MS. YOUNG:  2004.

11          THE COURT:  All right.  And just help me out

12  here, so Singh is published in 2004 and it discloses -- and

13  both sides are now contending it discloses the contacting

14  and reacting steps?

15          MS. YOUNG:  Vanda agrees that it discloses the

16  contacting and reacting steps.  When Dr. Bergmeier was asked

17  about it at his deposition, he also agreed.

18          THE COURT:  Right, I guess -- and they're going

19  to say, well it's contingent argument.  It discloses it.  If

20  I read the patent, if I interpret contacting and reacting

21  the way plaintiffs want to.

22          MR. ROZENDAAL:  Yes, Your Honor.

23          But I think the point is that if Vanda obtained

24  the process from BMS before the publication of this article,

25  then they still have an inventorship problem.

1          MS. YOUNG:  And, Your Honor, we believe that is

2   a legal issue whether or not publically disclosed

3   information about 10 years before the patent was filed could

4   actually create an inventorship issue.

5          MR. ROZENDAAL:  And we're happy to join --

6          THE COURT:  Look, why don't we do this:  It's

7   4:20, why don't we just let it in and I will just withhold

8   deciding whether I can make a determination that this

9   discloses the BMS.  I mean, because maybe this is all going

10  to go away depending on claim construction.

11         MR. ROZENDAAL:  Yes, Your Honor.

12         THE COURT:  Let's just do that.

13         So I'm not ruling on admissibility, we'll --

14  unlike the other issue, we'll punt this one.

15         MR. ROZENDAAL:  When it is offered, I expect to

16  renew my objection just for the record.

17         THE COURT:  That's fine.

18         MS. YOUNG:  Would it be helpful, Your Honor, to

19  have Dr. Perni's testimony on this issue?

20         THE COURT:  You're going to call Dr. Perni?

21         MS. YOUNG:  No, no, I'm just saying in terms of

22  what we had anticipated Dr. Perni to talk about regarding

23  the Singh article.

24         MR. STONE:  Dr. Perni is their testimony, Your

25  Honor.  The testimony in question is his deposition where he

DIRECT EXAMINATION - DR. BERGMEIER

1    said yes, this is from BMS.

2                MR. ROZENDAAL:  Well, that's not in evidence.

3                THE COURT:  Yeah.  I don't understand what are

4    you trying -- you're just trying to admit it?

5                MS. YOUNG:  I was just trying to help the Court

6    to provide some context for the Court, because in direct

7    examination we started to illicit this testimony.  We

8    thought we had agreement on it and then on redirect is when

9    it became confused.

10                THE COURT:  In direct --

11                MS. YOUNG:  I'm sorry, in cross-examination.

12                THE COURT:  Oh, of Dr. Perni?

13                MS. YOUNG:  Of Dr. Perni.  We believed we had

14    agreement on the issue and then on redirect is when we

15    understood there was confusion.

16                MR. ROZENDAAL:  But he was asked nothing about

17    the Singh reference.

18                THE COURT:  Right.

19                Okay.  Let's just allow the testimony for right

20    now and we can debate what it proves later on.

21                (Dr. Bergmeier retook the stand.)

22                THE COURT:  All right.  And, Doctor, you remain

23    under oath.

24                THE WITNESS:  Yes.

25    BY MS. YOUNG:

DIRECT EXAMINATION - DR. BERGMEIER

1   Q.      Welcome back, Dr. Bergmeier.

2   A.      Thank you.

3   Q.      Did you help prepare a demonstrative to assist in

4   your testimony today?

5   A.      Yes, I did.

6   Q.      Is that PDX-9 shown up on the screen?

7   A.      Yes, it is.

8   Q.      Have you been sitting in the courtroom this week

9   listening to testimony?

10  A.      Yes, I have.

11  Q.      Were you here in court yesterday for the testimony of

12  defendant's expert Dr. Perni?

13  A.      Yes, I was.

14  Q.      Did you agree with Dr. Perni's opinion that some

15  unknown person from BMS could have been named as an inventor

16  on the '465?

17  A.      No, I did not -- No, I do not agree, I'm sorry.

18  Q.      Did you help prepare slide two summarizing your

19  disagreements?

20  A.      Yes, I did.

21  Q.      What is that opinion?

22  A.      My opinion is that Vanda conceived of the claimed

23  invention, they worked to identify impurities 1, 2, 3, 5 and

24  6 and to determine their importance in the manufacturing

25  process.  And this is also indicative of BMS's failure to

DIRECT EXAMINATION - DR. BERGMEIER

1    conceive of this invention.

2              Similarly, BMS had no conception, they did

3    publically disclose methods to manufacture tasimelteon,

4    including methods with --

5              MR. ROZENDAAL:  Objection, Your Honor,

6    undisclosed expert testimony.

7              THE COURT:  Is this the same objection?

8              MR. ROZENDAAL:  The very same objection.

9              THE COURT:  I just wanted to make sure for the

10   record, it's noted and it will be ruled on later.

11   BY MS. YOUNG:

12   Q.    Please continue, Dr. Bergmeier.

13   A.      Including methods with a reducing step and a

14   propionylating step.

15              They did not identify any of Impurities 1, 2, 3,

16   5 or 6.  And they really did not appreciate the process

17   concerns or the potential association with toxic compounds,

18   such phosgene.

19   Q.    Did you agree with doctor --

20              THE COURT:  Hold on.  Stop for a second, sorry.

21              All right.  Counsel, can I see you at sidebar.

22              (Whereupon, a discussion was held at sidebar as

23   follows:)

24              THE COURT:  So the slide says that BMS

25   publically disclosed methods to manufacture tasimelteon,

DIRECT EXAMINATION - DR. BERGMEIER

1    including methods with a reducing step and a propionylating

2    step.  Paragraph 70, 71 and 72 don't discuss the

3    propionylating step at all.

4            MR. ROZENDAAL:  I think they might.

5            MS. YOUNG:  I thought they did.  I think we're

6    in agreement about that aspect.

7            THE COURT:  Well, okay, if that's not an issue,

8    I just wanted to make sure because the quote -- and I'll

9    quote from Paragraph 70, it says:  "Dr. Perni alleges that

10   Singh discloses the contacting and reacting steps of Claim

11   1..."

12           And then the next paragraph says:  "Singh does

13   disclose the contacting and reacting steps..."

14           And then we have discussed about those two

15   steps, so I just want to make sure that your objection that

16   has nothing to do with that.

17           MR. ROZENDAAL:  No, my objection is just whether

18   it was BMS or not.

19           THE COURT:  Okay.  Had nothing to do with that,

20   I wanted to make sure.

21           Good, all right, thank you very much.

22           (Whereupon, the discussion held at sidebar

23   concluded.)

24   BY MS. YOUNG:

25   Q.    Dr. Bergmeier, did you agree with Dr. Perni's opinion

DIRECT EXAMINATION - DR. BERGMEIER

1    that Claim 10 of the '465 patent is obvious over either the

2    '529 patent or CN268 in view of the ICHQ3A guidelines?

3    A.      No, I did not agree that these were obvious based on

4    either the '529 patent and the ICHQ3A guidelines or the

5    CN268 application and the Q3A guidelines.

6    Q.      Are your opinions summarized on slide three?

7    A.      Yes, they are.

8    Q.      Can you please tell you us, at a very high level,

9    what those opinions are?

10   A.      Yes.  So the '529 patent did not disclose the

11   impurity, let alone Impurities 1 through 3, 5 and 6.  They

12   didn't mention any process concerns or association with

13   other toxic compounds.  And, consequently, there was no

14   motivation and no reasonable likelihood of success.

15           Similarly, the CN268 application did not

16   disclose Impurities 1, 2, 3, 5 and 6.  And while they did

17   mention a relatively high impurity, that can still contain

18   significant amounts of Impurities 1, 2, 3, 5, and 6.

19           Again, no disclosure process concerns or

20   association with toxic compounds.  And, again, no motivation

21   and no reasonable likelihood of success.

22   Q.      All right.  Before we get to those opinions, let's

23   talk about a person of ordinary skill in the art.

24           When coming to your opinions about what the

25   reducing step means and whether defendants infringe Claim 10

DIRECT EXAMINATION - DR. BERGMEIER

1    of the -- I'm sorry, whether or not Claim 10 of the '465

2    patent is invalid, did you consider who would be a person of

3    ordinary skill in the art?

4    A.    Yes, I did.  I defined it as a person having a

5    bachelor's degree in chemistry or organic chemistry or

6    related discipline.

7    Q.    And are you a person of at least ordinary skill in

8    the art?

9    A.    Yes, I am.

10   Q.    Did you hear Dr. Perni's opinion of who a person of

11   ordinary skill in the art would be for the '465 patent?

12   A.    Yes, I did.

13   Q.    What do you understand of Dr. Perni's definition of a

14   person of ordinary skill?

15   A.    It's a somewhat more complex definition.  Someone

16   with more advanced degree, more skill, etc.

17   Q.    Do you agree with Dr. Perni's definition?

18   A.    No, I don't.

19   Q.    On Slide 5, did you provide bullet points for

20   Dr. Perni's definition of a person of ordinary skill?

21   A.    Yes, I did.

22   Q.    What skill is being described in the first bullet

23   point?

24   A.    It's education.  So he suggested this person would

25   have a PhD in organic chemistry or related discipline.

DIRECT EXAMINATION - DR. BERGMEIER

1     Alternatively, having an undergraduate or master's degree

2     with considerable experience working in the field.

3     Q.     Do you agree with that aspect of Dr. Perni's

4     definition?

5     A.     No, I don't.

6     Q.     Why not?

7     A.     I've worked with people who have had my definition of

8     skill in the art and, similarly, the invention really

9     requires analyzing and determining structures.

10    Q.     Are you a person of at least ordinary skill in the

11    art under that aspect of Dr. Perni's definition?

12    A.     Yes, I am.

13    Q.     Now, turning to the next bullet.  Do you agree with

14    that aspect of Dr. Perni's definition?

15    A.     No, I do not.

16    Q.     Why not?

17    A.     Someone who would have known or been aware of

18    relevant regulatory considerations.  I don't think that

19    that's really a requirement.  While it would be nice, it's

20    not a requirement.

21           One can certainly look these things up, but,

22    again, the invention is identifying compounds and

23    structures.

24    Q.     Are you a person of at least ordinary skill in the

25    art under that aspect of Dr. Perni's definition?

DIRECT EXAMINATION - DR. BERGMEIER

1   A.      Yes, I am.

2   Q.      Would any of your opinions change if you applied

3   Dr. Perni's definition instead of own?

4   A.      No, they would not.

5   Q.      All right.  Let's now turn to inventorship.  Were you

6   in the courtroom when Dr. Perni testified that BMS had

7   publically disclose a synthesis of tasimelteon that

8   contained the two contacting and reacting steps of Claim 10

9   in response to Dr. Perni -- to Mr. Groombridge's question,

10  but then on redirect Ms. Wells took that back and he wasn't

11  sure because he assumed the IND was published?

12  A.      Yes, I was.

13  Q.      What was your understanding of whether or not BMS had

14  publically disclosed different methods for synthesizing

15  tasimelteon on that included the two contacting and reacting

16  steps of Claim 10, the reducing step and the propionylating

17  step?

18          MR. ROZENDAAL:  Objection; undisclosed expert

19  testimony.

20          THE COURT:  All right.  I'll withhold ruling.

21          Go ahead.  So for now you can answer.

22          THE WITNESS:  I'm sorry, could you ask the

23  question again?

24          THE COURT:  You don't need to object this time,

25  it's preserved.

DIRECT EXAMINATION - DR. BERGMEIER

1        MR. ROZENDAAL:  Thank you, Your Honor.

2   BY MS. YOUNG:

3   Q.      What was your understanding of whether or not BMS had

4   publically disclosed different methods for synthesizing

5   tasimelteon that included the two contacting and reacting

6   steps of Claim 10, the reducing step and the propionylating

7   step?

8   A.      Yes, they did.

9   Q.      And how had BMS disclosed that?

10  A.      They disclosed it in a publication in early 2000, I

11  believe it was.

12  Q.      So let's take a look at that.  Can you turn in your

13  binder to the first tab, DTX-52?

14  A.      Right.

15  Q.      Do you recognize this document?

16  A.      Yes, this is the publication that I was thinking of.

17  Q.      Do you -- did you -- can we refer to that reference

18  as the Singh reference?

19  A.      Yes.

20  Q.      How did you become aware of the Singh reference?

21  A.      In one of Dr. Perni's reports, he had cited this

22  paper and I subsequently went and looked this up.

23  Q.      Did you consider the Singh reference in rendering

24  your opinions in this case?

25  A.      Yes, I did.

DIRECT EXAMINATION - DR. BERGMEIER

1    Q.       I'd like to offer DTX-52 into evidence.

2                 MR. ROZENDAAL:  Subject to the objections

3    previously stated, Your Honor.

4                 THE COURT:  All right.  It's admitted

5    conditionally.

6                 (DTX-52 was admitted.)

7    BY MS. YOUNG:

8    Q.       Mr. Weir, can you put up DTX-52 on the screen.

9                 And if you could blow up the title.

10                Who are the authors of this reference?

11   A.       Ambarish Singh J. Siva Prasad and Edward Delaney.  My

12   understanding is that they worked at BMS.

13                MR. ROZENDAAL:  Objection; again, undisclosed

14   testimony.  Nonresponsive.  Move to strike.

15                THE COURT:  You know what, just for right now,

16   keep objecting, because I did not think this is the way we

17   were getting to this as the process, but we are, so the --

18   so it's conditionally overruled, but it is conditionally and

19   I'll sort it out.  Let's just go.

20                I mean, there's no foundation.  I don't know how

21   he would know that this is the person, but it's

22   conditionally admitted.  You do what you want, create the

23   record you think you need to create and I'm going to decide

24   afterwards.

25                MS. YOUNG:  Your Honor, if it would be

DIRECT EXAMINATION - DR. BERGMEIER

```
 1    helpful --
 2              THE COURT:  Don't ask me what's helpful, just do
 3    what -- you do what your job is, it's 4:35, we need to move.
 4              MS. YOUNG:  Okay.
 5    BY MS. YOUNG:
 6    Q.    When did this article get published?
 7    A.    2004.
 8    Q.    Is that prior to the '465 patent?
 9    A.    I believe it is, yes.
10    Q.    Let's turn to the next page and look at Page 2.
11              Do you see the section there entitled:  Chemical
12    Approach Employed During Preclinical Research and
13    Development (Route A)?
14    A.    Yes, I do.
15    Q.    Mr. Weir, if you could blow that up as well as the
16    first paragraph under that header.
17              Dr. Bergmeier, what is being described here?
18    A.    Basically, they're disclosing their preliminary
19    approaches to synthesizing a compound, which is tasimelteon.
20    Q.    And Mr. Weir, if you could blow up -- go to Page 3
21    and blow up Figure 2 is this -- Dr. Bergmeier, is this the
22    reaction scheme for that route for the preclinical research
23    and development?
24    A.    Yes, I believe it was.
25    Q.    And in this route, is that there a propionylating
```

DIRECT EXAMINATION - DR. BERGMEIER

1    step?

2    A.    Yes; that final step R.

3    Q.    And what is compound 10?

4    A.    Compound 10 is the methanamine or what we have been

5    referring to as the methanamine in the patent.

6    Q.    And what is Compound 1?

7    A.    Compound 1 is tasimelteon.

8    Q.    Is there a carboxamide in this reaction scheme?

9    A.    In this particular one, no there is no.

10   Q.    So is there a reducing step?

11   A.    There is a reducing step, but it's not of the

12   carboxamide.

13   Q.    So there's not a reduction from the carboxamide to

14   the methanamine; is that fair?

15   A.    Yes.

16   Q.    How does this reaction scheme compare to what is

17   disclosed in BMS's '529 patent?

18   A.    This is pretty much the same as was disclosed in the

19   '529 patent.

20         MR. ROZENDAAL:  Objection, Your Honor;

21   undisclosed expert opinion.

22         THE COURT:  Is this the same --

23         MR. ROZENDAAL:  This is actually a slightly

24   different point.

25         THE COURT:  Yeah.  Is this disclosed?

DIRECT EXAMINATION - DR. BERGMEIER

1      MS. YOUNG:  Your Honor, this was in response

2   to --

3      THE COURT:  Are you pointing to the same

4   paragraphs?

5      MS. YOUNG:  No, I was just trying to give some

6   context and then we're going to go to the synthetic route

7   where they are disclosing the --

8      THE COURT:  All right.  The objection then --

9   you have not been able to point to where it is in the expert

10  report, so the objection is sustained.

11     MR. ROZENDAAL:  Move to strike, Your Honor.

12     THE COURT:  It is struck.

13  BY MS. YOUNG:

14  Q.    Okay.  If we can go forward to Page 5 to section

15  entitled:  Development of the Process Technology Support

16  Phase 2, 3 Clinical Studies and Future Commercialization

17  (Route C and D).

18     And Mr. Weir, if you could blow up the title for

19  Section 2.4, and the first four and five lines under that

20  header.

21     Dr. Bergmeier, what is being described here?

22  A.    It's a route that they wanted to use to produce large

23  quantities of their drug candidate.

24  Q.    And Mr. Weir, if we can now turn to Page 8, Figure 8

25  in this section.  And if you could blow up that figure along

DIRECT EXAMINATION - DR. BERGMEIER

1    with its legend.

2                Dr. Bergmeier, what is being described in this

3    figure?

4    A.      This is, I believe, the method that they were

5    mentioning in that previous heading.

6    Q.      And is there a reducing step in this figure?

7    A.      Yes, there is.

8    Q.      Which one is it?

9    A.      It's Step H.  Treatment with -- of the carboxamide 24

10   with Red-Al followed by acid to generate the methanamine

11   salt Compound 10.

12   Q.      And what is Compound 24?

13   A.      Compound 24 is the carboxamide, which is what we see

14   in the patent under discussion.

15   Q.      Is it fair to say that the carboxamide Compound 24 is

16   being reduced to the methanamine that is Compound 10?

17   A.      Yes, it is.

18   Q.      And is there a propionylating step in this reaction

19   scheme?

20   A.      Yes, there is, it's Step J, treatment of the Compound

21   10 or the methanamine with propionyl chloride in the

22   presence of base to generate Compound 1.

23   Q.      And what is Compound 1?

24   A.      It's tasimelteon.

25   Q.      And if we can now, Mr. Weir, go to Page 9 of this

DIRECT EXAMINATION - DR. BERGMEIER

1    document to the section headed:  2.5.

2              And if you could blow up the first paragraph

3    there.

4              Dr. Bergmeier, what is being described in this

5    section?

6    A.    They're basically describing that, you know, there's

7    a lot of considerations in designing a synthesis for

8    basically the manufacturing in terms of cost for the process

9    as well as direct shortness of the path as well.

10   Q.    All right.  And Mr. Weir, if we could turn to Page

11   11, Figure 10, please.  And blow that up along with the

12   legend.

13             Dr. Bergmeier, what is being shown here?

14   A.    This is their, I believe, more or less final path to

15   Compound 1.

16   Q.    And is there a reducing step and a propionylating

17   step in this reaction scheme?

18   A.    Yes, there is.  They don't actually draw or -- yes,

19   they don't actually draw the methanamine in this case, they

20   simply have the propionyl chloride.

21   Q.    Let's start with -- okay.  Let's go with the

22   propionyl chloride, does that correspond to a letter in this

23   scheme?

24   A.    Yes, it's (h).

25   Q.    And is there a disclosure of a reducing step in this

964

DIRECT EXAMINATION - DR. BERGMEIER

1    scheme?

2    A.      Yes, there is.  It's step F treatment with LAH or

3    lithium aluminum hydride followed by HCL.

4    Q.      And Mr. Weir, if we could turn to Page 12 and blow up

5    that first full paragraph there.

6            And if you could focus on the last sentence,

7    what's being -- or the last two sentences, what is being

8    described here, Dr. Bergmeier?

9    A.      Basically they're indicating that the dropout of

10   clinical candidates is fairly high.  And basically the

11   majority of the processes that are actually developed for --

12           MR. ROZENDAAL:  Objection; undisclosed expert

13   opinion.  I don't know what that is about.

14           THE COURT:  Where is this disclosed in the

15   expert report?

16           MS. YOUNG:  This is just the conclusion of the

17   paper, Your Honor.  I was just trying to conclude about the

18   paper and what the paper discloses.

19           THE COURT:  It's just the conclusion of Singh?

20           MS. YOUNG:  Yes, that's correct.

21           THE COURT:  I'll right now let it in

22   conditionally.

23           THE WITNESS:  So they're just noting that many

24   of the methods that are designed for making a clinical

25   candidate never actually reach a production stage.  And they

DIRECT EXAMINATION - DR. BERGMEIER

1    note that the process described above was just such a case.

2    BY MS. YOUNG:

3    Q.      And what is the melatonin agonist one that is

4    referenced there?

5    A.      It's tasimelteon.

6    Q.      Okay.  Let's now turn to Vanda's work.  If you could

7    turn to the next tab in your binder, it should be labeled

8    PTX-299.

9    A.      Okay.

10   Q.      Do you recognize this document?

11   A.      Yes.

12   Q.      What is this document?

13   A.      This is specification change history that Vanda was

14   supplying to the FDA.

15   Q.      Is this one of the documents you reviewed in

16   rendering your opinions?

17   A.      Yes, it was.

18   Q.      We'd like to offer PTX-299 into evidence.

19           MR. ROZENDAAL:  No objection, Your Honor.

20           THE COURT:  It's admitted.

21           (PTX-299 was admitted.)

22   BY MS. YOUNG:

23   Q.      Dr. Bergmeier, did you prepare slide 7 with

24   annotations to Page 2 of PTX-299?

25   A.      Yes, I did.

DIRECT EXAMINATION - DR. BERGMEIER

1   Q.      Dr. Bergmeier, what are you showing here?

2   A.      This is part of that overall table listing the

3   specification change history.  At the bottom there in 2011 I

4   note that Vanda indicated that at that point in time they

5   had identified Impurities 1, 2 and 3.  But it was not until

6   approximately two years later that the Impurities 5 and 6

7   had been identified and were added into their specification

8   sheet.

9   Q.      What is the significance of that?

10  A.      Really just that it was not a trivial process to

11  identify these Impurities 1, 2, 3, 5 and 6, and it did take

12  time and effort on Vanda's part to identify those compounds.

13  Q.      Now let's turn to the next tab in your binder,

14  JTX-117.  And I believe these documents have already been

15  admitted into evidence.

16          Dr. Bergmeier -- Mr. Weir, if you could put it

17  up on the screen.

18          Dr. Bergmeier, what is this document?  I'm

19  sorry, JTX-117?

20  A.      This is part of the chemistry manufacturing control

21  report that BMS had submitted to the FDA.

22  Q.      And Mr. Weir, if you could blow up the top portion

23  there, which submission is this?

24  A.      I believe this is number four.

25  Q.      And if we could then turn to Page 24 of this

DIRECT EXAMINATION - DR. BERGMEIER

1    document, please.

2              And Mr. Weir, if you could blow up the top

3    portion of this document.

4              Which submission is this, Dr. Bergmeier?

5    A.    This is submission number 7.

6    Q.    And if we could turn to Page 47 of this document,

7    please.

8              What is shown on this page?

9    A.    Okay.  So this is their impurities specification.  So

10   down at the bottom there you'll note that they're allowing

11   up to 1 percent of an individual impurity and up to

12   3 percent of total impurity.

13   Q.    Had these specifications changed at all from BMS's

14   original IND?

15   A.    I don't believe it has.

16   Q.    Did you prepare Slide 8 of PTX-098?

17   A.    Yes, I did.

18   Q.    And does it include the specifications from BMS's

19   original IND and BMS's amendment to number seven?

20   A.    Yes, it is.

21   Q.    Mr. Weir, could you put that up on the screen,

22   please.

23              Dr. Bergmeier, what are you showing here?

24   A.    Well, again, the individual impurity is just limited

25   to 1 percent and total impurity is up to 3 percent.

                    DIRECT EXAMINATION - DR. BERGMEIER

1    Q.      Let's focus our attention now on Impurities 1 through

2    3, 5, and 6 in Slide 9.

3            What is your opinion about whether BMS had

4    identified Impurities 1 through 3, 5, and 6?

5    A.      They did not, so if you look on the right-hand column

6    there, there's work done at Formosa for Vanda, you'll note

7    they had identified Impurities 1 and 2, BMS had not seen

8    those in their HPLC analysis.  They also identified a

9    compound Impurity 5, which they thought might co-elute with

10   what BMS called your Impurity P5, and then they also

11   identified Impurities 3 and 6, which, again, BMS had not

12   seen in their HPLC studies at all.

13   Q.      I see the chart that you have highlighted is from

14   PTX-811, so let's take a look at that document.

15           MS. YOUNG:  And I believe this document has

16   already been entered into evidence, Mr. Weir if you could

17   put that on screen and...

18   BY MS. YOUNG:

19   Q.      Dr. Bergmeier, what is this document?

20   A.      Again, this is from Formosa, again, just potential

21   impurities that were identified in Vanda's tasimelteon

22   product.

23   Q.      And if we could blow up the top of the screen,

24   Mr. Weir, I think Dr. Bergmeier you said Formosa, is this

25   from Vanda's NDA?

DIRECT EXAMINATION - DR. BERGMEIER

1   A.      Yes.

2   Q.      And if we could turn now to -- and Mr. Weir, if you

3   could blow up the second paragraph in the bottom.

4           What did Vanda tell FDA about P5?

5   A.      So they noted that P5 was identified at BMS from

6   LC/MS and LV/NMR data as described in their IND amendment

7   number seven.

8   Q.      Was that the document we were just looking at?

9   A.      Yes.

10  Q.      If we could go back and look at that particular --

11  those particular pages then.

12          Mr. Weir, if you could go back to JTX-117.  And

13  I believe Page 54 of that document corresponds to Page 29 of

14  BMS's amendment number seven.

15          What tentative structure did BMS identify for

16  P5?

17  A.      So the structure on the lower left was the structure

18  that BMS had tentatively identified as P5.

19  Q.      How many RRTs are associated with that?

20  A.      They associated three RRTs with that.  They said that

21  they were possibly stereoisomers of that original structure

22  there.

23  Q.      Do you understand those RRTs to be different

24  impurities?

25  A.      Yes.

DIRECT EXAMINATION - DR. BERGMEIER

1    Q.      Did you prepare a demonstrative, which is comparing

2    the structures of Impurity 5 to the proposed structures of

3    those RRT impurities?

4    A.      Yes, I did.

5    Q.      And Mr. Weir, if we could go to PDX-09.10.

6            What is being shown here?

7            Oh, I'm sorry, PDX-09, Slide 10?

8    A.      There we go.

9    Q.      What is being shown here?

10   A.      Okay.  So, again, we've got the tentative structure

11   that BMS had proposed on the left-hand side of the slide

12   there.  Whereas on the right-hand side, we have the correct

13   structure of -- that Vanda had determined for Impurity 5.

14           So they are similar, but they are different.

15   Q.      How are they different?

16   A.      The BMS structure, basically they drew a line, a

17   chemical bond between two carbons to essentially show that

18   they believed this to be a dimeric product.

19           Vanda, again, has a bond between two carbons

20   there in different places to form a different dimeric

21   structure.

22   Q.      And when you say it has a different dimeric structure

23   and bond, are you referring to the line from P3 on the

24   bottom structure there?

25   A.      Yeah.  So we're talking about this bond right here

DIRECT EXAMINATION - DR. BERGMEIER

1    versus this bond right here.  So they're basically joining

2    those two, sort of, identical pieces together at different

3    spots on those two halves of the molecule.

4    Q.    And do you see in BMS's figure there's a reference to

5    LC/MS?

6    A.    Yes.

7    Q.    What is that?

8    A.    Basically the LC/MS is going to give you the mass of

9    the molecule that elutes at that relative retention time,

10   but we would expect that the mass of the compound of both of

11   those compounds would be the same; they would have the same

12   chemical formula, same number of carbons, hydrogens and

13   nitrogens and oxygens, but the connectivity between those

14   carbons, hydrogens, nitrogens and oxygens is going to be

15   different.

16   Q.    Do you see reference to LC/NMR?

17   A.    Yes.

18   Q.    What --

19   A.    NMR is typically used to identify that connectivity

20   between hydrogens and carbons.  And we're looking at a -- I

21   would call it a subtle difference between these two

22   molecules.  And without really probably fairly extensive NMR

23   examination, you may not make the correct structural

24   determination here.

25            I might add that the structure that Vanda

DIRECT EXAMINATION - DR. BERGMEIER

1    proposed is -- seems to be chemically much more correct.

2    There's, I believe, multiple proposals as to how it might be

3    formed.   I don't think anyone has come up with a good

4    proposal as to how P5 might be formed.

5    Q.      What is your opinion then of whether BMS should be an

6    inventor on the '465 patent?

7    A.      They really did not identify Impurities 5, 6, 1, 2,

8    or 3 so, no, I do not think that they should be an inventor.

9    Q.      What about the first part of the claim; the contact

10   and the reacting steps?

11   A.      My opinion is that they had already publically

12   disclosed this --

13            MR. ROZENDAAL:  Objection, Your Honor.  Same

14   undisclosed testimony.

15            THE COURT:  All right.  Conditionally overruled.

16            THE WITNESS:  And so, no.

17   BY MS. YOUNG:

18   Q.      Dr. Bergmeier, let's now turn to your obviousness

19   opinions.

20            What is your understanding of what's in dispute

21   with regard to Claim 10 with respect to obviousness?

22   A.      The composition that comprises up to or .15 percent

23   or less of Impurities 5, 6, 1, 2 and 3.

24   Q.      Did the Patent Office consider any of the references

25   relied on by Dr. Perni?

1    A.    Yes, they did.

2    Q.    Did you prepare a demonstrative, Slide 14,

3    highlighting the front page of the '465 patent?

4    A.    Yes, I did.

5    Q.    Which references did the Patent Office consider?

6    A.    They examined the '529 patent.  They also examined

7    the FDA, Q3A guidelines, which is quite similar to the ICH

8    guidelines, they also examined a Chinese patent, the '019

9    patent.

10   Q.    Dr. Bergmeier, did you review documents to determine

11   what Vanda said to the Patent Office with regard to some of

12   these references?

13   A.    Yes, I did.

14   Q.    If you could turn now in your binder to the tab

15   labeled PTX-830.

16         Do you recognize this document?

17   A.    Yes, I do.

18   Q.    What is this document?

19   A.    This is a response from Vanda to the U.S. Patent

20   Office.

21   Q.    Did you consider that document in rendering your

22   opinions?

23   A.    Yes, I did.

24         MS. YOUNG:  We'd like to offer PTX-829 into

25   evidence.

DIRECT EXAMINATION – DR. BERGMEIER

1          MR. ROZENDAAL:  No objection.

2          THE COURT:  It's admitted.

3          (PTX-829 was admitted.)

4    BY MS. YOUNG:

5    Q.     Mr. Weir, if you could put that up on screen,

6    PTX-830, and if you could go to Page 7 under section 1 in

7    that first paragraph.

8          What is being disclosed here?

9    A.     The Patent Office had rejected Claims 1 through 19,

10   23, 24 and 38.

11   Q.     Based on which references?

12   A.     Basically, the Chinese patent '019 and Catt or the

13   '529 patent.

14   Q.     And now let's turn to the next page.

15         And Mr. Weir, if you could blow up the last two

16   paragraphs.

17         How did Vanda respond to the Patent Office?

18   A.     Well, they noted that these impurities were not

19   previously known according to the method described in the

20   '529 patent.  And really without the patent application

21   here, no one would have known that such impurities could be

22   formed or present in the product.

23   Q.     What did the Patent Office think of Vanda's response?

24   A.     I believe that they allowed it eventually.

25   Q.     Okay.  And if we could turn to the next document in

DIRECT EXAMINATION - DR. BERGMEIER

1    your binder, which should be PTX-829.

2             Do you recognize this document?

3    A.     Yes.

4    Q.     What is that document?

5    A.     Again, a response from Vanda to the U.S. Patent

6    Office.

7    Q.     Did you consider this document in rendering your

8    opinions?

9    A.     Yes, I did.

10            MS. YOUNG:  We'd like to offer PTX-830 into

11   evidence.

12            MR. ROZENDAAL:  No objection.

13            THE COURT:  All right.  It's admitted.

14            (PTX-830 was admitted.)

15   BY MS. YOUNG:

16   Q.     If we could turn to Page 5 -- and Mr. Weir, if you

17   could put that up on the screen to the third paragraph,

18   please.

19             What is Vanda responding to here?

20   A.     Again, I believe this patent was initially rejected.

21   Q.     And what was the basis of that rejection?

22   A.     Again, they noted it was clearly anticipated by the

23   '529 patent.

24   Q.     And how did Vanda respond -- and Mr. Weir, if you

25   could blow up the bottom half of that paragraph.

DIRECT EXAMINATION - DR. BERGMEIER

1          I'm sorry, the next paragraph.

2          How did Vanda respond?

3    A.    Well, again, they noted that these impurities were

4    not disclosed in the '529 patent.  And they really could not

5    have even known that they were in the -- in their

6    preparation of the compounds.

7    Q.    What did the Patent Office think of this response?

8    A.    Again, eventually this patent was allowed.

9    Q.    And Mr. Weir, if we can go back to the demonstrative

10   slides, and if you could put up slide 17, please.

11         Did you hear Dr. Perni's testimony regarding the

12   '529 patent?

13   A.    Yes, I did.

14   Q.    Did you agree with Dr. Perni that the '529 patent has

15   no reference to the impurity of tasimelteon and has no

16   reference to Impurities 1 through 3, 5 and 6?

17   A.    Yes, I did.

18   Q.    Let's now turn to the ICH guidelines, which is

19   DTX-555, which I believe is also into evidence.

20         What does ICHQ3A disclose?

21   A.    Provides guidelines as to how to deal with impurities

22   in your drug product.

23   Q.    Did you prepare Slide 18 to go through a bit of what

24   the ICHQ3A provides?

25   A.    Yes.

1    Q.      What is being shown on Slide 18?

2    A.      Basically, this is sort of the decision tree that's

3    listed in the guidelines that, sort of, sets out how you

4    might approach knowing the structure, not knowing the

5    structure, how much you have, etc., and how you might deal

6    with those things.

7    Q.      What happens if you know the structure of an

8    impurity?

9    A.      Your path is somewhat simpler; in that, you can

10   simply, in a way, just sort of move ahead and make sure that

11   as long as you know the impurity, you might be able to

12   purify out that impurity knowing the structure of that

13   compound.

14   Q.      What happens if you do not know the structure?

15   A.      Well, actually, as Dr. Perni noted, your path forward

16   is much more onerous; in that, you need to figure out how to

17   either remove the impurities without really knowing what

18   they are or carry out additional toxicity studies on those

19   impurities.

20   Q.      Is there anything in ICHQ3A that would point a person

21   of ordinary skill to Impurities 1 through 3, 5 or 6?

22   A.      No, there is not.

23   Q.      Did you prepare Slide 19 summarizing your opinions

24   about the '529 and the ICHQ3A guidelines?

25   A.      Yes, I did.

DIRECT EXAMINATION - DR. BERGMEIER

1   Q.      What are you disclosing here?

2   A.      Well, essentially, the '529 patent and the ICH

3   guidelines don't have any information about potentially

4   impurities of tasimelteon, let alone are the claimed

5   Impurities 1, 2, 3, 5 and 6.  They really don't provide any

6   motivation to identify those compounds nor their structure.

7   And there is no reasonable expectation of success for

8   identifying these compounds based on those general

9   informations provided in the '529 patent or the ICH

10  guidelines.

11  Q.      Let's turn to Dr. Perni's second obviousness

12  combination, which is CN268 and ICHQ3A guidelines.

13          Do you agree with Dr. Perni that CN268 only

14  mentions purity in a couple of places and does not include

15  any information as to how long the purified tasimelteon --

16  A.      Yes, I do.

17  Q.      And do you also agree with Dr. Perni that CN268

18  discloses tasimelteon, but the highest purity discloses 99.6

19  pure?

20  A.      Yes.  You know, the claimed purity is fairly high,

21  but that still could contain a significant amount of

22  Impurities 1, 2, 3, 5 or 6.

23          I should also point out that the melting point

24  was relatively low relative to the melting points that have

25  been reported for tasimelteon, as well as the aqua flow

DIRECT EXAMINATION - DR. BERGMEIER

1  rotation is quite low relative to the known aqua flow

2  rotation of tasimelteon, which might indicate that the

3  purity might not really be quite as good as they are

4  claiming.

5  Q.    And do you agree with Dr. Perni that CN268 does not

6  mention Impurities 1 through 3, 5 or 6?

7  A.    I do agree it does not mention any of those

8  impurities.

9  Q.    Did you provide a slide summarizing your opinions

10  with regard to Dr. Perni's second obviousness combination?

11  A.    Yes.

12  Q.    Is that Slide 23?

13  A.    Yes.

14  Q.    What is your opinion with regard to whether or not

15  the '468 patent is obvious in view of CN268 and ICHQ3A

16  guidelines?

17  A.    Well, again, the CN268 application and the ICH

18  guidelines combined don't have any information about

19  potential impurities, much less the structures of these

20  Impurities 1, 2 3, 5 and 6.

21       They don't provide any motivation to identify

22  those impurities, much less their structure.

23       And, again, no reasonable expectation success

24  for identifying those impurities based on those general

25  disclosures in the Chinese application or the ICH

DIRECT EXAMINATION - DR. BERGMEIER

1    guidelines.

2    Q.    I understand you considered other factors or

3    secondary considerations as to whether Claim 10 of the '465

4    patent is nonobvious?

5    A.    Yes, I did.

6    Q.    What other facts or factors did you consider?

7    A.    I looked at the FDA response letters to both Teva and

8    Apotex.

9    Q.    If you could turn to the second-to-the-last tab in

10   your binder.  It should be labeled PTX-153.

11             Do you recognize this document?

12   A.    Yes, I do.

13   Q.    What is this document?

14   A.    This is the response letter to Teva and their

15   manufacturer Watson Pharmaceuticals regarding their

16   application.

17   Q.    Is this one of the documents you reviewed in

18   rendering your opinions?

19   A.    Yes, it is.

20             MS. YOUNG:  We'd like to offer PTX-153 into

21   evidence.

22             MR. ROZENDAAL:  No objection.

23             THE COURT:  All right.  It's admitted.

24             (PTX-153 was admitted.)

25   BY MS. YOUNG:

DIRECT EXAMINATION - DR. BERGMEIER

1    Q.      Mr. Weir, could you put PTX-153 on the screen.

2             Do you see on the top there it says:  Complete

3    response?

4    A.      Yes.

5    Q.      What is a complete response letter?

6    A.      Basically responding to everything that they have

7    presented to the FDA and they are letting them know if what

8    they have submitted is adequate.

9    Q.      And if, Mr. Weir, you could blow up the second

10   paragraph of this letter.

11            What is FDA saying to Teva?

12   A.      They said that your submission is not adequate in its

13   present form and they provided recommendations to address

14   the issues.

15   Q.      And Mr. Weir, if we could go to --

16            THE COURT:  Ms. Young, how much longer do you

17   have?

18            MS. YOUNG:  I have maybe five more minutes.

19            THE COURT:  Okay.

20   BY MS. YOUNG:

21   Q.      Maybe it's easiest just to get to the slide then.

22   Mr. Weir, if you could pull up PDX-09, Slide 25.

23            Is this a slide you made highlighting what FDA

24   said to Teva with regard to Impurities 1, 2, 3, 5 and 6?

25   A.      Yes, it is.

DIRECT EXAMINATION - DR. BERGMEIER

1    Q.      What did FDA ask Teva to do?

2    A.      They asked them to basically let them know whether or

3    not the following impurities, which are the ones that are a

4    noted in the patent -- or '465 patent, I'm sorry.  And

5    whether or not they could detect them.  And if so, how they

6    are controlling for those compounds.

7    Q.      Do you see a reference there to US20170190683A1?

8    A.      Yes.

9    Q.      Do you have an understanding of what that is?

10   A.      Yeah, I believe that is the patent application for, I

11   believe, the '977 patent.

12   Q.      And how is the '977 patent related to the '465

13   patent?

14   A.      It's the parent patent of the '465 patent, I believe

15   it's called.

16   Q.      And how did Teva respond to FDA's complete response

17   letter?

18   A.      They indicated that they could either quantitate

19   these individual impurities or that their method was capable

20   -- or their method was not going to form those impurities.

21   Q.      And how was Teva able to quantitate those impurities?

22   A.      By knowing the structure, they were able to basically

23   make some of those impurities independently and spike their

24   samples with those impurities to determine whether or not

25   they were actually in there.

DIRECT EXAMINATION - DR. BERGMEIER

1    Q.      It stands to reason that Teva would not have been

2    able to do that if they didn't know the structure?

3    A.      If you did not know the structure, you would not be

4    able to do that.

5    Q.      Why wouldn't it have been sufficient for the

6    specification to be less than 0.10 percent of any unknown

7    impurities; why wouldn't that be sufficient?

8    A.      It's important to be able to control your process to

9    make sure that you're not making those as well.

10   Q.      If we could turn to the last slide.

11           Did FDA ask the same thing of Apotex?

12   A.      Yes, they did.

13   Q.      And how did Apotex respond?

14   A.      Again, they noted that they would be able to identify

15   those compounds in the HPLC or else control for their

16   presence by -- through their process.

17   Q.      And how did -- how was Apotex able to determine

18   whether or not they were able to find these impurities by

19   HPLC?

20   A.      Again, they have the structure, so they could make

21   them separately and analyze them by HPLC.  But they were

22   also able to control their process so that some of these

23   things were not made.

24           MS. YOUNG:  I believe this document is already

25   in evidence.

CROSS-EXAMINATION - DR. BERGMEIER

```
1          MR. COBLENTZ:  There's no objection.

2          MS. YOUNG:  I have no further questions.

3          THE COURT:  You're moving it?  Just in case --

4          MS. YOUNG:  I'm sorry it's JTX-071.

5          THE COURT:  All right.  It's admitted.

6          MS. YOUNG:  Thank you.

7          (JTX-071 was admitted.)

8          THE COURT:  All right.

9          How long are you going to be in cross?

10         MR. ROZENDAAL:  I don't know 20 minutes.

11         THE COURT:  All right.  Let's go ahead.

12                    CROSS-EXAMINATION

13    BY MR. ROZENDAAL:

14    Q.    Good afternoon, Dr. Bergmeier.

15    A.    Good afternoon.

16    Q.    Dr. Bergmeier, why don't we start with some

17    impurities?

18    A.    Okay.

19    Q.    And could you turn in your black binder, please, to

20    DTX-073, which is in evidence.

21          And if we could go, please, to 73.9, Page 9.

22          Dr. Bergmeier, the second sentence of this

23    section says that:  The chromatographic conditions used by

24    three manufacturers of tasimelteon to measure related

25    substances in tasimelteon drug substance are essentially
```

CROSS-EXAMINATION - DR. BERGMEIER

1    identical.

2              Do you see that?

3    A.    Yes.

4    Q.    That's what -- that's what Vanda told the FDA about

5    the impurity detection procedures used by the various

6    manufacturers, right?

7    A.    Right.

8    Q.    And you agree with that, right?

9    A.    Yeah.

10   Q.    It says:  "Therefore, a direct comparison of the

11   impurities present in the tasimelteon drug substance lots

12   and the level of each impurity can be performed."

13              Did I read that correctly?

14   A.    Yes.

15   Q.    And you agree with that, right?

16   A.    Yeah, sort of.

17   Q.    Sort of?

18   A.    There can be inconsistencies in columns even when

19   they are nominally the same column.  Length of time in

20   between when these were done and when they were done years

21   ahead of time could lead to changes that maybe we weren't

22   really aware of.

23   Q.    You're not saying it would be inappropriate to make

24   the comparison that Vanda made in this document submitted to

25   the FDA, though, are you?

CROSS-EXAMINATION - DR. BERGMEIER

1    A.    No, not really.

2    Q.    Okay.  So let's go ahead then, Mr. Brooks, and pull

3    up the table that goes at the bottom of that page and on to

4    the top of the next page.  See if we can kind of stack it up

5    together a little bit.

6              This is -- again, this is the comparison of the

7    retention time data for impurities in various manufacturers

8    of tasimelteon, right?

9    A.    Yes.

10   Q.    And this kind of data comes from HPLC; is that right?

11   A.    Yes.

12   Q.    Okay.  And HPLC can be used to detect impurities even

13   if the structural identity of those impurities is not known?

14   A.    It can be used to detect an impurity, but you may not

15   know what it is.

16   Q.    Right.  So you can detect the presence of the

17   impurity without knowing the structural identity of the

18   impurity, right?

19   A.    You can detect an impurity, you may not know what it

20   is.

21   Q.    I'm having trouble understanding what we're

22   disagreeing about.

23             So the way HPLC works is you put a sample into a

24   column and different components of the sample come out at

25   different speeds, right?

CROSS-EXAMINATION - DR. BERGMEIER

1   A.      Yes.

2   Q.      And it's the time that it takes for the different

3   components of the sample to make it through the column that

4   is being reported here in this table from DTX-73, right?

5   A.      Yes.

6   Q.      And it is possible to detect the presence of the

7   various impurities in this table even if -- even if one does

8   not know the contents of the peak on the chromatogram; is

9   that a fair way of putting it?

10  A.      Yes, but you can have co-elution.

11  Q.      Oh, I see, so your point is it's possible that two

12  things can come out close in time?

13  A.      Yes.

14  Q.      Or something could come out close in time with the

15  drug product that you're looking at?

16  A.      Yes.

17  Q.      Okay.  Now, there's no evidence that you've seen in

18  this case that co-elution was an issue with Impurities 1

19  through 3 or 5 and 6 that are at issue in this case?

20  A.      I don't believe that they indicated that there was an

21  issue with this particular set of studies.

22  Q.      Okay.  Now, if we look in -- the first column here

23  talks about -- the third row talks about Impurity 7.

24          Do you see that?

25  A.      Right.

CROSS-EXAMINATION - DR. BERGMEIER

1    Q.    That's currently not at issue in the case, right?

2    A.    I believe that's correct.

3    Q.    But it's one of the identified impurities.

4          And when BMS identified that impurity, they

5    called it Impurity P1, right?

6    A.    Yes.

7    Q.    So Impurity 7 and Impurity P1 you see next to each

8    other on the table are the same thing, right?

9    A.    Yes.

10   Q.    So a person reading this would know that they're --

11   referring to the same thing?

12   A.    Yes.

13   Q.    All right.  So then -- but then we go down to

14   Impurity 5 in the table.  And next to that is Impurity P5,

15   right?

16   A.    Right.

17   Q.    And so your testimony is that the evidence that

18   you've looked at has revealed that Impurity P5, as you read

19   the data, is different from Impurity 5?

20   A.    Yes.

21   Q.    Right.  And so what I'm trying to figure out is is it

22   your testimony that Vanda just made a mistake when it told

23   the FDA, when it put them sort of next to each other in a

24   table like this just like it did for Impurity 7 and Impurity

25   P1?

CROSS-EXAMINATION - DR. BERGMEIER

1    A.      I don't know that Vanda made any mistakes.  I think

2    that they noted that BMS had identified something called P5.

3    It was later, I believe, that they found the structure of

4    what P5 was or Impurity 5 was, which was different from what

5    BMS had tentatively identified it as.

6    Q.      Okay.  But a fair reading of this table is that this

7    is Vanda telling the FDA that they're the same thing, right?

8    A.      They thought they were the same thing.

9    Q.      Okay.  And so -- but you just think they were wrong

10   about that?

11   A.      I mean, they subsequently showed that they were not

12   the same compound.

13   Q.      Do you know if they ever informed the FDA about the

14   difference between those two impurities?

15   A.      I do not know.

16   Q.      Okay.  Now, let's go back to the previous page of the

17   document, DTX-73.8, please, Mr. Brooks.

18           And if we go down to the next to the last

19   paragraph.  And we look at the second line, this is one that

20   you directed our attention to on your direct exam, right.

21           It says impurities P2, P3, P4 and P5 were

22   identified at BMS from LC/MS and LC/NMR data, right?

23   A.      Yes.

24   Q.      And LC/MS is liquid chromatography mass spectrometry,

25   right?

CROSS-EXAMINATION - DR. BERGMEIER

1    A.    Yes.

2    Q.    And LC/NMR is liquid chromatography followed by

3    nuclear magnetic resonance, right?

4    A.    Yes.

5    Q.    And those are the standard tests you use to identify

6    a chemical structure, right?

7    A.    Yes.

8    Q.    BMS was not doing anything out of the ordinary here?

9    A.    No.

10   Q.    All right.  And you expect those typically to be

11   reliable ways of identifying a structure?

12   A.    They can be prone to interpretations, especially NMR.

13   Q.    Okay.  But generally this is what you would expect to

14   use.  It's not like they chose some exotic test that's

15   outside the mainstream for this sort of analysis, right?

16   A.    No.

17   Q.    All right.  And then -- now you say that the

18   structure in -- let's see, I think we may have an issue --

19   Mr. Brooks, would you pull up JTX-117 and look at Page 54.

20         All right.  And you had identified what you

21   think was the structure of P5 as this structure in the lower

22   left-hand corner; is that right?

23   A.    I believe that's what BMS proposed for P5, yes.

24   Q.    Right.  But we can agree that nothing in this

25   document talks about P5, right; it doesn't say P5?

CROSS-EXAMINATION - DR. BERGMEIER

1    A.      No.

2    Q.      You have pieced together that this is what you think

3    they think P5 was?

4    A.      Yes.

5    Q.      Okay.  Now, it was known in the prior art before the

6    '465 patent that pharmaceutical products needed to be

7    analyzed for impurities, right?

8    A.      Yes.

9    Q.      And it was also known that limiting impurities in

10   drug substances like tasimelteon is something important;

11   yes?

12   A.      Yes.

13   Q.      And a drug manufacturer would typically use HPLC to

14   detect the impurity?

15   A.      Yes.

16   Q.      Right.  And one can also determine the quantity of

17   the impurity based on HPLC, right?

18           I need a verbal answer.

19   A.      Yes.

20   Q.      And we agree that people of skill in the art would

21   have known how to adjust the HPLC conditions to separate

22   individual impurities, right?

23   A.      It's not always easy.

24   Q.      Is that a yes or a no?

25   A.      Generally, you know, you can adjust the conditions to

CROSS-EXAMINATION - DR. BERGMEIER

1    separate most impurities.

2    Q.    So generally, yes?  More often than not, yes?

3    A.    I don't know about more often than not, but I think

4    generally, yes.

5          I would note that I believe it was Teva or

6    perhaps Apotex, I forget which one, did note that Impurities

7    3 and 5 did co-elute.

8    Q.    Okay.  But the separation -- the adjusting of HPLC

9    conditions to separate individual impurities is something

10   generally within the skill of a person of skill in the art?

11   A.    Yes.

12   Q.    This is what people who work with HPLC do everyday,

13   right?

14   A.    Yes.

15   Q.    And the patent doesn't discuss any special conditions

16   for detecting Impurities 1 through 3, 5 and 6, right?

17   A.    No.

18   Q.    It doesn't tell you at all how to adjust your machine

19   to find these things?

20   A.    No.

21   Q.    It assumes that you'll know how to adjust the HPLC to

22   detect them, right?

23   A.    I would say so, yes.

24   Q.    Now, it's -- it would be -- at the time of the

25   invention -- strike that.  Let me start that again.

CROSS-EXAMINATION - DR. BERGMEIER

1              At the time of the invention would someone

2    making -- someone making tasimelteon for pharmaceutical use

3    would be motivated to keep the quantity of each impurity

4    below 0.15 percent, right?

5    A.      Yes.

6    Q.      And people of skill in the art before the '465 patent

7    had not previously thought that Impurities 1 through 3, 5

8    and 6 were an issue or a problem for the synthesis of

9    tasimelteon, right?

10   A.      Yes.

11   Q.      And at the time of the invention there were

12   regulatory requirements for the amount of impurities that

13   were allowed in a drug substance, right?

14   A.      Yes.

15   Q.      And at the time of the invention, the FDA had

16   recognized the ICH guidelines on impurities, correct?

17   A.      Yes.

18   Q.      And ICHQ3A guideline includes specific thresholds for

19   identifying impurities and qualifying impurities and

20   reporting impurities, right?

21   A.      Right.

22   Q.      I'm sorry, did you --

23   A.      Yes.

24   Q.      Thank you.

25              So let's go ahead and take a look at those

CROSS-EXAMINATION - DR. BERGMEIER

1   thresholds.

2           Can we bring up, Mr. Brooks, DTX-55 at Page 12.

3           You're welcome to follow along in your binder,

4   Doctor, but I think you'll recognize these numbers on the

5   screen.

6   A.    Yes.

7   Q.    So this is -- these are the thresholds in the ICH

8   guidelines, right?

9   A.    Correct.

10  Q.    And the lowest threshold -- and, first of all, there

11  are two rows in the chart; the upper row is for drugs for

12  which the maximum daily dose is less than 2 grams a day,

13  right?

14  A.    Yes.

15  Q.    And tasimelteon is one of those, right?

16  A.    Yes.

17  Q.    So if we then read across, the first threshold we

18  come to is the 0.05 reporting threshold, right?

19  A.    Yes.

20  Q.    That means that if you detect an impurity at greater

21  than 0.05 percent, you need to tell the FDA about the

22  existence of the impurity, right?

23  A.    Yes.

24  Q.    Okay.  And then if the impurity -- the next column is

25  the identification threshold.  So if you have more than

CROSS-EXAMINATION - DR. BERGMEIER

1    0.1 percent of the impurity or 1 milligram per day of

2    intake, whichever is lower, then you need to not only tell

3    the FDA about the existence of the impurity, but you need to

4    identify the impurity, right?

5    A.    Yes.

6    Q.    And in this context "identify" means determine the

7    chemical structure of the impurity, right?

8    A.    Yes.

9    Q.    Okay.  And then your reward for identifying the

10   impurity is that you're allowed to have more of it in the

11   drug product, right?

12   A.    Yes.

13   Q.    And so, you're allowed to have as much as

14   0.15 percent of identified impurities in the drug product,

15   whereas if you don't go to the trouble of identifying the

16   impurity, you need to keep it below 0.1 percent, right?

17   A.    You don't have to identify it if you go through the

18   qualification route.

19   Q.    Right.  Well, let's do it one at a time.

20         So if you -- oh I see what you're saying.  If

21   you don't identify it, you can do safety qualification

22   testing on the product rather than going to the trouble of

23   identifying the structure?

24   A.    Right, which is what BMS did.

25   Q.    But if you go above 0.15 percent for any impurity,

CROSS-EXAMINATION - DR. BERGMEIER

1    even if you identified it, then you have to go through

2    safety qualification testing for the product regardless of

3    whether you've identified it or not, right?

4    A.     Yes.

5    Q.     So you have a choice, you can -- when you find

6    something that's between 0.1 and 0.15 percent, you can

7    either try to get it under 0.1 percent so you don't have to

8    identify it, right?

9    A.     Correct.

10   Q.     Or you can identify, in which case you can just leave

11   it alone and you don't have to do the qualification, right?

12   A.     Right.

13   Q.     Or if you end up going over 0.15 percent, regardless

14   of whether you identify it, you need to do safety tests,

15   right?

16   A.     Correct.

17   Q.     And safety tests can be quite onerous and expensive,

18   can't they?

19   A.     Yes.

20   Q.     First of all, you have to figure out how to

21   manufacture the impurity, right?

22   A.     Correct.

23   Q.     And you need to make large quantities of it, right,

24   for testing?

25   A.     Yes.

CROSS-EXAMINATION - DR. BERGMEIER

1   Q.      You might have to do animal studies?

2   A.      Yes.

3   Q.      Those animal studies could go on more many months?

4   A.      Yes.

5   Q.      They could cost certainly more than a million

6   dollars, maybe multiple millions of dollars, right?

7   A.      Perhaps.

8   Q.      So there's an incentive not to go over the

9   0.15 percent threshold, right?

10  A.      Correct, but one could purify.

11  Q.      Yes.  When you say "one could purify," you mean one

12  could reduce the amount of the impurity below 0.15 percent?

13  A.      Yes.

14  Q.      Right.  That was my point.  I was saying there's an

15  incentive to do that rather than do the qualification safety

16  testing; we agree about that?

17  A.      Yes.

18  Q.      Now, we can take that down, Mr. Brooks.

19          Highly pure tasimelteon is something that was

20  known in the prior art before the '465 patent, right?

21  A.      I think the term "highly pure" is perhaps a little

22  bit subjective, but, yes.

23  Q.      Well, one of the items that you discussed on your

24  direct is the Chinese patent application, the CN019

25  application.

CROSS-EXAMINATION - DR. BERGMEIER

1            Do you recall that?

2    A.    I believe I discussed the '268, but --

3    Q.    Well --

4            THE COURT:  He's already said yes and I know

5    about the Chinese patent and the language in the Chinese

6    patent.  I can find that it's highly purified.  It seems it

7    is not even disputed.  Highly purified tasimelteon -- I'm

8    getting tired -- was in the state of the art, I don't think

9    it's disputed; right, it's not disputed?

10           MR. GROOMBRIDGE:  Correct.

11           THE COURT:  Let's move on.  I have a court

12   reporter and it's 5:30.

13           MR. ROZENDAAL:  I do think it is important to

14   get the '019 application into evidence.

15           THE COURT:  The Chinese application?

16           MR. ROZENDAAL:  Yes, Your Honor.

17           THE COURT:  I thought it was in evidence.

18           MR. ROZENDAAL:  Well, there are two; one is in

19   and one I'm about to put in it.

20           MR. GROOMBRIDGE:  For clarity for the Court, one

21   is the subject, is the obviousness reference is one called

22   '268.  This is a different one and we may be hearing about

23   how they are or aren't connected.

24           THE COURT:  Okay.  Sorry.

25           Can they move it into evidence without

CROSS-EXAMINATION - DR. BERGMEIER

1    objection?

2              MR. GROOMBRIDGE:  They can, Your Honor, without

3    objection.

4              THE COURT:  All right.  You can bring it in

5    without objection.  It's admitted.

6              What exhibit is it?

7              MR. ROZENDAAL:  It's Exhibit DTX-411.

8              THE COURT:  Okay.

9              (DTX-411 was admitted.)

10             MR. ROZENDAAL:  And we can pull it up, please,

11   Mr. Brooks.

12   BY MR. ROZENDAAL:

13   Q.    And just so that we're clear, if we go to -- oh, I'm

14   sorry.

15             If we go to DTX-411.53, which is the last page

16   of the document and we focus on the bottom part of the first

17   paragraph, please.  We'll see that if we start with the line

18   that begins with "Eluent was taken and the solvent was

19   removed to obtain 2.2 grams of white needle-like crystal

20   tasimelteon with a purity of 99.9 percent and a yield of

21   92 percent."

22             And so we agree, don't we, that this is a

23   reference that discloses 99.9 percent pure tasimelteon,

24   right?

25   A.    They do state that it is 99.9 percent pure.

CROSS-EXAMINATION - DR. BERGMEIER

1    Q.    All right.  And if it is 99.9 percent pure, then we

2    also agree that the level of impurities of -- the level of

3    each Impurities 1 through 3, 5 and 6 would necessarily have

4    been less than 0.15 percent, right?

5    A.    Yes.

6    Q.    Okay.  And so, this example from the '019 patent

7    application, which, for the record, was published on

8    May 8th, 2013, was -- pardon me.  This embodiment with the

9    99.9 percent purity satisfies all purity limitations of

10   Claim 10 of the '465 patent, right?

11   A.    What do you mean "satisfies all limitations?"

12   Q.    Well, I mean that if I made this product, which is

13   described here, and it's 99.9 percent pure, then that

14   would -- that would have less than 0.15 percent of all of

15   the impurities listed in -- of each of the impurities listed

16   in the '465 patent?

17   A.    I think it probably would.  I have my doubts as to

18   the 99.9 percent purity.

19   Q.    Okay.  So you think that the reference is not

20   accurately describing the purity?

21   A.    No.

22   Q.    Okay.  But if it were accurately describing the

23   purity, then there wouldn't be any individual impurity

24   greater than 0.15 percent, right?

25   A.    That would be hard to do.

CROSS-EXAMINATION - DR. BERGMEIER

1   Q.    Right.  So that's -- so we agree that it -- none of

2   them would be over that threshold, right?

3   A.    Yes.

4   Q.    Okay.  Now, in the interest of trying to speed this

5   up for time -- you can take that down, Mr. Brooks.

6         We agree, there's another Chinese application,

7   right, it's the '268 Chinese application, that's the one

8   that we've talked about before in this case?

9   A.    Yes.

10  Q.    And that one, on your reading of the claim, actually

11  uses even the claimed process of Claim 10 of the '465

12  patent, right?

13  A.    Yes.

14  Q.    So it goes through the route of a carboxamide, which

15  is reduced to a methanamine, which is then propionylated to

16  make tasimelteon, right?

17  A.    Yes.

18  Q.    Yes, it's reduced and reacted with acid.  Pardon me,

19  the carboxamide is reduced and reacted with acid to make the

20  methanamine --

21         THE COURT:  I think you need to start over,

22  because this seems to me to be a very central point about

23  whether it's sequential or it is a unified process.

24  BY MR. ROZENDAAL:

25  Q.    Okay.  So I'm now asking you to apply your

```
 1   interpretation of the claim, okay, Doctor.
 2              So as you interpret the claim, the CN268 patent
 3   carries out both of the process steps that are described at
 4   the beginning of Claim 1 and, therefore, also Claim 10 of
 5   the '465 patent, right?
 6   A.    I believe that's correct.
 7   Q.    Okay.  Well, I think it's important that we be sure.
 8   So if there's any doubt about it --
 9   A.    If I could take a look at the language of that one.
10   Q.    That would be DTX-301.  It's in your binder and it's
11   also in evidence.
12              THE COURT:  So let's do this, we have already
13   gone about half an hour.  Why don't we call it a day and
14   resume tomorrow.
15              All right.  You can step down.
16              Are there any issues I need to attend to
17   tonight?
18              MR. GROOMBRIDGE:  None that we're aware of, Your
19   Honor.
20              MR. ROZENDAAL:  No, Your Honor.
21              THE COURT:  And then you need to be -- we're
22   going to finish up, I would assume, before lunch, certainly
23   I would expect, and then we're doing claim construction,
24   right?
25              MR. ROZENDAAL:  Yes.
```

1    THE COURT:  I mean, we were going to get to it

2    today, but it took a lot longer.

3    MR. GROOMBRIDGE:  That makes sense to us, Your

4    Honor.  Let's get to it.

5    THE COURT:  Okay.  And then you'll be prepared

6    for -- and we'll debate about what and how long closing

7    arguments Friday morning.

8    All right, okay, that's the plan right now.

9    Subject to change, but that's the plan.

10    Okay.  And we're going to break for the evening.

11    Thanks.

12    MR. ROZENDAAL:  Oh, may the witness be

13    admonished not to --

14    THE COURT:  Oh, yeah, that is the one downside,

15    but this the way we were.  So the witness is not to engage

16    in any substantive conversations.

17    So just enjoy your dinner.  Speak about the

18    dinner, don't speak about the case.

19    All right.  I have to reboot my computer; you're

20    all free.

21    (Whereupon, the following proceeding concluded

22    at 5:36 p.m.)

23    I hereby certify the foregoing is a true

24    and accurate transcript from my stenographic notes in the

25    proceeding.

1          **/s/ Michele L. Rolfe, RPR, CRR**
               U.S. District Court

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'019** [4] - 973:9, 974:13, 998:15, 1000:7
**'244** [42] - 727:9, 727:15, 727:23, 728:4, 800:15, 800:17, 803:11, 803:15, 805:6, 805:15, 805:22, 806:5, 806:15, 806:23, 807:11, 807:23, 808:10, 809:18, 810:8, 811:4, 811:20, 813:11, 813:21, 814:5, 814:7, 815:2, 818:25, 819:2, 820:1, 820:3, 820:17, 820:18, 822:12, 822:13, 823:25, 824:4, 824:5, 827:13, 876:5, 876:11, 882:21, 883:1
**'268** [3] - 998:3, 998:23, 1001:8
**'465** [23] - 680:18, 687:18, 687:19, 761:13, 943:12, 950:17, 953:2, 954:2, 954:12, 959:9, 972:7, 973:4, 980:4, 982:5, 982:13, 982:15, 991:7, 993:7, 997:21, 1000:11, 1000:17, 1001:12, 1002:6
**'468** [1] - 979:16
**'487** [10] - 705:6, 822:7, 822:10, 822:17, 822:22, 824:6, 824:20, 826:7, 826:10, 828:17
**'510** [1] - 761:13
**'511** [1] - 761:13
**'529** [15] - 953:3, 953:5, 953:11, 960:18, 960:20, 973:7, 974:14, 974:21, 975:24, 976:5, 976:13, 976:15, 977:25, 978:3, 978:10
**'604** [8] - 704:22, 803:10, 804:9, 811:25, 813:12,

815:8, 817:18, 819:18
**'704** [1] - 761:13
**'80s** [1] - 838:6
**'829** [9] - 704:22, 705:1, 818:21, 818:23, 819:3, 819:17, 880:24, 882:2, 882:3
**'90s** [1] - 838:6
**'910** [8] - 704:22, 705:1, 820:12, 820:15, 820:21, 821:2, 821:10, 821:21
**'924** [1] - 799:8
**'977** [2] - 982:12, 982:13

**/**

**/s** [1] - 1004:2

**0**

**0.05** [5] - 921:7, 921:12, 924:3, 994:19, 994:22
**0.05-milligram** [1] - 910:1
**0.1** [4] - 995:2, 995:17, 996:7, 996:8
**0.10** [1] - 983:7
**0.15** [9] - 993:5, 995:15, 996:1, 996:14, 997:10, 997:13, 1000:5, 1000:15, 1000:25
**0.2** [1] - 923:14
**0.3** [1] - 910:9
**0.5** [17] - 719:18, 719:22, 723:4, 808:14, 837:13, 852:23, 852:25, 871:17, 909:25, 910:9, 911:17, 928:13, 928:20, 930:8, 930:14, 934:1, 996:7
**0.5-milligram** [3] - 906:16, 909:25, 929:24
**01163032** [3] - 785:12, 789:16, 789:17

**1**

**1** [65] - 680:22, 681:5, 682:16, 710:2, 710:3, 724:22,

801:18, 803:14, 804:9, 804:19, 805:7, 807:13, 809:14, 816:12, 817:12, 821:13, 822:18, 836:1, 836:23, 836:25, 837:9, 858:3, 858:9, 859:5, 859:8, 861:8, 863:19, 867:10, 871:12, 942:12, 943:12, 950:24, 951:16, 953:12, 953:17, 953:19, 960:7, 960:8, 962:23, 962:24, 963:16, 966:6, 966:12, 967:12, 968:1, 968:2, 968:5, 968:8, 972:8, 972:24, 974:7, 974:10, 976:17, 977:22, 978:6, 978:23, 979:7, 979:21, 981:25, 987:19, 992:17, 993:8, 995:2, 1000:4, 1002:5
**1.** [1] - 952:12
**1.1** [1] - 805:1
**1.43** [1] - 921:8
**1/31/2020** [1] - 786:4
**10** [38] - 723:5, 728:25, 807:2, 845:13, 851:18, 853:2, 853:4, 866:23, 870:5, 876:17, 881:6, 893:5, 910:8, 924:3, 924:4, 927:3, 928:14, 928:21, 929:20, 948:4, 953:2, 954:1, 954:2, 956:9, 956:17, 957:7, 960:4, 960:5, 962:12, 962:17, 962:22, 963:12, 970:8, 972:22, 980:4, 1000:11, 1001:12, 1002:5
**10-milligram** [1] - 922:10
**100** [10] - 728:25, 807:2, 866:24, 870:6, 870:18, 871:25, 875:9, 875:17, 876:18, 884:18
**100-milligram** [4] - 729:3, 876:15, 877:11, 884:6

**102(a** [11] - 764:11, 764:13, 764:16, 764:22, 764:25, 765:2, 765:6, 766:2, 766:7, 766:9, 766:11
**102(b** [5] - 764:7, 764:10, 764:23, 765:10, 765:12
**102(b)** [4] - 764:23, 765:8, 766:12, 776:2
**10:00** [3] - 738:13, 902:23, 915:14
**11** [1] - 963:12
**11.1.2.1** [2] - 876:22, 883:25
**11:00** [1] - 901:14
**11:15** [1] - 776:22
**12** [6] - 704:13, 795:15, 846:13, 913:16, 964:5, 994:3
**12-hour** [1] - 913:23
**12/27/2019** [2] - 739:2, 749:14
**12:26** [1] - 936:22
**13** [3] - 738:24, 790:20, 819:4
**1347** [1] - 751:24
**1355** [2] - 751:25, 752:13
**1358** [2] - 752:16, 753:5
**1359** [1] - 752:16
**13th** [4] - 740:24, 779:22, 780:5, 787:12
**14** [8] - 724:25, 725:3, 725:4, 818:23, 819:3, 819:6, 819:17, 973:3
**15** [20] - 739:4, 742:21, 745:14, 748:1, 748:14, 749:6, 750:10, 754:20, 754:24, 754:25, 758:20, 759:21, 760:9, 771:18, 776:20, 776:22, 789:20, 794:5, 795:12, 972:23
**15th** [12] - 733:9, 740:18, 740:25, 745:24, 747:13, 748:21, 749:19, 754:15, 755:19, 756:1, 780:7, 791:12
**17** [2] - 839:1, 976:11
**18** [6] - 741:1, 795:12, 846:13, 876:20, 976:24, 977:2
**18-651-CFC** [1] - 1:6

**19** [5] - 876:23, 885:4, 974:10, 977:24
**1980s** [1] - 712:16
**1983** [2] - 712:16, 838:24
**1988** [3] - 900:6, 900:12, 901:2
**1991** [4] - 849:23, 902:11, 902:20, 929:6
**1992** [1] - 896:10
**1995** [3] - 713:4, 920:12, 929:7
**1997** [3] - 896:11, 929:7
**1:00** [5] - 913:2, 913:5, 913:10, 913:15, 916:10
**1st** [1] - 934:18

**2**

**2** [38] - 710:2, 710:3, 728:19, 729:9, 758:21, 799:5, 801:18, 806:3, 808:21, 817:10, 858:3, 858:10, 859:4, 859:8, 864:10, 867:11, 873:23, 884:25, 885:12, 928:25, 950:24, 951:16, 953:17, 953:19, 959:11, 959:22, 961:17, 965:25, 966:6, 966:12, 968:8, 972:8, 972:24, 978:6, 978:23, 979:21, 981:25, 994:13
**2.2** [1] - 999:20
**2.4** [1] - 961:20
**2.5** [1] - 963:2
**20** [47] - 703:9, 727:21, 728:3, 728:25, 729:10, 746:5, 773:2, 773:5, 773:10, 788:24, 797:5, 799:12, 806:13, 806:20, 807:4, 807:5, 812:19, 816:7, 816:15, 819:10, 823:2, 845:9, 846:9, 853:3, 853:4, 858:19, 866:23, 870:5, 871:7, 873:13, 874:21, 875:4, 882:22,

883:3, 883:8, 883:12, 883:13, 883:18, 910:5, 910:8, 910:14, 911:22, 912:3, 923:15, 923:19, 924:6, 984:11
**20-milligram** [8] - 812:13, 812:15, 816:13, 818:10, 821:5, 885:19, 885:22, 911:15
**20-milligram-per-day** [1] - 808:17
**2000** [21] - 714:6, 714:17, 715:17, 718:8, 897:11, 899:17, 903:8, 919:13, 919:14, 919:23, 925:17, 926:16, 929:2, 929:17, 929:21, 932:21, 932:23, 933:12, 935:11, 957:11
**2001** [3] - 716:13, 929:25, 930:17
**2002** [3] - 716:19, 842:9, 852:18
**2003** [4] - 719:15, 725:22, 855:3, 919:14
**2004** [4] - 716:25, 947:11, 947:13, 959:8
**2005** [2] - 717:7, 916:9
**2007** [4] - 720:10, 727:8, 917:19, 918:13
**2009** [5] - 728:14, 730:2, 730:11, 865:4, 872:20
**2010** [73] - 721:14, 733:9, 735:23, 738:24, 740:18, 740:19, 740:25, 741:11, 742:21, 745:14, 745:24, 746:4, 746:18, 747:2, 747:14, 748:1, 748:14, 748:21, 749:6, 749:19, 750:10, 754:11, 754:15, 754:20, 754:24, 754:25, 755:19, 756:2, 759:21, 760:10, 765:11, 767:23, 767:24, 767:25, 768:4,

769:4, 769:5, 770:3, 771:18, 772:17, 773:14, 776:15, 779:22, 780:2, 780:5, 780:7, 780:23, 781:4, 782:9, 785:10, 787:12, 787:19, 788:24, 789:14, 789:21, 789:24, 790:2, 790:5, 790:9, 790:20, 791:9, 791:12, 792:19, 794:5, 795:12, 796:25, 816:10, 816:15, 816:25, 860:4, 860:12, 863:23
**2011** [23] - 742:25, 744:11, 760:12, 762:3, 762:13, 763:14, 763:20, 763:22, 764:1, 765:18, 765:19, 767:5, 767:7, 767:9, 767:16, 768:10, 768:23, 776:11, 798:14, 878:14, 893:22, 966:4
**2012** [16] - 705:11, 705:24, 708:16, 709:18, 722:23, 809:23, 832:15, 859:11, 881:13, 883:6, 910:13, 934:18, 934:22, 935:5, 936:7, 936:13
**2013** [3] - 739:4, 757:24, 1000:9
**2013/0197076** [1] - 827:1
**2014** [3] - 675:24, 684:22, 739:4
**2015** [21] - 746:3, 746:16, 746:20, 748:19, 749:21, 754:18, 755:24, 757:16, 757:22, 759:21, 762:13, 779:7, 780:16, 781:7, 781:9, 792:15, 792:18, 792:25, 793:6, 797:21, 919:1
**2017** [2] - 829:25, 845:8
**2018** [1] - 751:25
**2019** [3] - 747:17, 747:21, 749:10
**2020** [2] - 736:7,

740:24
**2021** [3] - 759:1, 761:11, 770:23
**2022** [2] - 1:14, 858:15
**21** [1] - 739:4
**214778** [1] - 725:23
**23** [6] - 767:7, 767:9, 767:15, 882:13, 974:11, 979:13
**23rd** [3] - 763:14, 768:23
**24** [13] - 706:9, 708:3, 741:23, 847:4, 869:20, 914:16, 941:20, 962:10, 962:13, 962:14, 962:16, 967:1, 974:11
**24-hour** [12] - 707:23, 708:2, 712:18, 714:22, 715:23, 773:19, 804:16, 805:19, 806:1, 814:24, 870:13, 905:17
**24.36** [2] - 921:14, 921:18
**24.45** [1] - 909:2
**24.69** [1] - 922:14
**24.7** [1] - 922:9
**24.9-hour** [1] - 922:15
**25** [5] - 808:19, 867:2, 870:8, 877:2, 981:23
**25.1** [1] - 922:4
**25.43** [3] - 921:23, 921:25, 922:12
**26** [3] - 678:8, 697:5, 698:20
**26th** [1] - 780:23
**27th** [2] - 749:10, 781:4
**283** [2] - 850:5, 850:8
**29** [4] - 932:18, 933:8, 933:12, 969:14
**29th** [1] - 941:4
**2nd** [2] - 780:2, 791:9

### 3

**3** [86] - 728:19, 731:10, 736:9, 739:14, 739:16, 770:11, 773:2, 779:9, 783:22, 788:23, 789:4, 793:5, 796:25, 799:6, 799:10, 799:13, 800:10, 800:13, 800:14, 801:17, 803:10, 805:3,

806:18, 807:15, 809:4, 809:19, 810:1, 810:24, 811:6, 811:11, 811:16, 813:12, 815:13, 817:18, 819:7, 819:16, 819:18, 820:22, 821:11, 821:20, 821:22, 822:15, 822:21, 822:23, 823:3, 826:21, 837:13, 855:10, 861:7, 878:3, 878:18, 878:24, 885:3, 885:12, 906:19, 910:5, 931:24, 931:25, 950:24, 951:16, 953:12, 953:17, 953:19, 959:21, 961:17, 966:6, 966:12, 967:13, 968:1, 968:3, 968:5, 968:12, 972:9, 972:24, 976:17, 977:22, 978:6, 978:23, 979:7, 979:21, 981:25, 987:20, 992:8, 992:17, 993:8, 1000:4
**3-hour** [1] - 864:10
**30** [17] - 1:14, 702:12, 702:14, 708:4, 708:8, 709:8, 709:12, 759:1, 808:2, 808:13, 813:5, 823:14, 823:16, 824:1, 887:24, 932:18, 932:23
**30,000** [1] - 682:25
**30th** [1] - 738:13
**31** [2] - 933:8, 933:12
**31st** [2] - 736:7, 754:19
**36** [1] - 921:17
**36-hour** [1] - 921:7
**38** [1] - 974:11
**39** [1] - 932:20
**3:15** [1] - 895:10

### 4

**4** [13] - 754:17, 820:13, 820:15, 820:21, 821:1, 821:10, 821:21, 822:3, 822:18, 835:10,

835:20, 863:3, 906:19
**40** [1] - 846:9
**402** [2] - 732:9, 738:5
**41.25** [1] - 805:16
**411** [1] - 885:3
**419.3** [2] - 746:5, 746:10
**419.4** [1] - 746:6
**42** [5] - 771:7, 793:17, 795:20, 795:22, 798:1
**42.9** [3] - 779:15, 787:21, 794:13
**47** [1] - 967:7
**4:20** [1] - 948:8
**4:35** [1] - 959:4
**4B** [1] - 672:4

### 5

**5** [65] - 747:10, 754:16, 806:10, 822:10, 822:17, 822:20, 822:22, 823:3, 824:6, 824:19, 824:20, 825:13, 825:17, 830:9, 835:10, 838:10, 838:12, 843:11, 853:5, 863:18, 881:8, 882:2, 893:5, 901:24, 902:22, 904:20, 921:7, 922:10, 922:13, 926:2, 927:13, 929:14, 930:5, 950:24, 951:17, 953:12, 953:17, 953:19, 954:20, 961:15, 966:7, 966:12, 968:3, 968:5, 968:10, 970:3, 970:14, 972:8, 972:24, 975:17, 976:17, 977:22, 978:6, 978:23, 979:7, 979:21, 981:25, 987:20, 988:15, 988:20, 989:5, 992:8, 992:17, 993:8, 1000:4
**5-milligram** [5] - 901:13, 921:22, 921:24, 922:16, 922:20
**5.2** [1] - 843:21
**5.36** [1] - 921:12
**5.99** [1] - 855:18

**50** [11] - 727:21, 728:3, 728:25, 846:13, 866:24, 870:6, 873:13, 874:21, 875:4, 882:22, 893:7
**50-milligram** [1] - 812:19
**54** [2] - 969:14, 990:20
**55** [2] - 830:15, 924:4
**59** [1] - 846:16
**5:00** [2] - 916:10, 923:16
**5:30** [1] - 998:13
**5:36** [1] - 1003:23
**5th** [1] - 935:5

## 6

**6** [30] - 789:4, 805:4, 806:10, 813:7, 843:20, 855:8, 919:12, 950:25, 951:17, 953:12, 953:17, 953:19, 966:7, 966:12, 968:3, 968:5, 968:12, 972:8, 972:24, 976:17, 977:22, 978:6, 978:23, 979:7, 979:21, 981:25, 987:20, 992:17, 993:9, 1000:4
**6.6** [1] - 804:25
**6.64** [1] - 855:20
**62** [2] - 941:20, 941:24

## 7

**7** [22] - 763:22, 764:1, 778:20, 802:3, 802:17, 804:22, 805:2, 812:21, 815:6, 855:24, 866:8, 866:11, 873:1, 880:21, 884:13, 942:14, 965:24, 967:6, 974:7, 987:24, 988:8, 988:25
**70** [7] - 830:16, 942:15, 943:6, 943:10, 946:4, 952:3, 952:10
**71** [2] - 946:4, 952:3
**72** [4] - 942:22, 943:7, 946:5, 952:3
**73.9** [1] - 984:22
**7th** [2] - 742:25, 767:5

## 8

**8** [8] - 815:6, 845:16, 846:9, 866:11, 874:19, 961:25, 967:17
**8.10** [1] - 907:10
**8.11** [1] - 908:2
**8.12** [1] - 909:17
**8.15** [1] - 911:8
**8.17** [1] - 913:9
**8.3** [2] - 899:14
**8.6** [1] - 902:18
**8.7** [1] - 903:17
**80** [1] - 739:9
**84** [9] - 736:6, 739:10, 739:11, 742:5, 785:8, 786:3, 788:16, 788:20, 788:22
**895** [1] - 751:24
**8:30** [1] - 672:4
**8th** [1] - 1000:9

## 9

**9** [12] - 779:13, 794:13, 795:15, 802:3, 804:23, 805:2, 847:19, 855:25, 880:21, 963:1, 968:3, 984:22
**9-hour** [1] - 802:17
**90** [1] - 898:9
**901** [3] - 748:9, 749:13, 796:19
**902** [2] - 749:7, 749:12
**902(b)(2** [1] - 749:1
**92** [1] - 999:22
**93** [1] - 873:10
**99.6** [1] - 978:19
**99.9** [8] - 680:6, 999:21, 999:24, 1000:1, 1000:2, 1000:10, 1000:14, 1000:19
**9:00** [6] - 904:20, 906:17, 913:1, 914:22, 916:5, 920:1
**9th** [1] - 893:22

## A

**a.m** [5] - 672:4, 913:2, 913:5, 915:14, 916:10
**abbreviated** [2] - 710:3, 867:25
**abbreviation** [1] - 912:9
**ability** [10] - 722:8, 832:23, 849:1, 851:10, 889:19, 897:2, 922:24, 922:25, 929:11, 933:5
**able** [37] - 713:21, 718:9, 718:10, 729:15, 742:11, 771:3, 771:10, 772:11, 798:3, 833:8, 849:7, 851:12, 851:15, 851:25, 852:1, 871:9, 895:6, 902:23, 904:22, 905:1, 906:21, 907:2, 921:5, 921:13, 921:14, 922:16, 961:10, 977:12, 982:22, 982:23, 983:3, 983:5, 983:9, 983:15, 983:18, 983:19, 983:23
**abnormality** [1] - 931:15
**abolish** [1] - 914:8
**abolishing** [1] - 912:8
**absent** [1] - 733:4
**absolute** [1] - 858:25
**absolutely** [1] - 757:8
**abstract** [8] - 726:6, 830:15, 860:2, 925:19, 926:21, 927:8, 928:12, 931:4
**ACA** [1] - 753:23
**academic** [2] - 701:15, 888:4
**Academy** [6] - 702:4, 702:6, 702:23, 703:11, 723:2, 723:17
**accept** [4] - 680:22, 767:10, 800:20, 817:22
**accepted** [2] - 710:24, 839:6
**access** [5] - 681:11, 786:13, 797:20, 798:4, 886:1
**accessed** [5] - 747:17, 747:21, 757:8, 797:22, 798:2
**accidentally** [1] - 905:6
**accomplish** [1] - 771:4
**according** [6] - 689:24, 711:8, 763:24, 878:13, 916:19, 974:20
**accuracy** [1] - 749:2
**accurate** [7] - 699:18, 748:20, 762:23, 830:18, 831:2, 836:6, 1003:25
**accurately** [4] - 790:8, 795:16, 1000:21, 1000:23
**achieve** [8] - 804:3, 805:11, 810:6, 841:7, 852:4, 853:15, 912:7, 915:19
**achieved** [7] - 709:16, 762:24, 871:16, 914:7, 921:6, 921:7, 929:13
**achieving** [1] - 862:20
**acid** [3] - 962:11, 1001:19, 1001:20
**acknowledge** [2] - 935:9, 937:6
**acknowledgments** [1] - 926:4
**acronym** [1] - 867:6
**act** [2] - 831:12, 848:13
**acting** [3] - 726:8, 810:9, 812:4
**ACTION** [1] - 1:5
**action** [1] - 810:12
**actions** [1] - 861:3
**active** [1] - 843:2
**activities** [2] - 849:2, 863:11
**activity** [1] - 727:18
**actual** [5] - 707:9, 824:18, 866:6, 877:6, 921:25
**add** [5] - 819:17, 821:21, 823:3, 943:2, 972:1
**added** [1] - 966:8
**addition** [3] - 748:25, 769:17, 848:13
**additional** [9] - 769:15, 807:15, 819:23, 820:4, 820:7, 822:3, 823:7, 906:19, 977:19
**Additional** [2] - 758:8, 758:11
**address** [5] - 693:21, 872:25, 938:10, 939:14, 981:14
**addressed** [2] - 785:16, 894:7
**addressing** [2] - 752:6, 807:18
**adds** [2] - 819:19, 823:5
**adduce** [3] - 770:17, 770:18, 790:7
**adducement** [1] - 737:23
**adequate** [2] - 981:9, 981:13
**adjudicate** [1] - 751:11
**adjudicating** [1] - 751:10
**adjust** [4] - 991:22, 992:1, 992:19, 992:22
**adjusting** [1] - 992:9
**administer** [5] - 715:22, 773:5, 788:24, 820:6, 825:10
**administered** [18] - 727:21, 727:25, 728:2, 808:2, 817:2, 821:12, 823:8, 823:16, 823:20, 823:21, 823:22, 827:20, 827:21, 830:20, 836:9, 837:13, 841:8, 841:12
**administering** [25] - 710:5, 710:6, 714:19, 718:2, 719:21, 773:2, 806:13, 807:1, 807:4, 808:13, 812:25, 816:7, 816:23, 818:12, 823:1, 823:5, 824:1, 824:21, 824:22, 825:9, 825:24, 826:1, 826:16, 827:16, 876:17
**administers** [3] - 912:25, 913:5, 916:22
**administration** [18] - 723:8, 797:3, 797:5, 807:18, 807:25, 808:11, 813:5, 821:9, 836:5, 837:18, 879:17, 879:19, 880:4, 923:7, 925:22, 927:8, 931:6, 931:9
**Administration** [1] - 850:16
**admissibility** [7] - 737:4, 737:9,

737:13, 750:1, 758:13, 770:20, 948:14
**admissible** [1] - 789:25
**admission** [1] - 794:21
**admissions** [1] - 939:11
**admit** [6] - 697:4, 790:14, 795:22, 796:4, 829:22, 949:5
**admitted** [64] - 690:21, 697:7, 699:3, 699:6, 713:11, 713:12, 714:13, 714:14, 715:13, 715:14, 717:14, 717:15, 717:16, 717:17, 717:18, 719:11, 719:12, 720:17, 720:18, 721:21, 721:22, 724:1, 724:2, 724:12, 725:18, 725:19, 727:2, 727:3, 730:8, 730:9, 738:6, 749:12, 798:21, 798:22, 828:21, 828:23, 830:7, 830:8, 850:7, 850:8, 901:7, 901:8, 902:15, 902:16, 911:6, 911:7, 919:8, 919:9, 958:5, 958:7, 958:23, 965:21, 965:22, 966:16, 974:3, 974:4, 975:14, 975:15, 980:24, 980:25, 984:6, 984:8, 999:6, 999:10
**admonished** [1] - 1003:14
**advance** [30] - 690:25, 729:12, 841:15, 850:18, 850:24, 851:3, 851:7, 852:3, 864:10, 885:7, 885:10, 885:13, 902:24, 903:2, 905:7, 905:10, 912:7, 913:3, 913:18, 913:21, 913:22, 914:4, 914:7, 914:8, 914:15, 917:1, 920:21, 932:3, 933:5
**advanced** [4] - 843:15, 904:24, 906:20,

954:17
**Advances** [1] - 850:17
**advances** [3] - 836:10, 843:5, 851:25
**advancing** [1] - 927:18
**advantage** [1] - 849:9
**advised** [1] - 828:16
**advisory** [2] - 829:20, 829:23
**affect** [2] - 684:6, 838:3
**affects** [1] - 841:9
**affidavit** [3] - 762:20, 765:17, 767:5
**affiliate** [1] - 701:16
**affinities** [3] - 858:22, 859:1
**affinity** [1] - 799:19
**affirmed** [1] - 895:21
**afternoon** [8] - 793:16, 829:1, 829:2, 836:9, 895:25, 924:24, 984:15, 984:16
**afterwards** [2] - 883:17, 958:25
**agent** [5] - 709:2, 709:4, 709:10, 710:7, 843:1
**aggregate** [1] - 684:4
**ago** [2] - 702:14, 887:24
**agomelatine** [8] - 861:21, 862:5, 862:9, 862:16, 862:18, 862:25, 863:10, 864:8
**Agomelatine's** [1] - 863:7
**agonist** [13] - 722:1, 722:3, 724:8, 812:4, 814:20, 830:21, 831:6, 831:9, 832:6, 832:10, 862:10, 865:20, 965:4
**agonists** [8] - 722:6, 722:12, 860:15, 860:23, 861:2, 861:19, 863:24, 873:20
**agree** [55] - 688:16, 689:11, 696:20, 710:21, 737:14, 761:10, 774:14, 838:1, 840:9, 840:13, 851:10, 851:14, 852:2, 856:9, 856:10, 857:5, 857:13,

858:13, 860:21, 860:24, 861:1, 862:18, 871:12, 872:23, 876:10, 876:13, 881:12, 882:1, 882:5, 915:7, 944:13, 944:17, 946:7, 950:15, 950:18, 951:20, 953:1, 953:4, 954:18, 955:4, 955:14, 976:15, 978:14, 978:18, 979:6, 979:8, 985:9, 985:16, 990:25, 991:21, 997:17, 999:23, 1000:3, 1001:2, 1001:7
**agreed** [7] - 700:14, 711:19, 766:23, 860:13, 884:17, 898:18, 947:18
**agreeing** [1] - 944:12
**agreement** [6] - 672:10, 894:16, 946:10, 949:9, 949:15, 952:7
**agrees** [4] - 673:3, 944:7, 944:8, 947:16
**ahead** [18] - 675:6, 696:10, 700:10, 747:15, 753:21, 777:11, 784:22, 796:6, 833:20, 889:9, 914:17, 917:2, 956:22, 977:11, 984:12, 985:22, 986:3, 994:1
**air** [1] - 890:14
**AI** [5] - 715:21, 842:9, 842:10, 887:7, 962:11
**al** [8] - 1:8, 716:11, 716:19, 716:25, 717:6, 721:14, 935:11
**alerting** [1] - 708:24
**alertness** [2] - 830:24, 832:18
**Alfred** [2] - 702:17, 887:2
**alive** [1] - 888:15
**allege** [1] - 946:9
**alleged** [2] - 761:15, 761:17
**allegedly** [1] - 801:10
**alleges** [3] - 943:11, 944:5, 952:10
**allow** [6] - 737:23, 797:18, 797:24,

798:3, 848:8, 949:20
**allowed** [7] - 696:2, 798:8, 974:25, 976:9, 993:14, 995:11, 995:14
**allowing** [1] - 967:11
**alludes** [1] - 726:3
**almost** [2] - 882:6, 882:7
**alone** [3] - 953:12, 978:5, 996:12
**alternatively** [1] - 955:2
**aluminum** [1] - 964:4
**Ambarish** [1] - 958:12
**ambiguous** [1] - 689:6
**amendment** [3] - 967:20, 969:7, 969:15
**American** [7] - 702:3, 702:4, 702:6, 702:23, 703:11, 723:2, 723:17
**Amneal** [1] - 751:24
**amnestic** [1] - 891:24
**amount** [9] - 745:10, 753:24, 753:25, 843:11, 843:14, 923:3, 978:22, 993:13, 997:13
**amounts** [2] - 875:12, 953:19
**analogy** [1] - 849:7
**analysis** [5] - 790:22, 904:11, 935:20, 968:9, 990:16
**analytical** [1] - 693:8
**analyze** [2] - 703:15, 983:22
**analyzed** [2] - 705:5, 991:8
**analyzing** [5] - 677:12, 801:17, 819:3, 822:17, 955:10
**AND** [1] - 1:3
**and..** [1] - 968:18
**animal** [3] - 726:5, 997:2, 997:4
**animals** [4] - 712:17, 726:4, 840:11, 890:5
**annotations** [1] - 965:25
**annual** [1] - 936:13
**ANOVA** [1] - 877:14
**answer** [12] - 672:15, 677:20, 685:22, 697:13, 699:10, 786:11, 810:21, 834:1, 862:13, 900:1, 956:22,

991:19
**answers** [1] - 900:2
**anticipate** [3] - 773:15, 816:3, 818:5
**anticipated** [5] - 800:21, 815:19, 815:21, 948:23, 975:23
**anticipates** [1] - 773:24
**anticipation** [5] - 680:9, 681:8, 772:24, 815:9, 815:10
**anticipatory** [1] - 816:2
**antidepressants** [1] - 862:12
**anyway** [3] - 688:20, 894:12, 895:8
**apart** [2] - 692:17, 693:16
**apologies** [1] - 759:24
**apologize** [7] - 751:12, 752:14, 753:1, 797:10, 833:22, 872:5, 882:15
**Apotex** [7] - 671:18, 683:18, 980:9, 983:12, 983:14, 983:18, 992:7
**appeal** [2] - 753:10, 796:13
**appear** [3] - 722:12, 908:4, 939:6
**APPEARANCES** [1] - 671:1
**appended** [4] - 746:22, 766:8, 768:8, 768:25
**applicant** [1] - 727:5
**Application** [1] - 826:25
**application** [22] - 726:19, 726:20, 727:5, 795:19, 827:4, 876:5, 876:11, 876:14, 953:6, 953:16, 974:21, 979:18, 980:1, 980:17, 982:11, 997:25, 998:1, 998:15, 998:16, 1000:8, 1001:7, 1001:8
**applications** [2] - 862:3, 862:4
**applied** [1] - 956:3
**apply** [4] - 770:17,

803:9, 833:10, 1002:1

**appreciate** [2] - 774:9, 951:17

**Approach** [1] - 959:13

**approach** [4] - 736:2, 777:9, 924:20, 977:5

**approaches** [1] - 959:20

**appropriate** [3] - 814:23, 924:2, 924:10

**appropriately** [2] - 930:8, 932:2

**approvable** [1] - 685:4

**approval** [4] - 687:20, 740:5, 757:25, 829:21

**approved** [3] - 685:1, 687:17, 736:12

**approximate** [1] - 869:18

**aqua** [2] - 979:1, 979:2

**arbitrate** [1] - 775:14

**archive** [1] - 735:5

**archive's** [1] - 762:24

**area** [2] - 807:3, 890:8

**areas** [1] - 896:25

**Arendt** [16] - 713:3, 713:15, 713:18, 720:9, 896:15, 896:16, 896:19, 900:8, 901:2, 901:12, 903:25, 917:15, 919:22, 920:10, 929:7, 930:23

**ARENDT** [1] - 896:17

**argue** [1] - 738:4

**argued** [4] - 685:10, 685:12, 685:18, 938:22

**arguing** [3] - 686:15, 698:12, 764:10

**argument** [17] - 673:1, 675:8, 678:8, 686:9, 687:9, 688:13, 689:2, 698:3, 699:5, 738:5, 738:13, 772:23, 774:14, 774:15, 774:22, 800:20, 947:20

**arguments** [2] - 941:21, 1003:8

**arise** [1] - 802:24

**arm** [1] - 797:4

**arms** [1] - 816:19

**Arms** [2] - 791:25, 792:2

**arose** [1] - 938:16

**arrange** [1] - 785:15

**arrive** [2] - 809:25, 813:15

**arriving** [2] - 810:24, 814:10

**ARSHT** [1] - 671:12

**art** [129] - 673:14, 673:25, 676:1, 676:24, 678:17, 679:7, 680:8, 680:13, 681:9, 695:12, 697:16, 701:9, 705:11, 705:18, 705:20, 705:24, 709:23, 710:17, 710:23, 711:3, 722:21, 729:4, 732:11, 732:16, 732:23, 733:1, 734:18, 734:25, 735:18, 737:11, 737:17, 743:2, 743:16, 750:7, 750:8, 750:16, 750:17, 751:9, 754:7, 757:3, 759:12, 759:15, 759:19, 760:17, 760:20, 761:22, 764:7, 764:10, 764:11, 764:13, 764:16, 764:23, 764:24, 764:25, 765:6, 765:12, 766:9, 771:10, 795:3, 801:3, 801:4, 801:6, 801:10, 802:6, 802:8, 802:21, 803:8, 807:20, 808:22, 809:23, 810:23, 811:13, 811:19, 813:14, 814:9, 815:22, 819:13, 819:24, 821:17, 833:8, 849:13, 860:12, 863:23, 879:6, 879:8, 881:23, 882:3, 883:6, 891:12, 891:13, 898:15, 910:12, 915:23, 917:8, 917:9, 919:18, 922:23, 923:6, 923:18, 924:1, 938:12, 938:20, 938:23, 938:24, 939:1, 939:17, 940:2, 940:4, 940:7,

941:22, 942:1, 942:2, 942:3, 944:13, 944:17, 953:24, 954:4, 954:9, 954:12, 955:9, 955:12, 956:1, 991:6, 991:21, 992:11, 993:7, 997:21, 998:9

**art's** [1] - 811:8

**article** [85] - 678:25, 679:14, 679:15, 679:17, 679:19, 679:24, 679:25, 689:24, 698:6, 698:16, 699:2, 699:3, 699:4, 699:7, 699:8, 699:11, 699:16, 720:9, 720:20, 720:25, 721:13, 721:24, 726:3, 730:1, 730:11, 734:5, 734:8, 734:16, 748:19, 749:21, 754:19, 755:24, 757:17, 762:13, 780:12, 780:14, 780:16, 781:7, 781:9, 792:15, 792:19, 792:25, 793:2, 798:14, 798:25, 809:6, 829:8, 829:25, 832:22, 835:14, 835:17, 842:9, 845:7, 845:12, 853:1, 860:4, 862:22, 865:16, 872:11, 873:18, 876:14, 893:21, 900:17, 900:22, 903:19, 904:17, 917:16, 917:18, 917:23, 918:20, 919:4, 919:11, 919:17, 920:15, 920:18, 931:2, 931:5, 941:21, 947:2, 947:25, 948:24, 959:7

**articles** [5] - 703:6, 703:9, 716:3, 865:10, 890:22

**articulated** [4] - 734:15, 751:1, 771:15, 771:20

**articulation** [1] - 911:18

**artisan** [6] - 890:25,

891:6, 892:12, 892:13, 892:15, 893:9

**artist** [1] - 676:2

**aside** [1] - 816:5

**asleep** [24] - 707:12, 802:9, 889:23, 890:8, 890:9, 890:19, 891:5, 891:8, 891:10, 891:16, 891:21, 891:24, 891:25, 892:1, 892:4, 892:6, 892:14, 892:21, 892:25, 893:1, 893:2, 893:3, 893:7

**aspect** [10] - 675:9, 675:10, 675:24, 676:11, 682:11, 952:7, 955:4, 955:12, 955:15, 956:1

**aspects** [1] - 936:17

**asserted** [6] - 732:22, 761:2, 800:5, 935:20, 939:19, 939:20

**asserting** [2] - 938:20, 939:17

**assertion** [1] - 692:6

**assess** [1] - 703:16

**assessed** [2] - 925:23, 926:9

**assessing** [2] - 789:7, 799:11

**assessment** [1] - 842:4

**assist** [2] - 701:4, 950:4

**associate** [1] - 701:15

**associated** [6] - 867:15, 878:9, 919:21, 946:19, 969:20, 969:21

**Association** [2] - 702:4, 702:5

**association** [3] - 951:18, 953:13, 953:21

**assume** [4] - 802:8, 891:9, 905:9, 1002:23

**assumed** [1] - 956:12

**assumes** [1] - 992:22

**assuming** [4] - 680:23, 680:24, 741:15, 943:14

**astronauts** [1] - 898:7

**asymmetric** [1] - 945:19

**attached** [7] - 762:17, 762:22, 762:25, 765:16, 767:4, 776:1, 797:22

**attaches** [1] - 770:5

**attack** [2] - 696:3, 696:4

**attempt** [7] - 707:12, 731:23, 777:16, 784:24, 900:4, 901:13, 902:12

**attempted** [1] - 769:9

**attempting** [1] - 804:13

**attempts** [1] - 899:7

**attend** [1] - 1002:17

**attention** [4] - 840:4, 840:7, 968:2, 989:21

**attest** [1] - 755:20

**Attorney** [1] - 701:13

**attorneys** [2] - 800:25, 815:19

**attracted** [2] - 840:4, 840:6

**attributable** [1] - 856:7

**audience** [1] - 835:17

**August** [3] - 770:3, 780:23, 781:4

**authentic** [1] - 748:9

**authenticate** [2] - 734:4, 770:18

**authenticated** [1] - 752:11

**authenticating** [3] - 745:3, 795:10, 795:16

**authentication** [3] - 743:7, 771:20, 772:1

**authenticity** [8] - 736:18, 736:24, 750:15, 750:18, 751:10, 752:8, 770:24, 790:13

**author** [19] - 703:11, 716:3, 716:13, 829:15, 839:14, 839:20, 852:16, 900:7, 903:25, 904:5, 904:9, 904:10, 904:12, 904:14, 906:5, 906:8, 906:11, 928:10

**authored** [2] - 897:12, 925:17

**authors** [9] - 699:7, 829:12, 842:13, 871:19, 903:19, 910:24, 919:4,

946:13, 958:11
**automatic** [2] - 781:14, 797:18
**automatically** [5] - 778:23, 780:14, 781:10, 793:2, 797:22
**availability** [4] - 733:11, 751:22, 752:1, 761:21
**available** [25] - 674:12, 678:18, 694:20, 734:1, 735:23, 743:17, 751:15, 753:23, 754:5, 754:7, 754:12, 758:4, 766:16, 769:4, 773:13, 776:15, 785:11, 788:8, 789:14, 792:11, 795:2, 872:19, 873:19, 894:16
**average** [2] - 708:8, 789:3
**avoid** [2] - 806:7, 821:25
**awake** [8] - 707:12, 889:16, 890:8, 890:10, 890:18, 891:16, 892:25, 893:8
**awaken** [3] - 802:11, 802:23, 892:7
**aware** [8] - 672:8, 705:16, 710:16, 712:10, 955:18, 957:21, 985:23, 1002:19

## B

**bachelor's** [2] - 896:10, 954:6
**back-and-forth** [3] - 770:22, 771:5, 775:14
**background** [4] - 701:21, 756:5, 826:22, 896:9
**backward** [2] - 837:3, 837:17
**baffling** [1] - 912:18
**bar** [9] - 870:23, 871:5, 871:21, 871:22, 871:25, 884:14
**bars** [2] - 707:6, 708:11
**base** [2] - 835:16, 962:23
**based** [22] - 685:10, 685:13, 726:7, 730:14, 730:21, 735:13, 738:21, 750:17, 794:14, 814:18, 815:18, 822:6, 883:5, 884:9, 887:4, 942:19, 946:6, 953:4, 974:12, 978:9, 979:25, 991:18
**basis** [10] - 691:4, 733:19, 782:13, 782:18, 794:22, 795:1, 796:5, 890:7, 946:15, 975:22
**batch** [2] - 680:6, 680:9
**bearing** [1] - 737:25
**beat** [2] - 706:7
**beat-to-beat** [1] - 706:7
**became** [7] - 692:5, 692:8, 692:23, 693:17, 795:2, 946:24, 949:10
**become** [8] - 692:9, 692:12, 695:14, 695:23, 697:19, 699:15, 915:13, 957:21
**becomes** [2] - 695:8, 908:17
**bed** [4] - 802:24, 848:18, 893:5
**bedtime** [28] - 727:22, 728:2, 773:3, 773:6, 773:10, 789:2, 797:9, 807:19, 808:3, 808:14, 813:1, 813:5, 816:24, 817:2, 818:13, 818:15, 821:11, 821:13, 821:14, 823:16, 824:1, 848:17, 867:16, 916:8, 916:9, 920:2, 923:15, 927:4
**BEFORE** [1] - 1:18
**begin** [3] - 803:11, 803:17, 822:8
**beginning** [10] - 672:4, 771:15, 830:14, 835:13, 851:21, 868:6, 868:9, 895:15, 910:13, 1002:5
**begins** [4] - 753:7, 867:25, 941:24, 999:19
**behalf** [2] - 700:21, 703:4
**behavioral** [1] - 706:5
**behind** [3] - 764:16, 764:19, 903:13
**beings** [4] - 838:4, 839:3, 840:12, 863:14
**below** [8] - 780:3, 780:6, 780:20, 893:17, 929:7, 993:5, 995:17, 997:13
**bench** [3] - 672:3, 696:23, 742:19
**Bench** [1] - 1:15
**beneficial** [2] - 672:11, 874:13
**benefit** [2] - 684:12, 692:1
**Bergmeier** [29] - 673:14, 674:7, 938:1, 942:17, 947:17, 949:22, 950:2, 951:13, 953:1, 959:18, 959:22, 961:22, 962:3, 963:5, 963:14, 964:9, 965:24, 966:2, 966:17, 966:19, 967:5, 967:24, 968:20, 968:25, 972:19, 973:11, 984:15, 984:17, 984:23
**Bergmeier's** [2] - 940:25, 941:19
**best** [4] - 691:11, 775:3, 845:10, 918:14
**bet** [1] - 749:8
**better** [6] - 696:6, 737:21, 824:22, 845:13, 889:25, 941:14
**between** [27] - 682:6, 706:19, 771:6, 789:10, 794:23, 801:5, 834:19, 857:7, 858:21, 862:7, 862:15, 871:21, 886:16, 892:25, 894:3, 897:5, 922:24, 936:6, 946:13, 970:18, 970:20, 971:14, 971:21, 971:22, 985:21, 989:15, 996:7
**Beyond** [1] - 789:19
**big** [8] - 675:3, 811:11, 839:25, 843:14, 843:16, 885:16, 887:21, 887:22
**bigger** [3] - 826:5, 887:23, 921:6
**biggest** [1] - 729:1
**binary** [5] - 889:21, 890:2, 890:11, 890:21, 891:4
**bind** [4] - 710:2, 722:4, 727:17, 857:21
**binder** [37] - 712:23, 713:25, 714:24, 716:6, 718:25, 720:4, 721:8, 723:14, 731:1, 774:8, 778:4, 779:11, 797:13, 826:11, 829:4, 849:18, 852:7, 880:7, 900:15, 902:7, 903:14, 906:3, 910:20, 917:12, 918:18, 920:7, 925:12, 947:8, 957:14, 965:8, 966:14, 973:15, 975:2, 980:11, 984:20, 994:4, 1002:11
**binders** [2] - 895:19, 924:19
**binds** [4] - 813:23, 858:1, 859:4, 859:7
**biological** [22] - 707:24, 708:3, 709:3, 709:5, 709:19, 709:23, 710:24, 712:14, 712:18, 728:21, 729:11, 810:12, 814:25, 836:4, 841:19, 868:6, 868:9, 869:5, 870:13, 896:11, 916:20
**biology** [1] - 896:10
**biphasic** [1] - 890:17
**bit** [35] - 701:11, 702:20, 703:25, 704:20, 705:23, 705:25, 712:7, 724:21, 756:5, 756:17, 779:23, 783:23, 791:6, 791:10, 791:14, 791:25, 801:15, 810:21, 813:20, 826:4, 831:7, 835:4, 840:16, 847:4, 858:12, 862:9, 868:6, 868:21, 869:19, 869:20, 869:22, 899:20, 976:24, 986:6, 997:23
**black** [1] - 984:20
**BLAKE** [1] - 671:16
**blank** [1] - 792:12
**Blind** [5] - 778:18, 789:19, 829:9, 850:17, 900:23
**blind** [63] - 707:22, 719:19, 719:22, 720:24, 722:25, 723:5, 731:11, 773:3, 773:6, 773:10, 797:12, 799:11, 803:20, 804:10, 806:18, 808:23, 809:5, 809:7, 809:10, 809:12, 811:7, 813:21, 817:7, 817:9, 818:17, 818:19, 821:6, 821:8, 830:16, 839:3, 846:20, 852:21, 854:20, 854:23, 897:1, 898:20, 899:8, 901:13, 902:12, 902:22, 904:19, 905:14, 906:15, 914:24, 919:19, 921:11, 921:25, 922:17, 925:23, 926:9, 926:23, 927:9, 927:20, 928:15, 928:17, 928:22, 929:12, 930:9, 930:13, 932:15, 934:2, 935:10, 937:7
**blow** [19] - 826:22, 883:25, 934:11, 958:10, 959:16, 959:21, 959:22, 961:19, 962:1, 963:3, 963:12, 964:5, 966:23, 967:3, 968:24, 969:4, 974:16, 976:1, 981:10
**blue** [8] - 816:14,

816:17, 818:10, 819:10, 821:5, 823:2, 871:21, 888:23
**BMS** [101] - 674:15, 674:22, 675:17, 675:22, 676:13, 678:3, 679:8, 680:6, 681:11, 681:16, 681:21, 682:4, 682:11, 682:13, 682:14, 682:16, 683:7, 685:22, 687:2, 687:4, 687:6, 687:11, 687:12, 687:22, 688:1, 688:2, 688:13, 689:7, 689:25, 690:5, 690:19, 690:22, 691:13, 692:5, 692:8, 692:12, 692:21, 692:25, 693:1, 693:2, 693:3, 693:6, 693:16, 694:8, 694:21, 694:24, 697:18, 699:3, 699:7, 699:8, 699:11, 725:23, 938:6, 939:21, 940:8, 940:15, 940:17, 940:19, 945:10, 946:3, 946:4, 946:6, 946:9, 946:14, 946:19, 946:21, 947:25, 948:10, 949:2, 950:16, 951:3, 951:25, 952:19, 956:7, 956:14, 957:4, 957:10, 958:13, 966:22, 968:4, 968:8, 968:11, 968:12, 969:6, 969:16, 969:19, 970:12, 970:17, 972:6, 988:5, 989:3, 989:6, 989:23, 990:9, 990:24, 995:25
**BMS's** [18] - 679:20, 680:5, 680:19, 681:4, 694:4, 698:7, 698:11, 698:16, 938:13, 940:10, 941:21, 951:1, 960:18, 967:14, 967:19, 967:20, 969:15, 971:5
**board** [3] - 753:11, 753:12, 823:18

**Bob** [4] - 715:21, 887:7, 891:17, 891:18
**bobbing** [1] - 892:4
**body** [27] - 706:14, 708:6, 708:23, 831:10, 831:15, 831:20, 831:24, 832:14, 836:13, 837:5, 837:6, 841:2, 842:6, 850:22, 850:23, 857:14, 857:21, 867:11, 868:8, 868:14, 868:23, 869:3, 869:4, 874:5, 874:8, 881:10, 912:5
**body's** [1] - 868:4
**bond** [5] - 970:18, 970:20, 970:24, 971:1, 971:2
**book** [7] - 854:8, 859:13, 864:20, 872:5, 876:4, 877:17, 880:15
**borne** [1] - 687:20
**Boston** [1] - 896:4
**bottom** [25] - 707:20, 708:9, 738:21, 746:5, 746:10, 746:11, 756:3, 778:6, 780:10, 786:14, 786:22, 808:16, 815:23, 845:23, 866:11, 873:5, 933:16, 934:11, 966:4, 967:11, 969:4, 970:25, 976:1, 986:4, 999:17
**box** [2] - 911:13, 912:1
**brain** [13] - 697:1, 706:8, 707:25, 867:21, 869:15, 890:6, 890:7, 890:9, 890:18, 891:18, 892:5, 924:9
**break** [5] - 776:22, 828:7, 895:5, 895:9, 1003:11
**breaking** [1] - 801:23
**breath** [1] - 890:14
**Brief** [4] - 791:4, 791:14, 791:16
**brief** [1] - 738:11
**briefing** [8] - 672:12, 672:25, 691:21, 701:9, 751:4, 751:8, 772:5, 772:12
**briefly** [14] - 701:20,

702:11, 706:2, 707:21, 723:14, 793:10, 800:12, 802:10, 815:10, 882:11, 886:18, 904:6, 924:1, 935:25
**Brigham** [4] - 702:15, 896:3, 897:20, 897:22
**bring** [13] - 674:22, 689:16, 694:8, 738:3, 738:8, 755:17, 758:18, 777:20, 783:2, 946:18, 994:3, 999:5
**bringing** [1] - 689:18
**Bristol** [1] - 674:10
**Bristol-Myers** [1] - 674:10
**broader** [1] - 758:12
**broadly** [3] - 722:1, 726:1, 869:3
**broken** [1] - 881:9
**Brooks** [1] - 925:13
**brooks** [19] - 783:6, 784:1, 784:8, 784:14, 786:18, 787:6, 792:8, 826:2, 826:20, 882:12, 883:24, 884:25, 986:3, 989:18, 990:20, 994:3, 997:19, 999:12, 1001:6
**brought** [4] - 682:1, 694:16, 694:23, 842:13
**browser** [1] - 783:7
**BRYON** [1] - 671:4
**building** [1] - 676:23
**builds** [1] - 676:2
**built** [1] - 676:16
**bullet** [5] - 882:16, 914:10, 954:20, 954:23, 955:14
**bunch** [1] - 779:19
**burden** [5] - 691:9, 692:1, 745:8, 748:16, 796:19
**Burgess** [1] - 837:13
**business** [1] - 760:23
**but..** [1] - 680:15
**BY** [115] - 671:3, 671:8, 671:12, 671:15, 700:24, 711:21, 712:11, 713:13, 714:15, 715:15, 717:19, 718:23, 719:13, 720:19, 721:23,

724:3, 725:20, 727:4, 730:10, 778:3, 782:4, 782:22, 783:10, 783:19, 784:2, 784:9, 784:15, 786:10, 786:23, 787:8, 787:15, 790:16, 791:7, 791:15, 792:1, 792:9, 792:24, 793:13, 796:8, 796:23, 798:10, 798:23, 826:6, 826:24, 828:25, 830:11, 835:12, 835:22, 836:24, 838:13, 840:21, 845:6, 846:5, 847:16, 847:22, 850:14, 851:23, 852:15, 853:9, 855:11, 856:14, 860:3, 860:20, 861:9, 863:8, 863:21, 865:1, 866:13, 870:25, 872:7, 872:17, 873:6, 876:25, 880:14, 881:25, 882:19, 884:1, 884:16, 885:2, 895:24, 898:23, 901:10, 901:19, 902:19, 903:18, 904:7, 905:22, 906:7, 907:11, 908:3, 909:8, 911:9, 919:10, 924:23, 925:15, 934:17, 936:2, 950:1, 951:12, 952:25, 957:3, 958:8, 959:6, 961:14, 965:3, 965:23, 968:19, 972:18, 974:5, 975:16, 981:1, 981:21, 984:14, 999:13, 1001:25
**byproduct** [1] - 683:25

# C

**calendar** [1] - 893:16
**candidate** [2] - 961:24, 965:1
**candidates** [1] - 964:11
**candidly** [1] - 695:25
**cannot** [4] - 745:20, 749:2, 758:1, 924:14

**capable** [7] - 838:23, 839:2, 862:19, 862:22, 862:25, 863:13, 982:20
**capture** [3] - 744:6, 744:11, 744:13
**captured** [3] - 762:12, 763:20, 763:23
**captures** [2] - 744:2, 762:2
**carbons** [5] - 970:18, 970:20, 971:13, 971:15, 971:21
**carboxamide** [11] - 675:12, 690:7, 945:22, 960:9, 960:13, 960:14, 962:10, 962:14, 962:16, 1001:15, 1001:20
**Care** [1] - 701:14
**care** [2] - 815:8, 818:20
**cared** [1] - 688:3
**carries** [1] - 1002:4
**carry** [1] - 977:19
**carrying** [1] - 746:6
**cartoon** [1] - 912:22
**case** [63] - 672:21, 673:6, 673:18, 673:23, 674:1, 674:3, 679:4, 679:12, 679:21, 686:11, 700:15, 702:21, 703:4, 703:15, 704:8, 706:15, 710:14, 711:10, 721:13, 730:1, 734:11, 737:25, 741:20, 743:15, 752:4, 752:6, 753:9, 758:1, 759:19, 772:19, 772:20, 774:1, 785:20, 790:23, 794:16, 796:18, 800:9, 830:12, 837:12, 843:1, 862:5, 862:16, 867:15, 886:5, 894:15, 894:18, 895:15, 897:5, 908:12, 910:2, 916:11, 938:2, 939:16, 957:25, 963:20, 965:2, 984:4, 987:19, 987:20, 988:2, 996:11, 1001:9, 1003:19

**cases** [2] - 735:15, 910:6
**cast** [1] - 797:25
**categories** [1] - 834:8
**category** [1] - 864:5
**Catt** [4] - 724:18, 724:23, 724:25, 974:13
**causality** [1] - 868:19
**caused** [6] - 729:10, 771:9, 883:12, 883:14, 883:15, 946:24
**causes** [4] - 831:9, 831:10, 868:20, 883:13
**causing** [2] - 719:24, 848:9
**centers** [3] - 887:25, 888:2
**central** [1] - 1001:23
**Central** [1] - 746:24
**certain** [2] - 705:3, 752:7, 764:13, 771:25, 831:9, 897:6, 946:15
**certainly** [15] - 684:1, 710:9, 763:9, 805:2, 813:17, 828:20, 842:12, 845:16, 859:11, 862:14, 918:6, 918:13, 955:22, 997:6, 1002:23
**certify** [1] - 1003:24
**chain** [1] - 934:8
**challenge** [2] - 683:5, 749:19
**challenging** [2] - 749:20, 861:3
**chance** [4] - 718:5, 852:14, 939:5, 943:8
**chances** [1] - 718:3
**change** [7] - 687:10, 764:15, 886:4, 956:3, 965:14, 966:4, 1003:10
**changed** [3] - 786:16, 916:7, 967:14
**Changes** [12] - 741:11, 747:3, 755:7, 785:11, 785:24, 786:14, 786:25, 787:3, 787:9, 787:19, 788:9, 789:14
**changes** [9] - 740:7, 740:17, 744:17, 745:18, 756:8, 767:20, 768:10,

789:7, 985:22
**characterization** [1] - 689:9
**characterized** [2] - 688:10, 908:11
**Charles** [2] - 702:14, 703:3
**Charmane** [1] - 829:15
**chart** [8] - 870:23, 884:14, 909:18, 920:14, 923:5, 968:14, 994:12
**check** [1] - 709:3
**chemical** [7] - 683:1, 831:11, 959:12, 970:18, 971:13, 990:7, 995:8
**chemically** [1] - 972:2
**chemist** [1] - 673:14
**chemistry** [5] - 940:12, 954:6, 955:1, 966:21
**chemists** [1] - 693:8
**Chief** [1] - 1:18
**Chinese** [9] - 973:9, 974:13, 980:1, 997:25, 998:6, 998:16, 1001:7, 1001:8
**chloride** [3] - 962:22, 963:21, 963:23
**choice** [3] - 721:3, 931:10, 996:6
**choices** [2] - 708:22, 823:19
**chose** [3] - 709:4, 885:24, 990:15
**chromatogram** [2] - 688:10, 987:9
**chromatograms** [1] - 688:8
**chromatographic** [1] - 984:24
**chromatography** [2] - 989:25, 990:3
**chromidiotic** [1] - 727:18
**chronic** [2] - 805:25, 879:25
**Chronobiotic** [1] - 863:7
**chronology** [3] - 687:20, 898:14, 900:11
**circadian** [119] - 702:18, 702:9, 702:13, 702:23, 702:25, 703:7, 703:10, 704:25, 706:2, 706:3,

706:10, 706:13, 706:17, 706:18, 706:22, 707:7, 707:13, 707:15, 707:16, 708:17, 708:21, 709:6, 710:4, 712:1, 713:21, 713:23, 720:2, 720:23, 722:7, 722:10, 722:13, 722:18, 724:5, 725:1, 726:10, 727:24, 728:1, 729:5, 730:17, 730:18, 789:10, 799:17, 799:24, 803:25, 804:2, 804:11, 805:8, 805:10, 805:12, 810:17, 811:3, 812:5, 812:8, 814:13, 814:24, 815:1, 822:25, 830:22, 832:16, 836:4, 837:6, 839:3, 841:24, 842:4, 844:8, 844:9, 847:3, 847:12, 848:13, 850:20, 852:22, 854:22, 862:3, 862:4, 862:7, 862:15, 875:8, 883:2, 887:18, 888:13, 896:6, 896:21, 896:22, 897:1, 897:2, 897:7, 897:10, 898:20, 899:9, 899:22, 900:5, 914:23, 915:4, 915:18, 916:5, 916:17, 916:20, 916:23, 916:25, 920:19, 924:11, 925:23, 925:24, 926:10, 926:24, 927:9, 927:19, 928:15, 928:22, 930:9, 931:15, 932:4, 932:15, 933:5, 935:10, 937:7
**Circadian** [1] - 918:21
**Circadin** [3] - 873:23, 873:25, 874:15
**circle** [1] - 898:10
**Circuit** [4] - 749:3, 751:25, 754:5, 796:2
**Circuit's** [1] - 751:23
**circulating** [1] - 869:2
**circulation** [3] -

913:16, 913:21, 914:3
**circumstances** [7] - 692:22, 693:14, 693:15, 764:13, 788:4, 848:24, 897:6
**citation** [5] - 754:22, 779:2, 780:12, 792:15, 792:18
**citations** [1] - 754:18
**cite** [2] - 796:3, 814:4
**cited** [4] - 733:22, 750:20, 750:24, 957:22
**cites** [8] - 739:11, 739:12, 929:17, 929:20, 929:25, 930:17, 932:18, 933:8
**citing** [1] - 937:8
**CIVIL** [1] - 1:5
**Claim** [75] - 680:22, 681:5, 682:16, 724:22, 724:25, 725:3, 725:4, 800:10, 800:13, 800:14, 801:17, 803:10, 803:14, 804:9, 805:7, 807:13, 807:15, 808:21, 809:19, 810:1, 810:24, 813:12, 816:12, 817:10, 817:12, 817:18, 818:23, 819:3, 819:4, 819:6, 819:7, 819:16, 819:17, 819:18, 820:13, 820:15, 820:21, 820:22, 821:1, 821:10, 821:11, 821:13, 821:20, 821:21, 821:22, 822:3, 822:10, 822:15, 822:17, 822:20, 822:21, 822:22, 822:23, 823:3, 824:6, 824:19, 824:20, 825:13, 825:17, 942:12, 943:12, 952:11, 953:2, 954:1, 954:2, 956:9, 956:17, 957:7, 972:22, 980:4, 1000:11, 1001:12, 1002:5
**claim** [24] - 680:23, 682:12, 684:25, 747:9, 748:13,

773:17, 800:3, 801:1, 801:9, 801:21, 815:19, 815:20, 815:21, 816:1, 817:23, 820:21, 823:12, 894:20, 948:11, 972:10, 1001:11, 1002:2, 1002:3, 1002:24
**claimed** [8] - 773:8, 801:6, 810:1, 813:16, 950:23, 978:5, 978:21, 1001:12
**claiming** [3] - 676:24, 824:16, 979:5
**claims** [10] - 693:19, 728:4, 748:12, 800:6, 801:15, 801:18, 807:11, 816:4, 883:1, 935:20
**Claims** [2] - 822:18, 974:10
**clarify** [4] - 739:15, 772:18, 841:18, 856:21
**clarifying** [1] - 699:17
**clarity** [7] - 689:14, 691:20, 691:25, 816:18, 818:7, 920:4, 998:21
**clear** [28] - 680:17, 688:5, 691:10, 691:17, 691:24, 692:2, 692:17, 703:2, 710:23, 721:2, 722:24, 723:1, 742:23, 747:14, 752:5, 757:21, 759:23, 772:3, 796:19, 805:25, 810:18, 854:18, 854:22, 857:2, 916:18, 920:25, 945:12, 999:14
**cleared** [2] - 874:8, 913:23
**clearly** [17] - 723:3, 734:23, 770:8, 785:24, 803:19, 804:10, 806:2, 806:19, 809:12, 811:10, 811:13, 812:17, 812:19, 814:2, 814:20, 817:1, 975:23
**click** [17] - 740:20, 741:11, 747:2,

755:8, 767:24, 768:9, 783:16, 783:17, 783:25, 784:4, 784:7, 784:10, 784:13, 787:3, 787:5, 787:10, 787:14
clicking [1] - 786:14
climb [1] - 868:11
clinic [2] - 885:7, 888:5
clinical [46] - 736:9, 736:11, 739:14, 739:16, 740:5, 740:6, 746:21, 759:8, 761:15, 773:1, 778:10, 778:11, 780:15, 785:9, 788:23, 789:12, 789:23, 790:1, 790:9, 790:17, 790:21, 792:19, 794:15, 798:4, 799:14, 800:22, 815:12, 816:8, 816:20, 816:23, 816:25, 817:4, 817:6, 817:24, 818:8, 879:12, 879:20, 880:16, 885:23, 885:24, 887:16, 917:4, 920:3, 925:9, 964:11, 964:25
Clinical [2] - 918:20, 961:17
clinicaltrials.gov [42] - 731:7, 731:8, 740:1, 740:6, 740:15, 741:4, 742:7, 743:19, 745:10, 747:11, 748:14, 749:10, 755:3, 755:12, 758:13, 761:18, 763:12, 767:6, 767:15, 767:20, 768:16, 770:4, 770:6, 775:5, 778:12, 778:24, 782:23, 783:2, 784:3, 784:25, 785:6, 785:12, 785:25, 787:2, 788:10, 789:15, 789:17, 793:3, 816:10, 816:15, 817:8, 818:4
clinicaltrials.gov's [1] - 765:16

clinicaltrials.org [2] - 785:10, 789:13
clinicians [1] - 708:16
clinics [2] - 888:6
clock [61] - 707:24, 707:25, 708:5, 709:5, 709:8, 709:11, 709:15, 709:19, 710:25, 712:18, 713:17, 715:23, 727:19, 728:21, 729:11, 730:17, 810:13, 814:24, 814:25, 830:22, 832:16, 836:4, 836:10, 836:12, 836:13, 836:16, 837:5, 837:6, 837:17, 841:19, 841:24, 844:1, 844:11, 844:12, 847:6, 867:18, 870:13, 899:19, 899:21, 902:25, 905:12, 905:18, 913:3, 913:7, 914:16, 914:21, 914:22, 915:5, 915:20, 916:4, 916:20, 918:11, 920:19, 922:15, 924:11, 932:4, 933:5
close [4] - 758:25, 839:7, 987:13, 987:15
closer [1] - 841:14
closing [1] - 1003:7
closings [1] - 672:9
CN019 [1] - 997:25
CN268 [10] - 953:3, 953:6, 953:16, 978:13, 978:14, 978:18, 979:6, 979:16, 979:18, 1002:3
co-elution [2] - 987:11, 987:19
co-elute [2] - 968:10, 992:8
coauthored [1] - 897:11
COBLENTZ [14] - 671:16, 898:21, 901:6, 902:14, 911:5, 919:7, 924:19, 924:23, 925:13, 925:15, 934:10, 934:17, 935:23, 984:2

cocktail [1] - 887:12
cocounsel [1] - 741:19
coding [3] - 801:20, 801:22, 821:1
cognizant [1] - 737:21
coin [1] - 842:7
coincident [1] - 913:18
coined [1] - 842:9
coinventor [1] - 685:23
coinventors [1] - 693:4
coinventorship [1] - 693:16
colleague [3] - 697:11, 758:18, 860:8
colleagues [11] - 714:6, 715:5, 725:11, 728:14, 850:1, 851:15, 851:24, 856:23, 902:11, 907:6, 912:3
collected [1] - 868:3
collecting [1] - 872:19
collectively [4] - 809:18, 813:11, 824:5, 851:8
College [1] - 701:22
COLM [1] - 1:18
color [4] - 801:20, 801:22, 801:24, 821:1
color-coding [3] - 801:20, 801:22, 821:1
column [13] - 753:8, 845:23, 846:2, 860:19, 925:20, 926:3, 930:6, 968:6, 985:20, 986:25, 987:4, 987:23, 994:25
columns [1] - 985:19
coma [3] - 889:4, 889:5, 889:13
combination [20] - 673:17, 800:15, 803:13, 805:21, 806:14, 807:21, 808:22, 809:18, 811:18, 813:10, 818:24, 819:1, 820:2, 820:16, 822:11, 822:13, 872:9, 938:21, 978:13, 979:11
combinations [12] -

712:9, 772:22, 803:9, 819:13, 819:24, 821:17, 822:4, 822:14, 824:3, 854:16, 876:8, 877:23
combine [6] - 801:13, 809:25, 810:18, 813:15, 814:3, 879:4
combined [4] - 810:20, 810:22, 814:8, 979:19
combining [1] - 879:7
combs [1] - 817:14
comfort [1] - 894:10
comfortable [1] - 941:9
coming [5] - 672:22, 675:1, 688:25, 768:17, 953:25
comments [1] - 937:4
commercial [1] - 683:23
commercial-grade [1] - 683:23
Commercialization [1] - 961:17
committee [2] - 829:20, 829:23
common [8] - 803:2, 819:6, 819:11, 820:22, 821:15, 855:1, 862:12, 897:4
commonalities [1] - 820:25
commonly [2] - 803:4, 839:5
commonsense [2] - 802:25, 803:5
companies [1] - 740:4
company [2] - 693:6, 740:14
compare [9] - 744:13, 768:9, 787:17, 790:25, 791:16, 791:21, 792:2, 833:24, 960:17
Compared [2] - 778:18, 789:19
compared [2] - 795:20, 804:24
comparing [3] - 788:13, 834:24, 970:2
comparison [4] - 834:6, 985:11, 985:25, 986:7
compilation [2] - 756:13, 778:10
compiled [1] - 756:8

complete [5] - 797:17, 798:7, 981:3, 981:6, 982:17
completed [2] - 672:12, 937:20
completes [1] - 882:9
complex [1] - 954:16
complicated [1] - 862:9
components [2] - 986:25, 987:4
composition [1] - 972:23
Compound [9] - 960:7, 962:12, 962:13, 962:16, 962:17, 962:21, 962:23, 962:24, 963:16
compound [11] - 673:4, 690:2, 959:20, 960:4, 960:5, 960:8, 962:14, 968:10, 971:11, 977:14, 989:13
compounds [11] - 951:18, 953:14, 953:21, 955:23, 966:13, 971:12, 976:7, 978:7, 978:9, 982:7, 983:16
comprises [1] - 972:23
compromise [1] - 849:1
computer [1] - 1003:20
concede [1] - 743:16
conceded [2] - 734:18, 940:18
conceive [1] - 951:2
conceived [1] - 950:23
concentration [1] - 847:24
Concept [1] - 838:15
concept [4] - 803:23, 815:25, 835:1, 850:19
conception [2] - 693:2, 951:3
concern [2] - 751:21, 757:18
concerned [1] - 753:18
concerning [1] - 733:10
concerns [4] - 883:7, 951:18, 953:13, 953:20

**conclude** [14] - 685:6, 686:7, 713:18, 713:20, 719:21, 720:25, 722:15, 726:6, 730:20, 817:23, 820:6, 825:13, 846:19, 964:18

**concluded** [4] - 726:7, 920:18, 952:24, 1003:22

**concludes** [2] - 730:16, 814:22

**concluding** [3] - 766:24, 819:22, 822:2

**conclusion** [4] - 718:14, 800:1, 964:17, 964:20

**Conclusion** [1] - 927:7

**conclusions** [3] - 730:14, 820:14, 920:15

**conclusively** [1] - 718:16

**condition** [4] - 783:11, 783:15, 797:11, 851:12

**conditional** [1] - 772:23

**conditionally** [6] - 958:6, 958:19, 958:23, 964:23, 972:16

**conditions** [5] - 984:24, 991:22, 992:1, 992:10, 992:16

**conducted** [2] - 736:9, 739:17

**confer** [4] - 685:15, 737:8, 764:9, 765:6

**conference** [2] - 775:18, 887:11

**confess** [1] - 912:18

**confidence** [2] - 767:14, 894:11

**confident** [1] - 752:5

**confidential** [4] - 680:8, 692:21, 692:25, 693:14

**confirm** [5] - 734:4, 796:24, 815:12, 878:12, 903:14

**confirms** [1] - 930:12

**conflicted** [1] - 924:1

**conflicting** [2] - 710:17, 917:9

**conform** [1] - 722:3

**confronted** [2] - 680:14, 785:21

**confused** [6] - 674:22, 732:7, 762:19, 779:16, 931:25, 949:10

**confusing** [2] - 710:17, 924:9

**confusion** [2] - 946:24, 949:16

**connected** [1] - 998:24

**connection** [4] - 679:4, 680:2, 862:14, 862:15

**connectivity** [2] - 971:14, 971:20

**CONNOLLY** [1] - 1:18

**consciousness** [1] - 889:18

**consensus** [1] - 917:19

**consequences** [1] - 774:16

**consequently** [1] - 953:14

**consider** [22] - 716:4, 737:3, 750:6, 750:8, 750:17, 751:9, 801:1, 801:2, 801:11, 801:12, 801:18, 819:4, 887:17, 909:10, 919:20, 954:3, 957:24, 972:25, 973:6, 973:22, 975:8, 980:7

**considerable** [1] - 955:3

**considerations** [5] - 711:11, 801:7, 955:19, 963:8, 980:4

**considered** [6] - 750:16, 876:15, 877:12, 884:6, 926:18, 980:3

**considering** [1] - 738:14

**consistent** [2] - 798:1, 946:22

**constantly** [1] - 744:6

**constructed** [1] - 833:25

**constructing** [1] - 835:6

**construction** [5] - 800:3, 823:12, 894:21, 948:11, 1002:24

**construe** [1] - 772:2

**construes** [1] - 693:18

**contact** [2] - 943:12, 972:10

**contacting** [12] - 680:25, 942:18, 943:14, 944:7, 947:14, 947:17, 947:21, 952:11, 952:14, 956:9, 956:16, 957:6

**Contacts** [1] - 746:25

**Contacts/Locations** [1] - 746:24

**contain** [6] - 712:6, 739:17, 803:22, 827:8, 953:18, 978:22

**contained** [2] - 761:17, 956:9

**contains** [1] - 865:9

**contend** [1] - 938:23

**contending** [1] - 947:14

**content** [6] - 731:21, 745:18, 747:16, 751:6, 789:23, 801:3

**contentions** [2] - 759:11, 939:10

**contents** [7] - 756:9, 758:1, 766:14, 766:25, 795:14, 795:15, 987:9

**contested** [1] - 753:19

**context** [9] - 697:18, 698:3, 698:7, 758:21, 939:16, 945:1, 949:7, 961:7, 995:7

**contingent** [1] - 947:20

**continue** [6] - 702:24, 806:8, 913:22, 921:3, 922:5, 951:13

**continues** [1] - 943:17

**contract** [4] - 677:10, 677:11, 687:13, 688:5

**contractually** [1] - 687:7

**contradicting** [1] - 696:24

**contradiction** [1] - 944:15

**contradictory** [1] - 939:7

**contrast** [3] - 836:15, 859:7, 929:10

**contrasts** [1] - 877:14

**contribute** [2] - 677:3, 684:6

**contributed** [2] - 677:8, 687:19

**contribution** [2] - 688:11, 693:1

**control** [6] - 683:12, 708:5, 966:21, 983:9, 983:16, 983:23

**controlling** [3] - 683:20, 919:21, 982:7

**controversially** [1] - 932:3

**convenient** [1] - 864:19

**conventionally** [1] - 858:3

**conversation** [2] - 884:17, 891:7

**conversations** [1] - 1003:17

**convincing** [3] - 691:10, 691:18, 692:2

**copies** [1] - 762:23

**copy** [7] - 753:2, 758:9, 758:18, 776:10, 777:6, 786:3, 829:5

**copying** [1] - 934:19

**core** [2] - 706:14, 708:6

**corner** [1] - 738:22, 738:25, 747:18, 778:6, 835:21, 990:23

**correct** [265] - 674:24, 681:3, 681:13, 688:12, 690:4, 695:1, 703:4, 707:19, 711:18, 725:3, 728:5, 732:12, 733:16, 734:5, 736:10, 748:5, 750:19, 763:15, 763:23, 763:24, 773:13, 774:15, 775:25, 776:10, 786:20, 794:5, 794:6, 794:7, 795:23, 796:1, 805:4, 805:16, 807:12, 808:9, 808:20, 812:12, 815:7, 829:10, 829:13, 829:17, 829:21, 830:25, 831:15, 831:20, 831:24, 832:3, 832:6, 832:24,

834:12, 834:20, 834:23, 835:5, 835:24, 836:6, 836:10, 836:11, 836:17, 836:25, 837:3, 837:8, 837:21, 837:22, 837:25, 838:16, 838:20, 838:21, 838:24, 838:25, 839:3, 839:4, 839:9, 839:15, 839:20, 839:21, 839:23, 839:24, 840:24, 840:25, 841:4, 841:5, 841:8, 841:12, 841:17, 841:21, 841:25, 842:3, 842:23, 843:3, 843:12, 843:18, 843:23, 844:4, 844:8, 844:14, 844:19, 845:14, 846:10, 846:13, 846:17, 847:12, 848:1, 848:10, 848:18, 851:5, 851:13, 852:12, 852:17, 853:4, 853:11, 853:18, 854:19, 854:25, 855:3, 855:18, 855:21, 855:22, 855:25, 856:1, 856:4, 856:24, 857:10, 857:24, 858:1, 858:5, 858:16, 858:19, 858:23, 858:24, 859:2, 859:5, 859:6, 859:9, 859:11, 859:24, 859:25, 860:5, 860:6, 860:9, 861:14, 861:15, 861:17, 861:19, 862:3, 862:21, 863:15, 864:6, 864:18, 865:4, 865:5, 865:7, 865:8, 865:10, 866:16, 866:17, 866:19, 866:21, 866:22, 866:24, 866:25, 867:2, 867:3, 867:4, 867:12, 868:25, 869:17, 870:2, 870:9, 870:10, 870:18, 871:13, 871:17, 871:22, 873:8, 873:15,

873:16, 873:20, 873:21, 874:19, 874:22, 875:14, 875:15, 876:8, 877:2, 877:4, 877:7, 877:9, 877:10, 877:15, 877:16, 877:23, 878:4, 878:7, 878:10, 880:1, 880:2, 882:8, 882:24, 886:21, 896:18, 902:2, 903:20, 904:2, 904:15, 906:9, 909:11, 911:25, 912:11, 916:5, 919:2, 920:13, 920:19, 920:20, 921:20, 925:1, 925:4, 925:5, 925:7, 925:8, 925:10, 925:11, 925:17, 926:5, 926:12, 926:16, 926:19, 927:5, 927:11, 927:25, 928:3, 928:8, 928:10, 928:16, 928:24, 929:4, 929:18, 929:25, 930:3, 930:17, 930:20, 930:21, 930:23, 931:2, 931:15, 932:18, 932:21, 932:24, 933:13, 935:1, 935:21, 935:22, 936:21, 942:6, 964:21, 970:13, 971:24, 972:2, 988:3, 993:17, 994:10, 996:10, 996:17, 996:23, 997:11, 998:11, 1002:7
**correctable** [3] - 686:1, 686:8, 686:21
**corrected** [1] - 688:15
**correcting** [1] - 720:1
**correction** [1] - 739:20
**correctly** [2] - 928:23, 985:14
**correlation** [3] - 833:18, 833:21, 862:7
**correspond** [2] - 816:12, 963:23
**corresponds** [2] - 827:5, 969:14
**corroborates** [3] - 766:13, 766:16,

768:7
**cortisol** [4] - 706:13, 901:18, 901:20, 908:13
**cost** [2] - 963:9, 997:6
**counsel** [10] - 677:6, 685:17, 736:22, 737:11, 756:21, 772:7, 794:23, 828:13, 888:22, 951:22
**counteract** [4] - 709:12, 843:7, 843:8, 921:18
**counteracted** [1] - 914:8
**country** [3] - 888:1, 888:7, 888:8
**couple** [7] - 711:24, 724:22, 737:2, 764:22, 772:14, 910:17, 978:15
**course** [8] - 688:7, 688:19, 693:18, 693:24, 704:4, 796:15, 846:22, 922:20
**court** [7] - 704:7, 737:15, 785:3, 790:7, 896:16, 950:12, 998:12
**COURT** [417] - 1:2, 672:5, 672:13, 672:24, 673:5, 673:10, 673:21, 674:4, 674:21, 674:25, 675:6, 675:10, 675:15, 675:19, 676:7, 676:9, 676:17, 676:20, 676:22, 677:2, 677:6, 677:14, 677:18, 677:22, 678:8, 678:13, 678:23, 679:5, 680:16, 680:19, 680:22, 681:4, 681:7, 681:14, 681:20, 682:14, 682:16, 682:19, 682:22, 684:4, 684:14, 684:19, 685:6, 685:12, 685:16, 686:19, 687:1, 687:15, 689:3, 689:13, 689:18, 689:21, 689:23, 690:2, 690:11, 690:17, 691:7,

692:7, 692:19, 693:21, 694:1, 694:8, 694:12, 694:15, 694:23, 695:2, 695:4, 695:10, 695:17, 696:1, 696:6, 696:8, 696:10, 696:13, 696:17, 696:22, 697:3, 697:15, 697:21, 697:24, 698:5, 698:12, 698:20, 698:24, 699:19, 699:23, 700:3, 700:7, 700:9, 711:7, 711:12, 711:19, 713:11, 714:13, 715:13, 717:14, 718:18, 718:20, 719:11, 720:17, 721:21, 724:1, 725:18, 727:2, 730:8, 731:16, 732:5, 732:7, 732:18, 732:21, 733:5, 733:12, 733:17, 733:21, 734:2, 734:9, 734:14, 734:20, 735:3, 735:10, 735:20, 735:25, 736:3, 736:8, 736:11, 736:14, 736:20, 737:14, 738:16, 739:11, 739:19, 740:3, 740:8, 740:12, 741:2, 741:6, 741:9, 741:13, 741:22, 742:1, 742:9, 743:5, 743:21, 743:24, 744:4, 744:15, 744:20, 744:22, 744:25, 745:5, 745:13, 745:21, 746:8, 746:12, 747:9, 747:15, 747:20, 747:24, 748:3, 748:6, 749:4, 750:3, 750:20, 751:17, 752:3, 752:15, 752:20, 752:24, 753:3, 753:6, 753:17, 754:2, 754:8, 754:14, 754:23, 755:4, 755:10, 756:19, 756:23, 757:10, 758:5, 758:14, 758:17,

758:23, 759:4, 759:13, 760:4, 760:13, 761:9, 761:23, 762:5, 762:10, 762:15, 763:7, 763:10, 763:18, 763:21, 764:1, 764:4, 764:18, 765:9, 765:14, 765:20, 765:23, 766:10, 766:18, 766:21, 767:2, 768:2, 768:5, 768:12, 768:20, 769:6, 769:13, 769:16, 769:19, 769:22, 770:10, 770:13, 770:15, 772:9, 773:16, 773:21, 774:3, 774:6, 774:9, 774:12, 774:19, 774:24, 775:1, 775:12, 775:24, 776:6, 776:13, 776:17, 776:21, 776:24, 777:4, 777:8, 777:11, 777:13, 777:17, 777:20, 777:23, 778:2, 781:16, 781:23, 782:2, 782:15, 783:3, 783:5, 784:20, 785:4, 786:1, 786:5, 787:25, 788:5, 788:15, 788:18, 788:21, 792:23, 793:11, 795:5, 795:8, 795:18, 795:24, 796:4, 796:11, 797:15, 798:21, 828:6, 828:10, 828:21, 830:7, 844:25, 850:7, 880:9, 880:13, 881:19, 881:24, 882:10, 886:9, 886:14, 886:19, 886:22, 886:25, 887:4, 887:10, 887:20, 887:25, 888:9, 888:15, 888:17, 888:20, 888:25, 889:7, 889:15, 889:21, 890:22, 890:25, 891:4, 891:21, 892:8, 892:12, 892:14, 892:20, 892:24,

893:9, 893:12, 893:15, 894:5, 894:19, 894:23, 895:1, 895:8, 895:13, 895:17, 895:20, 898:22, 901:7, 902:15, 911:6, 919:8, 924:18, 924:21, 934:16, 935:24, 937:23, 938:4, 938:10, 938:18, 939:2, 939:8, 939:13, 940:1, 940:5, 940:13, 940:16, 940:21, 941:3, 941:6, 941:9, 941:14, 941:23, 941:25, 942:4, 942:7, 942:13, 942:16, 942:21, 943:4, 943:24, 944:4, 944:8, 944:18, 945:3, 945:5, 945:11, 945:15, 946:11, 946:17, 947:1, 947:10, 947:12, 947:19, 948:7, 948:13, 948:18, 948:21, 949:4, 949:11, 949:13, 949:19, 949:23, 951:8, 951:10, 951:21, 951:25, 952:8, 952:20, 956:21, 956:25, 958:5, 958:16, 959:3, 960:23, 961:1, 961:4, 961:9, 961:13, 964:15, 964:20, 964:22, 965:21, 972:16, 974:3, 975:14, 980:24, 981:17, 981:20, 984:4, 984:6, 984:9, 984:12, 998:5, 998:12, 998:16, 998:18, 998:25, 999:5, 999:9, 1001:22, 1002:13, 1002:22, 1003:2, 1003:6, 1003:15
**Court** [39] - 673:7, 681:19, 701:1, 707:5, 711:22, 712:10, 733:8, 737:22, 751:23, 753:15, 755:2, 758:22, 759:2,

761:5, 800:18, 800:20, 810:3, 817:22, 823:11, 825:13, 839:17, 894:10, 895:9, 896:1, 896:8, 899:6, 899:15, 902:1, 908:7, 912:13, 914:9, 923:5, 923:25, 944:14, 949:6, 949:7, 998:21, 1004:2
**Court's** [3] - 760:22, 783:1, 823:12
**Courtroom** [1] - 672:4
**courtroom** [12] - 736:17, 736:19, 736:21, 736:22, 736:23, 736:25, 760:24, 817:13, 825:5, 892:2, 950:9, 956:7
**cover** [16] - 701:7, 704:23, 704:24, 724:23, 724:25, 762:18, 762:25, 763:3, 763:13, 778:15, 865:2, 865:13, 865:17, 899:17, 905:20, 910:18
**covered** [4] - 685:15, 685:17, 905:20, 910:19
**COVID** [2] - 889:22
**COZEN** [1] - 671:15
**crawled** [1] - 744:10
**crawls** [1] - 744:1
**create** [4] - 686:17, 948:5, 958:23, 958:24
**created** [4] - 676:4, 692:15, 921:1, 921:2
**credentials** [2] - 701:8, 701:11
**credibility** [2] - 696:3, 696:5
**credit** [2] - 687:2, 842:10
**credited** [2] - 681:24, 693:1
**criteria** [1] - 780:4
**critical** [2] - 751:16, 753:24
**critically** [1] - 712:8
**cross** [23] - 679:16, 689:15, 691:12, 694:16, 694:17, 694:19, 694:24, 695:23, 696:16,

790:14, 793:10, 797:23, 828:13, 886:4, 895:7, 910:24, 914:20, 924:18, 924:19, 947:3, 947:8, 949:12, 984:10
**CROSS** [4] - 793:12, 828:24, 924:22, 984:13
**cross-examination** [9] - 679:16, 689:15, 691:12, 790:14, 797:23, 886:4, 910:24, 914:20, 949:12
**CROSS-EXAMINATION** [4] - 793:12, 828:24, 924:22, 984:13
**cross-examine** [1] - 793:10
**crossover** [3] - 827:25, 841:15, 926:23
**CRR** [2] - 1:24, 1004:2
**crystal** [1] - 999:20
**cued** [1] - 869:16
**cull** [6] - 804:4, 804:18, 812:21, 813:7, 879:16, 911:11
**culled** [9] - 805:3, 805:15, 807:10, 808:18, 812:10, 815:5, 823:24, 873:3, 873:7
**culls** [2] - 812:7, 815:2
**culprit** [1] - 853:11
**current** [5] - 701:12, 788:9, 789:15, 835:16, 931:10
**Current** [1] - 875:1
**curve** [17] - 833:23, 835:1, 835:24, 837:9, 837:24, 841:16, 843:3, 843:16, 843:17, 905:6, 905:15, 912:7, 912:10, 912:23, 912:24, 913:2, 916:24
**curves** [4] - 835:7, 835:8, 837:14, 905:10
**cut** [2] - 847:24, 895:6
**CV** [2] - 886:10, 886:11
**cycle** [7] - 804:16, 805:9, 805:19,

847:1, 847:5, 905:17, 912:21
**Cycle** [1] - 900:23
**cycles** [1] - 804:13
**cyclopropanation** [1] - 945:20
**CYP** [1] - 705:3
**CYP1A2** [4] - 819:21, 820:5, 881:4, 882:7
**CYP3A4** [1] - 821:25
**CYP3A4-related** [1] - 820:10
**cytochrome** [1] - 704:17
**Czeisler** [6] - 702:14, 703:3, 705:16, 711:2, 711:23, 886:14
**Czeisler's** [2] - 705:21, 710:13

## D

**D)** [1] - 961:18
**daily** [16] - 788:25, 802:3, 804:22, 821:10, 821:13, 823:2, 849:2, 855:24, 880:20, 925:22, 927:3, 929:13, 931:5, 931:9, 933:25, 994:13
**DANIEL** [1] - 671:10
**dark** [2] - 869:8, 869:15
**darkness** [2] - 868:25, 869:3
**data** [15] - 790:9, 825:23, 846:15, 884:9, 908:4, 908:9, 912:18, 912:20, 921:10, 922:7, 969:7, 986:8, 986:11, 988:20, 989:23
**date** [66] - 673:8, 674:13, 674:16, 674:19, 675:23, 676:13, 687:18, 691:14, 691:16, 694:25, 699:11, 731:24, 732:8, 732:14, 732:16, 733:24, 734:5, 735:18, 737:18, 739:2, 740:21, 741:1, 742:24, 743:1, 744:9, 744:14, 745:14,

746:16, 747:12, 749:13, 751:16, 752:7, 752:10, 753:24, 754:6, 754:12, 757:7, 759:2, 759:25, 762:3, 764:2, 764:6, 764:7, 764:17, 765:1, 766:17, 768:2, 771:25, 779:21, 780:1, 780:20, 780:22, 781:3, 787:12, 790:18, 790:20, 791:8, 794:1, 795:12, 850:13, 872:20, 910:13, 916:11, 917:10, 919:2
**dated** [4] - 738:23, 748:19, 749:21, 755:24
**dates** [4] - 739:4, 739:5, 745:20, 762:25, 763:4, 794:9
**day-to-day** [2] - 869:12, 904:10
**days** [2] - 690:25, 724:22
**daytime** [4] - 830:23, 832:18, 867:21, 931:16
**DDI** [1] - 881:3
**DDX-419** [1] - 771:10
**DDX-5.55** [1] - 800:8
**DDX-5.9** [1] - 705:13
**de** [1] - 693:3
**Deacon** [2] - 713:3, 713:14, 713:18, 920:10
**dead** [1] - 890:16
**deadline** [2] - 758:25, 936:25
**deal** [4] - 672:22, 839:25, 976:22, 977:6
**dealt** [1] - 912:16
**debate** [12] - 676:19, 678:21, 723:7, 723:10, 723:12, 739:13, 755:15, 758:16, 858:9, 949:21, 1003:7
**Deborah** [2] - 903:23, 917:14
**decade** [1] - 838:7
**December** [5] - 673:4, 673:8, 673:9, 749:10
**decide** [7] - 672:15, 672:25, 693:20,

738:14, 790:13, 879:5, 958:24
**decided** [6] - 760:18, 865:15, 918:6, 918:13, 947:6, 947:7
**deciding** [1] - 948:9
**decision** [5] - 751:23, 753:11, 797:18, 797:24, 977:3
**declarant** [3] - 760:19, 767:11, 776:3
**declaration** [29] - 734:22, 735:2, 743:18, 743:21, 758:12, 759:4, 759:6, 759:17, 759:23, 760:2, 760:7, 760:15, 762:2, 762:6, 762:8, 762:16, 762:22, 766:8, 766:13, 766:15, 766:20, 766:22, 767:13, 768:7, 769:18, 769:20, 775:23, 776:8
**decline** [1] - 868:18
**decreased** [4] - 889:2, 889:5, 889:11, 889:13
**Defendant** [2] - 1:9, 700:21
**defendant's** [4] - 674:9, 761:12, 761:17, 950:13
**defendants** [6] - 673:17, 700:12, 732:3, 759:1, 761:14, 954:1
**defined** [2] - 893:1, 954:5
**definitely** [14] - 775:16, 810:2, 810:25, 818:1, 829:23, 835:7, 837:25, 840:2, 840:5, 841:9, 886:6, 887:8, 893:11, 932:10
**definition** [16] - 705:17, 705:21, 888:25, 889:7, 889:15, 954:14, 954:16, 954:18, 954:21, 955:5, 955:8, 955:12, 955:15, 956:1, 956:4
**degree** [6] - 701:22, 896:10, 925:1, 954:6, 954:17, 955:2

**DEIRDE** [1] - 671:4
**Delaney** [1] - 958:12
**DELAWARE** [1] - 1:3
**Delaware** [1] - 1:14
**delay** [15] - 709:9, 836:16, 841:3, 841:15, 841:16, 843:3, 843:17, 851:4, 851:8, 905:8, 905:10, 908:12, 913:7, 914:6, 932:3
**delayed** [1] - 844:12
**delays** [1] - 843:6
**deleterious** [1] - 883:7
**demonstrate** [2] - 728:20, 897:9
**demonstrated** [4] - 714:20, 753:18, 862:19, 883:21
**demonstrating** [1] - 838:7
**demonstration** [2] - 712:17, 926:8
**Demonstration** [1] - 838:14
**demonstrative** [6] - 707:2, 912:12, 950:4, 970:2, 973:3, 976:10
**demonstratively** [1] - 697:6
**demonstratives** [1] - 701:3
**density** [1] - 890:6
**Department** [1] - 701:17
**dependent** [1] - 857:2
**depose** [1] - 776:3
**deposition** [14] - 677:19, 686:17, 690:21, 695:16, 695:24, 699:3, 699:6, 829:6, 833:17, 928:18, 940:18, 946:22, 947:18, 949:1
**depression** [2] - 862:5, 862:8
**depth** [1] - 907:25
**Deputy** [1] - 701:13
**DEREK** [1] - 671:17
**describe** [3] - 706:2, 717:20, 728:18
**described** [20] - 685:2, 757:12, 766:4, 799:13, 802:22, 813:19, 821:17, 898:13, 917:18, 954:23, 959:18, 961:22, 962:3,

963:5, 964:9, 965:2, 969:7, 974:20, 1000:14, 1002:4
**describes** [4] - 728:19, 739:13, 813:4, 916:24
**describing** [7] - 731:9, 731:10, 767:19, 901:11, 963:7, 1000:21, 1000:23
**description** [5] - 809:3, 817:4, 824:9, 824:12, 825:21
**Description** [1] - 791:20
**designated** [1] - 738:19
**designed** [1] - 964:25
**designing** [1] - 963:8
**desire** [2] - 706:20, 884:22
**desired** [3] - 707:17, 810:7, 844:3
**despite** [1] - 938:22
**detail** [2] - 801:16, 824:14
**detailed** [1] - 817:3
**Detailed** [1] - 791:20
**details** [2] - 696:21, 703:24
**detect** [9] - 982:6, 986:13, 986:15, 986:17, 986:20, 987:7, 991:15, 992:23, 994:21
**detecting** [1] - 992:17
**detection** [1] - 985:6
**determination** [2] - 948:9, 971:25
**determine** [9] - 890:7, 905:1, 905:14, 950:25, 973:11, 982:25, 983:18, 991:17, 995:7
**determined** [1] - 970:14
**determining** [2] - 933:21, 955:10
**detract** [1] - 692:23
**develop** [1] - 693:7
**developed** [2] - 830:2, 964:12
**Development** [2] - 959:14, 961:16
**development** [4] - 711:25, 861:1, 873:20, 959:24
**deviation** [1] - 805:1
**diagnosed** [1] - 925:3
**diagnosis** [2] -

700:16, 829:8
**diaries** [1] - 891:15
**difference** [6] - 682:4, 871:21, 894:3, 911:21, 971:22, 989:15
**differences** [7] - 801:5, 837:12, 837:15, 857:12, 858:21, 918:10, 918:11
**different** [49] - 673:18, 679:3, 681:17, 681:18, 686:11, 698:3, 698:4, 705:17, 710:18, 740:15, 756:7, 764:23, 788:12, 788:13, 801:23, 802:13, 809:5, 809:6, 834:4, 844:7, 844:20, 858:22, 858:25, 859:1, 879:7, 887:18, 896:22, 908:10, 909:1, 910:3, 914:21, 936:16, 956:15, 957:5, 960:25, 969:24, 970:15, 970:16, 970:21, 970:23, 971:3, 971:16, 986:25, 987:1, 987:3, 988:20, 989:5, 998:23
**difficult** [1] - 679:25
**difficulties** [1] - 814:15
**digest** [1] - 682:24
**dim** [7] - 702:20, 850:23, 867:6, 867:25, 868:2, 868:3
**dimeric** [3] - 970:19, 970:21, 970:23
**dinner** [2] - 1003:18, 1003:19
**direct** [33] - 685:2, 689:17, 694:8, 694:21, 831:5, 832:2, 833:7, 839:12, 852:11, 854:21, 855:13, 859:23, 864:17, 866:7, 871:1, 871:4, 873:3, 874:24, 881:15, 882:20, 883:1, 892:19, 905:3, 906:22, 925:16, 928:8, 935:19, 949:7,

949:11, 963:10, 985:11, 989:21, 997:25
**DIRECT** [3] - 700:23, 796:7, 895:23
**directed** [3] - 817:17, 933:20, 989:21
**directions** [1] - 710:18
**disagree** [6] - 710:22, 711:22, 761:20, 774:23, 875:20, 942:24
**disagreeing** [2] - 875:23, 986:23
**disagreements** [1] - 950:20
**discipline** [2] - 954:7, 955:1
**disclose** [40] - 678:9, 678:11, 678:14, 678:15, 689:8, 690:24, 759:1, 759:6, 759:9, 806:24, 808:11, 808:22, 808:25, 809:2, 809:10, 809:19, 812:14, 812:25, 813:3, 816:8, 816:13, 816:23, 817:7, 818:9, 818:12, 818:16, 818:18, 824:5, 942:18, 942:23, 943:13, 943:14, 944:20, 944:24, 951:4, 952:14, 953:11, 953:17, 956:8, 976:21
**disclosed** [40] - 674:10, 674:23, 679:8, 679:11, 679:20, 689:24, 690:15, 690:21, 690:25, 694:9, 694:24, 694:4, 697:8, 697:18, 698:3, 698:16, 759:11, 761:16, 777:2, 788:23, 807:6, 812:20, 817:24, 944:21, 945:16, 946:1, 946:22, 948:3, 952:1, 956:15, 957:5, 957:10, 957:11, 960:18, 960:19, 961:1, 964:15, 972:13, 974:9, 976:5

**discloses** [29] - 674:18, 678:18, 690:5, 697:17, 698:6, 699:2, 773:2, 773:14, 774:22, 812:15, 816:15, 938:13, 940:2, 942:11, 943:11, 943:13, 943:19, 943:22, 944:6, 947:13, 947:14, 947:16, 947:20, 948:10, 952:11, 964:19, 978:19, 999:24
**disclosing** [5] - 806:18, 940:8, 959:19, 961:8, 978:2
**disclosure** [15] - 674:15, 691:6, 692:25, 694:3, 694:4, 734:8, 739:8, 782:1, 785:1, 785:8, 788:3, 788:6, 811:6, 953:20, 964:1
**disclosures** [4] - 803:22, 883:5, 942:20, 980:1
**discontinue** [2] - 819:20, 821:24
**discontinuing** [2] - 705:3, 820:5
**discourages** [3] - 942:19, 943:18, 944:22
**discovered** [1] - 718:1
**discovery** [2] - 734:15, 759:1
**discreet** [2] - 913:10, 914:14
**discretion** [1] - 796:21
**discretionary** [1] - 693:22
**discuss** [8] - 819:9, 945:7, 945:9, 945:16, 945:17, 945:25, 952:3, 992:16
**discussed** [15] - 699:4, 722:5, 730:12, 737:7, 815:24, 885:14, 909:9, 910:23, 914:20, 917:9, 925:16, 928:8, 952:15, 997:24, 998:3
**discusses** [3] - 805:8, 808:12, 945:5
**discussing** [10] -

723:18, 752:17, 783:23, 799:4, 808:5, 815:5, 822:15, 826:8, 884:10, 941:10

**discussion** [8] - 774:25, 794:23, 857:17, 915:1, 926:4, 951:23, 952:23, 962:15

**Discussion** [3] - 927:14, 927:15, 930:6

**discussions** [1] - 888:21

**disease** [1] - 783:15

**disjointed** [1] - 905:20

**Disorder** [9] - 700:19, 778:19, 783:16, 789:20, 803:21, 816:11, 818:9, 829:9, 931:11

**disorder** [20] - 704:25, 706:17, 706:19, 708:15, 708:21, 709:6, 720:2, 721:4, 722:7, 723:13, 726:11, 728:1, 729:13, 729:15, 804:12, 805:12, 822:25, 830:15, 844:12, 908:11

**Disorders** [1] - 918:22

**disorders** [39] - 700:17, 700:18, 701:19, 702:23, 703:1, 703:7, 706:23, 707:3, 707:15, 708:18, 708:20, 710:5, 712:1, 713:23, 720:23, 722:11, 722:14, 722:19, 724:5, 725:1, 727:24, 729:6, 730:19, 799:17, 799:24, 810:17, 811:3, 811:5, 812:9, 814:14, 815:1, 815:3, 844:8, 844:10, 862:7, 862:16, 882:23, 883:2, 896:23

**displaced** [1] - 855:1

**display** [1] - 845:1

**displayed** [4] - 701:6, 712:21, 791:1, 800:7

**dispute** [22] - 682:6, 690:9, 690:11, 691:5, 691:21,

700:14, 732:8, 734:10, 734:16, 734:25, 737:17, 739:22, 742:13, 755:21, 761:11, 768:25, 774:16, 776:12, 785:19, 795:4, 946:13, 972:21

**disputed** [6] - 752:9, 761:21, 761:24, 998:8, 998:10

**disputing** [1] - 776:4

**disruption** [1] - 726:10

**distinction** [1] - 892:18

**distinguish** [1] - 889:4

**distinguished** [1] - 702:3

**distinguishing** [1] - 889:12

**DISTRICT** [2] - 1:2, 1:3

**District** [1] - 1004:2

**Disturbed** [1] - 900:23

**dividing** [1] - 892:24

**DLMO** [7] - 867:2, 867:4, 870:8, 877:1, 877:5, 877:12, 884:7

**Doctor** [8] - 797:16, 842:12, 863:9, 863:22, 881:1, 949:23, 994:5, 1002:2

**doctor** [7] - 845:7, 850:18, 854:11, 882:1, 903:22, 941:10, 951:20

**doctors** [2] - 887:10, 889:23

**document** [129] - 695:13, 697:22, 712:25, 714:2, 714:25, 716:16, 716:22, 717:3, 719:2, 720:6, 721:10, 721:15, 723:20, 724:15, 725:5, 725:8, 726:15, 726:21, 728:10, 728:15, 729:23, 731:4, 731:25, 732:15, 732:23, 733:11, 733:21, 735:17, 735:19, 736:18, 736:25, 737:4, 737:7, 737:24, 738:22, 738:23, 739:1, 739:2, 739:3,

739:5, 739:6, 739:11, 739:12, 740:24, 741:3, 741:7, 741:16, 741:17, 742:20, 743:9, 746:22, 747:9, 749:5, 749:12, 749:21, 750:15, 751:15, 752:1, 752:25, 754:5, 754:17, 754:25, 755:16, 755:18, 756:11, 756:13, 758:7, 760:25, 766:7, 768:15, 770:1, 770:19, 770:24, 772:19, 772:22, 772:23, 774:1, 778:5, 778:8, 778:15, 779:12, 790:4, 791:21, 792:3, 794:12, 794:13, 794:14, 812:10, 826:21, 849:15, 853:5, 860:2, 878:13, 880:17, 880:20, 884:25, 917:13, 918:18, 920:6, 920:7, 921:1, 940:14, 957:16, 963:2, 965:11, 965:13, 966:19, 967:2, 967:4, 967:7, 968:15, 968:16, 968:20, 969:9, 969:14, 973:17, 973:19, 973:22, 975:1, 975:3, 975:5, 975:8, 980:12, 980:14, 983:25, 985:25, 989:18, 991:1, 999:17

**document's** [1] - 737:12

**documents** [8] - 696:19, 766:24, 781:20, 791:4, 965:16, 966:15, 973:11, 980:18

**dollars** [2] - 997:7

**dolphins** [2] - 890:14, 890:16

**domain** [3] - 675:25, 691:13, 691:14

**done** [20] - 681:12, 681:22, 684:12, 684:24, 686:24, 693:15, 693:19,

737:15, 748:15, 757:24, 795:13, 801:20, 834:21, 834:22, 844:18, 879:24, 898:6, 968:7, 985:21

**Donuts** [1] - 940:4

**door** [1] - 743:11

**dosage** [6] - 728:3, 808:17, 833:13, 856:6, 866:21, 923:6

**dose** [107] - 717:24, 718:3, 718:4, 718:9, 719:17, 723:10, 729:1, 729:3, 729:10, 799:12, 807:2, 807:4, 807:8, 808:15, 812:13, 812:15, 816:13, 818:10, 819:10, 821:5, 823:1, 833:14, 833:15, 833:23, 834:4, 836:3, 837:10, 840:23, 840:24, 841:9, 842:21, 843:4, 845:10, 845:14, 848:8, 848:25, 849:8, 853:16, 853:20, 853:21, 854:6, 856:17, 856:24, 857:2, 870:7, 874:18, 876:15, 876:16, 876:18, 877:11, 877:12, 877:13, 882:22, 883:7, 884:6, 884:7, 884:19, 885:19, 901:14, 901:23, 904:20, 906:16, 907:7, 907:14, 907:15, 907:16, 907:17, 907:19, 909:25, 910:1, 910:9, 911:15, 911:16, 911:19, 911:20, 911:22, 911:23, 912:5, 913:10, 913:14, 913:22, 913:24, 914:2, 914:12, 918:5, 920:5, 920:18, 921:5, 921:7, 921:13, 921:22, 921:24, 922:7, 922:10, 922:13, 922:16, 923:3, 924:2, 924:14, 924:15, 930:8, 933:21,

933:25, 994:13

**dose-dependent** [1] - 857:2

**doses** [33] - 723:4, 727:20, 728:24, 729:5, 807:6, 812:18, 842:17, 852:20, 852:23, 853:2, 866:14, 870:16, 873:12, 873:18, 875:4, 875:13, 875:22, 876:1, 876:2, 883:3, 900:3, 909:10, 909:13, 909:20, 910:3, 910:4, 910:11, 914:13, 923:13, 923:14, 924:2, 924:7, 929:24

**dosing** [3] - 723:8, 806:24, 918:6

**double** [1] - 912:20

**double-plot** [1] - 912:20

**doubt** [6] - 674:9, 723:12, 748:19, 753:19, 797:25, 1002:9

**doubts** [1] - 1000:18

**down** [44] - 696:12, 696:14, 718:4, 778:22, 779:23, 780:20, 780:24, 783:18, 786:21, 790:25, 791:6, 791:10, 791:13, 791:24, 792:8, 828:12, 830:20, 836:22, 840:18, 844:23, 845:2, 847:15, 860:17, 863:17, 868:19, 870:21, 872:3, 874:25, 881:9, 893:13, 893:17, 893:18, 923:16, 927:7, 927:14, 929:7, 944:23, 967:11, 988:14, 989:19, 997:19, 1001:6, 1002:16

**downside** [1] - 1003:15

**downstream** [1] - 943:1

**Dr** [222] - 673:14, 674:7, 674:8, 690:19, 691:12, 696:16, 700:12, 700:16, 700:25,

701:2, 701:3, 702:14, 702:17, 703:3, 703:13, 704:5, 704:9, 704:14, 705:16, 705:21, 710:13, 710:14, 711:2, 711:3, 711:9, 711:23, 713:14, 716:2, 717:21, 718:12, 720:20, 730:24, 731:21, 732:15, 733:9, 735:21, 739:25, 742:4, 746:1, 748:25, 756:14, 765:12, 765:21, 777:19, 777:21, 778:4, 782:5, 782:23, 783:11, 783:20, 784:4, 786:11, 786:24, 787:10, 790:17, 792:10, 793:14, 796:24, 798:11, 798:24, 799:25, 803:7, 809:17, 811:17, 817:14, 818:22, 820:9, 822:5, 825:5, 826:8, 828:4, 829:1, 830:12, 834:25, 839:15, 839:17, 839:20, 839:22, 840:3, 840:6, 849:25, 851:14, 851:24, 855:12, 856:20, 856:23, 860:7, 860:8, 872:18, 873:18, 875:16, 881:17, 882:20, 884:2, 886:2, 886:10, 886:14, 886:23, 886:24, 888:9, 891:14, 894:15, 895:3, 895:5, 895:6, 895:15, 895:25, 896:2, 896:16, 897:12, 897:13, 898:11, 898:19, 898:25, 899:15, 900:11, 901:11, 901:25, 902:1, 902:2, 902:4, 902:11, 903:1, 903:7, 905:23, 906:22, 907:12, 908:4, 909:15, 910:17, 910:23, 910:24, 910:25,

911:10, 914:19, 915:3, 916:1, 917:13, 917:14, 917:15, 917:18, 919:4, 920:8, 924:24, 930:2, 930:23, 935:19, 938:1, 940:18, 940:25, 941:1, 941:19, 941:21, 942:17, 943:11, 944:2, 946:21, 947:3, 947:17, 948:20, 948:21, 948:23, 948:25, 949:13, 949:14, 949:22, 950:2, 950:13, 950:15, 951:13, 952:10, 953:1, 954:11, 954:14, 954:18, 954:21, 955:4, 955:12, 955:15, 956:1, 956:4, 956:7, 956:10, 957:22, 959:18, 959:22, 961:22, 962:3, 963:5, 963:14, 964:9, 965:24, 966:2, 966:17, 966:19, 967:5, 967:24, 968:20, 968:25, 972:19, 973:1, 973:11, 976:12, 976:15, 977:16, 978:12, 978:14, 978:18, 979:6, 979:11, 984:15, 984:17, 984:23

**drafts** [1] - 935:1
**dramatically** [2] - 718:5, 885:13
**draw** [4] - 730:14, 923:1, 963:19, 963:20
**drawing** [1] - 693:15
**Dressman** [2] - 934:19, 936:7
**drew** [1] - 970:17
**drift** [3] - 708:7, 709:14, 869:19
**drifting** [1] - 708:10
**drive** [2] - 707:7, 707:13
**drives** [1] - 706:19
**driving** [2] - 704:6, 849:2
**dropout** [1] - 964:10
**dropped** [1] - 938:21

**drowsiness** [1] - 892:9
**drowsy** [5] - 891:21, 891:23, 892:9, 892:16, 892:17
**Drs** [1] - 837:13
**drug** [39] - 703:17, 704:6, 704:11, 704:17, 704:19, 710:12, 730:22, 740:5, 803:21, 803:25, 805:25, 810:9, 813:22, 820:11, 821:25, 831:9, 841:8, 841:11, 846:25, 847:11, 851:11, 881:16, 907:16, 937:20, 937:21, 961:24, 976:23, 985:1, 985:12, 987:16, 991:11, 991:14, 993:14, 995:12, 995:15
**drug-driving** [1] - 704:6
**drug-drug** [4] - 704:11, 704:19, 821:25, 881:16
**drugs** [5] - 709:18, 710:8, 834:8, 862:1, 994:12
**DTX** [2] - 738:19, 749:9
**DTX-073** [1] - 984:21
**DTX-154** [3] - 716:6, 716:8, 717:11
**DTX-155** [2] - 716:20, 717:12
**DTX-156** [2] - 717:1, 717:12
**DTX-16** [7] - 729:21, 730:5, 730:9, 812:21, 813:7, 815:6, 872:6
**DTX-16.1** [1] - 812:11
**DTX-16.7** [2] - 814:7, 873:1
**DTX-20** [7] - 797:14, 798:11, 798:18, 798:22, 877:18, 880:11, 893:15
**DTX-20.5** [1] - 808:8
**DTX-20.6** [3] - 804:5, 806:21, 809:8
**DTX-301** [1] - 1002:11
**DTX-331** [2] - 934:5, 936:4
**DTX-331.2** [1] - 935:4
**DTX-331.3** [1] - 934:10

**DTX-37** [3] - 723:15, 723:23, 724:2
**DTX-39** [5] - 720:4, 720:14, 917:12, 930:22, 931:22
**DTX-39.3** [3] - 931:19, 933:1, 933:15
**DTX-39.5** [2] - 932:20, 933:11
**DTX-41** [6] - 726:13, 726:24, 727:3, 806:10, 876:4, 882:12
**DTX-41.10** [2] - 808:19, 823:25
**DTX-41.19** [1] - 883:24
**DTX-41.2** [1] - 805:15
**DTX-41.25** [1] - 807:11
**DTX-41.3** [1] - 876:19
**DTX-410.1** [1] - 762:16
**DTX-411** [2] - 999:8, 999:10
**DTX-411.53** [1] - 999:16
**DTX-419** [5] - 731:2, 731:12, 749:18, 767:1, 880:16
**DTX-419.1** [2] - 738:20, 747:10
**DTX-42** [8] - 756:7, 778:5, 793:7, 793:18, 793:21, 794:12, 795:14, 815:16
**DTX-42.1** [2] - 793:19, 793:20
**DTX-42.10** [1] - 792:4
**DTX-42.11** [3] - 780:8, 792:14, 793:1
**DTX-42.12** [1] - 793:1
**DTX-42.13** [1] - 780:17
**DTX-42.16** [1] - 781:5
**DTX-42.7** [1] - 793:2
**DTX-42.9** [4] - 782:6, 791:1, 793:17, 793:23
**DTX-49.2** [2] - 779:10, 787:16
**DTX-5.2** [1] - 701:6
**DTX-52** [5] - 673:15, 957:14, 958:2, 958:7, 958:9
**DTX-55** [1] - 994:3
**DTX-555** [1] - 976:20
**DTX-73** [1] - 987:5
**DTX-73.8** [1] - 989:18
**due** [3] - 759:2, 759:25, 924:8
**duly** [1] - 700:21
**Dunkin'** [1] - 940:3

**duration** [1] - 855:14
**during** [10] - 734:14, 867:21, 868:13, 869:3, 869:4, 869:10, 886:18, 890:4, 909:19, 910:23
**During** [1] - 959:13
**dustbin** [1] - 688:22

## E

**e-mail** [7] - 770:1, 934:8, 934:11, 934:18, 935:8, 936:6, 936:16
**earliest** [4] - 743:1, 744:9, 744:11, 787:11
**early** [9] - 712:16, 735:17, 760:12, 764:10, 836:9, 838:6, 902:4, 929:2, 957:11
**earth** [1] - 898:10
**ease** [1] - 912:20
**easier** [4] - 672:22, 683:12, 683:13, 796:14
**easiest** [1] - 981:22
**easily** [3] - 749:8, 753:18, 760:23
**Eastman** [2] - 829:16, 837:13
**easy** [1] - 991:24
**ebb** [1] - 868:14
**edition** [3] - 865:3, 865:9, 865:12
**editors** [1] - 865:15
**education** [1] - 954:25
**educational** [2] - 701:20, 896:9
**Edward** [1] - 958:12
**EEG** [1] - 890:6
**effect** [35] - 707:23, 709:24, 711:16, 734:8, 750:5, 810:7, 827:16, 836:16, 837:16, 843:16, 848:5, 848:20, 849:9, 856:17, 857:2, 860:23, 870:17, 871:10, 871:25, 874:13, 883:7, 892:4, 899:20, 907:7, 907:23, 909:5, 910:18, 912:4, 913:2, 913:6, 913:13, 914:11,

924:8, 932:7, 932:13
**effective** [27] - 710:24, 719:23, 722:13, 722:18, 722:25, 723:13, 729:5, 799:12, 807:8, 810:16, 811:5, 812:18, 815:3, 825:3, 825:10, 825:25, 827:20, 840:24, 873:12, 876:16, 877:12, 882:23, 884:6, 918:5, 933:21, 935:12, 937:12
**effectively** [2] - 687:4, 934:1
**effects** [21] - 683:16, 712:15, 713:17, 713:19, 807:8, 807:9, 826:16, 833:24, 836:3, 841:17, 848:4, 856:24, 865:20, 874:24, 897:2, 907:15, 907:20, 915:11, 924:14, 927:18, 937:21
**efficacious** [1] - 789:6
**Efficacy** [2] - 778:17, 789:18
**efficacy** [1] - 825:14
**efficiency** [2] - 893:4, 893:7
**efficiently** [1] - 712:9
**effort** [3] - 732:15, 811:12, 966:13
**efforts** [1] - 902:4
**either** [22] - 683:8, 705:3, 710:5, 831:11, 837:3, 837:17, 854:1, 864:4, 889:22, 889:23, 912:7, 914:6, 916:8, 920:1, 922:10, 924:11, 939:22, 953:2, 953:5, 977:18, 982:19, 996:7
**EKINER** [1] - 671:15
**elaborate** [2] - 764:8, 765:6
**element** [1] - 879:4
**elevated** [1] - 869:13
**elicited** [1] - 946:23
**elucidation** [1] - 679:24
**Eluent** [1] - 999:19
**elutes** [1] - 971:10
**embodied** [1] - 684:12

**embodiment** [1] - 1000:9
**Emens** [74] - 700:12, 700:16, 700:25, 701:2, 701:3, 703:13, 710:13, 711:9, 713:14, 716:2, 716:19, 716:25, 717:6, 717:21, 720:20, 730:24, 731:21, 732:15, 733:9, 735:21, 739:25, 742:4, 746:1, 748:25, 756:14, 765:12, 765:21, 777:19, 777:21, 778:4, 782:5, 782:23, 783:11, 783:20, 784:4, 786:11, 786:24, 787:10, 790:17, 792:10, 793:14, 796:24, 798:11, 798:24, 799:25, 803:7, 809:17, 811:17, 818:22, 826:8, 828:4, 829:1, 830:12, 834:25, 855:12, 882:20, 884:2, 886:2, 886:10, 895:6, 900:11, 903:7, 905:23, 906:22, 910:17, 910:23, 910:25, 911:11, 914:19, 915:3, 917:13, 917:18, 919:4, 920:8
**EMENS** [1] - 700:20
**Emens's** [3] - 898:11, 898:25, 901:25
**empathy** [1] - 756:23
**employed** [2] - 880:4, 932:14
**Employed** [1] - 959:13
**employees** [2] - 770:2, 770:3
**enclosed** [1] - 796:19
**end** [16] - 685:6, 687:10, 738:16, 746:22, 751:2, 754:17, 792:8, 804:14, 841:16, 847:23, 854:1, 854:5, 887:3, 925:19, 939:17, 996:14
**endogenous** [13] - 706:4, 706:13,

706:16, 706:19, 708:25, 831:11, 831:14, 831:17, 831:19, 832:8, 868:10, 869:2, 869:16
**endogenously** [2] - 867:12, 867:14
**ends** [2] - 757:6, 866:10
**engage** [2] - 849:2, 1003:16
**engineered** [4] - 861:18, 862:2, 863:23, 873:19
**England** [7] - 715:6, 715:24, 840:3, 865:7, 888:12, 891:18, 927:24
**English** [1] - 865:23
**enjoy** [1] - 1003:18
**enlarge** [16] - 835:21, 838:11, 840:19, 843:20, 847:20, 850:11, 851:20, 852:14, 853:7, 855:9, 856:12, 860:2, 860:18, 861:8, 863:6, 873:4
**enlarging** [1] - 830:10
**entered** [1] - 968:17
**entire** [2] - 684:16, 890:6
**entitled** [3] - 918:20, 959:12, 961:16
**entity** [2] - 735:10, 740:11
**entrain** [71] - 702:18, 714:21, 715:23, 718:9, 718:10, 718:15, 723:5, 774:21, 804:13, 810:5, 813:21, 830:22, 832:16, 833:3, 840:11, 840:12, 840:13, 840:14, 844:2, 844:10, 847:9, 851:12, 852:1, 853:21, 863:11, 897:7, 897:10, 899:8, 899:18, 900:4, 901:13, 902:4, 902:12, 903:2, 904:23, 904:24, 907:1, 908:23, 909:14, 909:24, 912:3, 915:13, 915:17, 917:20, 918:10,

919:19, 921:13, 922:8, 922:14, 922:17, 922:25, 923:4, 923:20, 924:4, 924:5, 924:7, 924:8, 924:15, 925:22, 927:9, 927:19, 928:14, 928:21, 929:3, 929:11, 930:9, 932:14, 934:1, 935:10, 937:7
**entrained** [27] - 708:2, 774:18, 806:1, 846:9, 846:12, 846:17, 852:21, 870:2, 905:2, 906:18, 906:19, 906:21, 908:16, 908:17, 908:20, 908:25, 910:7, 910:8, 910:9, 910:14, 911:15, 911:16, 911:18, 911:20, 921:24, 922:11, 922:22
**entraining** [15] - 710:24, 718:3, 722:25, 773:11, 773:19, 804:15, 811:25, 838:23, 839:2, 840:24, 846:20, 852:25, 863:13, 877:25, 878:5
**Entrainment** [1] - 850:17
**entrainment** [52] - 709:16, 712:19, 719:19, 719:24, 727:19, 774:22, 803:23, 804:3, 805:11, 810:14, 812:7, 813:25, 814:15, 814:17, 818:4, 841:8, 842:23, 843:22, 852:4, 853:15, 854:18, 857:17, 862:20, 862:25, 863:2, 864:2, 864:7, 864:9, 869:11, 870:1, 899:10, 901:16, 901:17, 902:24, 903:9, 906:23, 907:2, 907:4, 908:19, 909:5, 911:23, 911:24, 916:13, 921:10, 923:2, 926:8, 929:12,

930:13, 933:4, 933:22
**entry** [1] - 779:24
**environment** [1] - 889:19
**environmental** [5] - 889:3, 889:6, 889:11, 889:14, 889:20
**enzyme** [2] - 704:17, 881:4
**equivalent** [3] - 709:12, 834:5, 834:12
**equivocal** [2] - 689:6, 691:11
**ERIC** [1] - 671:9
**especially** [7] - 718:8, 749:20, 799:23, 811:2, 875:4, 896:20, 990:13
**ESQ** [14] - 671:3, 671:3, 671:4, 671:4, 671:5, 671:8, 671:9, 671:9, 671:10, 671:12, 671:15, 671:16, 671:16, 671:17
**essence** [3] - 717:25, 823:19, 860:7
**essentially** [15] - 687:11, 688:9, 693:3, 694:17, 695:9, 750:8, 751:10, 751:14, 756:7, 759:20, 767:21, 924:9, 970:18, 978:3, 985:1
**establish** [6] - 679:25, 737:2, 748:4, 759:7, 775:3, 838:3
**established** [4] - 682:5, 732:11, 748:9, 761:15
**establishing** [1] - 771:17
**estimate** [4] - 742:23, 794:7, 794:10, 905:13
**et** [8] - 1:8, 716:11, 716:19, 716:25, 717:6, 721:14, 935:10, 935:11
**etc** [2] - 954:17, 977:6
**evaluate** [1] - 854:1
**evaluated** [1] - 693:5
**evaluation** [1] - 842:2
**evening** [4] - 823:20, 836:9, 869:21, 1003:11

event [2] - 739:14, 946:16
events [1] - 687:21
eventually [3] - 765:7, 974:25, 976:9
everyday [2] - 921:17, 992:13
evidence [110] - 672:21, 679:15, 679:17, 681:18, 682:5, 687:24, 687:25, 691:9, 691:10, 691:18, 712:7, 713:9, 713:12, 714:11, 714:14, 715:11, 715:14, 717:12, 717:15, 717:16, 717:17, 717:18, 719:9, 719:12, 720:15, 720:18, 721:19, 721:22, 722:15, 722:17, 723:24, 724:2, 724:12, 725:16, 725:19, 726:25, 727:3, 728:8, 730:6, 730:9, 731:13, 732:13, 737:9, 737:24, 747:25, 748:10, 756:22, 766:24, 770:17, 771:2, 771:10, 790:4, 790:12, 793:8, 798:19, 798:22, 828:17, 828:20, 828:23, 830:5, 830:8, 850:5, 850:9, 852:8, 854:10, 859:22, 864:24, 872:6, 875:17, 875:18, 875:25, 876:2, 877:18, 880:12, 886:11, 900:15, 901:8, 901:15, 901:16, 902:16, 903:12, 905:3, 906:5, 911:3, 911:7, 917:13, 919:9, 920:2, 920:8, 934:13, 949:3, 958:2, 965:19, 966:16, 968:17, 974:1, 975:12, 976:20, 980:22, 984:1, 984:21, 987:18, 988:18, 998:15, 998:18, 999:1, 1002:12

evidentially [1] - 756:10
evidentiary [4] - 673:12, 772:8, 796:11, 938:6
evolved [1] - 890:17
exact [5] - 673:8, 745:22, 810:11, 818:5, 837:9
exactly [27] - 692:11, 694:5, 695:22, 696:7, 723:10, 735:3, 775:21, 776:16, 814:7, 834:13, 837:1, 841:5, 841:10, 842:1, 843:9, 843:19, 847:2, 847:13, 848:15, 851:3, 851:6, 854:7, 869:1, 870:3, 870:13, 878:8, 916:12
exam [1] - 989:21
examination [30] - 679:16, 689:15, 690:20, 691:12, 691:15, 697:11, 790:14, 797:23, 831:5, 832:2, 833:7, 839:12, 852:11, 855:13, 859:23, 864:17, 866:7, 871:1, 873:3, 882:21, 886:4, 901:25, 906:22, 910:24, 914:20, 928:8, 935:19, 949:8, 949:12, 971:24
EXAMINATION [9] - 700:23, 793:12, 796:7, 828:24, 882:18, 895:23, 924:22, 936:1, 984:13
examine [1] - 793:10
examined [4] - 929:10, 973:7, 973:9
examining [2] - 946:18, 946:20
example [27] - 676:18, 683:3, 683:14, 696:15, 708:3, 709:7, 710:11, 737:20, 773:22, 797:21, 815:22, 844:16, 848:25, 849:3, 850:19, 864:1, 873:22,

883:12, 890:3, 900:2, 908:19, 910:14, 913:15, 913:23, 914:1, 917:1, 1000:7
examples [4] - 706:10, 706:22, 709:21, 710:10
except [1] - 692:7
excerpt [2] - 907:13, 918:3
excerpted [1] - 921:1
exchange [1] - 936:6
exciting [1] - 715:20
exclude [1] - 736:16
exclusively [2] - 882:7
excuse [3] - 726:20, 736:15, 740:25
excused [2] - 736:19, 755:19
exercise [1] - 796:20
exhibit [22] - 673:12, 690:15, 756:7, 760:2, 762:17, 762:23, 767:4, 770:1, 771:6, 777:4, 777:14, 790:8, 790:12, 793:20, 797:18, 797:24, 876:20, 876:23, 880:9, 902:7, 912:12, 999:7
Exhibit [9] - 758:20, 771:7, 795:22, 798:1, 835:10, 843:11, 850:5, 850:8, 999:8
exhibits [1] - 859:22
exist [1] - 744:2
existed [8] - 746:4, 760:9, 760:11, 762:2, 765:19, 789:24, 790:1, 910:12
existence [2] - 994:23, 995:4
exists [1] - 685:5
exogenous [8] - 831:11, 831:16, 831:22, 832:1, 928:13, 928:20, 931:9, 932:2
exotic [1] - 990:15
expect [9] - 814:18, 827:3, 837:19, 841:9, 948:16, 971:11, 990:11, 990:14, 1002:24
expectation [13] - 801:14, 810:23,

811:9, 811:14, 814:9, 878:17, 878:19, 878:25, 879:3, 879:6, 879:13, 978:8, 979:24
expectations [1] - 879:10
expected [1] - 730:21
expensive [1] - 996:18
experience [4] - 702:8, 702:11, 702:12, 955:3
experienced [1] - 804:22
experiments [1] - 835:6
expert [69] - 673:21, 673:24, 674:9, 674:17, 677:5, 678:5, 678:22, 679:2, 679:10, 679:19, 679:24, 680:2, 681:18, 689:16, 689:18, 694:3, 694:6, 697:8, 697:17, 697:23, 697:25, 698:2, 699:21, 700:16, 704:5, 704:16, 710:14, 733:15, 733:20, 733:21, 733:22, 734:3, 734:4, 734:7, 734:12, 735:22, 742:5, 756:15, 759:16, 765:13, 781:14, 781:21, 785:1, 785:6, 785:23, 786:4, 788:3, 788:5, 788:7, 790:7, 888:18, 898:19, 938:8, 938:16, 938:25, 940:7, 940:11, 940:17, 943:22, 944:3, 944:5, 944:7, 950:13, 951:7, 956:19, 960:22, 961:10, 964:13, 964:16
expert's [2] - 678:1, 697:4
expertise [2] - 820:10, 822:6
experts [5] - 700:15, 759:14, 802:12, 898:19, 944:13
explain [24] - 679:19, 701:6, 707:5,

707:21, 710:1, 735:22, 740:1, 749:22, 763:5, 763:8, 767:17, 768:14, 772:25, 800:7, 801:21, 802:5, 807:17, 810:3, 823:11, 825:22, 883:10, 883:17, 912:19, 946:1
explained [8] - 800:19, 800:25, 801:2, 815:20, 815:24, 819:15, 824:11, 824:13
explaining [2] - 691:4, 707:3
explains [4] - 755:7, 755:9, 914:10, 914:11
explanation [5] - 762:20, 785:14, 788:11, 857:1, 883:16
explicitly [5] - 772:7, 814:12, 814:14, 943:17, 944:22
explore [2] - 881:22, 909:13
exposure [2] - 869:21, 869:23
extended [2] - 873:25, 874:12
extends [1] - 930:12
extensive [1] - 971:23
extensively [1] - 838:19
extent [3] - 688:11, 711:9, 781:19
external [1] - 869:14
extraordinarily [1] - 688:1
extreme [2] - 890:13, 890:20
extremely [1] - 710:17
eye [1] - 891:19

**F**

F.3d [1] - 751:24
face [8] - 732:17, 733:25, 735:18, 738:18, 739:6, 740:23, 748:19, 749:23
fact [58] - 679:6, 679:10, 679:14, 680:13, 685:14, 688:19, 690:22,

691:11, 692:18, 692:23, 693:17, 697:16, 697:22, 718:7, 723:2, 726:7, 730:21, 733:8, 734:18, 735:16, 742:10, 748:18, 749:3, 755:23, 758:25, 759:7, 766:16, 767:10, 770:9, 775:5, 776:4, 776:9, 794:9, 797:25, 812:7, 814:18, 829:19, 836:2, 840:23, 842:21, 844:1, 845:8, 845:23, 878:6, 878:18, 878:23, 879:12, 894:11, 899:18, 906:24, 906:25, 917:7, 917:8, 922:14, 935:15, 937:15, 937:19, 938:25

**facto** [1] - 693:3
**factors** [2] - 980:3, 980:7
**facts** [4] - 691:22, 737:3, 755:13, 980:7
**factual** [4] - 696:24, 736:17, 743:7, 790:6
**factually** [1] - 755:20
**failed** [1] - 909:7
**fails** [1] - 924:5
**failure** [1] - 951:1
**fair** [49] - 689:8, 707:14, 739:19, 748:20, 790:11, 833:11, 834:2, 834:17, 835:19, 844:9, 846:19, 849:4, 849:10, 853:21, 854:4, 855:14, 857:20, 858:8, 860:25, 862:20, 863:3, 863:11, 863:12, 864:9, 865:13, 867:22, 868:1, 869:6, 872:21, 874:5, 874:6, 875:19, 878:2, 878:21, 880:5, 880:6, 881:4, 881:5, 881:22, 897:7, 897:13, 905:9, 940:9, 943:23, 945:8, 960:15, 962:16, 987:10,

989:7
**fairly** [6] - 838:19, 887:22, 909:23, 964:11, 971:23, 978:21
**fairness** [5] - 695:17, 763:7, 775:15, 796:16, 851:16
**fall** [2] - 891:24, 891:25
**fallen** [1] - 892:5
**falling** [1] - 892:6
**familiar** [6] - 706:25, 753:13, 834:25, 849:20, 902:2
**far** [5] - 702:21, 753:17, 818:20, 879:2, 942:7
**fast** [1] - 676:8
**fat** [1] - 847:25
**faulting** [1] - 893:24
**FDA** [36] - 683:17, 684:5, 684:8, 684:10, 684:11, 685:1, 685:4, 687:17, 687:19, 688:2, 740:5, 740:8, 740:10, 747:5, 752:18, 752:22, 752:23, 757:25, 965:15, 966:22, 969:5, 973:8, 980:8, 981:8, 981:12, 981:24, 982:2, 983:12, 985:5, 986:1, 988:24, 989:8, 989:14, 993:16, 994:22, 995:4
**FDA's** [2] - 752:19, 982:17
**feasible** [1] - 683:5
**feature** [3] - 785:25, 843:25, 844:7
**February** [8] - 763:14, 765:19, 767:7, 767:9, 767:15, 768:10, 768:23
**Federal** [6] - 751:23, 751:25, 752:22, 753:9, 753:13, 754:4
**federal** [3] - 733:7, 740:10, 750:24
**federally** [1] - 702:24
**feet** [1] - 682:25
**fellow** [2] - 702:3, 702:6
**fellows** [1] - 701:17
**felt** [1] - 874:3
**Ferguson** [5] - 721:14,

721:25, 722:6, 722:15, 860:7
**few** [4] - 703:25, 763:17, 867:14, 898:6
**field** [28] - 683:22, 700:16, 702:8, 704:4, 708:17, 712:14, 715:21, 829:16, 830:1, 830:2, 833:2, 835:16, 835:18, 836:19, 838:3, 839:25, 842:14, 853:19, 858:16, 859:10, 860:9, 887:11, 887:21, 888:10, 896:24, 897:15, 955:3, 999:21
**fields** [1] - 700:17
**fight** [1] - 776:8
**Figure** [12] - 729:9, 836:1, 836:23, 836:25, 837:9, 861:8, 881:8, 882:2, 919:12, 959:22, 961:25, 963:12
**figure** [20] - 675:3, 679:9, 682:2, 697:9, 698:25, 738:12, 738:17, 771:12, 827:19, 834:11, 870:22, 870:23, 871:5, 962:1, 962:4, 962:7, 971:5, 977:17, 988:22, 996:21
**figures** [1] - 881:6
**figuring** [1] - 796:15
**filed** [3] - 684:22, 761:11, 948:4
**files** [1] - 762:24
**filing** [1] - 699:14
**final** [5] - 807:13, 882:16, 899:23, 960:3, 963:15
**finally** [10] - 717:1, 805:6, 808:21, 810:15, 812:24, 817:6, 821:9, 824:8, 847:10, 886:3
**fine** [4] - 769:1, 776:21, 781:20, 948:18
**finish** [2] - 833:19, 1002:23
**finished** [1] - 945:3
**firm** [1] - 741:22
**firms** [1] - 742:14

**first** [94] - 672:8, 678:5, 680:14, 680:16, 687:16, 694:16, 700:21, 701:11, 702:18, 703:25, 704:21, 705:25, 712:17, 712:20, 716:4, 719:23, 723:2, 724:11, 738:25, 739:3, 740:22, 742:3, 742:22, 748:9, 761:10, 761:12, 770:14, 778:14, 779:24, 780:3, 780:6, 782:9, 782:16, 784:21, 785:2, 785:4, 791:8, 792:20, 793:20, 794:2, 800:23, 802:1, 802:2, 803:14, 803:18, 804:9, 805:7, 805:20, 811:24, 818:20, 824:17, 829:5, 829:12, 838:11, 839:14, 839:19, 853:12, 877:13, 896:21, 897:9, 900:4, 901:13, 903:8, 903:23, 904:4, 904:8, 904:10, 904:14, 906:5, 906:8, 909:24, 918:4, 925:20, 925:21, 926:8, 928:12, 929:1, 936:18, 936:24, 943:3, 944:2, 954:23, 957:14, 959:17, 961:20, 963:3, 964:6, 972:10, 974:8, 987:23, 994:11, 994:18, 996:21, 999:17
**firsthand** [1] - 734:5
**five** [11] - 728:22, 739:2, 783:20, 852:1, 885:7, 885:9, 885:14, 885:17, 936:12, 961:20, 981:19
**five-hour** [2] - 885:7, 885:9
**five-page** [1] - 739:2
**fix** [1] - 687:7
**fixed** [1] - 916:4
**flip** [2] - 778:20,

826:10
**flow** [2] - 979:1, 979:2
**Fluvoxamine** [1] - 819:21
**focus** [8] - 688:12, 811:21, 824:17, 927:16, 934:8, 964:7, 968:2, 999:17
**focused** [1] - 675:13
**folks** [2] - 685:3, 863:4
**follow** [3] - 674:19, 840:12, 994:4
**followed** [3] - 962:11, 964:4, 990:3
**following** [6] - 672:3, 678:18, 919:12, 929:13, 982:4, 1003:22
**follows** [6] - 700:22, 777:22, 788:23, 841:6, 895:22, 951:24
**food** [28] - 705:8, 823:6, 823:8, 823:13, 823:18, 823:20, 823:21, 823:23, 824:21, 824:23, 825:3, 825:9, 825:11, 825:15, 825:16, 825:25, 826:1, 826:18, 827:16, 827:17, 827:21, 827:24, 828:1, 848:5, 848:20, 849:9
**football** [3] - 865:19, 865:23, 866:1
**FOR** [1] - 1:3
**force** [1] - 702:22
**foregoing** [1] - 1003:24
**forever** [1] - 760:17
**forget** [1] - 992:7
**forgive** [2] - 905:19, 917:3
**forgot** [2] - 689:14, 911:2
**form** [7] - 732:13, 795:2, 842:2, 873:25, 970:21, 981:14, 982:21
**format** [1] - 746:3
**formed** [4] - 703:18, 972:4, 972:5, 974:23
**forming** [18] - 704:1, 704:10, 705:9, 713:5, 714:7, 715:7, 717:8, 719:6, 720:11, 721:15, 723:20, 724:19,

725:12, 726:21, 728:15, 730:3, 797:1, 798:15
**Formosa** [5] - 688:6, 688:9, 968:7, 968:21, 968:25
**formula** [1] - 971:13
**formulation** [2] - 719:17, 918:8
**forth** [7] - 764:14, 770:22, 771:5, 775:14, 819:14, 819:25, 947:7
**forward** [7] - 837:3, 837:17, 850:20, 864:20, 906:3, 961:15, 977:16
**foundation** [14] - 732:1, 748:16, 748:22, 748:25, 771:4, 775:3, 777:3, 777:16, 781:13, 781:24, 781:25, 782:13, 795:14, 958:21
**foundational** [2] - 733:10, 793:25
**four** [19] - 717:8, 717:20, 718:12, 729:2, 773:9, 773:18, 826:13, 846:10, 851:25, 861:10, 864:21, 866:21, 870:16, 906:18, 906:24, 908:9, 961:20, 966:25
**fourth** [3] - 705:5, 807:13, 904:24
**fractions** [1] - 688:3
**framed** [1] - 750:4
**Frank** [3] - 762:21, 765:17, 767:4
**Frank-White** [3] - 762:21, 765:17, 767:4
**frankly** [10] - 674:22, 678:19, 686:9, 686:14, 690:8, 691:8, 737:21, 742:13, 759:16, 767:10
**free** [21] - 708:15, 804:11, 838:23, 844:2, 852:21, 854:22, 888:6, 925:22, 926:9, 926:24, 927:10, 927:19, 928:14, 928:21, 929:3,

929:11, 930:9, 930:13, 932:15, 934:2, 1003:21
**free-running** [18] - 708:15, 804:11, 838:23, 852:21, 854:22, 925:22, 926:9, 926:24, 927:10, 927:19, 928:14, 928:21, 929:3, 929:11, 930:9, 930:13, 932:15, 934:2
**free-standing** [1] - 888:6
**frequently** [1] - 866:3
**Friday** [1] - 1003:8
**friend** [1] - 880:16
**frivolous** [1] - 894:6
**front** [15] - 681:18, 761:5, 763:11, 774:8, 775:4, 787:17, 791:1, 791:21, 792:3, 793:17, 794:12, 826:12, 897:14, 941:10, 973:4
**frustrated** [1] - 750:22
**full** [8] - 681:11, 786:15, 851:20, 851:21, 885:13, 885:17, 890:16, 964:6
**fully** [1] - 858:5
**funded** [1] - 702:25
**funny** [1] - 943:10
**furthermore** [2] - 761:14, 810:13
**furthest** [1] - 859:19
**Future** [1] - 961:17
**future** [1] - 700:6

## G

**Gabrielle** [1] - 934:19
**game** [1] - 790:11
**GARRISON** [1] - 671:8
**gather** [1] - 771:11
**general** [7] - 701:7, 703:10, 726:5, 947:2, 947:5, 978:9, 979:25
**General** [1] - 701:13
**generally** [7] - 742:14, 830:18, 990:14, 992:1, 992:3, 992:5, 992:11
**generate** [2] - 962:11, 962:23
**generated** [1] - 706:4

**generates** [2] - 706:6, 706:8
**germane** [1] - 795:4
**gestalt** [1] - 879:9
**given** [18] - 740:21, 744:18, 762:20, 788:4, 789:1, 820:10, 837:10, 841:22, 846:24, 848:25, 895:7, 901:14, 901:23, 904:20, 908:15, 912:24, 914:2, 927:2
**gland** [1] - 867:21
**glean** [1] - 679:23
**government** [18] - 733:7, 738:21, 740:10, 740:11, 745:1, 745:2, 745:3, 745:23, 747:4, 747:5, 747:11, 749:1, 752:2, 754:10, 761:3, 795:10, 795:17, 798:5
**grab** [1] - 758:9
**grade** [1] - 683:23
**grams** [2] - 994:13, 999:20
**grant** [1] - 936:25
**graphically** [1] - 836:20
**grappling** [1] - 790:10
**grateful** [1] - 894:17
**great** [5] - 683:11, 705:23, 868:7, 889:1, 894:19
**greater** [4] - 858:10, 858:11, 994:21, 1000:25
**greatly** [1] - 857:7
**green** [7] - 729:9, 807:16, 817:1, 818:14, 821:14, 871:5, 871:21
**Greenblatt** [2] - 820:9, 894:15
**Greenblatt's** [5] - 704:5, 704:9, 704:14, 822:5, 881:17
**GRETKOWSKI** [1] - 671:17
**Groombridge** [27] - 681:21, 688:12, 689:15, 694:12, 735:25, 738:2, 742:2, 745:6, 746:9, 746:23, 751:5, 751:8, 755:23,

766:2, 771:22, 788:18, 884:2, 884:18, 886:3, 893:20, 893:24, 898:14, 910:23, 911:2, 914:20, 946:20, 947:3
**GROOMBRIDGE** [200] - 671:8, 673:7, 674:6, 674:24, 675:4, 675:7, 675:11, 675:16, 675:20, 676:8, 676:11, 676:18, 676:21, 677:1, 677:4, 677:8, 677:16, 677:20, 678:15, 679:1, 681:25, 682:15, 682:17, 682:20, 683:2, 684:8, 684:16, 684:21, 685:9, 685:14, 685:17, 686:20, 687:3, 689:10, 689:17, 689:20, 689:22, 690:1, 690:4, 690:13, 691:8, 692:11, 694:13, 694:19, 695:1, 695:3, 695:5, 695:15, 695:22, 696:4, 696:7, 696:9, 696:11, 696:15, 696:18, 699:2, 699:20, 700:1, 700:5, 700:8, 711:17, 713:10, 714:12, 715:12, 717:13, 719:10, 720:16, 721:20, 723:25, 725:17, 727:1, 730:7, 731:14, 731:17, 732:12, 732:20, 732:25, 733:13, 733:18, 733:23, 734:6, 734:10, 734:17, 734:21, 735:4, 735:12, 742:3, 742:22, 743:14, 743:23, 745:7, 745:17, 745:25, 746:10, 746:13, 750:19, 762:7, 763:6, 763:9, 764:5, 764:21, 768:18, 768:21, 769:7, 774:2, 774:13, 774:20, 777:15, 781:12,

781:18, 781:25, 782:12, 784:18, 784:23, 785:7, 787:20, 787:23, 788:2, 788:6, 788:19, 792:21, 793:9, 793:13, 794:19, 794:25, 798:20, 828:8, 828:19, 828:25, 830:4, 830:9, 830:11, 835:9, 835:12, 835:20, 835:22, 836:22, 836:24, 838:10, 838:13, 840:18, 840:21, 844:23, 845:6, 846:3, 846:5, 847:15, 847:16, 847:20, 847:22, 850:4, 850:10, 850:14, 851:19, 851:23, 852:13, 852:15, 853:7, 853:9, 855:9, 855:11, 856:12, 856:14, 860:1, 860:3, 860:17, 860:20, 861:7, 861:9, 863:6, 863:8, 863:17, 863:21, 864:24, 865:1, 866:12, 866:13, 870:21, 870:25, 872:2, 872:7, 872:14, 872:17, 873:4, 873:6, 876:21, 876:25, 880:11, 880:14, 881:20, 881:25, 882:9, 894:2, 894:24, 937:25, 998:11, 998:21, 999:3, 1002:19, 1003:4
**Groombridge's** [3] - 737:16, 748:7, 956:10
**ground** [2] - 897:4, 910:19
**grounds** [2] - 673:19, 751:18
**groundwork** [1] - 831:8
**group** [2] - 716:4, 827:24
**growth** [1] - 861:2
**guarantee** [1] - 840:14
**guess** [17] - 672:18, 732:7, 739:12,

741:20, 743:9, 743:11, 752:9, 761:1, 762:19, 782:2, 782:3, 793:16, 826:13, 859:14, 935:1, 947:19

**guidance** [2] - 677:16, 677:18

**Guideline** [2] - 918:21, 944:24

**guideline** [1] - 993:19

**guidelines** [18] - 683:3, 953:3, 953:5, 953:6, 973:8, 973:9, 976:19, 976:22, 977:4, 977:25, 978:4, 978:11, 978:13, 979:17, 979:19, 980:2, 993:17, 994:9

**guy** [1] - 757:2

**guys** [3] - 737:20, 738:7, 766:10

**gymnastics** [1] - 679:9

# H

**h)** [1] - 963:25

**Hack** [47] - 719:5, 719:6, 719:14, 719:16, 719:21, 800:15, 800:17, 803:11, 803:15, 804:8, 804:10, 804:21, 805:22, 805:24, 805:25, 809:1, 809:10, 809:18, 810:4, 811:19, 813:11, 813:20, 813:25, 818:25, 819:1, 820:1, 820:3, 820:17, 820:18, 822:12, 822:13, 824:4, 854:13, 856:20, 856:23, 857:5, 905:24, 906:8, 906:14, 908:4, 919:13, 919:23, 928:7, 933:13

**hairs** [3] - 867:16, 867:20, 868:16

**half** [24] - 727:21, 728:2, 812:25, 813:1, 816:23, 816:24, 818:12, 818:13, 821:12,

821:13, 828:8, 828:10, 828:11, 845:23, 847:24, 874:5, 891:5, 893:7, 893:8, 895:4, 911:24, 937:3, 976:1, 1002:14

**half-life** [1] - 874:5

**halfway** [1] - 778:22

**halves** [1] - 971:4

**hand** [23] - 707:1, 710:5, 710:6, 747:18, 752:4, 753:8, 753:16, 763:22, 766:7, 777:6, 778:6, 835:21, 840:20, 845:23, 860:19, 884:14, 925:20, 926:3, 930:6, 968:6, 970:12, 970:13, 990:23

**handed** [2] - 765:23, 786:2, 941:7

**handful** [1] - 897:14

**hanging** [2] - 924:8, 936:3

**hangs** [1] - 912:5

**happy** [5] - 762:7, 775:12, 796:2, 828:20, 948:6

**hard** [6] - 834:1, 834:5, 890:11, 935:15, 937:15, 1001:1

**Hardeland** [37] - 730:2, 730:3, 730:11, 730:14, 730:20, 730:22, 800:17, 811:19, 811:21, 811:24, 812:14, 812:15, 812:18, 812:25, 813:3, 813:4, 813:10, 813:22, 814:4, 814:12, 814:16, 814:18, 814:20, 814:22, 815:4, 818:25, 819:1, 820:2, 820:18, 822:13, 824:4, 872:8, 872:18, 872:24, 873:18, 875:16

**Harvard** [2] - 702:15, 896:3

**hasten** [1] - 864:2

**hats** [1] - 887:19

**HCL** [1] - 964:4

**head** [6] - 827:22,

834:24, 892:4, 904:12

**head-bobbing** [1] - 892:4

**head-to-head** [2] - 827:22, 834:24

**headed** [3] - 746:11, 838:14, 963:2

**header** [3] - 850:12, 959:17, 961:21

**heading** [4] - 838:12, 863:7, 875:1, 962:6

**Health** [4] - 701:14, 701:16, 701:25

**health** [1] - 684:6

**healthy** [3] - 826:17, 879:24, 885:4

**hear** [10] - 672:16, 677:23, 678:13, 711:22, 817:16, 825:8, 915:3, 915:6, 954:11, 976:12

**heard** [13] - 677:7, 682:2, 691:11, 702:20, 704:18, 706:1, 706:12, 708:2, 724:21, 829:19, 832:9, 899:20, 910:7

**hearing** [4] - 678:5, 839:17, 917:21, 998:23

**hearsay** [2] - 731:25, 761:2

**heart** [1] - 706:6

**held** [6] - 672:3, 686:5, 774:25, 794:23, 951:23, 952:23

**hello** [2] - 896:2, 924:25

**help** [12] - 679:10, 687:7, 708:23, 760:15, 765:24, 769:23, 913:12, 940:7, 947:12, 949:6, 950:4, 950:19

**helpful** [9] - 689:5, 699:21, 758:21, 772:20, 843:5, 947:9, 948:19, 959:2, 959:3

**helping** [1] - 776:1

**helps** [1] - 769:20

**hemisphere** [1] - 890:18

**hemispheres** [1] - 890:18

**hemorrhagic** [1] - 900:17

**hereby** [1] - 1003:24

**hereto** [1] - 762:22

**hesitating** [1] - 833:22

**Hetlioz** [8] - 770:11, 773:1, 778:11, 783:22, 796:25, 815:14, 817:17, 818:8

**hide** [1] - 868:4

**high** [21] - 703:14, 704:21, 717:20, 718:4, 727:15, 728:18, 796:19, 799:19, 842:22, 843:4, 847:25, 852:20, 853:2, 854:3, 890:6, 924:3, 924:7, 953:9, 953:18, 964:11, 978:21

**high-density** [1] - 890:6

**high-fat** [1] - 847:25

**higher** [8] - 842:16, 853:21, 853:24, 907:14, 907:17, 912:5, 914:2, 914:3

**highest** [1] - 978:19

**highlighted** [32] - 715:25, 720:1, 722:9, 723:3, 725:2, 726:6, 727:20, 729:9, 730:16, 799:10, 799:18, 804:14, 806:17, 806:25, 807:3, 807:14, 808:3, 809:13, 811:1, 812:3, 812:17, 813:6, 814:6, 816:11, 816:14, 816:17, 816:25, 819:8, 821:7, 821:14, 823:15, 968:14

**highlighting** [2] - 973:4, 981:24

**highly** [5] - 688:25, 997:20, 997:22, 998:7, 998:8

**historic** [1] - 798:2

**historical** [4] - 784:11, 786:13, 786:15, 798:4

**Historical** [3] - 784:16, 786:6, 786:12

**histories** [1] - 704:4

**history** [14] - 688:22, 739:22, 740:17, 744:17, 755:6, 756:8, 767:20,

768:10, 770:21, 838:22, 840:9, 923:18, 965:14, 966:4

**History** [12] - 741:11, 747:3, 755:7, 785:11, 785:24, 786:14, 786:24, 787:3, 787:9, 787:19, 788:9, 789:14

**hits** [2] - 831:9, 847:11

**hitting** [1] - 847:1

**hmm** [1] - 783:13

**HOESCHEN** [1] - 671:3

**hold** [12] - 680:16, 700:9, 747:15, 748:16, 749:12, 752:24, 753:3, 762:5, 767:2, 922:6, 939:2, 951:21

**holder** [1] - 676:21

**Honor** [196] - 672:7, 673:7, 674:6, 674:8, 677:21, 677:24, 678:16, 679:23, 680:18, 681:25, 682:21, 683:3, 685:9, 685:25, 686:7, 687:4, 687:14, 689:10, 689:12, 690:8, 690:18, 691:3, 691:8, 691:22, 692:16, 693:18, 694:7, 694:14, 695:15, 695:22, 697:10, 698:10, 698:19, 699:13, 699:20, 700:8, 700:11, 700:13, 712:5, 713:8, 714:10, 715:10, 717:11, 719:8, 719:10, 720:14, 721:18, 723:23, 725:15, 726:24, 727:1, 730:5, 731:12, 731:14, 731:20, 732:4, 732:12, 732:25, 733:6, 733:13, 734:6, 734:17, 734:19, 735:5, 735:13, 735:21, 736:10, 737:5, 739:24, 741:18, 742:3, 743:3, 743:14, 744:1,

745:19, 745:25, 746:7, 746:19, 747:7, 748:2, 748:24, 750:19, 752:14, 753:1, 755:2, 756:4, 757:4, 757:20, 758:7, 758:15, 758:20, 762:1, 762:7, 762:9, 763:6, 763:9, 763:15, 764:3, 764:5, 764:21, 766:1, 766:23, 767:18, 768:19, 769:14, 772:18, 774:2, 774:5, 774:13, 775:11, 775:21, 776:9, 776:16, 776:19, 777:1, 777:7, 777:15, 778:1, 781:12, 782:12, 784:18, 785:18, 785:23, 786:3, 787:20, 788:8, 788:19, 790:15, 792:21, 793:7, 793:9, 794:20, 794:25, 795:7, 795:9, 795:23, 796:1, 796:22, 798:9, 798:18, 828:5, 828:8, 828:15, 828:19, 828:22, 830:4, 850:4, 880:12, 881:14, 881:20, 882:11, 886:7, 894:2, 894:14, 894:22, 894:24, 895:14, 895:18, 898:18, 902:17, 904:3, 905:19, 924:17, 924:20, 935:25, 938:5, 939:4, 939:24, 940:25, 941:8, 941:12, 942:6, 943:2, 944:1, 944:12, 946:7, 947:23, 948:2, 948:12, 948:19, 949:1, 951:6, 957:2, 958:4, 959:1, 960:21, 961:2, 961:12, 964:18, 965:20, 972:14, 998:17, 999:3, 1002:20, 1002:21, 1003:5

**Honor's** [3] - 751:13,

751:21, 761:3
**HONORABLE** [1] - 1:18
**hope** [2] - 701:7, 798:7
**hopefully** [1] - 849:14
**hormone** [3] - 868:22, 868:24, 897:6
**hormones** [2] - 706:13, 708:6
**hospital** [1] - 897:23
**Hospital** [3] - 702:15, 896:3, 897:20
**hour** [35] - 727:22, 728:2, 729:11, 729:12, 729:17, 773:3, 773:6, 773:10, 789:2, 812:25, 813:1, 816:24, 817:2, 818:13, 818:15, 821:12, 828:9, 828:10, 828:11, 836:10, 837:5, 841:20, 848:16, 871:12, 871:14, 885:7, 885:9, 885:18, 895:4, 916:8, 927:3, 1002:14
**Hour** [1] - 700:19
**hours** [35] - 700:5, 706:9, 708:3, 728:22, 741:23, 772:14, 802:3, 804:23, 804:25, 805:1, 805:2, 808:14, 847:4, 855:18, 855:21, 855:25, 867:11, 867:14, 869:3, 869:4, 869:7, 869:10, 869:20, 871:17, 880:21, 885:14, 885:17, 893:5, 913:16, 916:8, 920:1, 921:12, 921:17, 922:9
**housekeeping** [2] - 672:6, 828:15
**HPLC** [15] - 688:7, 968:9, 968:13, 983:16, 983:20, 983:22, 986:11, 986:13, 986:24, 991:14, 991:18, 991:22, 992:9, 992:13, 992:22
**human** [5] - 726:4,

838:4, 839:3, 840:12, 863:14
**humans** [1] - 864:5
**hurriedly** [1] - 759:25
**hydride** [1] - 964:4
**hydrogens** [3] - 971:13, 971:15, 971:21
**hyperlink** [6] - 752:23, 757:13, 767:25, 768:2, 768:15, 783:25
**hyperlinks** [4] - 740:18, 740:20, 757:13, 767:21
**hypnotic** [1] - 708:22
**hypnotics** [1] - 710:6
**hypothesis** [3] - 687:22, 874:11, 907:23
**hypothesized** [3] - 841:1, 853:15, 905:5

---

**I**

**i.e** [1] - 797:21
**ICH** [9] - 944:24, 973:8, 976:19, 978:3, 978:10, 979:18, 980:1, 993:17, 994:8
**ICHQ3A** [9] - 953:3, 953:5, 976:21, 976:25, 977:21, 977:25, 978:13, 979:16, 993:19
**idea** [11] - 688:25, 692:24, 767:23, 807:7, 833:15, 853:12, 875:22, 875:24, 890:17, 905:16, 912:4
**ideal** [1] - 918:6
**identical** [3] - 795:21, 971:3, 985:2
**identification** [2] - 682:17, 995:1
**identifications** [1] - 681:22
**identified** [20] - 683:21, 684:10, 966:6, 966:8, 968:5, 968:8, 968:9, 968:12, 968:22, 969:6, 969:19, 988:4, 988:5, 989:3, 989:6, 989:23, 990:21, 995:15, 996:2, 996:4
**identifier** [3] - 778:24,

789:17, 793:3
**identifies** [1] - 739:7
**identify** [24] - 677:17, 683:1, 683:5, 687:23, 689:24, 736:4, 950:24, 951:16, 966:12, 966:13, 969:16, 971:20, 972:8, 978:7, 979:22, 983:15, 990:6, 995:5, 995:7, 995:18, 995:22, 996:9, 996:11, 996:15
**identifying** [8] - 955:23, 978:9, 979:25, 990:12, 993:20, 995:10, 995:16, 995:24
**identity** [3] - 682:3, 986:14, 986:18
**ignorant** [1] - 682:23
**illicit** [1] - 949:8
**illustrate** [1] - 836:2
**illustrating** [1] - 908:10
**illustration** [1] - 912:21
**imagine** [4] - 693:5, 734:12, 734:14, 735:15
**immediately** [2] - 870:24, 906:18
**impact** [2] - 811:8, 916:25
**impaired** [1] - 821:7
**impeach** [1] - 767:11
**impeached** [1] - 695:24
**impeachment** [1] - 696:1
**implications** [3] - 825:16, 825:19, 943:1
**importance** [2] - 774:10, 950:25
**important** [20] - 692:14, 712:8, 774:10, 774:11, 775:2, 775:13, 814:15, 830:13, 844:1, 846:21, 857:22, 858:7, 867:17, 914:12, 915:16, 940:22, 983:9, 991:11, 998:14, 1002:8
**importantly** [1] - 706:14

**impossible** [2] - 696:25, 761:7
**impress** [1] - 738:9
**impression** [1] - 686:17
**improper** [2] - 688:13, 756:13
**improve** [2] - 728:21, 931:16
**improved** [1] - 825:14
**improvements** [2] - 830:23, 832:17
**Impurities** [25] - 951:16, 953:12, 953:17, 953:19, 966:6, 966:7, 966:12, 968:2, 968:5, 968:8, 968:12, 972:8, 972:24, 976:17, 977:22, 978:6, 978:23, 979:7, 979:21, 981:25, 987:19, 992:7, 992:17, 993:8, 1000:4
**impurities** [59] - 677:17, 682:18, 683:4, 683:11, 683:18, 684:5, 684:9, 687:23, 688:3, 688:8, 688:23, 693:9, 950:24, 967:10, 968:22, 969:25, 970:4, 974:19, 974:22, 976:4, 976:22, 977:18, 977:20, 978:5, 979:9, 979:20, 979:23, 979:25, 982:4, 982:20, 982:21, 982:22, 982:24, 982:25, 983:8, 983:19, 984:18, 985:12, 986:8, 986:13, 986:14, 987:8, 988:4, 989:15, 989:22, 991:8, 991:10, 991:23, 992:2, 992:10, 993:13, 993:17, 993:20, 993:21, 995:15, 1000:3, 1000:16
**impurity** [34] - 683:1, 953:12, 953:18, 967:12, 967:13, 967:25, 968:1,

976:16, 977:9, 977:12, 977:13, 985:6, 985:13, 986:15, 986:18, 986:19, 986:20, 988:5, 991:15, 991:18, 993:4, 994:21, 994:23, 994:25, 995:2, 995:4, 995:5, 995:8, 995:11, 995:17, 996:1, 996:22, 997:13, 1000:24

**Impurity** [15] - 968:10, 968:11, 970:3, 970:14, 987:24, 988:6, 988:8, 988:15, 988:19, 988:20, 988:25, 989:5

**IN** [2] - 1:2, 1:3

**inappropriate** [1] - 985:24

**inaudible** [1] - 814:19

**INC** [2] - 1:5, 1:8

**incapable** [1] - 842:22

**incentive** [2] - 997:9, 997:16

**inclined** [1] - 697:3

**include** [4] - 705:2, 826:13, 967:19, 978:15

**included** [3] - 910:24, 956:16, 957:6

**includes** [4] - 690:6, 736:25, 746:2, 993:19

**including** [10] - 700:17, 703:1, 744:20, 744:21, 805:9, 879:8, 901:17, 951:5, 951:14, 952:2

**inconsistencies** [3] - 899:9, 899:12, 985:19

**incorporates** [1] - 825:14

**increased** [1] - 802:18

**incumbent** [3] - 749:23, 771:1, 775:7

**IND** [5] - 695:8, 956:12, 967:15, 967:20, 969:7

**Indeed** [1] - 847:7

**indeed** [6] - 715:9, 784:12, 787:4, 788:13, 799:5, 876:9

**independently** [1] - 982:24

**indexed** [4] - 778:23, 780:15, 781:10, 793:3

**indexing** [1] - 781:14

**indicate** [2] - 927:18, 979:3

**indicated** [4] - 878:19, 966:5, 982:19, 987:21

**indicates** [1] - 797:20

**indicating** [1] - 964:10

**indicative** [1] - 951:1

**individual** [10] - 687:6, 718:10, 729:18, 841:22, 846:24, 853:1, 908:14, 908:20, 908:24, 909:4, 911:15, 918:10, 918:11, 967:12, 967:25, 982:20, 991:23, 992:10, 1000:24

**individualized** [1] - 910:4

**individually** [1] - 716:5

**individuals** [33] - 702:19, 707:22, 714:20, 715:22, 718:16, 719:19, 719:22, 722:25, 731:11, 797:12, 803:20, 804:11, 806:18, 809:7, 810:6, 813:21, 819:9, 821:4, 821:6, 822:24, 826:17, 830:16, 857:7, 885:4, 892:1, 902:22, 902:25, 904:25, 907:3, 908:9, 910:2, 910:6

**induced** [1] - 885:6

**inducer** [1] - 821:25

**inducers** [1] - 705:3

**induces** [1] - 773:8

**indulge** [1] - 890:13

**infer** [1] - 868:18

**inference** [1] - 923:1

**inferences** [1] - 834:3

**influence** [1] - 696:25

**information** [24] - 676:16, 692:14, 692:21, 694:24, 712:6, 738:23, 761:16, 766:16, 769:3, 769:4, 785:15, 798:8, 830:18, 850:12, 859:10, 872:15, 872:19, 879:17, 882:1, 924:2, 948:4, 978:4, 978:16, 979:19

**informations** [1] - 978:10

**informed** [1] - 989:14

**infringe** [2] - 818:3, 954:1

**infringement** [4] - 711:16, 773:8, 800:20, 938:2

**infringes** [1] - 773:24

**infringing** [1] - 816:1

**inhibition** [1] - 862:11

**inhibitor** [2] - 819:21, 820:5

**inhibitors** [2] - 705:4, 881:4

**initial** [4] - 733:6, 789:2, 838:14, 914:4

**initiate** [1] - 924:12

**input** [2] - 677:9, 707:24

**insomnia** [8] - 722:2, 799:2, 808:5, 865:21, 866:19, 879:25, 880:1, 885:6

**instance** [7] - 679:13, 711:14, 855:17, 865:15, 913:1, 945:17, 945:19

**instances** [1] - 853:14

**instantaneous** [1] - 892:10

**instead** [3] - 760:10, 884:23, 956:4

**institution** [3] - 839:22, 850:1, 888:5

**intake** [1] - 995:3

**integral** [1] - 761:4

**intellectual** [1] - 677:9

**intend** [1] - 732:13

**intended** [3] - 835:17, 862:2, 863:24

**intends** [1] - 731:22

**interact** [1] - 889:19

**interaction** [2] - 704:17, 822:1, 881:16

**interactions** [4] - 704:6, 704:12, 704:19, 820:11

**interest** [4] - 887:5, 914:18, 947:7, 1001:5

**interested** [1] - 887:8

**interesting** [2] - 718:7, 814:17

**interfere** [2] - 915:12,

915:20

**interim** [1] - 693:13

**internal** [8] - 841:23, 847:1, 847:3, 847:11, 915:4, 916:19, 916:20, 918:11

**Internet** [10] - 735:6, 735:7, 735:16, 738:20, 738:21, 744:1, 746:18, 749:9, 749:10, 762:24

**internship** [1] - 701:24

**interpret** [6] - 679:19, 757:15, 802:6, 940:6, 947:21, 1002:3

**interpretation** [7] - 680:23, 802:13, 802:15, 802:19, 803:5, 942:25, 1002:2

**interpretations** [1] - 990:13

**interrogatories** [1] - 761:13

**interrupt** [1] - 856:21

**Interventions** [2] - 791:25, 792:2

**interventions** [1] - 816:19

**intrinsic** [1] - 837:6

**Intrinsic** [1] - 918:21

**introduce** [6] - 678:25, 700:25, 732:15, 886:10, 896:1, 939:10

**introduced** [4] - 771:13, 797:18, 797:24, 890:23

**introducing** [1] - 712:7

**introductory** [1] - 872:15

**inures** [1] - 692:1

**invalid** [12] - 685:19, 685:21, 686:6, 686:10, 688:18, 688:20, 800:14, 818:24, 822:3, 825:20, 881:21, 954:3

**invalidated** [2] - 938:20, 938:22

**invalidity** [8] - 685:10, 685:12, 701:10, 759:10, 772:19, 790:22, 818:22, 938:1

**invent** [2] - 682:14, 682:16, 697:19, 824:16

**invented** [4] - 682:8, 702:19, 824:16, 825:8

**invention** [17] - 677:3, 693:1, 766:5, 801:6, 809:25, 810:24, 813:16, 814:10, 824:15, 950:24, 951:2, 955:9, 955:23, 993:1, 993:2, 993:12, 993:16

**Invention** [3] - 727:9, 826:23, 876:19

**inventive** [2] - 676:24, 682:25

**inventor** [17] - 675:22, 676:3, 676:6, 676:15, 682:13, 685:7, 685:11, 685:20, 686:2, 686:8, 686:11, 686:23, 687:6, 824:14, 950:16, 972:7, 972:9

**inventors** [8] - 684:2, 688:14, 688:16, 692:13, 692:17, 694:22, 765:1, 770:2

**inventorship** [13] - 678:2, 678:16, 680:5, 681:24, 685:13, 685:25, 686:4, 687:9, 688:13, 948:1, 948:5, 956:6

**invested** [1] - 811:15

**investigated** [1] - 866:16

**investigator** [1] - 897:21

**involve** [1] - 682:8

**involved** [4] - 684:1, 741:20, 796:15, 945:20

**involving** [1] - 926:23

**IPD/Information** [1] - 792:11

**IR,2R)-2-(2,3-dihydrobenzofuran-4-yl)cyclopropane** [1] - 945:21

**IR,2R)-2-(2,3-dihydrobenzofuran-4-yl)cyclopropyl** [1] - 945:23

**ironic** [1] - 894:1

**irrelevant** [6] - 732:10, 732:23, 733:2, 733:4, 734:8, 753:17
**irreversible** [1] - 889:13
**isolation** [2] - 879:15, 885:21
**issuance** [1] - 816:2
**issue** [62] - 672:9, 674:5, 675:7, 679:6, 685:15, 685:24, 686:13, 689:4, 690:23, 691:2, 691:20, 693:20, 694:16, 697:5, 697:19, 699:1, 707:1, 731:20, 734:24, 737:4, 749:4, 749:6, 751:10, 751:22, 755:25, 757:17, 758:6, 758:12, 760:24, 761:24, 769:9, 771:16, 771:18, 772:2, 775:16, 776:16, 785:19, 790:10, 796:13, 796:17, 824:8, 894:9, 938:15, 938:24, 939:5, 940:17, 946:8, 948:3, 948:5, 948:15, 948:20, 949:15, 952:8, 987:19, 987:20, 987:22, 988:2, 990:19, 993:9
**issued** [4] - 684:15, 684:17, 724:18, 726:18
**issues** [12] - 672:16, 672:20, 693:22, 703:14, 711:23, 770:24, 881:16, 887:5, 888:13, 981:15, 1002:17
**it'd** [1] - 732:23
**it'll** [3] - 847:4, 868:4, 868:16
**item** [12] - 718:24, 720:3, 721:5, 726:12, 728:7, 729:19, 730:25, 849:18, 854:8, 877:17, 880:7, 880:15
**items** [3] - 876:7, 880:23, 997:24
**itself** [17] - 720:2, 755:2, 755:7, 767:6,

776:8, 831:15, 831:20, 832:12, 832:16, 848:12, 858:1, 860:15, 861:13, 866:6, 874:4, 879:12, 917:9

## J

**JACOBS** [1] - 671:12
**January** [9] - 705:11, 705:24, 708:16, 709:18, 722:23, 736:7, 809:23, 881:13, 883:6
**Jazz** [1] - 751:23
**jet** [7] - 706:24, 844:16, 844:17, 850:19, 866:2, 866:19, 885:15
**job** [2] - 737:21, 959:4
**Joe** [1] - 891:5
**JOHN** [1] - 671:3
**join** [1] - 948:6
**joining** [1] - 971:2
**joint** [1] - 887:3
**Jonathan** [2] - 700:12, 701:2
**JONATHAN** [1] - 700:20
**Josephine** [4] - 896:15, 896:19, 903:25, 920:10
**JOSEPHINE** [1] - 671:9
**journal** [1] - 865:7
**Journal** [6] - 715:6, 715:25, 840:3, 888:12, 891:18, 927:24
**journals** [1] - 865:9
**JTX-003** [1] - 880:24
**JTX-071** [2] - 984:5, 984:8
**JTX-1** [1] - 774:7
**JTX-117** [4] - 966:15, 966:20, 969:13, 990:20
**JTX-12** [1] - 724:13
**JTX-123** [5] - 716:14, 852:7, 910:20, 911:4, 911:7
**JTX-127** [1] - 859:14
**JTX-139** [5] - 712:22, 713:2, 713:8, 713:12, 920:7
**JTX-146** [12] - 718:25, 719:8, 719:12, 804:19, 805:4, 806:3, 809:14,

854:9, 906:2, 928:6, 928:7, 930:5
**JTX-147** [6] - 713:25, 714:10, 714:14, 903:13, 925:12, 926:2
**JTX-148** [5] - 714:24, 715:10, 715:14, 926:14, 927:13
**JTX-149** [3] - 918:17, 919:6, 919:9
**JTX-153** [2] - 717:12, 717:18
**JTX-155** [1] - 717:16
**JTX-156** [1] - 717:17
**JTX-246** [1] - 928:25
**JTX-39** [1] - 720:18
**JTX-5** [4] - 826:3, 826:7, 828:16, 828:23
**JTX-91** [3] - 725:6, 725:15, 725:19
**JTX-94** [4] - 721:7, 721:12, 721:18, 859:17
**jTX-94** [1] - 721:22
**JTX-DTX-154** [1] - 717:15
**Judge** [1] - 1:18
**judge's** [1] - 693:23
**judicial** [5] - 733:8, 755:2, 755:11, 755:13, 795:24
**July** [55] - 733:9, 735:23, 738:24, 740:18, 740:24, 740:25, 741:11, 742:21, 745:14, 745:24, 747:2, 747:13, 748:1, 748:14, 748:21, 749:6, 749:19, 750:10, 754:11, 754:15, 754:20, 754:24, 754:25, 755:19, 756:1, 759:1, 759:21, 760:9, 767:23, 767:25, 771:18, 772:17, 773:14, 776:15, 779:22, 780:2, 780:5, 780:7, 782:9, 785:10, 787:12, 787:19, 788:24, 789:13, 789:20, 789:24, 790:2, 790:5, 790:9, 790:20, 791:9, 791:12, 794:5, 795:12, 796:25

**jumping** [1] - 872:5
**June** [4] - 761:11, 770:23, 934:18, 935:5

## K

**KAREN** [1] - 671:12
**KAUN** [1] - 671:15
**keep** [6] - 849:13, 893:17, 921:21, 958:17, 993:4, 995:17
**keeping** [1] - 869:16
**keeps** [1] - 909:6
**KELLER** [1] - 671:2
**kept** [1] - 693:6
**KERRY** [1] - 671:16
**kind** [26] - 677:18, 722:12, 737:14, 737:15, 750:22, 758:12, 768:13, 772:9, 810:25, 812:7, 827:23, 833:15, 834:1, 834:5, 835:15, 843:5, 863:22, 868:6, 868:8, 874:23, 879:8, 879:9, 887:18, 892:18, 986:5, 986:11
**KLEIN** [1] - 671:10
**knowing** [10] - 682:8, 683:10, 683:23, 905:11, 977:5, 977:13, 977:18, 982:23, 986:18
**knowledge** [2] - 775:14, 835:16
**known** [32] - 676:12, 699:4, 699:5, 709:18, 710:18, 722:9, 722:22, 829:16, 830:1, 840:10, 853:19, 853:24, 857:6, 859:10, 863:23, 865:6, 881:13, 882:2, 882:6, 883:18, 892:3, 896:24, 955:18, 974:20, 974:22, 976:6, 979:2, 986:14, 991:6, 991:10, 991:22, 997:21
**knows** [1] - 735:22

## L

**lab** [4] - 886:18, 919:22, 930:19, 930:20
**label** [4] - 773:7, 817:17, 818:2, 818:8
**labeled** [4] - 747:10, 965:8, 973:16, 980:11
**labels** [1] - 773:5
**laboratory** [5] - 702:14, 702:17, 887:3, 909:15, 909:16
**lack** [7] - 685:13, 691:25, 731:25, 750:17, 825:20, 857:1, 860:22
**lag** [9] - 706:25, 844:16, 844:17, 850:19, 866:2, 866:19, 885:15, 908:20, 908:23
**LAH** [1] - 964:3
**laid** [3] - 691:2, 778:4, 795:13
**Lancelot** [1] - 746:14
**Lancet** [8] - 754:18, 779:7, 780:16, 793:6, 864:15, 864:21, 865:3, 865:6
**language** [5] - 797:19, 824:18, 885:9, 998:6, 1002:10
**Lankford** [38] - 798:14, 798:15, 798:25, 799:1, 799:3, 799:16, 799:18, 800:15, 803:11, 803:15, 803:17, 803:18, 803:19, 803:22, 806:15, 806:16, 806:17, 807:22, 807:25, 808:1, 809:1, 809:2, 809:3, 809:18, 810:8, 810:25, 811:2, 818:25, 820:1, 820:3, 820:16, 822:12, 824:3, 877:18, 878:1, 878:9, 879:8, 880:3
**Lankford's** [1] - 811:6
**large** [4] - 900:1, 917:3, 961:23, 996:24
**large-scale** [2] - 900:1, 917:3

**larger** [3] - 840:23, 853:15, 913:24
**laser** [1] - 912:25
**last** [41] - 676:9, 699:25, 700:1, 721:5, 724:21, 741:23, 741:25, 745:13, 759:3, 760:18, 763:14, 767:7, 780:25, 783:23, 791:10, 811:20, 822:7, 824:8, 840:19, 845:23, 847:21, 853:7, 882:5, 903:22, 903:25, 904:5, 904:8, 904:11, 905:21, 914:3, 918:18, 920:6, 920:7, 923:22, 964:7, 964:8, 974:16, 980:10, 983:11, 989:19, 999:16
**lasted** [1] - 913:15
**lasts** [1] - 673:4
**late** [6] - 690:16, 691:6, 745:14, 760:12, 844:13, 936:25
**latency** [1] - 875:8
**latest** [1] - 745:15
**launch** [1] - 673:2
**launched** [2] - 684:23, 751:5
**law** [3] - 676:3, 692:16, 796:18
**lawsuit** [1] - 880:25
**lawyers** [4] - 737:1, 764:19, 800:19, 824:11
**lay** [13] - 742:10, 748:16, 748:22, 771:3, 771:24, 775:3, 777:3, 777:16, 824:13, 831:8, 868:7, 912:13
**laying** [1] - 748:25
**LC/MS** [5] - 969:7, 971:6, 971:9, 989:23, 989:25
**LC/NMR** [3] - 971:17, 989:23, 990:3
**lead** [4] - 677:6, 718:13, 817:18, 985:22
**leads** [1] - 937:11
**learned** [3] - 690:9, 690:22, 865:10
**least** [16] - 673:4,

674:9, 682:11, 739:3, 739:12, 771:8, 807:9, 848:24, 858:18, 862:6, 890:4, 892:1, 942:8, 954:8, 955:11, 955:25
**leave** [2] - 936:3, 996:11
**lectern** [1] - 775:25
**led** [3] - 904:11, 935:11
**left** [26] - 730:17, 736:19, 738:21, 738:25, 747:18, 753:8, 799:10, 808:4, 809:13, 810:4, 811:1, 813:6, 814:22, 816:14, 817:1, 821:4, 835:21, 845:23, 861:13, 873:5, 900:17, 938:5, 941:17, 969:18, 970:12, 990:23
**left-hand** [6] - 747:18, 753:8, 835:21, 845:23, 970:12, 990:23
**legal** [5] - 672:20, 698:3, 774:16, 800:24, 948:3
**legend** [2] - 962:2, 963:13
**legitimate** [1] - 743:6
**length** [3] - 708:3, 869:20, 985:20
**less** [16] - 764:6, 764:12, 840:23, 859:4, 859:8, 868:22, 907:24, 963:15, 972:24, 979:20, 979:23, 983:7, 994:13, 1000:5, 1000:15
**letter** [5] - 963:23, 980:15, 981:6, 981:11, 982:18
**letters** [1] - 980:8
**letting** [1] - 981:8
**level** [13] - 703:14, 704:21, 717:20, 727:15, 728:18, 801:4, 868:10, 894:10, 894:11, 953:9, 985:13, 1000:3
**levels** [4] - 866:21, 868:4, 868:19, 869:13

**Lewy** [22] - 702:17, 702:19, 715:21, 716:11, 716:19, 716:25, 717:6, 717:21, 718:12, 842:9, 842:11, 849:25, 887:2, 887:7, 910:24, 911:11, 912:2, 929:7, 929:25, 930:2, 930:17
**Lewy's** [1] - 909:15
**liberty** [1] - 895:18
**licensed** [2] - 687:4, 925:6
**life** [1] - 874:5
**lifestyle** [2] - 915:12, 915:20
**light** [24] - 702:20, 707:24, 740:2, 801:10, 809:5, 819:23, 821:7, 821:17, 822:3, 850:24, 867:19, 867:25, 868:2, 868:3, 869:11, 869:15, 869:16, 869:21, 869:23, 897:2, 898:7, 945:14
**light-perception** [1] - 821:7
**lights** [2] - 867:6, 867:15
**likelihood** [3] - 823:17, 953:15, 953:22
**likely** [5] - 823:17, 823:22, 828:2, 841:16, 853:16
**likewise** [1] - 876:10
**limitation** [33] - 802:1, 802:2, 803:14, 803:18, 804:9, 805:7, 805:18, 805:20, 806:6, 806:12, 806:14, 806:24, 807:15, 807:24, 808:25, 809:2, 809:11, 809:19, 811:25, 812:14, 812:24, 813:12, 815:21, 816:9, 816:22, 819:23, 820:4, 820:7, 822:3, 823:7, 824:5, 944:25
**limitations** [15] - 773:12, 773:16, 801:18, 801:23, 807:20, 813:3,

816:5, 817:23, 819:4, 819:11, 821:15, 821:16, 874:4, 1000:10, 1000:12
**limited** [6] - 711:10, 711:12, 737:23, 738:8, 922:13, 967:25
**limiting** [1] - 991:10
**line** [13] - 780:25, 845:23, 855:14, 882:21, 884:5, 908:16, 909:1, 923:10, 936:7, 970:17, 970:24, 989:20, 999:18
**lines** [6] - 675:8, 853:8, 866:11, 892:15, 944:23, 961:20
**link** [3] - 786:14, 798:2, 798:3
**links** [2] - 788:12, 792:11
**liquid** [2] - 989:25, 990:3
**Lisa** [1] - 906:8
**list** [5] - 673:13, 760:2, 767:21, 770:1
**listed** [8] - 716:3, 734:23, 779:21, 780:1, 792:25, 977:4, 1000:16
**listen** [2] - 682:24, 697:24
**listened** [2] - 677:18, 751:6
**listening** [2] - 772:14, 950:10
**listing** [1] - 966:3
**literally** [1] - 755:8
**literature** [8] - 683:19, 704:4, 708:13, 720:22, 730:15, 837:24, 899:17, 922:3
**lithium** [1] - 964:4
**live** [4] - 775:16, 783:3, 890:15
**living** [1] - 849:2
**LLP** [3] - 671:2, 671:8, 671:12
**LNA** [1] - 875:3
**local** [1] - 890:5
**locations** [1] - 808:12
**lock** [2] - 908:17, 908:22
**Lockley** [41] - 711:3, 711:23, 714:5,

714:16, 780:12, 780:14, 781:7, 781:9, 792:15, 792:18, 792:25, 793:1, 839:15, 839:17, 856:20, 895:3, 895:5, 895:15, 895:25, 896:2, 898:19, 899:15, 901:11, 903:1, 903:19, 904:13, 906:14, 907:12, 908:4, 908:5, 911:10, 916:1, 919:13, 919:23, 924:24, 929:17, 932:21, 933:12, 935:10, 935:19
**LOCKLEY** [1] - 895:21
**Lockley's** [2] - 710:14, 840:6
**lodged** [1] - 893:25
**logs** [2] - 740:15, 747:7
**London** [1] - 885:15
**long-term** [1] - 907:15
**longest** [3] - 818:20, 922:3, 922:9
**look** [90] - 678:21, 680:4, 683:14, 692:3, 698:14, 698:15, 700:4, 712:20, 724:11, 736:4, 736:20, 736:22, 746:22, 752:3, 752:12, 752:16, 753:5, 753:14, 754:25, 755:11, 768:7, 768:22, 780:10, 780:24, 787:16, 790:25, 791:3, 791:19, 797:8, 807:13, 816:6, 822:18, 838:10, 844:6, 844:16, 845:22, 847:17, 849:15, 851:16, 856:11, 857:1, 863:4, 863:16, 863:19, 866:6, 870:20, 873:2, 874:25, 881:6, 883:11, 884:25, 890:7, 890:14, 892:5, 899:14, 902:7, 903:13, 906:2, 913:9, 915:25, 918:17,

920:6, 920:17, 925:19, 926:3, 926:21, 927:14, 928:12, 929:1, 929:6, 930:5, 931:19, 933:15, 938:7, 939:5, 941:25, 943:6, 948:7, 955:22, 957:13, 959:11, 968:6, 968:15, 969:11, 987:23, 989:20, 990:20, 994:1, 1002:10
**looked** [20] - 699:21, 704:3, 742:6, 744:18, 757:14, 758:3, 767:9, 767:15, 768:1, 772:16, 785:17, 786:19, 790:5, 790:9, 849:21, 870:16, 871:19, 957:23, 980:8, 988:19
**looking** [46] - 736:3, 745:19, 763:10, 774:4, 779:12, 789:5, 790:18, 792:16, 795:3, 795:9, 797:15, 799:14, 806:20, 813:4, 815:14, 816:19, 819:7, 820:23, 840:9, 845:1, 845:2, 856:25, 859:18, 866:18, 870:4, 870:24, 874:21, 876:19, 881:8, 884:14, 885:20, 890:6, 890:9, 894:11, 897:1, 906:13, 908:8, 909:19, 911:13, 918:1, 924:13, 931:23, 969:9, 971:21, 987:16
**looks** [11] - 740:21, 768:24, 779:3, 795:19, 801:20, 807:14, 808:18, 890:10, 912:13, 936:23, 943:6
**lose** [1] - 895:19
**loses** [1] - 921:8
**lost** [3] - 676:10, 707:24, 744:15
**low** [11] - 718:3, 719:17, 852:20,

852:23, 854:2, 854:6, 868:14, 924:3, 930:8, 978:25, 979:2
**low-dose** [1] - 930:8
**lower** [25] - 729:5, 835:21, 848:24, 853:20, 853:25, 854:1, 855:10, 856:13, 863:20, 875:13, 875:18, 875:22, 876:1, 876:2, 907:14, 907:16, 907:19, 909:10, 909:13, 909:19, 911:16, 913:22, 969:18, 990:22, 995:3
**lowest** [5] - 807:7, 876:16, 877:12, 884:6, 994:11
**LPS** [1] - 875:3
**lunch** [2] - 828:7, 1002:23
**LV/NMR** [1] - 969:7

# M

**MA-1** [6] - 727:10, 727:13, 807:1, 808:13, 823:15, 877:8
**machine** [1] - 992:19
**Machine** [16] - 734:22, 735:1, 735:3, 735:4, 742:24, 742:25, 743:4, 743:13, 743:17, 743:25, 744:10, 760:7, 760:8, 768:8, 776:4, 776:11
**magnetic** [1] - 990:4
**magnitude** [3] - 883:17, 883:21, 927:19
**mail** [7] - 770:1, 934:8, 934:11, 934:18, 935:8, 936:6, 936:16
**main** [4] - 717:25, 867:18, 891:12, 916:2
**mainstream** [1] - 990:16
**maintain** [1] - 938:13
**maintained** [3] - 747:11, 785:16, 798:5
**maintaining** [5] - 773:12, 773:19, 805:19, 806:6, 806:9

**maintains** [1] - 735:11
**maintenance** [1] - 844:21
**major** [1] - 888:4
**majority** [2] - 892:23, 964:12
**mammals** [1] - 890:14
**Man** [1] - 900:23
**manage** [1] - 683:19
**manmade** [2] - 724:10, 861:18
**manufacture** [2] - 952:1, 996:22
**manufactured** [1] - 832:14
**manufacturer** [3] - 951:4, 980:16, 991:14
**manufacturers** [6] - 677:10, 677:11, 688:6, 984:25, 985:7, 986:8
**manufacturing** [3] - 950:25, 963:9, 966:21
**map** [1] - 881:8
**March** [14] - 1:14, 738:13, 742:25, 744:7, 744:11, 762:3, 762:12, 763:20, 763:22, 764:1, 765:18, 765:19, 767:5, 776:11
**marine** [1] - 890:14
**marked** [1] - 762:16
**marker** [2] - 868:8, 868:22
**markers** [3] - 901:17, 925:24, 926:10
**market** [3] - 684:14, 684:18, 684:19
**Marlene** [1] - 934:19
**mass** [3] - 971:9, 971:11, 989:25
**Massachusetts** [1] - 701:23
**master** [1] - 836:13
**master's** [1] - 955:2
**match** [1] - 744:14
**matched** [1] - 827:25
**matches** [1] - 841:24
**material** [3] - 712:8, 757:5, 894:3
**materials** [3] - 682:3, 703:7, 753:23
**mathematics** [1] - 677:15
**matter** [12] - 686:14, 696:24, 698:7,

732:22, 733:7, 748:11, 761:1, 790:1, 828:16, 848:17, 916:21, 940:3
**Matters** [2] - 758:8, 758:11
**matters** [5] - 672:6, 672:8, 841:7, 841:11, 915:4
**maximum** [1] - 994:13
**MCTIGUE** [1] - 671:16
**meal** [1] - 847:25
**mean** [78] - 672:13, 676:15, 678:23, 682:22, 684:21, 687:8, 690:12, 691:12, 692:3, 693:22, 694:1, 695:17, 695:19, 696:13, 696:23, 723:9, 724:9, 732:10, 732:18, 737:14, 744:25, 750:3, 750:20, 750:21, 750:23, 751:4, 753:18, 755:11, 760:25, 761:23, 764:19, 768:16, 772:10, 775:16, 783:3, 785:14, 786:8, 805:11, 810:25, 811:10, 815:19, 823:19, 824:12, 826:12, 831:9, 832:7, 832:12, 834:2, 838:5, 844:7, 844:10, 855:18, 855:20, 856:21, 858:9, 878:2, 883:11, 887:6, 887:23, 888:11, 888:21, 889:23, 891:1, 893:1, 897:23, 939:13, 939:15, 943:5, 943:6, 944:21, 945:6, 948:10, 958:21, 989:12, 997:12, 1000:12, 1000:13, 1003:2
**meaning** [9] - 706:4, 727:18, 802:20, 802:25, 814:19, 837:6, 891:10, 921:5, 921:12
**meaningful** [1] - 833:9
**means** [21] - 733:3, 757:6, 757:23,

764:7, 802:8, 823:13, 831:11, 832:13, 835:23, 867:9, 867:20, 870:2, 877:9, 878:25, 892:8, 932:8, 943:13, 946:2, 954:1, 994:21, 995:7
**measure** [9] - 789:3, 789:9, 842:5, 850:22, 891:20, 893:4, 905:12, 905:17, 984:25
**measured** [5] - 789:4, 891:18, 901:16, 914:22, 922:2
**measurements** [2] - 901:18, 901:21
**measuring** [3] - 870:11, 891:13, 892:5
**mechanical** [1] - 773:14
**mechanism** [7] - 709:16, 709:24, 710:1, 804:2, 805:11, 810:11, 812:6
**mechanisms** [1] - 860:22
**medical** [6] - 701:23, 865:6, 886:14, 886:17, 886:18, 925:1
**Medical** [2] - 702:15, 896:3
**medication** [3] - 708:23, 708:24, 925:7
**medicine** [5] - 803:2, 887:2, 887:16, 887:20, 887:22
**Medicine** [10] - 701:17, 702:7, 702:24, 715:6, 715:25, 723:2, 723:17, 840:4, 888:12, 927:24
**Medicine's** [1] - 703:11
**meet** [4] - 685:15, 737:7, 764:8, 765:6
**meet-and-confer** [1] - 765:6
**meeting** [4] - 752:17, 752:18, 936:13, 937:21
**meets** [1] - 749:13
**melatonergic** [1] -

730:21
**Melatonin** [3] -
838:15, 850:16,
900:23
melatonin [231] -
702:18, 702:20,
706:13, 709:22,
710:2, 710:19,
710:23, 711:25,
712:12, 712:15,
712:17, 713:17,
713:20, 714:19,
715:22, 717:23,
718:2, 718:14,
719:18, 719:22,
720:23, 721:2,
721:5, 722:1, 722:3,
722:5, 722:6,
722:10, 722:16,
722:17, 722:20,
722:22, 722:24,
723:4, 723:8,
723:13, 724:5,
724:8, 726:8,
727:17, 789:10,
797:9, 799:21,
804:25, 810:5,
810:6, 810:10,
812:4, 813:21,
813:23, 813:24,
814:1, 814:19,
830:21, 831:4,
831:6, 831:14,
831:15, 831:16,
831:19, 831:20,
831:22, 831:23,
832:1, 832:5, 832:6,
832:8, 832:10,
832:12, 832:13,
832:16, 832:23,
833:8, 833:14,
833:25, 834:19,
835:1, 836:3, 836:8,
836:15, 837:2,
838:3, 838:8,
838:23, 840:23,
841:2, 842:17,
843:1, 843:23,
847:9, 848:25,
849:13, 850:24,
852:21, 853:16,
855:20, 856:7,
857:6, 857:9,
857:10, 857:13,
857:15, 857:16,
857:21, 857:25,
858:1, 858:22,
859:7, 860:14,
860:15, 860:23,
861:1, 861:13,
861:19, 862:10,

863:24, 865:20,
867:6, 867:12,
867:14, 867:22,
868:1, 868:2, 868:4,
868:5, 868:10,
868:19, 868:21,
869:2, 869:12,
869:17, 873:20,
874:1, 874:4, 882:6,
896:21, 896:22,
897:5, 897:10,
898:15, 899:8,
899:18, 900:3,
900:5, 900:11,
901:14, 901:17,
901:20, 902:5,
902:12, 902:23,
903:9, 904:19,
904:20, 904:22,
905:1, 905:5,
906:16, 907:14,
907:19, 908:13,
908:16, 909:5,
909:11, 909:14,
909:20, 910:12,
910:15, 911:16,
912:5, 912:25,
913:5, 913:15,
913:18, 914:5,
914:12, 914:21,
915:11, 915:23,
916:12, 917:8,
917:9, 917:19,
918:8, 918:12,
918:14, 919:18,
919:25, 920:5,
920:19, 921:6,
921:17, 922:23,
923:6, 923:18,
923:19, 924:1,
924:2, 924:7,
924:14, 925:22,
926:9, 927:3, 927:8,
927:18, 928:13,
928:20, 929:3,
929:11, 929:13,
930:8, 930:14,
931:10, 931:14,
932:2, 932:14,
933:4, 933:5,
933:21, 933:25,
935:9, 937:7, 965:4
**melatonin's** [2] -
722:8, 932:7
**melatonins** [1] -
850:25
**melting** [2] - 978:24,
978:25
**member** [3] - 702:1,
702:5, 702:7

**memorializes** [1] -
790:5
**men** [1] - 904:19
**Mental** [1] - 701:13
**mental** [1] - 679:9
**mention** [14] - 775:18,
775:19, 855:5,
864:8, 872:23,
876:11, 877:25,
946:3, 946:4, 946:5,
953:13, 953:18,
979:7, 979:8
**mentioned** [15] -
703:2, 710:4,
720:20, 721:24,
771:6, 773:18,
798:24, 811:19,
839:5, 867:4, 871:1,
876:5, 878:5,
910:17, 911:14
**mentioning** [1] - 962:6
**mentions** [3] - 864:7,
864:10, 978:15
**mentor** [1] - 917:15
**mere** [2] - 878:23,
879:12
**merely** [2] - 734:7,
840:10
**merits** [1] - 751:22
**met** [3] - 780:4,
886:14, 886:16
**metabolic** [1] - 881:9
**metabolism** [1] -
726:2
**metabolized** [2] -
874:8, 882:7
**methanamine** [1] -
945:24
**methenamine** [11] -
675:13, 690:7,
960:5, 960:6,
960:15, 962:11,
962:17, 962:22,
963:20, 1001:16,
1001:21
**method** [10] - 704:11,
704:24, 705:2,
705:7, 773:8, 825:9,
962:5, 974:20,
982:20, 982:21
**Methods** [2] - 884:25,
926:21
**methods** [10] - 724:25,
883:1, 951:4, 951:5,
951:14, 952:1,
952:2, 956:15,
957:5, 964:25
**Michele** [2] - 1:24,
1004:2
**middle** [2] - 857:2,

912:1
**might** [51] - 672:13,
672:22, 673:1,
693:21, 695:14,
723:11, 736:17,
737:5, 739:12,
740:2, 743:6, 744:6,
749:22, 755:20,
756:19, 833:8,
838:8, 845:9, 848:7,
849:7, 853:22,
856:8, 857:11,
874:12, 875:22,
890:8, 890:18,
891:24, 892:3,
892:5, 892:10,
897:4, 907:7,
907:19, 907:25,
935:12, 937:12,
937:18, 940:11,
940:14, 952:5,
968:10, 972:1,
972:3, 972:5, 977:5,
977:6, 977:12,
979:3, 979:4, 997:2
**milligram** [5] - 834:5,
904:20, 910:9,
911:24, 995:2
**milligrams** [83] -
719:18, 719:22,
723:5, 727:21,
728:3, 728:25,
729:10, 773:2,
773:5, 773:10,
788:24, 797:5,
799:12, 806:13,
806:20, 807:2,
807:4, 807:5, 816:7,
816:15, 819:10,
823:2, 833:14,
834:15, 834:16,
837:14, 845:9,
845:13, 852:23,
852:25, 853:3,
866:23, 866:24,
870:5, 870:6,
870:18, 871:7,
871:25, 873:13,
873:23, 874:19,
874:21, 875:4,
875:9, 875:17,
876:18, 882:22,
883:3, 883:8,
883:12, 883:13,
883:18, 884:18,
901:24, 902:22,
910:5, 910:8,
910:14, 911:17,
911:22, 912:3,
921:8, 923:14,
923:15, 923:19,

924:3, 924:6, 927:3,
928:14, 928:21,
929:14, 929:20,
930:8, 930:14, 934:1
**MILLIKEN** [198] -
671:5, 700:11,
700:24, 711:8,
711:15, 711:21,
712:5, 712:11,
713:8, 713:13,
714:10, 714:15,
715:10, 715:15,
717:11, 717:19,
718:23, 719:8,
719:13, 720:14,
720:19, 721:18,
721:23, 723:23,
724:3, 725:15,
725:20, 726:24,
727:4, 730:5,
730:10, 731:12,
732:4, 732:6, 733:6,
733:16, 735:21,
736:2, 736:6,
736:10, 736:13,
737:5, 738:15,
739:10, 739:15,
739:24, 740:4,
740:9, 740:13,
741:4, 741:8,
741:10, 741:18,
741:25, 743:3,
743:25, 744:5,
744:16, 744:21,
744:24, 745:2,
746:7, 746:19,
747:13, 747:16,
747:22, 748:2,
748:5, 748:24,
749:25, 751:12,
751:20, 752:13,
752:16, 752:21,
753:1, 753:5, 753:7,
753:22, 754:4,
754:9, 754:21,
755:1, 755:6, 756:4,
756:20, 757:4,
757:20, 758:10,
761:20, 761:25,
762:8, 762:11,
763:15, 763:19,
763:24, 764:3,
765:11, 765:18,
765:21, 766:1,
766:13, 766:19,
766:23, 767:17,
768:3, 768:6,
769:14, 769:17,
769:21, 769:25,
770:11, 770:14,
772:6, 772:18,

773:18, 773:22, 774:4, 774:7, 774:11, 775:11, 776:19, 777:1, 777:6, 777:9, 777:12, 777:18, 778:1, 778:3, 782:4, 782:22, 783:1, 783:4, 783:6, 783:10, 783:14, 783:19, 783:25, 784:2, 784:7, 784:9, 784:13, 784:15, 785:23, 786:2, 786:10, 786:18, 786:23, 787:5, 787:8, 787:14, 787:15, 787:21, 788:17, 790:15, 790:16, 791:6, 791:7, 791:13, 791:15, 791:24, 792:1, 792:7, 792:9, 792:24, 793:7, 795:6, 795:9, 795:23, 796:1, 796:8, 796:22, 796:23, 798:9, 798:10, 798:18, 798:23, 826:2, 826:6, 826:20, 826:24, 828:5, 828:15, 828:22, 830:6, 850:6, 881:14, 882:11, 882:19, 883:23, 884:1, 884:12, 884:16, 884:23, 885:2, 886:7, 901:19, 909:8

**Milliken** [11] - 738:3, 750:22, 761:9, 763:7, 763:10, 765:9, 768:22, 775:1, 776:18, 776:25, 777:16

**milliken** [1] - 733:5

**million** [1] - 997:6

**millions** [1] - 997:7

**mind** [6] - 732:21, 736:15, 748:20, 757:18, 775:11, 797:19

**mindset** [1] - 809:23

**minimize** [1] - 807:9

**minimum** [3] - 849:14, 918:5, 933:21

**minus** [1] - 805:1

**minute** [3] - 760:18, 838:18, 895:5

**minutes** [16] - 708:4, 708:8, 709:8, 709:12, 752:17, 776:20, 776:22, 808:2, 808:13, 813:5, 823:14, 823:16, 824:1, 898:9, 981:19, 984:11

**misaligned** [1] - 707:16

**mischaracterization** [1] - 699:12

**mismatch** [1] - 706:19

**missed** [1] - 943:24

**missing** [3] - 675:2, 685:23, 881:22

**misspoke** [2] - 779:15, 787:22

**mistake** [2] - 686:6, 988:23

**mistakes** [1] - 989:2

**misunderstanding** [2] - 771:8, 944:12

**mixed** [1] - 906:17

**mixing** [1] - 827:13

**mixture** [1] - 769:3

**model** [1] - 885:15

**modest** [1] - 842:12

**molecule** [7] - 689:25, 832:5, 832:15, 840:11, 846:20, 971:4, 971:10

**molecules** [8] - 832:8, 834:4, 861:10, 862:2, 863:23, 864:5, 873:19, 971:23

**moment** [7] - 746:8, 758:9, 776:19, 816:4, 836:1, 895:4, 921:15

**momentary** [1] - 891:22

**Monday** [3] - 817:14, 891:14, 892:2

**money** [3] - 811:11, 811:12, 811:16

**month** [5] - 673:9, 744:6, 759:3, 789:1, 797:6

**months** [12] - 738:12, 741:1, 753:25, 754:3, 754:6, 754:11, 763:17, 795:12, 846:16, 847:5, 847:10, 997:4

**mood** [1] - 862:15

**morning** [16] - 672:5, 672:7, 690:10, 697:13, 700:11, 700:25, 793:14, 793:15, 799:4, 836:15, 869:23, 936:22, 938:6, 938:11, 939:5, 1003:8

**morphine** [1] - 834:12

**MORRIS** [1] - 671:12

**most** [13] - 692:4, 706:14, 706:25, 763:16, 810:2, 869:19, 869:25, 873:12, 885:18, 927:9, 927:20, 930:9, 992:2

**mostly** [4] - 802:9, 802:11, 892:20, 892:25

**motivated** [4] - 753:14, 809:24, 813:15, 993:4

**motivation** [7] - 801:13, 810:18, 814:3, 953:15, 953:21, 978:7, 979:22

**mouth** [1] - 797:6

**move** [52] - 709:10, 709:13, 712:9, 713:8, 713:24, 714:10, 714:23, 715:10, 716:2, 717:11, 718:17, 718:24, 719:8, 720:3, 720:14, 721:18, 723:23, 725:5, 725:15, 726:12, 726:24, 728:7, 729:19, 730:5, 730:24, 731:12, 756:21, 781:5, 796:24, 798:18, 804:8, 805:18, 811:18, 815:9, 816:4, 818:21, 820:12, 828:16, 847:17, 849:12, 852:6, 876:3, 876:4, 880:7, 880:15, 904:6, 958:15, 959:4, 961:12, 977:11, 998:12, 999:1

**movements** [1] - 891:19

**moving** [5] - 709:8, 816:22, 830:20, 866:3, 984:4

**MR** [554] - 672:7,

672:18, 673:3, 673:7, 673:11, 673:24, 674:5, 674:6, 674:24, 675:4, 675:7, 675:11, 675:16, 675:20, 676:8, 676:11, 676:18, 676:21, 677:1, 677:4, 677:8, 677:16, 677:20, 677:24, 678:11, 678:15, 679:1, 679:3, 679:22, 680:18, 680:21, 681:3, 681:6, 681:13, 681:15, 681:25, 682:15, 682:17, 682:20, 683:2, 684:8, 684:16, 684:21, 685:9, 685:14, 685:17, 686:20, 687:3, 687:14, 687:16, 689:10, 689:11, 689:17, 689:20, 689:22, 690:1, 690:4, 690:13, 690:15, 690:18, 691:3, 691:8, 692:11, 692:16, 692:20, 693:24, 694:5, 694:10, 694:13, 694:19, 695:1, 695:3, 695:5, 695:6, 695:11, 695:15, 695:22, 696:4, 696:7, 696:9, 696:11, 696:15, 696:18, 697:2, 697:7, 697:16, 697:22, 698:2, 698:9, 698:18, 698:22, 698:23, 699:1, 699:12, 699:20, 699:25, 700:1, 700:5, 700:8, 700:11, 700:24, 711:8, 711:15, 711:17, 711:21, 712:5, 712:11, 713:8, 713:10, 713:13, 714:10, 714:12, 714:15, 715:10, 715:12, 715:15, 717:11, 717:13, 717:19, 718:23, 719:8, 719:10, 719:13, 720:14, 720:16,

720:19, 721:18, 721:20, 721:23, 723:23, 723:25, 724:3, 725:15, 725:17, 725:20, 726:24, 727:1, 727:4, 730:5, 730:7, 730:10, 731:12, 731:14, 731:17, 732:4, 732:6, 732:12, 732:20, 732:25, 733:6, 733:13, 733:16, 733:18, 733:23, 734:6, 734:10, 734:17, 734:21, 735:4, 735:12, 735:21, 736:2, 736:6, 736:10, 736:13, 737:5, 738:15, 739:10, 739:15, 739:24, 740:4, 740:9, 740:13, 741:4, 741:8, 741:10, 741:18, 741:25, 742:3, 742:22, 743:3, 743:14, 743:23, 743:25, 744:5, 744:16, 744:21, 744:24, 745:2, 745:7, 745:17, 745:25, 746:7, 746:10, 746:13, 746:19, 747:13, 747:16, 747:22, 748:2, 748:5, 748:24, 749:25, 750:19, 751:12, 751:20, 752:13, 752:16, 752:21, 753:1, 753:5, 753:7, 753:22, 754:4, 754:9, 754:21, 755:1, 755:6, 756:4, 756:20, 757:4, 757:20, 758:7, 758:10, 758:15, 758:18, 759:3, 759:10, 759:14, 760:5, 760:14, 761:20, 761:25, 762:7, 762:8, 762:11, 763:6, 763:9, 763:15, 763:19, 763:24, 764:3, 764:5, 764:21, 765:11, 765:18, 765:21, 766:1, 766:13,

766:19, 766:23, 767:17, 768:3, 768:6, 768:18, 768:21, 769:7, 769:14, 769:17, 769:21, 769:25, 770:11, 770:14, 772:6, 772:18, 773:18, 773:22, 774:2, 774:4, 774:7, 774:11, 774:13, 774:20, 775:11, 775:21, 775:25, 776:7, 776:14, 776:19, 777:1, 777:6, 777:9, 777:12, 777:15, 777:18, 778:1, 778:3, 781:12, 781:18, 781:25, 782:4, 782:12, 782:22, 783:1, 783:4, 783:6, 783:10, 783:14, 783:19, 783:25, 784:2, 784:7, 784:9, 784:13, 784:15, 784:18, 784:23, 785:7, 785:23, 786:2, 786:10, 786:18, 786:23, 787:5, 787:8, 787:14, 787:15, 787:20, 787:21, 787:23, 788:2, 788:6, 788:17, 788:19, 790:15, 790:16, 791:6, 791:7, 791:13, 791:15, 791:24, 792:1, 792:7, 792:9, 792:21, 792:24, 793:7, 793:9, 793:13, 794:19, 794:25, 795:6, 795:9, 795:23, 796:1, 796:8, 796:22, 796:23, 798:9, 798:10, 798:18, 798:20, 798:23, 826:2, 826:6, 826:20, 826:24, 828:5, 828:8, 828:15, 828:19, 828:22, 828:25, 830:4, 830:6, 830:9, 830:11, 835:9, 835:12, 835:20, 835:22, 836:22, 836:24, 838:10,

838:13, 840:18, 840:21, 844:23, 845:6, 846:3, 846:5, 847:15, 847:16, 847:20, 847:22, 850:4, 850:6, 850:10, 850:14, 851:19, 851:23, 852:13, 852:15, 853:7, 853:9, 855:9, 855:11, 856:12, 856:14, 860:1, 860:3, 860:17, 860:20, 861:7, 861:9, 863:6, 863:8, 863:17, 863:21, 864:24, 865:1, 866:12, 866:13, 870:21, 870:25, 872:2, 872:7, 872:14, 872:17, 873:4, 873:6, 876:21, 876:25, 880:11, 880:14, 881:14, 881:20, 881:25, 882:9, 882:11, 882:19, 883:23, 884:1, 884:12, 884:16, 884:23, 885:2, 886:7, 894:2, 894:14, 894:22, 894:24, 895:3, 895:14, 895:18, 895:24, 898:18, 898:21, 898:23, 901:5, 901:6, 901:9, 901:10, 901:19, 902:13, 902:14, 902:17, 902:19, 903:17, 903:18, 904:3, 904:7, 905:19, 905:22, 906:6, 906:7, 907:9, 907:11, 908:1, 908:3, 909:8, 911:4, 911:5, 911:8, 911:9, 919:6, 919:7, 919:10, 924:16, 924:19, 924:23, 925:13, 925:15, 934:10, 934:14, 934:17, 935:23, 935:25, 936:2, 937:22, 937:25, 938:5, 938:11, 938:19, 939:4, 939:12, 939:19, 940:2, 940:9, 940:14, 940:17, 941:4, 941:12,

942:22, 943:2, 943:21, 944:1, 944:5, 944:10, 945:8, 945:12, 946:15, 947:23, 948:6, 948:12, 948:16, 948:25, 949:3, 949:17, 951:6, 951:9, 952:5, 952:18, 956:19, 957:2, 958:3, 958:14, 960:21, 960:24, 961:12, 964:13, 965:20, 972:14, 974:2, 975:13, 980:23, 984:2, 984:11, 984:14, 998:11, 998:14, 998:17, 998:19, 998:21, 999:3, 999:8, 999:11, 999:13, 1001:25, 1002:19, 1002:21, 1003:1, 1003:4, 1003:13
**MS** [56] - 940:25, 941:8, 941:19, 941:24, 942:3, 942:6, 942:10, 942:14, 942:17, 942:24, 943:20, 945:1, 945:4, 946:7, 946:12, 946:20, 947:5, 947:11, 947:16, 948:2, 948:19, 948:22, 949:6, 949:12, 949:14, 950:1, 951:12, 952:6, 952:25, 957:3, 958:8, 959:1, 959:5, 959:6, 961:2, 961:6, 961:14, 964:17, 964:21, 965:3, 965:23, 968:16, 968:19, 972:18, 973:25, 974:5, 975:11, 975:16, 980:21, 981:1, 981:19, 981:21, 983:25, 984:3, 984:5, 984:7
**MT** [10] - 710:3, 858:3, 858:9, 858:10, 859:4, 859:5, 859:7, 859:8
**MT-1** [2] - 799:19, 932:9
**MT-2** [2] - 799:20, 932:9

**MT1** [1] - 857:17
**MT2** [1] - 857:17
**multiple** [6] - 693:22, 808:1, 888:12, 901:17, 972:3, 997:7
**muscle** [1] - 891:19
**music** [1] - 769:12
**must** [3] - 878:19, 878:25, 879:3
**Myers** [1] - 674:10

## N

**name** [7] - 701:2, 708:14, 888:10, 896:2, 896:17, 903:23, 942:1
**named** [3] - 770:2, 829:15, 950:16
**namely** [2] - 761:7, 810:12
**names** [1] - 903:22
**napping** [1] - 931:16
**narrow** [1] - 723:11
**narrowed** [1] - 750:23
**NASA** [1] - 898:3
**NATHAN** [1] - 671:3
**Nathaniel** [2] - 762:21, 765:17
**nature** [6] - 756:25, 757:5, 759:7, 761:15, 891:23
**NCT** [6] - 778:24, 779:18, 785:12, 789:16, 789:17, 793:3
**NDA** [1] - 969:1
**near** [2] - 786:14, 887:3
**necessarily** [12] - 773:8, 790:7, 817:20, 818:3, 833:18, 840:12, 854:2, 868:19, 883:21, 905:7, 1000:4
**necessary** [6] - 682:7, 735:23, 771:3, 806:1, 842:23, 851:11
**need** [47] - 672:25, 673:1, 678:22, 679:10, 679:12, 683:18, 683:19, 685:7, 696:21, 729:16, 737:20, 738:9, 754:7, 770:18, 775:3, 775:9, 776:3, 776:18, 800:25,

827:19, 844:18, 853:20, 885:17, 885:18, 905:12, 905:17, 914:16, 923:2, 923:4, 938:8, 940:7, 940:11, 940:14, 956:25, 958:24, 959:4, 977:17, 991:19, 994:22, 995:3, 995:4, 995:17, 996:15, 996:24, 1001:22, 1002:17, 1002:22
**needed** [3] - 754:12, 918:4, 991:7
**needle** [1] - 999:20
**needle-like** [1] - 999:20
**needs** [2] - 772:3, 806:8
**negate** [1] - 883:14
**negative** [2] - 683:16, 843:16
**neglected** [1] - 828:16
**net** [1] - 843:11
**never** [21] - 678:2, 679:4, 680:2, 680:12, 682:5, 686:13, 729:16, 733:14, 734:18, 757:8, 769:7, 769:9, 837:23, 843:2, 863:13, 888:19, 909:7, 923:21, 925:3, 925:9, 965:1
**new** [2] - 681:12, 786:19
**New** [7] - 715:6, 715:24, 840:3, 885:15, 888:12, 891:18, 927:24
**next** [57] - 700:12, 713:24, 714:23, 714:25, 718:24, 720:3, 725:5, 726:12, 728:7, 729:19, 730:25, 744:7, 744:8, 746:15, 767:24, 768:3, 799:22, 816:6, 818:21, 820:12, 829:6, 849:17, 854:8, 856:11, 859:18, 863:3, 874:18, 877:17, 880:7, 880:15, 894:13, 894:15, 903:13, 907:9, 908:1,

909:17, 911:8, 912:23, 913:17, 920:23, 929:9, 930:25, 937:25, 952:13, 955:14, 959:11, 965:8, 966:14, 974:15, 975:1, 976:2, 986:5, 988:8, 988:15, 988:24, 989:19, 994:25

**nice** [2] - 885:14, 955:20

**NICHOLAS** [1] - 671:8

**NICHOLS** [1] - 671:12

**night** [8] - 741:25, 855:14, 855:18, 855:21, 868:7, 868:9, 868:17, 869:5

**nighttime** [6] - 789:3, 789:7, 830:23, 832:17, 868:13, 869:17

**nine** [1] - 927:4

**nitrogens** [2] - 971:14, 971:15

**NMR** [3] - 971:20, 971:23, 990:13

**NO** [1] - 1:6

**nobody** [4] - 688:2, 774:17, 774:19, 774:20

**nominally** [1] - 985:20

**non** [2] - 801:7, 858:11

**Non-24** [97] - 700:19, 702:13, 702:19, 703:1, 703:8, 703:10, 703:12, 704:25, 705:2, 705:7, 707:1, 707:20, 707:21, 707:22, 708:13, 709:7, 710:19, 710:25, 712:1, 713:23, 714:20, 715:22, 717:23, 718:16, 719:20, 719:22, 719:25, 720:23, 720:24, 721:1, 721:4, 722:22, 723:1, 723:6, 729:14, 729:16, 729:18, 731:11, 773:3, 773:6, 773:11, 783:12, 783:14, 788:25, 789:7, 789:8, 797:12, 799:11, 799:24,

804:12, 805:13, 806:19, 810:6, 810:17, 811:7, 812:9, 813:21, 816:6, 816:11, 818:9, 819:9, 821:2, 822:25, 824:22, 825:10, 825:15, 825:25, 827:20, 827:24, 830:14, 832:3, 832:19, 832:20, 833:3, 838:15, 841:23, 843:25, 845:10, 845:20, 847:8, 854:19, 854:20, 854:23, 855:1, 862:20, 872:23, 872:25, 879:21, 885:18, 885:24, 904:19, 906:15, 908:11, 919:19, 925:3, 931:11

**Non-24-Hour** [6] - 778:19, 783:16, 789:20, 803:20, 829:9, 914:16

**non-obviousness** [1] - 801:7

**non-REM** [1] - 858:11

**none** [8] - 781:19, 784:25, 785:16, 788:14, 935:9, 937:6, 1001:2, 1002:19

**nonentrained** [4] - 908:21, 908:22, 908:25, 909:2

**nonetheless** [1] - 839:1

**noninfringement** [1] - 711:14

**nonobvious** [1] - 980:5

**nonprofit** [2] - 735:12, 735:13

**nonpublic** [1] - 692:14

**nonresponsive** [1] - 958:15

**normal** [1] - 676:19

**normally** [1] - 674:25

**notable** [1] - 888:10

**NOTE** [1] - 672:3

**note** [10] - 771:22, 774:14, 846:8, 893:19, 965:2, 966:5, 967:11, 968:7, 992:6, 992:7

**notebook** [1] - 941:6

**noted** [10] - 893:23,

951:11, 969:6, 974:19, 975:23, 976:4, 977:16, 982:5, 983:15, 989:3

**notes** [3] - 752:21, 799:9, 1003:25

**nothing** [17] - 681:12, 682:20, 686:18, 699:16, 761:4, 781:14, 781:21, 794:19, 797:25, 880:3, 883:20, 886:8, 935:23, 949:17, 952:17, 952:20, 990:25

**notice** [11] - 733:8, 734:23, 743:15, 752:22, 753:9, 755:2, 755:11, 755:13, 770:23, 795:25, 796:16

**notices** [1] - 753:14

**noting** [1] - 964:24

**notion** [1] - 825:14

**nowhere** [1] - 939:21

**nuclear** [1] - 990:4

**Number** [1] - 827:1

**number** [16] - 778:25, 780:19, 783:20, 793:4, 827:3, 849:25, 857:9, 870:14, 888:3, 941:5, 966:25, 967:6, 967:20, 969:8, 969:15, 971:13

**numbered** [1] - 876:22

**numbers** [2] - 779:19, 919:21, 994:5

**numerous** [1] - 810:16

## O

**O'CONNOR** [1] - 671:15

**oath** [3] - 700:22, 777:23, 949:24

**Oberlin** [1] - 701:22

**object** [13] - 673:19, 733:14, 742:12, 750:25, 751:18, 756:22, 777:15, 781:12, 785:1, 794:21, 794:25, 881:14, 956:25

**objected** [4] - 750:5, 756:12, 893:22, 938:14

**objecting** [5] - 691:3, 732:14, 750:1,

938:9, 958:17

**objection** [89] - 673:12, 690:14, 713:10, 714:12, 715:12, 717:13, 719:10, 720:16, 721:20, 723:25, 725:17, 727:1, 730:7, 731:15, 731:21, 732:8, 732:9, 737:8, 737:10, 737:12, 737:16, 742:4, 748:7, 749:14, 749:15, 749:24, 750:4, 750:14, 750:16, 750:21, 751:5, 751:14, 756:16, 756:25, 760:22, 761:2, 768:17, 771:15, 771:20, 771:21, 772:1, 772:8, 776:14, 777:3, 777:13, 781:23, 782:12, 782:21, 784:18, 786:7, 787:24, 788:1, 788:2, 792:21, 798:20, 828:18, 830:6, 850:6, 881:24, 893:20, 894:6, 898:21, 901:6, 902:14, 911:5, 919:7, 934:15, 945:6, 948:17, 951:6, 951:8, 951:9, 952:16, 952:18, 956:19, 958:14, 960:21, 961:9, 961:11, 964:13, 965:20, 972:14, 974:2, 975:13, 980:23, 984:2, 999:2, 999:4, 999:6

**objections** [3] - 761:12, 893:25, 958:3

**objectively** [1] - 891:19

**obligated** [1] - 687:7

**observe** [1] - 693:25

**observed** [1] - 892:1

**obtain** [1] - 999:20

**obtained** [1] - 947:24

**obvious** [26] - 688:20, 689:1, 800:15, 800:16, 801:1, 801:10, 818:24,

819:1, 819:12, 819:16, 819:23, 820:1, 820:2, 820:7, 820:16, 820:18, 821:16, 821:20, 822:11, 823:9, 855:25, 935:21, 953:2, 953:4, 979:16

**obviously** [5] - 676:8, 676:10, 718:2, 735:1, 781:15

**obviousness** [21] - 673:17, 704:10, 712:8, 772:21, 800:23, 801:7, 801:25, 815:8, 822:4, 822:8, 822:10, 854:16, 872:9, 876:8, 877:23, 938:21, 972:19, 972:22, 978:12, 979:11, 998:22

**occasioned** [1] - 695:20

**occurred** [2] - 738:12, 933:4

**occurring** [1] - 830:15

**occurs** [2] - 898:17, 932:8

**ocean** [2] - 890:15, 890:16

**October** [2] - 739:4, 754:19

**odd** [1] - 680:14

**OF** [1] - 1:3

**off-the-wall** [1] - 898:2

**offer** [18] - 673:22, 699:10, 732:13, 793:7, 830:4, 850:5, 898:19, 901:5, 902:13, 907:6, 911:2, 911:4, 919:6, 958:2, 965:19, 973:25, 975:11, 980:21

**offered** [7] - 696:19, 705:16, 731:18, 731:19, 802:13, 934:12, 948:16

**offering** [7] - 703:3, 732:3, 760:15, 760:25, 789:22, 898:25, 899:4

**Office** [9] - 972:25, 973:6, 973:12, 973:21, 974:10, 974:18, 974:24, 975:7, 976:8

**office** [3] - 686:3,

686:24, 697:13
**often** [6] - 672:16, 710:3, 735:14, 893:2, 992:3, 992:4
**OHSU** [1] - 701:17
**older** [1] - 849:23
**omission** [1] - 688:13
**once** [4] - 821:10, 821:13, 844:18, 874:7
**one** [174] - 673:11, 681:2, 682:10, 686:15, 686:23, 690:25, 693:19, 696:11, 698:9, 700:9, 710:5, 713:20, 717:25, 718:8, 731:14, 735:15, 737:5, 743:3, 744:6, 745:19, 746:2, 746:15, 751:14, 758:8, 759:14, 767:23, 769:14, 770:2, 772:22, 776:2, 776:19, 777:9, 781:16, 785:15, 787:11, 789:2, 794:1, 796:11, 799:24, 801:10, 816:6, 818:21, 828:2, 828:15, 829:12, 829:19, 833:18, 834:3, 834:14, 834:15, 834:16, 837:20, 839:11, 839:14, 839:19, 840:13, 841:6, 841:7, 841:14, 842:13, 843:25, 846:21, 847:17, 847:18, 848:3, 848:23, 851:21, 852:10, 853:1, 853:22, 854:15, 855:12, 857:1, 858:21, 859:18, 859:22, 861:21, 861:23, 864:16, 864:20, 865:12, 865:16, 870:16, 871:14, 871:16, 871:24, 872:4, 872:8, 874:3, 876:7, 877:22, 879:24, 879:25, 882:5, 882:14, 890:8, 890:18, 893:17, 894:4, 896:25,

897:4, 897:11, 897:12, 897:20, 897:22, 898:13, 905:4, 905:14, 905:23, 906:3, 906:20, 907:4, 907:19, 909:9, 910:1, 912:2, 912:19, 912:25, 913:5, 914:17, 914:19, 915:22, 916:8, 916:21, 919:4, 919:11, 919:23, 920:1, 920:6, 922:18, 922:23, 924:6, 927:3, 939:9, 943:7, 943:16, 943:21, 943:23, 944:10, 944:15, 944:16, 948:15, 955:22, 957:22, 960:10, 962:9, 965:4, 965:16, 974:22, 980:18, 987:8, 988:4, 989:20, 991:17, 992:7, 994:16, 995:20, 997:11, 997:12, 997:24, 998:19, 998:20, 998:21, 998:22, 998:23, 1001:8, 1001:11, 1002:10, 1003:15
**one-third** [1] - 893:17
**one-to-one** [1] - 833:18
**one-year** [1] - 776:2
**onerous** [3] - 849:14, 977:17, 996:18
**ones** [4] - 817:24, 832:23, 875:18, 982:4
**ongoing** [6] - 799:9, 809:4, 811:6, 878:3, 879:20, 880:4
**online** [4] - 753:23, 754:6, 754:11, 893:21
**onset** [7] - 702:20, 850:24, 867:7, 868:2, 868:5, 869:13, 875:3
**open** [6] - 734:24, 743:11, 752:18, 785:3, 829:4, 938:5
**open-to-the-public** [1] - 752:18
**opened** [1] - 786:19
**opening** [2] - 688:22,

773:23
**operate** [1] - 887:11
**operates** [1] - 742:7
**operative** [1] - 744:14
**opiate** [1] - 834:14
**opiates** [2] - 834:9, 834:10
**opine** [2] - 750:12, 946:5
**opined** [2] - 679:1, 759:14
**Opinion** [1] - 875:2
**opinion** [35] - 673:22, 678:5, 678:9, 678:11, 679:5, 682:4, 694:21, 710:16, 715:8, 733:15, 742:8, 789:23, 790:7, 802:5, 809:17, 817:16, 823:8, 824:20, 833:9, 845:9, 879:9, 879:14, 881:17, 881:21, 950:15, 950:22, 950:23, 953:1, 954:11, 960:22, 964:14, 968:4, 972:6, 972:12, 979:15
**opinions** [52] - 701:9, 701:10, 703:4, 703:18, 703:22, 703:24, 704:1, 704:6, 704:9, 704:10, 704:14, 705:9, 713:6, 714:8, 717:9, 719:6, 720:12, 721:16, 723:21, 724:19, 725:13, 726:22, 728:16, 730:3, 794:14, 797:1, 798:16, 800:12, 801:25, 818:23, 822:9, 825:17, 855:24, 886:5, 898:25, 899:1, 899:3, 923:23, 926:19, 953:7, 953:10, 953:23, 953:25, 956:3, 957:25, 965:17, 972:20, 973:23, 975:9, 977:24, 979:10, 980:19
**opportunity** [3] - 711:2, 711:16, 803:3
**opposed** [2] - 681:2, 832:14

**opposite** [4] - 675:1, 836:3, 836:16, 889:18
**opposition** [1] - 707:13
**optimal** [2] - 718:1, 723:7
**optimization** [1] - 717:24
**optimizing** [1] - 718:9
**option** [2] - 709:2, 709:4
**or..** [1] - 832:8
**oral** [3] - 673:1, 882:22, 929:13
**orally** [2] - 806:12, 830:20
**orange** [1] - 823:15
**order** [12] - 682:7, 685:3, 711:8, 711:9, 711:17, 734:24, 758:21, 759:2, 759:22, 775:22, 845:10, 846:19
**ordinary** [23] - 705:11, 705:17, 753:12, 801:4, 802:20, 811:13, 813:14, 879:5, 883:6, 885:25, 891:1, 891:6, 893:9, 953:24, 954:4, 954:8, 954:12, 954:15, 954:21, 955:11, 955:25, 977:22, 990:9
**Oregon** [5] - 701:16, 701:24, 702:5, 702:16, 886:20
**organic** [2] - 954:6, 955:1
**organizations** [1] - 702:2
**orient** [1] - 712:13
**origin** [1] - 692:24
**original** [3] - 967:15, 967:20, 969:22
**originally** [2] - 756:6, 761:18
**otherwise** [2] - 792:12, 811:15
**outcome** [3] - 789:3, 789:9, 793:5
**outline** [1] - 689:2
**outside** [3] - 858:13, 881:14, 990:16
**overall** [5] - 684:4, 718:11, 718:14, 843:17, 966:3
**overrule** [2] - 786:7,

881:24
**overruled** [3] - 782:21, 958:19, 972:16
**oversimplified** [1] - 867:10
**overview** [2] - 701:7, 701:8
**own** [5] - 704:10, 705:21, 765:4, 868:4, 956:4
**oxygens** [2] - 971:14, 971:15

### P

**P-value** [1] - 877:13
**p.m** [13] - 901:14, 902:23, 904:20, 906:17, 913:1, 913:10, 913:15, 914:22, 916:5, 916:10, 920:1, 923:16, 1003:23
**P1** [3] - 988:6, 988:8, 989:1
**P2** [1] - 989:22
**P3** [2] - 970:24, 989:22
**P4** [1] - 989:22
**P450** [1] - 704:17
**P5** [16] - 968:11, 969:5, 969:6, 969:17, 969:19, 972:5, 988:15, 988:19, 989:3, 989:5, 989:22, 990:22, 990:24, 991:1, 991:4
**pacemaker** [3] - 706:8, 707:25, 713:21
**pacemaker's** [1] - 804:2
**Pack** [1] - 891:5
**Page** [51] - 754:16, 754:17, 805:3, 806:3, 809:14, 813:7, 826:21, 830:9, 835:10, 835:20, 838:10, 843:20, 845:16, 847:19, 851:18, 853:5, 855:8, 861:7, 863:3, 863:18, 873:1, 876:23, 881:6, 884:13, 884:25, 926:2, 927:13, 928:25, 930:5, 931:19, 931:24, 941:19, 942:14, 959:11,

959:21, 961:15, 961:25, 963:1, 963:11, 964:5, 965:25, 967:1, 967:7, 969:14, 974:7, 975:17, 984:22, 990:20, 994:3

**page** [48] - 731:7, 731:8, 738:25, 739:2, 739:3, 744:10, 744:23, 746:5, 746:15, 749:13, 752:12, 752:13, 757:7, 757:14, 762:12, 763:11, 778:20, 778:22, 779:13, 780:10, 780:20, 786:22, 793:20, 804:19, 812:21, 850:15, 856:11, 863:3, 863:20, 865:2, 866:8, 866:11, 874:18, 876:20, 882:13, 882:14, 925:20, 937:3, 944:23, 959:11, 967:9, 973:4, 974:15, 986:4, 986:5, 989:17, 999:16

**Pages** [3] - 794:13, 795:15, 806:10

**pages** [7] - 738:22, 739:1, 756:15, 815:6, 826:12, 826:13, 969:12

**pancreatitis** [1] - 900:18

**Pandi** [2] - 820:17, 820:19

**Pandi-Perumal** [2] - 820:17, 820:19

**paper** [103] - 713:3, 713:5, 713:15, 714:5, 714:7, 714:16, 715:5, 715:7, 715:16, 715:19, 715:20, 716:11, 716:19, 716:25, 717:6, 718:8, 719:5, 720:11, 725:11, 725:12, 725:21, 726:1, 728:13, 746:2, 746:13, 746:20, 829:3, 839:14, 839:19, 840:3, 840:6,

842:13, 851:14, 852:16, 854:13, 855:5, 856:18, 857:6, 859:19, 863:4, 864:13, 864:15, 864:22, 866:6, 866:7, 866:15, 866:16, 870:4, 872:8, 872:24, 877:19, 878:1, 883:12, 884:10, 900:7, 900:12, 901:2, 901:12, 901:23, 902:11, 902:20, 904:13, 906:8, 906:14, 907:7, 907:13, 908:5, 909:10, 910:22, 911:11, 917:14, 918:3, 919:13, 919:14, 919:23, 920:9, 925:16, 925:21, 926:5, 926:15, 926:18, 927:15, 927:17, 927:23, 928:7, 928:10, 929:17, 929:21, 929:25, 930:17, 930:22, 932:21, 932:23, 933:12, 933:13, 937:8, 946:14, 946:17, 957:23, 964:18, 964:19

**papers** [10] - 717:8, 717:21, 718:12, 840:1, 852:10, 897:11, 909:19, 919:17, 919:22, 929:6

**paragraph** [38] - 736:4, 739:9, 753:7, 759:24, 762:22, 838:11, 840:19, 843:21, 847:21, 851:20, 851:21, 863:6, 866:10, 876:22, 876:24, 884:3, 929:1, 929:2, 932:1, 933:16, 935:8, 936:24, 941:23, 941:24, 952:3, 952:13, 959:17, 963:3, 964:6, 969:4, 974:8, 975:18, 976:1, 976:2, 981:11, 989:20, 999:18

**Paragraph** [16] - 736:6, 742:5,

758:21, 785:8, 786:3, 788:16, 788:20, 788:22, 941:20, 942:15, 942:22, 943:10, 946:4, 946:5, 952:10

**paragraphs** [5] - 860:19, 939:7, 946:6, 961:5, 974:17

**paralegal** [2] - 741:14, 741:15

**paralegals** [1] - 737:1

**parameters** [3] - 703:12, 723:3, 723:18

**pardon** [2] - 1000:9, 1001:19

**parent** [1] - 982:15

**part** [36] - 673:17, 675:11, 676:24, 684:25, 687:8, 693:23, 700:20, 703:15, 711:10, 739:21, 746:23, 760:24, 766:15, 766:22, 784:4, 784:10, 841:3, 843:3, 843:15, 847:11, 863:20, 870:23, 887:16, 905:5, 913:18, 914:6, 926:2, 926:4, 926:18, 929:1, 938:2, 966:3, 966:13, 966:21, 972:10, 999:17

**partially** [1] - 887:6

**particular** [23] - 704:5, 704:16, 727:24, 731:24, 734:16, 735:8, 744:2, 744:10, 754:18, 821:25, 833:14, 840:11, 846:20, 851:10, 853:23, 865:3, 870:22, 927:23, 931:4, 960:10, 969:11, 969:12, 987:22

**particularly** [2] - 797:17, 841:22

**parties** [10] - 672:10, 682:7, 700:14, 770:22, 771:6, 774:15, 800:4, 897:5, 944:18, 946:13

**partly** [2] - 831:18, 846:24

**party** [2] - 682:1,

887:12

**pass** [4] - 828:5, 924:17, 924:19, 941:1

**passages** [1] - 815:4

**patent** [170] - 673:4, 673:18, 673:23, 674:1, 675:22, 675:24, 676:6, 676:13, 676:21, 679:3, 680:11, 680:17, 684:13, 684:15, 684:17, 684:21, 684:22, 684:24, 685:2, 685:5, 685:19, 686:2, 686:3, 686:23, 686:24, 687:18, 687:19, 688:16, 688:17, 688:20, 691:14, 704:22, 705:1, 705:5, 724:18, 724:21, 724:23, 724:25, 726:18, 726:19, 726:20, 727:5, 735:14, 741:1, 762:4, 764:19, 772:21, 773:24, 773:25, 774:4, 795:13, 800:11, 803:10, 804:9, 809:20, 811:25, 813:12, 814:5, 815:8, 815:25, 816:2, 816:16, 817:10, 817:18, 818:2, 818:3, 818:6, 818:21, 818:23, 819:4, 819:7, 819:17, 819:18, 820:12, 820:21, 820:22, 821:2, 821:3, 821:10, 821:12, 821:21, 821:22, 822:7, 822:8, 822:10, 822:15, 822:18, 822:21, 822:23, 823:4, 824:6, 824:21, 825:4, 825:23, 826:7, 826:10, 826:15, 827:4, 827:5, 827:8, 827:12, 828:17, 876:11, 876:14, 880:24, 881:3, 881:21, 882:2, 882:3, 938:21, 938:23, 939:16,

943:12, 947:21, 948:4, 953:2, 953:3, 953:5, 953:11, 954:3, 954:12, 959:9, 960:6, 960:18, 960:20, 962:15, 972:7, 973:4, 973:7, 973:9, 973:10, 974:13, 974:14, 974:21, 975:21, 975:24, 976:5, 976:9, 976:13, 976:15, 978:3, 978:10, 979:16, 980:5, 982:5, 982:11, 982:12, 982:13, 982:14, 982:15, 991:7, 992:16, 993:7, 997:21, 997:25, 998:6, 998:7, 1000:7, 1000:11, 1000:17, 1001:13, 1002:3, 1002:6

**Patent** [10] - 826:25, 972:25, 973:6, 973:12, 973:20, 974:10, 974:18, 974:24, 975:6, 976:8

**patentable** [1] - 688:24

**patented** [1] - 766:4

**patents** [16] - 674:18, 686:5, 703:16, 703:19, 704:2, 704:3, 704:11, 704:20, 704:22, 705:10, 761:14, 800:9, 819:12, 821:16, 828:1, 935:21

**patents-in-suit** [1] - 935:21

**path** [6] - 696:12, 696:14, 963:10, 963:15, 977:10, 977:16

**pathways** [1] - 881:9

**patient** [7] - 773:19, 808:23, 816:6, 823:13, 843:15, 925:3, 925:9

**patient's** [3] - 813:1, 849:1, 915:12

**patients** [30] - 703:17, 714:21, 718:8, 773:3, 773:11, 788:25, 789:1, 789:8, 797:7,

797:11, 804:21, 811:7, 817:7, 818:16, 818:19, 827:24, 827:25, 833:3, 846:9, 846:13, 879:25, 880:1, 887:17, 899:8, 902:5, 909:24, 909:25, 910:4, 922:21, 928:15

**pattern** [1] - 901:15

**PAUL** [1] - 671:8

**pause** [2] - 894:15, 921:15

**PCR** [1] - 835:23

**PDX** [5] - 899:14, 902:18, 903:17, 909:17, 911:8

**PDX-09** [2] - 970:8, 981:23

**PDX-09.10** [1] - 970:6

**PDX-8.16** [1] - 912:15

**PDX-8.18** [1] - 913:25

**PDX-8.2** [1] - 899:3

**PDX-8.21** [1] - 915:25

**PDX-8.28** [1] - 920:17

**PDX-8.29** [1] - 923:9

**PDX-8.9** [1] - 906:6

**PDX-9** [1] - 950:7

**peak** [3] - 688:9, 847:23, 987:9

**peer** [1] - 928:2

**peer-reviewed** [1] - 928:2

**pending** [2] - 782:20, 786:5

**People** [1] - 850:17

**people** [55] - 676:15, 681:23, 683:6, 693:3, 693:4, 693:7, 694:21, 699:11, 704:8, 707:15, 708:23, 710:25, 723:5, 736:21, 742:15, 798:3, 799:11, 809:5, 829:20, 836:19, 838:2, 838:7, 840:24, 846:17, 846:21, 854:19, 854:20, 858:16, 867:18, 874:3, 891:13, 896:22, 897:1, 897:14, 902:12, 905:2, 906:25, 908:23, 914:16, 918:9, 919:19, 924:4, 927:9, 929:12,

930:9, 930:14, 932:15, 934:2, 935:10, 937:7, 940:18, 955:8, 991:21, 992:13, 993:7

**per** [8] - 855:18, 855:21, 873:13, 873:23, 875:4, 875:9, 921:14, 995:2

**percent** [3] - 830:16, 846:9, 846:13, 846:16, 867:2, 870:8, 877:2, 893:7, 967:12, 967:13, 968:1, 972:23, 983:7, 993:5, 994:22, 995:2, 995:15, 995:17, 996:1, 996:7, 996:8, 996:14, 997:10, 997:13, 999:21, 999:22, 999:24, 1000:1, 1000:2, 1000:5, 1000:10, 1000:14, 1000:15, 1000:19, 1000:25

**perception** [2] - 809:5, 821:7

**percolating** [1] - 672:20

**perfect** [1] - 757:9

**performed** [2] - 926:22, 985:13

**perhaps** [8] - 674:10, 842:12, 845:13, 853:20, 867:9, 992:7, 997:8, 997:22

**period** [26] - 754:3, 776:2, 789:1, 797:6, 802:3, 802:11, 802:17, 802:22, 802:23, 803:4, 804:22, 838:7, 852:22, 855:24, 880:20, 892:9, 892:22, 893:1, 908:24, 909:2, 909:19, 916:10, 921:13, 921:23, 922:10, 922:18

**periodicity** [2] - 706:7, 706:9

**periods** [1] - 922:9

**perm** [1] - 835:23

**permission** [1] - 783:1

**permit** [1] - 790:14

**Perni** [24] - 674:8, 690:19, 691:12, 696:16, 940:18,

943:11, 944:2, 946:21, 947:3, 948:21, 948:23, 948:25, 949:13, 949:14, 950:13, 952:10, 956:7, 956:10, 973:1, 976:15, 977:16, 978:14, 978:18, 979:6

**Perni's** [18] - 941:1, 941:21, 948:20, 950:15, 953:1, 954:11, 954:14, 954:18, 954:21, 955:4, 955:12, 955:15, 956:1, 956:4, 957:22, 976:12, 978:12, 979:11

**person** [58] - 676:14, 699:23, 705:10, 705:17, 705:20, 722:21, 729:4, 736:16, 736:23, 748:13, 749:18, 749:22, 801:3, 802:5, 802:8, 802:9, 802:21, 809:23, 809:24, 810:23, 811:8, 811:13, 813:14, 814:9, 833:10, 840:10, 852:2, 852:21, 853:19, 879:5, 883:5, 885:25, 896:21, 897:9, 901:13, 904:10, 905:9, 905:14, 906:20, 914:24, 921:11, 922:17, 924:6, 950:16, 953:24, 954:3, 954:5, 954:8, 954:11, 954:15, 954:21, 954:25, 955:11, 955:25, 958:22, 977:21, 988:11, 992:11

**person's** [1] - 915:4

**persons** [2] - 753:12, 927:20

**Perumal** [2] - 820:17, 820:19

**pharma** [1] - 701:15

**pharma-psychiatry** [1] - 701:15

**Pharmaceutical** [1] - 727:6

**pharmaceutical** [3] -

683:23, 991:7, 993:3

**PHARMACEUTICAL S** [2] - 1:5, 1:7

**Pharmaceuticals** [5] - 671:6, 671:13, 751:24, 980:16

**pharmacokinetics** [3] - 726:2, 820:10, 857:6

**pharmacologist** [1] - 822:6

**pharmacology** [1] - 704:16

**phase** [97] - 709:9, 709:15, 713:16, 713:21, 718:15, 718:19, 722:8, 728:21, 729:1, 729:12, 730:17, 743:15, 789:10, 803:25, 804:1, 810:13, 812:5, 813:24, 814:23, 835:1, 835:23, 837:9, 837:14, 837:24, 838:4, 838:8, 841:4, 841:15, 842:5, 842:22, 843:2, 843:5, 843:6, 844:12, 850:17, 850:18, 850:24, 851:3, 851:4, 851:7, 851:8, 851:11, 852:3, 853:25, 854:1, 858:10, 862:23, 864:10, 870:11, 870:17, 871:10, 871:17, 874:22, 875:7, 875:8, 875:16, 876:16, 877:4, 877:5, 883:12, 883:14, 883:17, 883:19, 883:21, 884:19, 885:16, 885:19, 885:22, 899:9, 902:24, 903:2, 904:23, 905:6, 905:10, 906:20, 912:6, 912:22, 913:3, 913:18, 914:6, 914:15, 916:5, 916:24, 920:21, 921:6, 921:9, 922:7, 922:25, 923:1, 924:13, 927:18, 932:7, 932:13, 933:5

**Phase** [29] - 728:19,

731:10, 736:9, 739:14, 739:16, 770:11, 773:2, 779:9, 783:22, 788:23, 793:5, 796:25, 799:5, 799:6, 799:10, 799:13, 806:18, 811:6, 811:11, 811:16, 815:13, 878:3, 878:18, 878:24, 885:3, 885:12, 961:17

**phase-advancing** [1] - 927:18

**phase-resetting** [1] - 803:25

**phased** [1] - 851:25

**PhD** [6] - 896:11, 896:12, 896:14, 904:1, 925:2, 955:1

**phenomenon** [1] - 890:4

**phosgene** [1] - 951:19

**phrase** [9] - 802:2, 802:6, 802:13, 802:20, 803:2, 803:3, 831:5, 877:6, 912:9

**Phrase** [1] - 809:4

**physician** [1] - 701:18

**physicians** [1] - 835:18

**Physicians** [1] - 702:5

**physiological** [4] - 706:5, 858:7, 925:24, 926:10

**physiology** [6] - 700:18, 702:9, 702:13, 702:25, 703:10, 887:18

**pick** [3] - 807:5, 865:12, 887:4

**PICKARD** [1] - 671:4

**piece** [5] - 678:17, 681:8, 692:14, 887:9, 944:6

**pieced** [1] - 991:3

**pieces** [3] - 879:7, 940:10, 971:3

**pineal** [1] - 867:21

**place** [1] - 869:25

**placebo** [9] - 788:25, 789:2, 804:24, 817:1, 855:17, 870:9, 871:16, 884:20, 927:3

**Placebo** [2] - 778:18, 789:19

**places** [3] - 808:3,

970:21, 978:15
**plain** [1] - 802:20
**plainly** [2] - 769:3, 785:18
**Plaintiff** [1] - 1:5
**plaintiff** [1] - 894:17
**plaintiff's** [3] - 681:10, 737:11, 756:21
**Plaintiff's** [2] - 850:5, 850:8
**plaintiffs** [5] - 681:1, 711:12, 756:12, 777:2, 947:22
**plan** [3] - 788:24, 1003:9, 1003:10
**planes** [1] - 866:4
**planet** [1] - 898:8
**planning** [2] - 677:25, 848:17
**Platt** [6] - 677:2, 684:1, 685:7, 685:10, 686:1, 688:8
**play** [3] - 858:6, 858:10, 897:17
**players** [1] - 866:3
**plays** [2] - 772:19, 858:11
**plot** [1] - 912:20
**plotted** [2] - 836:19, 912:23
**plus** [2] - 773:19, 804:25
**point** [81] - 676:23, 677:24, 678:1, 680:10, 680:19, 681:4, 685:1, 685:4, 689:14, 692:5, 695:7, 696:11, 696:18, 698:13, 712:13, 722:10, 737:15, 744:2, 748:3, 748:8, 751:13, 751:22, 754:4, 754:9, 756:11, 757:20, 760:22, 761:3, 762:1, 762:11, 766:1, 766:6, 767:1, 768:17, 769:15, 770:16, 772:24, 773:12, 809:4, 810:11, 810:16, 831:13, 841:15, 843:2, 844:13, 844:20, 845:9, 845:15, 850:4, 854:4, 856:25, 860:9, 860:21, 863:9, 867:10, 867:17, 867:24,

874:17, 882:17, 899:23, 899:25, 912:24, 917:19, 939:23, 944:11, 944:13, 944:15, 944:16, 947:1, 947:24, 954:24, 960:25, 961:10, 966:5, 977:21, 978:24, 987:12, 997:15, 1001:23
**pointed** [2] - 695:13, 757:22, 776:9, 812:6, 884:5
**pointer** [1] - 912:25
**pointing** [4] - 746:23, 855:23, 884:2, 961:4
**points** [11] - 710:17, 755:23, 803:24, 806:19, 806:25, 808:1, 809:6, 814:12, 954:20, 978:25
**poison** [1] - 683:13
**polymeropoulos** [1] - 891:14
**Polymeropoulos** [1] - 825:5
**population** [1] - 922:1
**portion** [8] - 766:3, 803:1, 809:14, 812:10, 823:24, 842:17, 966:23, 967:4
**portions** [1] - 805:15
**Portland** [1] - 701:14
**POSA** [1] - 879:10
**posited** [1] - 848:23
**positing** [1] - 853:10
**position** [7] - 710:21, 710:22, 773:7, 785:5, 815:11, 817:22, 943:20
**positions** [1] - 701:12
**positive** [3] - 740:10, 843:14, 845:13
**possession** [1] - 824:15
**possible** [13] - 683:21, 688:14, 807:6, 826:5, 834:19, 834:23, 842:3, 852:3, 852:4, 854:5, 892:20, 987:7, 987:12
**possibly** [4] - 691:17, 692:6, 932:9, 969:22
**post** [3] - 672:12, 772:5, 772:11
**post-2015** [1] - 758:3

**post-trial** [2] - 772:5, 772:11
**posted** [22] - 733:9, 740:25, 742:20, 745:14, 745:15, 745:23, 747:10, 747:13, 752:2, 754:11, 755:16, 761:18, 767:22, 775:5, 775:6, 780:25, 782:9, 782:14, 791:11, 792:20, 794:2, 795:11
**posters** [7] - 934:22, 935:1, 936:7, 936:11, 936:12, 936:14, 936:19
**posting** [3] - 759:8, 770:4, 780:6
**posttrial** [2] - 691:21, 751:7
**potential** [7] - 799:17, 915:11, 951:18, 968:21, 979:20
**potentially** [4] - 683:24, 854:1, 914:4, 978:4
**PowerPoint** [1] - 935:2
**practice** [5] - 703:12, 723:2, 723:18, 817:18, 850:2
**Practice** [1] - 918:20
**Prasad** [1] - 958:12
**PRC** [6] - 842:18, 853:17, 912:9, 913:19, 914:6, 916:24
**PRCs** [1] - 836:2
**preamble** [3] - 816:5, 817:12, 817:24
**precedence** [1] - 796:2
**precise** [2] - 857:19, 867:13
**precisely** [5] - 723:10, 748:2, 798:3, 843:13, 905:13
**Preclinical** [1] - 959:13
**preclinical** [2] - 863:10, 959:23
**predicate** [2] - 737:3, 742:11
**predict** [2] - 921:10, 921:22
**predictions** [1] - 922:6
**preeminent** [1] - 896:20

**prefer** [1] - 941:12
**preferable** [2] - 848:24, 907:14
**preference** [1] - 939:20
**preferred** [1] - 927:4
**prejudicial** [3] - 785:2, 785:21, 788:4
**preliminaries** [1] - 703:25
**preliminary** [1] - 959:19
**premised** [1] - 751:14
**preparation** [1] - 976:7
**prepare** [8] - 950:4, 950:19, 965:24, 967:17, 970:2, 973:3, 976:24, 977:24
**prepared** [14] - 701:3, 703:21, 705:13, 707:2, 711:24, 898:24, 899:11, 909:18, 912:12, 913:9, 920:14, 923:5, 923:22, 1003:6
**prescribe** [1] - 925:6
**prescribing** [1] - 817:19
**presence** [4] - 962:23, 983:17, 986:17, 987:7
**present** [9] - 762:14, 817:13, 841:2, 843:1, 926:7, 930:7, 974:23, 981:14, 985:12
**presentation** [1] - 912:17
**presented** [4] - 686:11, 746:15, 936:13, 981:8
**presenting** [1] - 894:18
**presents** [1] - 912:19
**preserved** [1] - 957:1
**pressed** [2] - 738:1, 741:7
**prestigious** [1] - 888:2
**presumably** [6] - 679:13, 681:17, 746:19, 875:11, 875:18, 932:8
**presume** [1] - 679:23
**presumed** [1] - 707:16
**pretrial** [12] - 719:11, 734:23, 743:15, 758:5, 758:20,

759:2, 759:22, 775:17, 775:18, 775:22, 796:16, 894:7
**pretty** [7] - 688:5, 742:14, 752:5, 774:10, 837:15, 843:16, 960:19
**prevalence** [1] - 830:14
**prevent** [1] - 686:5
**preview** [1] - 712:5
**previous** [6] - 786:19, 810:21, 907:3, 930:13, 962:6, 989:17
**previously** [4] - 834:7, 958:4, 974:20, 993:8
**primary** [2] - 789:2, 880:1
**principal** [2] - 897:21, 900:7
**principle** [1] - 773:23
**print** [2] - 757:5, 763:1
**printed** [1] - 766:4
**printout** [3] - 738:20, 755:24, 763:2
**priority** [17] - 674:15, 675:23, 676:13, 687:18, 691:14, 694:25, 741:1, 762:3, 764:2, 764:6, 764:7, 766:17, 795:12, 910:13, 916:11, 917:10, 919:1
**private** [3] - 735:10, 735:13, 888:21
**probative** [2] - 767:8, 797:17
**problem** [11] - 678:2, 686:15, 686:21, 686:22, 687:7, 692:10, 745:17, 753:3, 769:2, 948:1, 993:9
**procedure** [2] - 679:20, 692:8
**procedures** [1] - 985:6
**proceed** [1] - 778:1
**proceeding** [2] - 1003:22, 1004:1
**proceedings** [1] - 800:5
**proceeds** [1] - 740:7
**Process** [1] - 961:16
**process** [59] - 674:11, 675:9, 675:14, 675:24, 676:12, 676:14, 676:25,

679:8, 680:5, 680:7, 682:11, 683:12, 683:15, 683:19, 684:25, 688:24, 689:25, 690:6, 691:13, 692:5, 692:21, 693:4, 693:6, 694:4, 695:12, 697:17, 697:23, 698:7, 698:11, 698:17, 699:2, 699:4, 699:5, 745:10, 918:12, 938:13, 939:21, 940:3, 940:8, 940:10, 940:12, 940:21, 945:20, 947:25, 951:1, 951:17, 953:13, 953:20, 958:18, 963:9, 965:2, 966:11, 983:9, 983:17, 983:23, 1001:12, 1001:24, 1002:4

**processes** [1] - 964:12

**produce** [6] - 851:15, 851:25, 852:3, 867:11, 869:10, 961:23

**produced** [5] - 680:6, 683:24, 688:7, 760:6, 832:8

**producing** [2] - 842:22, 869:11

**product** [14] - 687:11, 688:4, 693:7, 693:13, 968:23, 970:19, 974:23, 976:23, 987:16, 995:12, 995:15, 995:23, 996:3, 1000:13

**production** [2] - 868:5, 965:1

**products** [1] - 991:7

**profer** [1] - 940:19

**professional** [1] - 702:1

**Professor** [1] - 900:8

**professor** [1] - 701:15

**proffer** [1] - 678:24

**proffering** [2] - 766:11

**program** [1] - 887:8

**progressive** [2] - 708:10, 908:12

**promote** [1] - 937:21

**promotion** [1] - 858:11

**prompted** [1] - 691:23

**prone** [1] - 990:13

**proof** [4] - 711:9, 711:17, 733:2, 750:9

**proofs** [1] - 764:15

**propensity** [3] - 706:15, 708:6, 708:11

**proper** [5] - 844:2, 844:11, 914:12, 914:15

**properly** [1] - 750:5

**properties** [2] - 848:14, 891:24

**Properties** [1] - 863:7

**property** [1] - 795:19

**propionyl** [3] - 962:22, 963:21, 963:23

**propionylated** [1] - 1001:16

**propionylating** [8] - 951:15, 952:2, 952:4, 956:17, 957:7, 960:1, 962:19, 963:17

**proponent** [2] - 748:12, 763:8

**proposal** [1] - 972:5

**proposals** [1] - 972:3

**propose** [1] - 848:7

**proposed** [6] - 853:12, 912:3, 970:3, 970:12, 972:2, 990:24

**proposes** [1] - 746:1

**proposing** [1] - 689:15

**proposition** [1] - 795:14

**propylinating** [1] - 942:12

**prosecution** [1] - 704:3

**protocol** [42] - 739:16, 739:19, 740:14, 740:16, 740:17, 740:19, 740:21, 740:23, 744:18, 746:21, 747:3, 747:17, 756:9, 756:10, 758:2, 762:2, 766:14, 766:15, 766:25, 767:22, 767:25, 770:9, 770:10, 770:12, 773:1, 773:13, 778:11, 780:15, 782:9, 787:10, 790:18, 790:22, 792:19,

795:11, 795:15, 797:1, 797:3, 815:13, 816:20, 817:4, 817:6

**protocols** [2] - 740:6, 740:7

**prove** [6] - 745:8, 760:20, 761:1, 764:16, 764:25, 769:10

**proven** [5] - 733:1, 760:17, 776:15, 803:25, 932:10

**proves** [1] - 949:21

**provide** [8] - 796:3, 935:20, 937:3, 949:7, 954:20, 978:6, 979:10, 979:22

**provided** [3] - 677:16, 978:10, 981:14

**providers** [1] - 888:7

**provides** [4] - 833:9, 924:1, 976:22, 976:25

**proving** [1] - 732:13

**provision** [1] - 705:3

**psychiatric** [1] - 701:24

**Psychiatric** [2] - 702:4, 702:5

**psychiatry** [1] - 701:15

**PTAB** [1] - 753:11

**PTX** [1] - 941:5

**PTX-005** [1] - 829:6

**PTX-098** [1] - 967:17

**PTX-153** [4] - 980:11, 980:21, 980:25, 981:2

**PTX-283** [4] - 849:16, 902:8, 902:13, 902:16

**PTX-299** [4] - 965:9, 965:19, 965:22, 965:25

**PTX-490** [3] - 900:15, 901:5, 901:8

**PTX-496** [1] - 900:14

**PTX-5** [2] - 830:5, 830:8

**PTX-793** [1] - 941:1

**PTX-8.7** [1] - 904:16

**PTX-811** [1] - 968:15

**PTX-816** [3] - 728:8, 864:21, 884:12

**PTX-829** [3] - 973:25, 974:4, 975:2

**PTX-830** [4] - 973:16, 974:7, 975:11,

975:15

**public** [39] - 673:2, 674:15, 675:25, 676:5, 676:12, 678:4, 680:8, 682:12, 691:13, 691:14, 692:5, 692:8, 692:9, 692:12, 692:22, 692:23, 693:17, 695:8, 695:14, 695:24, 696:16, 699:14, 699:15, 733:10, 737:22, 751:22, 752:1, 752:18, 752:23, 756:1, 758:13, 759:6, 759:7, 761:15, 761:21, 785:10, 789:13, 943:10, 946:25

**publically** [24] - 674:11, 674:12, 678:18, 689:8, 694:9, 694:20, 694:24, 734:1, 743:17, 751:15, 754:7, 754:12, 773:13, 788:24, 795:2, 881:12, 946:21, 948:3, 951:4, 952:1, 956:8, 956:15, 957:5, 972:12

**publication** [29] - 681:17, 715:24, 731:22, 732:9, 737:18, 766:5, 779:3, 779:5, 807:23, 809:1, 810:5, 814:5, 818:25, 819:2, 820:1, 820:3, 827:5, 833:1, 833:4, 849:20, 849:23, 850:16, 928:2, 928:4, 938:12, 946:9, 947:25, 957:11, 957:17

**Publication** [30] - 727:10, 727:16, 727:23, 728:5, 800:16, 800:17, 803:12, 803:16, 805:6, 805:15, 805:23, 806:5, 806:15, 806:23, 808:10, 810:8, 811:4, 813:11, 813:22, 814:7, 820:17, 820:18,

822:12, 822:13, 823:25, 824:4, 824:5, 827:1, 882:21, 883:1

**publications** [3] - 778:23, 839:6, 848:4

**published** [47] - 676:1, 676:14, 703:6, 703:9, 714:16, 715:16, 719:14, 725:21, 727:7, 731:24, 734:11, 734:16, 746:3, 746:20, 752:18, 752:22, 753:9, 754:10, 754:15, 754:19, 754:24, 779:7, 785:9, 789:13, 793:6, 835:4, 835:6, 837:21, 845:7, 852:18, 855:3, 860:4, 862:14, 864:13, 865:4, 865:7, 878:13, 888:11, 893:21, 927:24, 947:10, 947:13, 956:12, 959:7, 1000:8

**pull** [16] - 744:23, 745:21, 745:22, 783:6, 826:3, 837:3, 837:17, 844:17, 850:20, 882:12, 884:12, 925:13, 981:23, 986:3, 990:20, 999:11

**pulled** [9] - 741:17, 749:9, 752:7, 752:8, 752:10, 753:20, 768:14

**pulling** [2] - 912:15, 923:9

**punt** [1] - 948:15

**pure** [10] - 680:6, 688:1, 688:25, 978:20, 997:20, 997:22, 999:24, 1000:1, 1000:2, 1000:14

**purified** [3] - 978:16, 998:7, 998:8

**purify** [3] - 977:13, 997:11, 997:12

**purity** [12] - 680:7, 681:22, 978:15, 978:19, 978:21, 979:4, 999:21, 1000:10, 1000:19, 1000:21, 1000:24

**purple** [4] - 809:13, 817:9, 818:18, 821:7
**purported** [2] - 771:17, 894:12
**purporting** [1] - 755:17
**purpose** [7] - 674:14, 686:4, 732:2, 766:19, 774:21, 798:3, 835:14
**purposes** [3] - 696:2, 765:10, 916:13
**pursuing** [1] - 740:4
**push** [3] - 741:13, 837:3, 837:17
**pushed** [1] - 851:5
**put** [46] - 673:13, 686:13, 688:16, 733:3, 743:14, 745:11, 761:8, 770:23, 770:25, 775:4, 775:10, 777:9, 790:12, 809:22, 815:23, 829:4, 830:9, 836:22, 850:11, 852:13, 860:1, 864:25, 865:16, 870:22, 872:14, 876:21, 876:24, 880:9, 886:11, 886:12, 893:15, 900:11, 917:13, 945:1, 947:3, 958:9, 966:17, 967:22, 968:18, 974:6, 975:18, 976:11, 981:2, 986:24, 988:24, 998:20
**putting** [4] - 686:6, 844:21, 895:19, 987:10

**Q**

**Q3A** [3] - 944:24, 953:6, 973:8
**QC** [1] - 780:4
**qualification** [6] - 853:22, 995:19, 995:22, 996:3, 996:12, 997:16
**qualifications** [2] - 700:15, 705:14
**qualified** [1] - 898:19
**qualifies** [3] - 734:25, 737:11, 765:5
**qualify** [5] - 705:20, 754:13, 764:13, 766:8, 795:3

**qualifying** [1] - 993:20
**quantitate** [2] - 982:19, 982:22
**quantities** [2] - 961:24, 996:24
**quantity** [2] - 991:17, 993:4
**questioned** [1] - 749:2
**questioning** [1] - 947:2
**questions** [12] - 672:14, 733:10, 790:12, 793:25, 796:12, 861:4, 882:9, 884:3, 886:9, 900:1, 937:22, 984:3
**queue** [1] - 914:14
**quick** [1] - 701:8
**quickly** [3] - 716:5, 745:12, 874:9
**quite** [15] - 692:17, 693:16, 712:7, 724:21, 745:12, 814:12, 833:25, 835:4, 854:5, 859:11, 898:6, 973:8, 979:2, 979:4, 996:18
**quote** [4] - 761:14, 793:2, 952:9, 952:10
**quotes** [1] - 789:18
**quoting** [1] - 766:2

**R**

**raised** [3] - 694:16, 861:3, 938:14
**raises** [2] - 757:18, 861:3
**Rajarantnam** [9] - 728:13, 728:24, 730:12, 799:3, 799:6, 799:8, 860:8, 885:13, 885:22
**Rajarantnam's** [1] - 885:10
**Rajaratnam** [9] - 728:18, 864:13, 864:22, 865:16, 866:15, 870:4, 883:11, 884:9
**ramelteon** [6] - 861:23, 862:19, 862:22, 864:1, 864:8, 874:18
**range** [12] - 723:11, 807:2, 812:19, 853:23, 873:13, 876:18, 896:22, 898:6, 919:25,

923:13, 923:15, 936:15
**ranging** [1] - 739:4
**rapidly** [1] - 875:8
**rather** [7] - 691:19, 691:21, 738:10, 759:25, 853:20, 995:23, 997:16
**rats** [5] - 838:24, 840:11, 863:11, 864:1, 864:4
**re** [6] - 695:18, 831:9, 864:2, 864:7, 929:10
**RE** [1] - 704:22
**re-entrainment** [2] - 864:2, 864:7
**re-examined** [1] - 929:10
**re-re** [1] - 695:18
**RE604** [21] - 772:21, 800:10, 800:14, 801:17, 809:20, 816:12, 816:16, 817:10, 819:7, 819:16, 820:22, 821:3, 821:12, 821:20, 821:22, 822:15, 822:21, 822:23, 823:4, 827:5, 827:12
**reach** [3] - 841:3, 843:2, 965:1
**reached** [1] - 800:4
**react** [1] - 675:12
**reacted** [2] - 1001:19, 1001:20
**reacting** [14] - 680:25, 942:18, 943:12, 943:15, 944:7, 947:15, 947:17, 947:21, 952:11, 952:14, 956:9, 956:16, 957:6, 972:11
**reaction** [7] - 756:24, 831:10, 959:23, 960:9, 960:17, 962:19, 963:18
**reactions** [1] - 942:25
**read** [23] - 680:25, 681:1, 710:13, 758:23, 762:15, 778:15, 784:4, 784:16, 786:6, 786:12, 788:7, 795:20, 833:13, 891:1, 928:19, 928:23, 943:5, 943:7, 943:9, 947:21, 985:14,

988:19, 994:18
**reading** [14] - 725:3, 728:4, 758:22, 781:20, 804:5, 806:3, 806:10, 806:21, 808:8, 809:8, 817:3, 988:11, 989:7, 1001:11
**reads** [3] - 680:22, 681:5, 788:22
**ready** [2] - 672:14, 777:18
**real** [4] - 742:12, 771:16, 785:22, 894:9
**realize** [1] - 946:8
**really** [49] - 679:5, 679:6, 679:25, 708:22, 712:8, 715:25, 717:22, 726:7, 729:16, 732:2, 738:5, 738:17, 743:6, 750:14, 754:17, 755:21, 755:25, 757:1, 757:19, 771:25, 772:16, 797:25, 810:18, 810:25, 822:5, 826:12, 827:22, 835:15, 838:6, 885:16, 890:21, 891:12, 899:25, 900:2, 905:17, 907:5, 951:17, 955:9, 955:20, 966:11, 971:23, 972:8, 974:21, 976:5, 977:18, 978:6, 979:4, 985:23, 986:2
**realm** [1] - 756:1
**reason** [27] - 675:21, 678:20, 680:4, 681:8, 684:8, 691:4, 692:13, 697:10, 746:19, 750:7, 753:15, 753:22, 756:20, 761:6, 768:6, 772:23, 773:25, 775:22, 796:20, 807:5, 833:6, 841:1, 865:23, 866:1, 907:18, 907:22, 983:2
**reasonable** [16] - 742:15, 801:14, 810:23, 811:14,

814:9, 878:17, 878:19, 878:25, 879:3, 879:6, 879:10, 879:13, 953:15, 953:22, 978:8, 979:24
**reasonably** [2] - 749:2, 771:9
**reasons** [7] - 735:15, 813:19, 819:15, 821:19, 899:19, 912:2, 918:9
**reboot** [1] - 1003:20
**rebuttal** [4] - 679:13, 689:19, 711:14, 895:15
**rebutting** [1] - 938:2
**recap** [1] - 707:14
**receipt** [1] - 770:6
**received** [2] - 692:20, 896:10
**receiving** [1] - 808:23
**recent** [5] - 763:16, 764:8, 929:10, 932:13, 933:17
**recently** [6] - 782:24, 784:3, 787:2, 787:9, 849:21
**receptor** [6] - 812:4, 831:10, 831:12, 860:23, 863:24, 873:20
**receptors** [18] - 710:3, 722:5, 726:8, 727:17, 799:20, 810:10, 857:10, 857:13, 857:14, 857:15, 857:16, 857:18, 857:20, 858:1, 858:10, 858:23, 932:8
**recess** [3] - 776:23, 828:14, 895:12
**recited** [2] - 682:12, 922:9
**recognize** [28] - 683:4, 712:25, 714:2, 715:2, 716:8, 716:16, 716:22, 717:3, 719:2, 720:6, 721:10, 724:15, 725:8, 726:15, 728:10, 729:23, 731:4, 778:8, 798:11, 910:22, 917:16, 920:9, 957:16, 965:11, 973:17, 975:3, 980:12, 994:5
**recognized** [2] -

752:1, 993:17
**recollection** [2] -
771:21, 775:19
**recommend** [1] -
945:19
**recommendation** [2] -
909:10, 920:3
**recommendations** [2]
- 919:24, 981:14
**recommended** [4] -
723:4, 723:6,
829:20, 874:18
**record** [35] - 687:17,
687:25, 688:1,
691:22, 736:21,
738:19, 739:1,
744:17, 762:16,
765:15, 771:23,
774:25, 783:20,
784:5, 786:13,
786:15, 786:16,
787:19, 787:21,
788:22, 794:24,
797:17, 798:7,
804:4, 805:14,
807:10, 816:18,
818:7, 893:19,
934:12, 939:16,
948:17, 951:11,
958:24, 1000:8
**records** [1] - 762:24
**Records** [4] - 784:11,
784:17, 786:6,
786:12
**recross** [1] - 695:18
**recruiting** [3] -
746:25, 757:23,
770:5
**Red** [1] - 962:11
**red** [1] - 871:25
**Red-AI** [1] - 962:11
**redirect** [13] - 674:12,
690:20, 690:22,
691:15, 695:9,
699:8, 699:18,
882:10, 935:24,
946:23, 949:9,
949:15, 956:11
**REDIRECT** [2] -
882:18, 936:1
**reduce** [5] - 848:8,
907:15, 914:7,
931:16, 997:13
**reduced** [5] - 718:5,
962:17, 1001:16,
1001:19, 1001:20
**reducing** [12] - 912:7,
942:11, 951:14,
952:2, 954:1,
956:17, 957:7,

960:11, 960:12,
962:7, 963:17, 964:1
**reduction** [3] - 680:23,
690:6, 960:14
**refer** [6] - 846:15,
865:13, 866:6,
890:23, 916:18,
957:18
**Reference** [5] -
932:20, 932:23,
933:8, 933:12
**reference** [39] -
673:14, 673:16,
673:25, 674:18,
690:22, 695:12,
697:17, 712:20,
713:24, 714:23,
724:11, 761:16,
761:17, 781:7,
794:15, 799:14,
801:11, 814:4,
816:8, 817:25,
855:23, 879:19,
905:24, 931:23,
931:24, 949:18,
957:18, 957:19,
957:21, 957:24,
958:11, 971:5,
971:17, 976:16,
976:17, 982:8,
998:22, 999:24,
1000:20
**referenced** [3] -
815:13, 818:8, 965:5
**references** [23] -
746:2, 800:16,
801:13, 803:13,
805:21, 808:25,
809:25, 810:20,
810:22, 811:21,
813:15, 814:3,
814:8, 819:13,
819:24, 854:15,
872:9, 877:22,
905:23, 972:25,
973:6, 973:13,
974:12
**References** [3] -
746:11, 792:11,
792:15
**referral** [1] - 797:19
**referred** [5] - 708:14,
802:9, 868:24,
904:13, 906:22
**referring** [10] - 788:15,
788:16, 788:19,
864:12, 901:2,
919:12, 929:5,
960:6, 970:24,
988:12

**refers** [8] - 720:24,
725:23, 850:21,
854:23, 868:2,
877:6, 880:20,
916:23
**refining** [1] - 717:22
**reflect** [2] - 738:22,
770:5
**reflected** [1] - 766:25
**reflecting** [1] - 739:13
**reflection** [1] - 748:20
**reflects** [5] - 748:4,
749:5, 767:5, 790:8,
795:16
**reflex** [1] - 892:6
**regard** [8] - 704:15,
730:23, 945:2,
972:22, 973:12,
979:11, 979:15,
981:25
**regarding** [9] -
704:10, 761:13,
800:13, 807:24,
820:4, 922:24,
948:23, 976:12,
980:16
**regardless** [2] - 996:3,
996:14
**regards** [1] - 722:16
**regime** [1] - 918:7
**Register** [3] - 752:22,
753:10, 753:13
**regulating** [2] - 805:8,
805:9
**regulations** [1] - 747:5
**regulatory** [4] -
695:13, 699:14,
955:19, 993:13
**reiterate** [1] - 813:20
**rejected** [2] - 974:10,
975:21
**rejection** [1] - 975:22
**relapse** [1] - 806:7
**relate** [1] - 921:25
**related** [6] - 888:13,
954:7, 955:1,
982:13, 984:25
**relates** [2] - 704:19,
881:3
**relating** [1] - 866:2
**relation** [1] - 870:7
**relationship** [5] -
681:10, 789:10,
862:6, 922:24
**relative** [9] - 807:19,
837:4, 844:3, 859:1,
860:22, 867:18,
971:10, 978:25,
979:2
**relatively** [4] - 723:11,

847:5, 953:18,
978:25
**release** [3] - 869:16,
873:25, 874:12
**relevance** [5] - 673:19,
751:14, 751:18,
771:21, 795:1
**relevant** [11] - 674:2,
692:21, 704:3,
737:3, 740:11,
750:24, 752:13,
754:6, 800:9,
857:16, 955:19
**reliable** [3] - 925:24,
926:10, 990:12
**relied** [12] - 673:16,
704:18, 756:14,
765:13, 765:22,
785:24, 790:22,
820:9, 820:11,
822:5, 823:12, 973:1
**rely** [26] - 704:9,
704:14, 713:5,
714:7, 715:7, 717:8,
719:6, 720:11,
721:15, 723:20,
724:19, 725:12,
726:21, 728:15,
730:3, 766:23,
769:3, 796:25,
798:15, 819:22,
820:6, 822:2,
854:15, 876:7,
877:22, 881:17
**relying** [6] - 740:22,
746:1, 765:7, 765:8,
765:9, 765:11
**REM** [1] - 858:11
**remain** [5] - 736:25,
777:23, 806:1,
892:2, 949:23
**remained** [1] - 913:21
**remaining** [2] -
817:23, 904:24
**remains** [2] - 841:2,
917:23
**remember** [13] -
673:8, 674:8,
684:22, 687:4,
695:4, 699:9,
738:13, 759:24,
794:3, 827:3,
891:15, 900:14,
917:5
**reminds** [1] - 870:14
**remove** [3] - 697:1,
764:24, 977:18
**removed** [2] - 688:23,
999:20
**rendering** [5] -

957:24, 965:17,
973:22, 975:8,
980:19
**renew** [3] - 787:23,
787:25, 948:17
**repeatedly** [1] -
785:19
**repeating** [1] - 772:6
**reply** [3] - 711:10,
711:16, 936:22
**report** [56] - 678:1,
678:22, 697:4,
697:8, 697:18,
697:23, 697:25,
698:2, 698:6,
698:14, 698:15,
733:15, 733:20,
733:22, 734:3,
736:1, 736:7, 742:5,
758:5, 759:16,
775:17, 781:14,
781:21, 785:1,
785:6, 785:7,
785:23, 786:4,
788:3, 788:5, 788:7,
788:16, 820:9,
820:11, 822:5,
851:15, 902:21,
930:13, 938:8,
939:6, 939:7,
939:22, 940:23,
940:24, 941:1,
941:5, 941:18,
941:19, 942:15,
942:17, 945:14,
961:11, 964:16,
966:22
**reported** [7] - 683:19,
848:4, 864:4, 870:6,
900:4, 979:1, 987:5
**Reporter** [1] - 895:9
**reporter** [2] - 896:16,
998:13
**REPORTER'S** [1] -
672:3
**reporting** [5] - 867:1,
870:15, 936:14,
993:21, 994:19
**reports** [14] - 674:17,
679:2, 681:18,
699:21, 704:5,
710:14, 734:4,
735:22, 765:13,
862:22, 914:21,
938:17, 938:19,
957:22
**represent** [3] - 707:6,
707:7, 707:9
**representation** [1] -
757:9

**represented** [2] - 737:11, 772:7
**representing** [2] - 708:12, 916:1
**represents** [3] - 769:3, 801:22, 939:21
**reprocessing** [1] - 890:3
**require** [3] - 679:19, 790:7, 824:21
**required** [4] - 706:20, 747:4, 759:6, 759:8
**requirement** [4] - 690:24, 824:12, 955:20, 955:21
**requirements** [2] - 680:7, 993:13
**requires** [4] - 691:19, 692:25, 820:5, 955:10
**requiring** [1] - 823:7
**Research** [2] - 702:7, 959:13
**research** [17] - 702:8, 702:13, 702:25, 703:9, 713:3, 714:5, 719:5, 728:13, 858:18, 860:22, 861:2, 896:6, 918:15, 923:17, 933:17, 933:20, 959:23
**researcher** [5] - 829:16, 839:22, 887:17, 896:6, 896:20
**researchers** [4] - 708:16, 835:18, 866:15, 870:5
**researching** [2] - 858:16, 897:14
**reset** [25] - 709:3, 709:4, 709:11, 709:19, 712:17, 713:21, 715:22, 727:18, 728:20, 746:14, 779:6, 810:12, 827:9, 827:15, 833:2, 836:12, 844:10, 846:6, 846:12, 869:15, 897:17, 897:24, 898:7, 936:17, 936:20
**resets** [1] - 836:9
**resetting** [16] - 707:23, 709:15, 709:24, 710:7, 712:14, 713:16, 803:25, 804:1,

805:10, 814:24, 833:24, 843:12, 844:13, 848:14, 870:13
**residency** [3] - 701:24, 887:3, 887:4
**residents** [1] - 701:18
**resolve** [8] - 738:9, 738:11, 771:19, 772:4, 772:5, 772:10, 772:11, 775:20
**resolved** [1] - 772:3
**resonance** [1] - 990:4
**resource** [1] - 737:22
**respect** [3] - 736:17, 736:24, 972:22
**respected** [1] - 928:4
**respectfully** [2] - 711:25, 942:24
**respond** [11] - 687:14, 711:2, 795:6, 889:19, 935:5, 939:8, 974:18, 975:25, 976:3, 982:17, 983:14
**responding** [4] - 895:5, 941:20, 975:20, 981:7
**response** [36] - 728:22, 759:10, 759:16, 833:23, 835:1, 835:7, 835:8, 835:24, 837:9, 837:14, 837:24, 841:4, 841:15, 870:7, 889:5, 889:11, 889:13, 898:25, 905:6, 912:6, 912:9, 912:23, 916:24, 921:5, 941:1, 956:10, 961:2, 973:20, 974:24, 975:6, 976:8, 980:8, 980:15, 981:4, 981:6, 982:17
**responses** [3] - 761:12, 899:10, 908:10
**responsive** [1] - 751:13
**responsivity** [1] - 889:3
**rest** [3] - 841:24, 864:2, 890:9
**result** [9] - 685:3, 707:23, 708:1, 709:14, 779:6, 843:17, 858:7,

869:24, 906:17
**resulted** [2] - 729:1, 832:17
**resulting** [4] - 817:21, 830:23, 911:23, 911:24
**results** [25] - 715:18, 739:13, 739:17, 740:6, 746:21, 756:10, 758:4, 779:9, 826:14, 827:9, 833:1, 833:4, 856:7, 856:8, 864:4, 867:1, 871:10, 885:11, 905:4, 911:14, 921:4, 925:21, 927:17, 930:7, 936:15
**resume** [1] - 1002:15
**retained** [1] - 888:20
**retention** [2] - 971:10, 986:8
**retook** [2] - 777:21, 949:22
**retrial** [1] - 759:25
**retrieve** [1] - 785:15
**revealed** [1] - 988:19
**reveals** [1] - 695:12
**reversed** [2] - 676:19, 944:19
**reversible** [4] - 889:2, 889:6, 889:10, 891:11
**reverted** [1] - 909:3
**review** [22] - 704:1, 720:9, 720:20, 720:25, 721:13, 721:24, 730:1, 730:15, 798:14, 798:24, 829:8, 835:14, 835:17, 860:4, 872:11, 930:24, 931:2, 931:4, 934:22, 934:25, 936:8, 973:11
**reviewed** [7] - 722:12, 785:9, 788:8, 789:12, 928:2, 965:16, 980:18
**reviewing** [7] - 720:21, 720:22, 721:25, 798:25, 799:1, 838:22, 860:8
**revise** [1] - 686:3
**reward** [1] - 995:10
**RFP** [1] - 759:5
**rhythm** [68] - 700:18, 702:23, 702:25, 703:7, 704:25,

706:2, 706:3, 706:4, 706:7, 706:8, 706:14, 706:16, 706:17, 706:18, 706:23, 707:15, 708:17, 708:21, 708:25, 709:6, 710:5, 712:1, 713:21, 713:23, 720:23, 722:7, 722:11, 722:13, 722:19, 724:5, 725:1, 726:11, 727:24, 728:1, 729:6, 730:18, 789:10, 799:17, 799:24, 805:12, 810:17, 811:3, 812:5, 812:8, 814:13, 815:1, 822:25, 837:3, 837:7, 839:3, 844:8, 844:9, 847:4, 847:12, 848:14, 850:20, 862:3, 862:4, 862:7, 863:11, 883:2, 897:7, 897:10, 898:20, 900:5, 909:6, 925:24, 931:15
**Rhythm** [1] - 918:21
**rhythms** [31] - 706:5, 706:11, 707:16, 708:5, 726:10, 804:11, 805:8, 805:10, 851:1, 851:4, 854:22, 862:15, 896:6, 896:21, 897:1, 897:3, 925:23, 926:24, 927:9, 927:10, 927:20, 928:15, 928:22, 929:3, 929:11, 930:9, 932:15, 934:2, 935:10, 937:7
**Rifampin** [1] - 821:24
**RIFKIND** [1] - 671:8
**right-hand** [10] - 763:22, 778:6, 840:20, 860:19, 884:14, 925:20, 926:3, 930:6, 968:6, 970:13
**rights** [2] - 687:5, 687:12
**rise** [2] - 689:4, 850:25
**rises** [1] - 898:9
**risk** [2] - 772:6, 868:16

**Robert** [3] - 702:17, 715:5, 926:15
**robust** [1] - 851:25
**role** [6] - 772:19, 858:6, 858:10, 858:11, 897:17, 897:19
**roles** [1] - 676:19
**Rolfe** [2] - 1:24, 1004:2
**room** [1] - 941:17
**rotation** [2] - 979:2, 979:3
**roughly** [2] - 869:12, 869:25
**Route** [2] - 959:14, 961:18
**route** [7] - 755:1, 959:23, 960:1, 961:7, 961:23, 995:19, 1001:15
**row** [2] - 987:24, 994:12
**rows** [1] - 994:12
**ROZENDAAL** [79] - 671:3, 672:7, 672:18, 673:3, 673:11, 673:24, 674:5, 677:24, 678:11, 679:3, 679:22, 680:18, 680:21, 681:3, 681:6, 681:13, 681:15, 687:14, 687:16, 689:11, 690:15, 691:3, 692:16, 692:20, 693:24, 694:5, 694:10, 695:6, 695:11, 698:2, 698:9, 698:18, 698:22, 699:12, 894:14, 939:4, 939:12, 939:19, 941:4, 941:12, 942:22, 945:8, 945:12, 946:15, 947:23, 948:6, 948:12, 948:16, 949:3, 949:17, 951:6, 951:9, 952:5, 952:18, 956:19, 957:2, 958:3, 958:14, 960:21, 960:24, 961:12, 964:13, 965:20, 972:14, 974:2, 975:13, 980:23, 984:11, 984:14, 998:14, 998:17,

998:19, 999:8, 999:11, 999:13, 1001:25, 1002:21, 1003:1, 1003:13
**Rozendaal** [8] - 696:23, 698:1, 773:15, 773:23, 938:14, 939:3, 939:14, 943:16
**rozendaal** [1] - 741:17
**Rozendaal's** [2] - 944:3, 944:5
**RPR** [2] - 1:24, 1004:2
**RRT** [1] - 970:4
**RRTs** [3] - 969:20, 969:21, 969:24
**rule** [3] - 750:21, 750:24, 770:19
**Rule** [5] - 678:8, 697:5, 738:5, 748:9, 749:12
**ruled** [1] - 951:11
**rules** [4] - 686:5, 742:18, 770:17, 771:2
**ruling** [2] - 948:14, 956:21
**rummaging** [2] - 688:21, 688:22
**run** [3] - 683:15, 740:8, 740:9
**running** [21] - 708:15, 804:11, 838:23, 844:2, 852:21, 854:22, 863:11, 908:15, 925:22, 926:9, 926:24, 927:10, 927:19, 928:14, 928:21, 929:3, 929:11, 930:9, 930:13, 932:15, 934:2

**S**

**S-I-N-G-H** [1] - 673:15
**S-K-E-N-E** [1] - 903:22
**Sack** [36] - 702:17, 715:5, 715:16, 715:18, 715:21, 718:7, 839:20, 839:22, 849:25, 851:14, 851:24, 886:24, 886:25, 887:7, 888:9, 897:12, 897:13, 902:1, 902:2, 902:4, 902:11, 902:20, 910:25, 916:6, 919:14, 919:23,

926:15, 927:17, 929:6, 929:7, 929:21, 930:2, 930:20, 932:23, 935:11, 937:8
**Sack's** [2] - 840:3, 891:17
**Sacks** [1] - 886:23
**safe** [1] - 941:15
**safety** [5] - 995:22, 996:3, 996:15, 996:18, 997:16
**Safety** [2] - 778:17, 789:18
**salt** [1] - 962:12
**sample** [3] - 986:24, 986:25, 987:4
**samples** [2] - 868:3, 982:25
**sandbagged** [1] - 756:18
**sat** [1] - 751:6
**satisfied** [2] - 680:7, 748:10
**satisfies** [2] - 1000:10, 1000:12
**satisfy** [2] - 749:7, 771:1
**saw** [5] - 683:2, 739:8, 764:9, 776:1, 822:22
**scale** [2] - 900:1, 917:3
**schedule** [2] - 672:11, 885:7
**scheduling** [1] - 672:9
**schematic** [2] - 707:3, 707:6
**scheme** [8] - 821:1, 959:23, 960:9, 960:17, 962:20, 963:18, 963:24, 964:2
**school** [4] - 701:23, 886:15, 886:17, 886:18
**School** [2] - 702:15, 896:4
**science** [1] - 898:20
**Science** [2] - 701:16, 701:25
**sciences** [1] - 896:11
**scientist** [1] - 857:19
**scientists** [1] - 677:12
**SCN** [1] - 932:8
**scope** [3] - 750:23, 801:3, 881:15
**score** [6] - 943:16, 943:21, 943:23, 944:10, 944:15, 944:16

**screen** [24] - 723:3, 783:2, 787:18, 790:18, 791:2, 791:20, 792:3, 792:10, 795:10, 846:4, 857:3, 872:15, 893:16, 925:14, 950:7, 958:9, 966:18, 967:22, 968:18, 968:24, 974:6, 975:18, 981:2, 994:6
**screenshot** [13] - 763:12, 765:16, 766:22, 767:5, 767:6, 767:8, 767:14, 768:25, 771:17, 771:18, 775:4, 775:6, 776:1
**screenshots** [1] - 762:23
**scroll** [6] - 783:18, 786:21, 787:7, 791:6, 791:24, 792:7
**search** [2] - 783:14, 783:17
**seat** [2] - 776:24, 777:24
**second** [32] - 687:22, 698:9, 700:9, 706:7, 709:2, 732:5, 753:4, 753:15, 753:22, 774:3, 805:18, 807:3, 811:18, 851:20, 851:21, 852:16, 897:23, 906:11, 914:9, 918:7, 918:18, 927:15, 929:1, 932:1, 951:21, 969:4, 978:12, 979:11, 980:10, 981:10, 984:23, 989:20
**second-to-last** [1] - 918:18
**second-to-the-last** [1] - 980:10
**secondary** [4] - 711:11, 789:9, 801:7, 980:4
**secrete** [1] - 867:25
**secreting** [1] - 867:22
**section** [36] - 727:9, 740:17, 741:11, 746:11, 755:8, 785:11, 788:9, 788:13, 789:15, 791:17, 791:20, 791:25, 792:2,

816:19, 817:4, 826:23, 838:12, 845:19, 847:21, 873:17, 885:1, 926:4, 926:22, 927:7, 927:14, 927:16, 930:6, 931:20, 933:2, 959:12, 961:15, 962:1, 963:2, 963:6, 974:7, 984:24
**Section** [3] - 764:22, 843:21, 961:20
**sections** [1] - 911:10
**sedative** [1] - 708:22
**sedatives** [1] - 710:6
**see** [141] - 672:13, 672:15, 673:1, 678:22, 683:15, 691:9, 694:15, 698:14, 699:22, 708:9, 725:23, 727:10, 729:9, 737:20, 740:20, 741:23, 742:9, 742:12, 743:5, 744:18, 746:15, 747:8, 748:22, 758:22, 762:18, 763:3, 763:21, 768:24, 769:24, 774:12, 778:4, 778:22, 779:2, 779:18, 779:23, 780:12, 780:19, 781:1, 781:7, 783:20, 786:8, 786:9, 786:24, 787:17, 789:6, 791:10, 792:10, 792:14, 792:17, 802:2, 808:3, 809:3, 812:3, 819:8, 821:11, 823:15, 826:25, 828:1, 839:5, 840:22, 842:19, 845:19, 846:3, 857:4, 861:10, 863:9, 864:1, 866:12, 875:5, 875:10, 883:22, 885:3, 890:8, 893:16, 898:13, 900:16, 900:17, 900:25, 902:20, 906:6, 908:14, 908:16, 909:1, 909:5, 909:22, 909:23, 912:21, 913:17,

916:7, 918:24, 919:12, 919:15, 923:11, 925:20, 926:22, 926:25, 927:21, 929:15, 929:22, 930:10, 930:15, 931:5, 931:7, 931:12, 931:17, 932:5, 932:11, 932:16, 933:6, 933:9, 933:11, 933:17, 933:18, 933:23, 934:3, 934:20, 934:23, 935:4, 935:6, 935:13, 935:17, 937:1, 937:13, 940:1, 941:7, 951:22, 959:12, 962:14, 968:14, 971:5, 971:17, 981:3, 982:8, 985:3, 986:5, 987:12, 987:25, 988:8, 990:19, 995:21, 999:18
**seeing** [6] - 672:21, 688:23, 785:2, 904:16, 907:12, 945:14
**seem** [3] - 674:21, 781:13, 867:16
**sees** [1] - 745:19
**selected** [1] - 911:10
**self** [4] - 745:3, 795:10, 795:16, 939:7
**self-authenticating** [3] - 745:3, 795:10, 795:16
**self-contradictory** [1] - 939:7
**senior** [1] - 904:12
**sense** [5] - 682:23, 757:1, 834:6, 862:10, 1003:4
**sensitivity** [1] - 857:10
**sensor** [1] - 890:3
**sent** [2] - 934:18, 936:12
**sentence** [9] - 676:9, 927:15, 928:13, 929:9, 931:5, 933:3, 944:2, 964:7, 984:23
**sentences** [1] - 964:8
**separate** [6] - 737:10, 769:9, 940:9, 991:22, 992:2, 992:10
**separately** [2] -

801:24, 983:22
**separation** [1] - 992:9
**September** [5] - 740:19, 744:8, 767:24, 768:4, 941:4
**sequential** [1] - 1001:24
**series** [5] - 686:16, 716:3, 909:23, 910:2, 910:6
**serotonin** [1] - 862:11
**served** [1] - 761:11
**set** [26] - 681:17, 681:18, 695:21, 700:13, 746:14, 761:12, 779:6, 816:5, 819:13, 819:24, 827:9, 827:15, 833:2, 844:12, 844:14, 845:24, 846:6, 846:8, 880:5, 897:17, 897:24, 905:4, 916:9, 936:17, 936:19, 987:22
**sets** [1] - 977:4
**setting** [1] - 925:9
**seven** [8] - 846:16, 904:19, 904:23, 922:21, 926:23, 967:20, 969:8, 969:15
**seventh** [1] - 718:10
**several** [9] - 682:2, 700:5, 776:9, 794:9, 847:5, 896:25, 908:22, 918:22, 929:10
**shall** [1] - 796:9
**Shasun** [1] - 688:6
**SHAW** [1] - 671:2
**shed** [1] - 740:2
**sheet** [6] - 745:22, 762:18, 762:25, 763:3, 763:13, 966:9
**shift** [42] - 709:11, 709:15, 713:21, 728:21, 729:1, 729:11, 729:12, 729:16, 729:17, 730:17, 812:5, 842:22, 843:18, 851:2, 851:11, 869:21, 871:17, 877:12, 883:12, 883:14, 883:17, 883:19, 883:22, 884:7, 884:19, 885:17, 885:19,

885:22, 897:2, 913:3, 913:7, 915:19, 920:19, 921:6, 921:7, 921:12, 921:14, 922:25, 923:1, 923:2, 923:3
**shifted** [3] - 870:8, 871:16, 875:8
**shifting** [25] - 713:16, 728:22, 814:23, 850:21, 850:25, 851:8, 858:10, 862:23, 870:11, 870:17, 871:10, 874:22, 875:8, 875:17, 876:16, 877:4, 877:5, 885:16, 899:9, 908:12, 921:10, 922:7, 924:13, 932:7, 932:13
**shifts** [11] - 718:15, 718:19, 722:9, 810:13, 813:24, 838:4, 838:8, 853:25, 854:1, 869:24, 921:17
**short** [2] - 862:13, 874:4
**shorten** [1] - 924:17
**shortened** [2] - 875:3, 908:24
**shortly** [1] - 907:24
**shortness** [1] - 963:10
**shove** [1] - 741:13
**show** [25] - 674:14, 682:23, 687:17, 736:1, 751:1, 751:3, 752:24, 755:13, 756:9, 766:20, 786:1, 786:15, 804:21, 881:8, 902:24, 904:22, 907:2, 907:4, 925:21, 930:7, 938:12, 940:23, 970:18
**showed** [12] - 688:8, 702:18, 715:21, 755:18, 804:24, 839:9, 855:16, 884:19, 899:18, 903:9, 906:18, 989:12
**showing** [8] - 705:13, 711:24, 863:1, 909:24, 916:3, 920:23, 966:2, 967:24

**shown** [33] - 684:10, 723:5, 795:1, 813:25, 830:22, 832:16, 832:23, 833:2, 838:23, 839:2, 863:10, 863:13, 882:2, 890:4, 897:6, 906:23, 913:16, 922:14, 922:18, 923:20, 924:4, 928:14, 928:21, 931:15, 932:2, 934:1, 938:24, 950:7, 963:14, 967:9, 970:7, 970:10, 977:2
**shows** [8] - 747:3, 749:17, 770:8, 836:25, 837:1, 837:9, 912:2, 926:8
**shy** [2] - 935:15, 937:15
**shying** [1] - 937:18
**sic** [1] - 679:8
**sic]** [1] - 702:6
**side** [23] - 677:23, 734:15, 770:23, 807:8, 807:9, 824:18, 840:20, 843:17, 884:14, 894:8, 900:17, 907:15, 907:20, 912:17, 914:8, 939:22, 943:21, 943:23, 944:16, 970:12, 970:13
**sidebar** [3] - 951:22, 951:23, 952:23
**sides** [2] - 699:21, 947:14
**sighted** [4] - 826:17, 867:18, 905:9, 905:13
**significance** [6] - 715:25, 788:12, 904:4, 904:8, 906:24, 966:10
**significant** [8] - 865:13, 870:17, 871:20, 871:24, 877:13, 884:19, 953:19, 978:22
**significantly** [2] - 841:7, 870:8
**similar** [10] - 799:21, 813:19, 813:23, 820:20, 822:23, 837:15, 887:7, 916:6, 970:15, 973:8

**similarities** [1] - 822:20
**similarly** [6] - 711:12, 811:4, 841:11, 951:3, 953:16, 955:9
**simpler** [1] - 977:10
**simplest** [1] - 755:1
**simply** [18] - 674:7, 676:15, 678:17, 683:4, 686:2, 686:25, 690:5, 692:3, 696:20, 699:10, 706:3, 706:18, 742:5, 764:16, 785:16, 912:13, 963:21, 977:11
**Singh** [34] - 673:15, 941:21, 942:2, 942:3, 942:5, 942:8, 942:9, 942:11, 942:18, 942:20, 943:11, 943:13, 943:14, 944:6, 944:14, 944:24, 945:19, 946:9, 946:11, 946:13, 946:19, 947:2, 947:10, 947:13, 948:24, 949:18, 952:11, 952:13, 957:19, 957:21, 957:24, 958:12, 964:20
**single** [6] - 693:6, 815:22, 920:18, 922:7, 923:3, 924:14
**sit** [1] - 772:13
**site** [2] - 738:21, 747:11
**sites** [3] - 885:4, 897:20, 897:23
**sitting** [1] - 950:9
**situation** [1] - 752:6
**Siva** [1] - 958:12
**Six** [1] - 891:5
**six** [5] - 754:11, 762:22, 789:1, 797:6, 902:22
**six-month** [2] - 789:1, 797:6
**Six-Pack** [1] - 891:5
**Skeme** [1] - 917:14
**SKEME** [1] - 917:14
**Skene** [4] - 720:9, 903:22, 930:23, 931:22
**skill** [40] - 705:11, 705:17, 705:20, 709:23, 722:21,

753:12, 801:4, 802:6, 802:8, 802:21, 809:23, 810:23, 811:8, 811:13, 813:14, 814:9, 852:2, 879:5, 883:6, 885:25, 891:1, 891:6, 893:10, 953:24, 954:4, 954:8, 954:12, 954:15, 954:17, 954:21, 954:23, 955:9, 955:11, 955:25, 977:22, 991:21, 992:11, 993:7
**skilled** [4] - 729:4, 833:10, 840:10, 853:19
**skip** [4] - 800:3, 864:20, 914:17, 917:2
**skipped** [2] - 817:12, 870:14
**sleep** [119] - 700:17, 700:18, 701:19, 702:23, 703:1, 703:7, 704:25, 706:15, 706:17, 706:18, 706:20, 706:21, 706:23, 707:8, 707:9, 707:13, 707:17, 708:6, 708:11, 708:17, 708:21, 708:23, 709:6, 713:23, 720:23, 722:7, 722:11, 722:13, 722:19, 724:5, 726:11, 727:24, 728:1, 728:22, 728:23, 729:6, 730:19, 789:3, 789:7, 789:11, 799:17, 799:24, 802:3, 802:11, 802:22, 803:2, 803:4, 804:13, 804:16, 804:22, 804:25, 805:9, 805:19, 810:17, 811:5, 812:9, 814:14, 815:1, 815:3, 830:23, 832:17, 844:3, 844:9, 844:12, 855:14, 855:18, 855:21, 855:24, 856:7, 856:8, 858:11, 860:23, 868:22,

875:3, 880:20, 882:23, 883:2, 885:6, 885:7, 885:13, 887:2, 887:5, 887:16, 887:20, 887:22, 887:25, 888:2, 888:5, 888:6, 888:7, 888:13, 888:25, 889:2, 889:8, 890:4, 890:5, 890:15, 890:17, 891:15, 891:20, 891:23, 892:10, 892:11, 892:12, 892:13, 892:18, 892:23, 893:4, 893:6, 896:7, 901:15, 931:16, 934:22, 936:7, 936:13

**Sleep** [15] - 702:6, 702:7, 702:24, 703:11, 723:2, 723:17, 778:19, 783:16, 789:20, 816:11, 818:9, 829:9, 900:23, 918:22, 931:11

**sleep-related** [2] - 888:13

**Sleep/Wake** [9] - 778:19, 783:16, 789:20, 816:11, 818:9, 829:9, 900:23, 918:22, 931:11

**Sleep/Wake** [5] - 804:13, 804:16, 805:9, 805:19, 885:7

**Sleep/Wake** [2] - 700:19, 803:21

**sleepiness** [7] - 802:17, 802:18, 802:23, 848:9, 867:11, 892:18, 915:11

**sleeping** [2] - 890:23, 891:1

**sleepy** [4] - 892:14, 892:15, 915:13, 915:21

**slept** [3] - 803:1, 803:6, 856:3

**slew** [1] - 890:22

**Slide** [12] - 873:10, 915:25, 954:20, 967:17, 968:3, 970:8, 973:3, 976:24, 977:2, 977:24, 979:13,

981:23

**slide** [31] - 703:21, 705:13, 706:24, 708:10, 804:4, 804:18, 805:3, 807:14, 808:18, 812:11, 824:18, 886:13, 898:24, 899:11, 907:9, 908:1, 909:17, 911:8, 913:17, 914:10, 923:22, 950:19, 951:25, 953:7, 965:24, 970:12, 976:11, 979:10, 981:22, 981:24, 983:11

**slides** [1] - 752:17, 801:21, 815:5, 826:3, 873:7, 879:16, 976:11

**slight** [2] - 837:12, 837:15

**slightly** [4] - 867:13, 868:22, 871:14, 960:24

**slope** [1] - 909:1

**small** [7] - 684:5, 843:18, 909:23, 910:4, 913:10, 913:14, 923:14

**smaller** [8] - 840:24, 849:8, 853:25, 875:11, 906:16, 910:11, 914:13, 922:13

**snapshot** [4] - 746:17, 760:9, 760:11, 860:11

**snapshots** [1] - 735:5

**sneak** [1] - 680:1

**snippets** [1] - 686:16

**so-called** [8] - 794:15, 835:14, 838:4, 848:5, 849:9, 854:13, 881:3, 931:11

**so..** [1] - 690:16

**soccer** [1] - 865:23

**Society** [1] - 702:7

**sold** [1] - 687:11

**sole** [2] - 674:14, 788:6

**solely** [1] - 681:23

**solvent** [1] - 999:19

**someone** [27] - 675:21, 676:1, 683:14, 685:21, 686:6, 734:12, 750:9, 811:10,

829:15, 831:23, 833:16, 839:20, 841:23, 844:11, 844:16, 847:3, 878:9, 878:24, 891:7, 915:13, 921:13, 921:18, 921:23, 954:16, 955:18, 993:2, 993:3

**sometimes** [7] - 745:11, 745:12, 840:23, 868:24, 911:20, 912:8, 924:5

**somewhat** [6] - 705:16, 855:1, 893:25, 922:15, 954:16, 977:10

**soon** [1] - 839:18

**soporific** [2] - 848:13, 874:24

**sorry** [51] - 680:24, 692:20, 702:4, 718:22, 732:6, 744:16, 762:18, 764:18, 764:21, 772:25, 779:12, 779:15, 784:23, 786:19, 805:14, 814:6, 827:11, 827:13, 833:19, 848:22, 856:19, 856:20, 856:21, 859:17, 876:23, 880:11, 881:2, 886:25, 916:15, 928:18, 931:25, 936:24, 941:5, 941:15, 943:24, 945:4, 949:12, 950:18, 951:21, 954:2, 956:23, 966:20, 970:8, 976:2, 982:5, 984:5, 993:23, 998:25, 999:15

**sort** [20] - 672:20, 688:22, 707:2, 710:18, 711:10, 718:11, 740:1, 751:21, 757:5, 860:11, 898:2, 958:20, 971:3, 977:3, 977:4, 977:11, 985:17, 985:18, 988:24, 990:16

**sound** [1] - 827:4

**sounds** [3] - 694:2, 893:1, 895:8

**source** [1] - 749:1

**space** [2] - 898:8, 898:9

**speaking** [2] - 726:1, 869:3

**special** [1] - 992:16

**specialize** [2] - 887:14, 887:15

**species** [2] - 840:14, 840:15

**specific** [4] - 694:11, 758:11, 786:8, 993:19

**specifically** [34] - 685:18, 703:8, 712:2, 717:24, 722:16, 722:17, 727:20, 728:1, 731:18, 756:21, 791:3, 794:13, 799:8, 799:9, 807:3, 814:17, 820:13, 855:13, 862:16, 865:13, 872:25, 875:24, 876:12, 876:19, 877:5, 881:16, 882:13, 884:5, 884:13, 888:14, 927:14, 939:15, 942:8, 942:10

**specification** [7] - 826:15, 827:8, 965:14, 966:4, 966:8, 967:10, 983:7

**specifications** [3] - 681:22, 967:14, 967:19

**specified** [1] - 762:25

**specifies** [2] - 808:16, 821:23

**specify** [1] - 808:15

**spectrometry** [1] - 989:25

**speculating** [1] - 857:11

**speculation** [1] - 792:22

**speed** [1] - 1001:5

**speeds** [1] - 987:1

**spells** [2] - 811:1, 896:16

**spend** [2] - 757:1, 866:3

**spending** [2] - 755:22, 811:11

**spent** [2] - 833:6, 838:2

**spike** [1] - 982:24

**spill** [19] - 842:17, 853:10, 853:13,

853:16, 883:7, 883:13, 883:16, 883:20, 899:20, 907:23, 910:18, 912:4, 913:12, 914:5, 914:11, 914:14, 924:8

**Spillover** [1] - 838:15

**spillover** [4] - 838:18, 840:17, 841:10, 842:8

**spills** [1] - 912:6

**splitting** [3] - 867:16, 867:20, 868:16

**sponsor/ collaborator** [1] - 739:7

**sponsors** [1] - 789:5

**spontaneously** [1] - 706:4

**sports** [1] - 866:2

**spots** [1] - 971:4

**spotted** [1] - 758:6

**Squibb** [1] - 674:10

**SSRIs** [1] - 862:12

**stabilization** [1] - 789:9

**stabilized** [1] - 901:15

**stack** [1] - 986:5

**stage** [1] - 965:1

**stand** [7] - 711:2, 741:14, 777:10, 777:21, 778:5, 895:16, 949:22

**standard** [6] - 692:2, 800:24, 805:1, 824:10, 834:11, 990:6

**standing** [3] - 760:10, 761:5, 888:6

**stands** [1] - 983:2

**staring** [1] - 845:3

**start** [24] - 705:4, 712:12, 712:14, 724:7, 758:14, 800:10, 824:10, 829:3, 830:10, 845:24, 847:8, 866:10, 867:14, 868:13, 895:10, 910:19, 924:11, 924:12, 938:8, 963:22, 984:17, 993:1, 999:18, 1001:22

**started** [5] - 702:13, 747:1, 757:24, 768:13, 949:8

**starters** [1] - 736:8

**starting** [4] - 810:4,

814:6, 819:19, 868:9
**starts** [2] - 867:11, 941:20
**state** [19] - 701:9, 705:24, 711:3, 809:12, 835:15, 860:8, 860:11, 889:2, 889:6, 889:10, 889:12, 889:13, 891:2, 891:11, 926:7, 927:8, 935:9, 998:9, 1000:1
**statement** [8] - 788:7, 831:2, 857:5, 860:24, 860:25, 878:21, 947:3, 947:6
**Statement** [2] - 758:8, 758:10
**statements** [2] - 873:2, 939:7
**STATES** [1] - 1:2
**states** [12] - 698:15, 785:24, 793:2, 795:11, 804:10, 806:7, 812:3, 812:18, 817:1, 817:9, 926:22, 942:17
**States** [2] - 747:12, 798:5
**stating** [1] - 882:22
**station** [1] - 898:8
**statistically** [5] - 870:17, 871:20, 871:24, 877:13, 884:19
**status** [1] - 693:16
**statute** [2] - 765:3, 766:3
**stay** [5] - 708:1, 868:17, 869:25, 908:17, 908:21
**stayed** [1] - 908:25
**staying** [1] - 844:19
**stenographic** [1] - 1003:25
**Step** [2] - 962:10, 962:21
**step** [29] - 680:24, 681:2, 693:19, 767:2, 770:16, 828:12, 893:12, 951:14, 951:15, 952:2, 952:3, 952:4, 954:1, 956:17, 956:18, 957:7, 957:8, 960:2, 960:3, 960:11, 960:12, 962:7, 962:19,

963:17, 963:18, 964:1, 964:3, 1002:16
**steps** [22] - 675:14, 681:2, 697:19, 766:14, 773:14, 796:15, 938:13, 942:12, 942:19, 942:23, 943:12, 943:15, 944:7, 947:15, 947:17, 952:11, 952:16, 956:9, 956:17, 957:7, 972:11, 1002:4
**steps..** [1] - 952:14
**stereoisomers** [1] - 969:22
**Steven** [4] - 895:15, 896:2, 920:9, 938:1
**STEVEN** [1] - 895:21
**sticking** [1] - 939:23
**still** [18] - 674:2, 841:3, 858:5, 858:8, 858:15, 888:15, 900:2, 909:2, 913:21, 916:14, 916:15, 916:16, 920:4, 938:9, 943:19, 948:1, 953:18, 978:22
**stimuli** [5] - 889:3, 889:6, 889:11, 889:14, 889:20
**stipulation** [1] - 705:8
**stipulations** [1] - 800:4
**STONE** [68] - 671:9, 690:18, 697:7, 697:16, 697:22, 698:23, 699:1, 699:25, 758:7, 758:15, 758:18, 759:3, 759:10, 759:14, 760:5, 760:14, 775:21, 775:25, 776:7, 776:14, 894:22, 895:3, 895:14, 895:18, 895:24, 898:18, 898:23, 901:5, 901:9, 901:10, 902:13, 902:17, 902:19, 903:17, 903:18, 904:3, 904:7, 905:19, 905:22, 906:6, 906:7, 907:9, 907:11, 908:1, 908:3, 911:4, 911:8,

911:9, 919:6, 919:10, 924:16, 934:14, 935:25, 936:2, 937:22, 938:5, 938:11, 938:19, 940:2, 940:9, 940:14, 940:17, 943:2, 943:21, 944:1, 944:5, 944:10, 948:25
**stone** [7] - 697:5, 758:23, 769:8, 870:14, 895:13, 939:9, 939:15
**stood** [1] - 775:25
**stop** [6] - 844:1, 908:18, 943:4, 943:16, 951:21
**stopped** [1] - 769:12
**straight** [1] - 800:5
**strategically** [1] - 919:25
**Strawn** [1] - 741:19
**streamline** [1] - 800:4
**stress** [1] - 771:14
**stretch** [1] - 894:6
**strike** [3] - 958:15, 961:12, 993:1
**striking** [1] - 836:2
**strong** [3] - 722:17, 819:21, 820:5
**strongly** [5] - 710:22, 859:4, 859:5, 859:7, 859:8
**struck** [1] - 961:13
**structural** [3] - 971:24, 986:14, 986:18
**structure** [31] - 683:10, 969:16, 969:18, 969:22, 970:11, 970:14, 970:17, 970:22, 970:23, 970:25, 972:1, 977:5, 977:6, 977:8, 977:13, 977:15, 978:7, 979:23, 982:23, 983:3, 983:4, 983:21, 989:4, 990:7, 990:12, 990:19, 990:22, 995:8, 995:24
**structures** [8] - 682:3, 682:9, 861:10, 955:10, 955:24, 970:3, 979:20
**studied** [2] - 809:13, 924:6
**Studies** [1] - 961:17

**studies** [40] - 726:5, 728:19, 730:12, 746:14, 797:21, 799:3, 799:6, 827:9, 827:15, 833:2, 834:21, 863:1, 863:10, 891:17, 897:17, 897:24, 898:6, 898:20, 903:8, 909:13, 909:23, 910:2, 916:2, 916:4, 916:7, 918:4, 919:20, 922:21, 924:10, 929:2, 929:10, 933:3, 933:4, 968:13, 977:19, 987:22, 997:2, 997:4
**study** [55] - 714:18, 714:19, 719:14, 726:2, 728:24, 738:23, 739:7, 746:25, 756:10, 757:23, 757:24, 758:3, 774:17, 774:22, 778:16, 778:24, 779:18, 779:21, 780:19, 781:10, 784:5, 789:5, 789:16, 790:1, 790:5, 793:3, 793:5, 797:4, 797:21, 804:21, 826:14, 827:16, 827:23, 834:22, 848:5, 885:3, 891:17, 896:14, 903:12, 903:14, 904:11, 904:18, 906:15, 906:18, 906:25, 907:3, 919:21, 921:4, 924:13, 926:7, 926:23, 937:20, 938:6
**studying** [6] - 712:14, 719:16, 773:4, 804:10, 896:25, 902:22
**stuff** [3] - 688:6, 886:12, 945:18
**subject** [10] - 713:14, 714:18, 790:1, 855:16, 858:18, 934:22, 936:7, 958:3, 998:22, 1003:10
**subjective** [2] - 789:3, 997:23
**subjects** [17] - 809:12,

817:9, 852:1, 854:23, 855:17, 855:20, 856:3, 857:22, 904:23, 906:18, 906:19, 925:23, 926:9, 926:23, 927:2, 928:17, 928:22
**Subjects** [2] - 778:18, 789:20
**submission** [6] - 770:6, 775:17, 966:24, 967:5, 967:6, 981:13
**submit** [5] - 672:25, 740:5, 740:14, 748:25, 770:9
**submitted** [11] - 740:24, 747:4, 747:5, 779:24, 780:3, 787:11, 790:20, 791:8, 966:22, 981:9, 985:25
**subsequent** [2] - 909:13, 918:15
**subsequently** [2] - 957:23, 989:12
**substance** [12] - 695:9, 750:12, 750:25, 757:2, 771:23, 771:24, 795:21, 798:1, 922:25, 985:1, 985:12, 993:14
**substances** [2] - 985:1, 991:11
**substantial** [1] - 753:24
**substantially** [1] - 875:3
**substantive** [3] - 696:2, 860:22, 1003:17
**subtle** [1] - 971:22
**succeed** [1] - 811:15
**succeeded** [1] - 688:1
**success** [17] - 801:14, 810:24, 811:9, 814:10, 828:2, 878:17, 878:20, 879:1, 879:3, 879:6, 879:11, 879:13, 910:10, 953:15, 953:22, 978:8, 979:24
**successful** [5] - 718:3, 718:5, 804:15, 852:25, 903:9

**successfully** [3] - 715:23, 718:15, 932:14

**successive** [1] - 756:11

**suddenly** [1] - 699:8

**sufferers** [1] - 862:20

**suffering** [1] - 844:17

**sufficient** [9] - 718:15, 718:18, 729:17, 748:11, 851:11, 919:21, 927:19, 983:6, 983:8

**suggest** [13] - 729:4, 745:13, 745:23, 803:14, 803:23, 806:6, 809:19, 811:24, 813:11, 825:8, 825:24, 875:17, 876:2

**suggested** [2] - 757:13, 954:25

**suggesting** [1] - 846:15

**suggestion** [2] - 687:18, 699:17

**suggests** [4] - 755:24, 803:18, 804:9, 805:7

**suit** [1] - 935:21

**suitable** [1] - 812:8

**suited** [2] - 799:23, 811:3

**sum** [5] - 722:20, 785:7, 809:17, 824:3, 914:9

**summarize** [8] - 701:20, 702:11, 715:18, 722:21, 800:12, 818:22, 820:14, 822:9

**summarized** [3] - 803:9, 815:10, 953:7

**summarizes** [5] - 799:5, 911:14, 921:4, 923:6, 923:12

**summarizing** [9] - 703:21, 830:1, 899:11, 904:16, 919:18, 923:13, 950:19, 977:24, 979:10

**Summary** [3] - 791:14, 791:16, 876:19

**summary** [13] - 701:8, 727:9, 785:9, 789:12, 813:10, 863:22, 899:3, 901:12, 902:21, 904:18, 916:2, 923:22, 926:7

**summery** [1] - 906:13

**sun** [1] - 898:9

**supervisor** [1] - 904:1

**supplying** [1] - 965:15

**support** [3] - 687:25, 692:6, 748:11

**Support** [1] - 961:16

**supported** [1] - 796:2

**suppose** [2] - 723:10, 834:3

**supposedly** [1] - 763:23

**supposition** [1] - 946:16

**suppress** [1] - 868:4

**sur** [1] - 695:18

**surface** [1] - 691:5

**surprised** [3] - 690:9, 730:22, 814:20

**surprisingly** [1] - 828:19

**Surrey** [1] - 896:13

**surrounding** [1] - 861:2

**sustained** [4] - 782:2, 782:3, 792:23, 961:11

**swear** [2] - 764:16, 764:19

**switch** [1] - 826:2

**sworn** [1] - 700:22

**symbols** [1] - 940:12

**symptomatic** [1] - 900:1

**synchronization** [2] - 709:17, 869:14

**Synchronization** [1] - 900:22

**synchronize** [2] - 714:21, 830:22

**synchronized** [2] - 708:1, 869:17

**synonymous** [3] - 806:9, 809:7, 821:8

**synthesis** [3] - 956:8, 963:8, 993:9

**synthesize** [2] - 683:15, 835:15

**synthesizing** [3] - 956:15, 957:5, 959:20

**synthetic** [6] - 724:8, 724:9, 831:6, 832:5, 832:10, 961:7

**system** [3] - 695:20, 875:9, 926:11

**System** [1] - 701:14

**systematic** [1] - 917:3

# T

**tab** [12] - 755:8, 786:19, 786:20, 872:5, 880:23, 903:13, 906:3, 957:14, 965:8, 966:14, 973:15, 980:10

**table** [11] - 855:13, 920:23, 920:25, 966:3, 986:4, 987:5, 987:8, 988:9, 988:15, 988:25, 989:7

**Table** [1] - 805:3, 855:10, 863:19

**tabs** [4] - 852:7, 859:15, 864:21, 906:2

**tackle** [1] - 808:21

**takeaway** [1] - 718:11

**talks** [21] - 727:10, 727:25, 733:23, 733:24, 753:8, 799:19, 811:2, 816:10, 821:2, 821:4, 823:25, 826:16, 854:18, 857:9, 878:2, 878:6, 913:10, 929:2, 987:24, 991:1

**target** [2] - 821:11, 848:16

**targeted** [3] - 813:1, 816:24, 821:14

**tasi** [1] - 935:12

**Tasimelteon** [3] - 778:17, 789:19, 845:19

**tasimelteon** [172] - 680:6, 680:20, 681:5, 681:21, 682:14, 684:14, 684:23, 685:1, 687:5, 687:17, 688:2, 688:25, 690:6, 703:17, 704:19, 705:1, 705:2, 705:4, 705:8, 709:22, 710:11, 710:19, 711:25, 724:6, 724:7, 724:23, 725:1, 725:25, 726:3, 727:14, 727:16, 728:20, 728:24, 729:10, 730:15, 730:17, 731:10, 736:12, 773:3,

773:5, 773:10, 774:21, 788:25, 789:1, 789:6, 796:9, 797:6, 797:7, 797:9, 799:1, 799:11, 799:12, 799:19, 799:22, 800:2, 803:21, 803:24, 806:13, 806:20, 807:2, 808:5, 808:13, 809:4, 810:9, 811:2, 811:7, 812:4, 812:18, 812:25, 813:5, 813:23, 814:13, 814:23, 816:7, 816:16, 816:23, 817:1, 817:17, 817:20, 818:11, 819:10, 819:20, 820:6, 821:5, 821:24, 823:2, 823:5, 823:8, 823:14, 823:15, 824:21, 825:9, 825:15, 825:16, 825:24, 826:17, 827:16, 827:19, 827:24, 829:21, 830:21, 832:24, 833:3, 833:11, 833:15, 833:24, 834:20, 837:16, 837:24, 845:10, 846:8, 846:16, 847:9, 847:24, 848:12, 849:8, 855:5, 856:4, 856:9, 858:21, 859:4, 861:16, 862:1, 864:9, 864:11, 865:20, 866:18, 870:8, 871:7, 872:20, 873:13, 875:2, 876:15, 877:9, 877:11, 879:17, 881:9, 882:23, 883:8, 883:19, 884:18, 925:10, 937:11, 951:4, 952:1, 956:8, 956:16, 957:6, 959:20, 960:8, 962:25, 965:6, 968:22, 976:16, 978:5, 978:16, 978:19, 979:1, 979:3, 984:25, 985:1, 985:12, 986:9, 991:11, 993:3, 993:10,

994:16, 997:20, 998:8, 999:21, 999:24, 1001:17

**tasimelteon's** [1] - 799:16

**task** [1] - 702:22

**tau** [4] - 847:3, 921:18, 921:25, 922:2

**teach** [5] - 803:13, 803:23, 806:6, 811:24, 813:11

**teaches** [4] - 679:25, 803:18, 804:8, 805:6

**teaching** [2] - 701:17, 833:9

**teacup** [1] - 678:19

**team** [1] - 865:24

**teams** [3] - 865:19, 865:23, 866:1

**technically** [1] - 760:25

**Technology** [1] - 961:16

**teed** [1] - 770:20

**temperature** [4] - 706:14, 708:7, 901:18, 901:20

**tempest** [1] - 678:19

**ten** [6] - 853:7, 906:15, 906:25, 908:9, 910:2, 944:23

**tendency** [5] - 708:4, 708:7, 709:9, 709:12, 869:19

**tender** [1] - 700:16

**tentative** [2] - 969:16, 970:11

**tentatively** [2] - 969:19, 989:6

**term** [8] - 832:6, 842:7, 842:14, 891:5, 899:12, 907:15, 997:22

**termed** [1] - 851:8

**terminology** [3] - 705:25, 854:23, 854:25

**terms** [11] - 706:1, 818:3, 824:13, 833:13, 844:21, 868:7, 889:18, 916:21, 923:6, 948:22, 963:9

**terrible** [1] - 848:21

**test** [2] - 683:14, 990:15

**tested** [3] - 866:21, 870:5, 875:13

**testified** [17] - 690:19, 700:22, 711:4,

777:22, 782:8,
782:16, 782:19,
794:9, 817:14,
825:6, 859:23,
881:20, 888:17,
895:22, 938:1, 956:7
**testify** [21] - 673:22,
673:25, 678:16,
699:24, 731:22,
732:16, 733:19,
736:24, 737:19,
739:25, 746:1,
748:8, 751:6, 757:2,
771:23, 771:24,
782:13, 782:18,
795:21, 881:15,
938:25
**testifying** [4] - 731:21,
732:22, 742:4,
882:20
**testimonial** [1] -
737:24
**testimony** [34] -
682:23, 688:5,
689:7, 692:4,
699:13, 699:18,
701:4, 701:8, 704:7,
711:16, 743:7,
743:12, 772:15,
789:25, 898:11,
901:25, 903:5,
940:11, 946:23,
948:20, 948:25,
949:1, 949:8,
949:20, 950:5,
950:10, 950:12,
951:7, 956:20,
958:15, 972:15,
976:12, 988:18,
988:23
**testing** [4] - 995:23,
996:3, 996:25,
997:17
**tests** [3] - 990:6,
996:15, 996:18
**TEVA** [1] - 1:7
**Teva** [11] - 671:6,
683:18, 980:8,
980:15, 981:12,
981:25, 982:2,
982:17, 982:22,
983:2, 992:6
**Texas** [1] - 735:13
**text** [10] - 786:15,
791:16, 830:10,
835:21, 856:12,
857:2, 870:24,
871:19, 873:4,
880:19
**texts** [1] - 875:1

**THE** [456] - 1:2, 1:3,
672:5, 672:13,
672:24, 673:5,
673:10, 673:21,
674:4, 674:21,
674:25, 675:6,
675:10, 675:15,
675:19, 676:7,
676:9, 676:17,
676:20, 676:22,
677:2, 677:6,
677:14, 677:18,
677:22, 678:8,
678:13, 678:23,
679:5, 680:16,
680:19, 680:22,
681:4, 681:7,
681:14, 681:20,
682:14, 682:16,
682:19, 682:22,
684:4, 684:14,
684:19, 685:6,
685:12, 685:16,
686:19, 687:1,
687:15, 689:3,
689:13, 689:18,
689:21, 689:23,
690:2, 690:11,
690:17, 691:7,
692:7, 692:19,
693:21, 694:1,
694:8, 694:12,
694:15, 694:23,
695:2, 695:4,
695:10, 695:17,
696:1, 696:6, 696:8,
696:10, 696:13,
696:17, 696:22,
697:3, 697:15,
697:21, 697:24,
698:5, 698:12,
698:20, 698:24,
699:19, 699:23,
700:3, 700:7, 700:9,
711:7, 711:12,
711:19, 713:11,
714:13, 715:13,
717:14, 718:18,
718:19, 718:20,
718:22, 719:11,
720:17, 721:21,
724:1, 725:18,
727:2, 730:8,
731:16, 732:5,
732:7, 732:18,
732:21, 733:5,
733:12, 733:17,
733:21, 734:2,
734:9, 734:14,
734:20, 735:3,
735:10, 735:20,

735:25, 736:3,
736:8, 736:11,
736:14, 736:20,
737:14, 738:16,
739:11, 739:19,
740:3, 740:8,
740:12, 741:2,
741:6, 741:9,
741:13, 741:22,
742:1, 742:9, 743:5,
743:21, 743:24,
744:4, 744:15,
744:20, 744:22,
744:25, 745:5,
745:13, 745:21,
746:8, 746:12,
747:9, 747:15,
747:20, 747:24,
748:3, 748:6, 749:4,
750:3, 750:20,
751:17, 752:3,
752:15, 752:20,
752:24, 753:3,
753:6, 753:17,
754:2, 754:8,
754:14, 754:23,
755:4, 755:10,
756:19, 756:23,
757:10, 758:5,
758:14, 758:17,
758:23, 759:4,
759:13, 760:4,
760:13, 761:9,
761:23, 762:5,
762:10, 762:15,
763:7, 763:10,
763:18, 763:21,
764:1, 764:4,
764:18, 765:9,
765:14, 765:20,
765:23, 766:10,
766:18, 766:21,
767:2, 768:2, 768:5,
768:12, 768:20,
769:6, 769:13,
769:16, 769:19,
769:22, 770:10,
770:13, 770:15,
772:9, 773:16,
773:21, 774:3,
774:6, 774:9,
774:12, 774:19,
774:24, 775:1,
775:12, 775:24,
776:6, 776:13,
776:17, 776:21,
776:24, 777:4,
777:8, 777:11,
777:13, 777:17,
777:20, 777:23,
777:25, 778:2,

781:16, 781:23,
782:2, 782:15,
783:3, 783:5,
784:20, 785:4,
786:1, 786:5,
787:25, 788:5,
788:15, 788:18,
788:21, 792:23,
793:11, 795:5,
795:8, 795:18,
795:24, 796:4,
796:11, 797:15,
798:21, 828:6,
828:10, 828:21,
830:7, 835:11,
844:25, 845:5,
850:7, 880:9,
880:13, 881:19,
881:24, 882:10,
886:9, 886:12,
886:14, 886:16,
886:19, 886:21,
886:22, 886:24,
886:25, 887:1,
887:4, 887:6,
887:10, 887:15,
887:20, 887:22,
887:25, 888:4,
888:9, 888:11,
888:15, 888:16,
888:17, 888:19,
888:20, 888:24,
888:25, 889:1,
889:7, 889:10,
889:15, 889:17,
889:21, 889:25,
890:22, 890:24,
890:25, 891:3,
891:4, 891:9,
891:21, 891:22,
892:8, 892:11,
892:12, 892:13,
892:14, 892:17,
892:20, 892:22,
892:24, 893:3,
893:9, 893:11,
893:12, 893:14,
893:15, 894:5,
894:19, 894:23,
895:1, 895:8,
895:13, 895:17,
895:20, 898:22,
901:7, 902:15,
911:6, 919:8,
924:18, 924:21,
934:16, 935:24,
937:23, 937:24,
938:4, 938:10,
938:18, 939:2,
939:8, 939:13,
940:1, 940:5,

940:13, 940:16,
940:21, 941:3,
941:6, 941:9,
941:14, 941:23,
941:25, 942:4,
942:7, 942:13,
942:16, 942:21,
943:4, 943:24,
944:4, 944:8,
944:18, 945:3,
945:5, 945:11,
945:15, 946:11,
946:17, 947:1,
947:10, 947:12,
947:19, 948:7,
948:13, 948:18,
948:21, 949:4,
949:11, 949:13,
949:19, 949:23,
949:25, 951:8,
951:10, 951:21,
951:25, 952:8,
952:20, 956:21,
956:23, 956:25,
958:5, 958:16,
959:3, 960:23,
961:1, 961:4, 961:9,
961:13, 964:15,
964:20, 964:22,
964:24, 965:21,
972:16, 972:17,
974:3, 975:14,
980:24, 981:17,
981:20, 984:4,
984:6, 984:9,
984:12, 998:5,
998:12, 998:16,
998:18, 998:25,
999:5, 999:9,
1001:22, 1002:13,
1002:22, 1003:2,
1003:6, 1003:15
**themselves** [1] - 892:7
**then-ongoing** [2] -
879:20, 880:4
**theoretically** [4] -
688:14, 921:11,
922:11, 922:17
**theory** [6] - 681:20,
687:1, 692:7, 692:9,
921:19, 921:20
**therapeutic** [2] -
718:1, 718:6
**thereabouts** [1] -
852:24
**thereby** [1] - 832:17
**therefore** [11] -
681:23, 713:22,
719:24, 795:4,
795:21, 799:23,

814:25, 818:5, 915:16, 985:11, 1002:5
**thereof** [1] - 766:5
**they've** [9] - 681:12, 685:12, 685:18, 707:24, 743:21, 761:24, 890:16, 892:5, 938:21
**Thibodeau** [4] - 934:19, 934:25, 935:5, 936:6
**thinking** [7] - 672:19, 675:2, 682:21, 765:24, 935:12, 937:11, 957:17
**thinks** [3] - 868:8, 868:9, 869:4
**Third** [2] - 749:3, 796:2
**third** [7] - 780:20, 806:12, 851:21, 893:17, 935:8, 975:18, 987:24
**thirds** [1] - 780:24
**thoughts** [1] - 907:6
**three** [18] - 704:22, 738:11, 761:1, 808:3, 809:25, 814:8, 864:21, 904:23, 904:25, 909:24, 919:20, 922:21, 927:4, 930:13, 946:6, 953:7, 969:21, 984:25
**threshold** [7] - 738:5, 994:11, 994:18, 994:19, 995:1, 997:10, 1001:3
**thresholds** [3] - 993:19, 994:2, 994:8
**throughout** [1] - 794:15
**timed** [4] - 905:6, 919:25, 930:8, 932:2
**timeline** [11] - 712:12, 712:21, 718:24, 720:4, 721:6, 722:20, 724:4, 724:12, 725:6, 729:20, 800:2
**timelines** [2] - 711:24, 712:6
**timeliness** [1] - 691:4
**timing** [18] - 707:9, 709:3, 709:5, 709:8, 723:8, 728:20, 728:22, 789:11, 807:24, 808:11,

810:12, 812:24, 816:22, 850:25, 867:17, 916:3, 916:7, 932:3
**timings** [1] - 923:15
**tiny** [1] - 688:3
**tired** [1] - 998:9
**Title** [2] - 791:4
**title** [12] - 725:23, 778:15, 789:18, 816:19, 817:8, 850:11, 852:14, 860:2, 918:23, 958:10, 961:19
**titled** [2] - 829:8, 850:16
**today** [17] - 701:4, 759:2, 759:20, 771:20, 776:10, 821:18, 834:22, 837:20, 837:23, 858:15, 895:1, 898:24, 899:4, 899:7, 923:13, 950:5, 1003:3
**together** [9] - 693:11, 756:9, 775:10, 842:10, 851:1, 851:7, 971:3, 986:6, 991:3
**tomorrow** [2] - 894:16, 1002:15
**tone** [1] - 891:19
**tonight** [1] - 1002:18
**took** [8] - 682:2, 693:4, 797:8, 831:23, 839:1, 895:18, 956:11, 1003:3
**top** [18] - 688:19, 722:9, 739:3, 746:6, 746:15, 747:18, 749:13, 778:4, 787:11, 790:19, 860:18, 874:17, 911:13, 966:23, 967:3, 968:24, 981:3, 986:5
**topic** [3] - 678:1, 708:13, 711:11
**topics** [1] - 703:7
**total** [8] - 785:7, 789:3, 789:7, 826:13, 855:14, 893:4, 967:13, 968:1
**totally** [23] - 707:22, 722:25, 731:11, 732:10, 738:4, 808:23, 809:7, 809:10, 811:7,

817:7, 817:9, 818:17, 818:19, 821:6, 830:16, 854:20, 890:2, 890:11, 904:19, 906:15, 926:23, 929:12, 932:14
**Totally** [2] - 778:18, 789:19
**touch** [1] - 694:14
**touched** [1] - 810:21
**towards** [1] - 786:21
**toxic** [4] - 683:24, 951:18, 953:14, 953:21
**toxicity** [1] - 977:19
**trade** [1] - 890:19
**train** [1] - 887:1
**Transcript** [1] - 1:15
**transcript** [2] - 752:17, 1003:25
**transferred** [1] - 693:13
**transient** [4] - 865:21, 866:19, 879:25, 885:6
**transitive** [1] - 795:19
**translated** [1] - 856:8
**translation** [1] - 921:12
**travel** [1] - 898:8
**treat** [25] - 703:17, 708:17, 708:21, 709:5, 710:4, 710:19, 720:23, 722:7, 722:10, 722:22, 724:5, 725:1, 728:1, 729:13, 729:15, 729:17, 731:11, 799:2, 845:10, 866:19, 885:17, 887:17, 892:15, 919:19, 925:6
**treated** [3] - 708:20, 847:8, 925:9
**treating** [26] - 701:19, 704:24, 705:2, 705:7, 719:25, 729:5, 799:17, 811:5, 812:8, 814:13, 815:3, 816:6, 819:9, 821:4, 821:23, 822:24, 824:22, 825:10, 825:14, 825:15, 827:20, 835:18, 843:25, 844:8, 882:23, 883:1
**treatment** [63] -

700:17, 702:22, 703:12, 704:11, 712:1, 713:22, 717:23, 719:25, 721:1, 721:3, 721:4, 722:2, 722:13, 722:18, 723:13, 726:9, 730:18, 789:6, 797:4, 799:23, 803:20, 805:12, 806:7, 806:9, 808:23, 810:7, 810:16, 811:3, 815:1, 817:21, 819:19, 819:20, 821:2, 825:25, 828:2, 832:3, 846:10, 846:16, 846:22, 847:10, 862:5, 899:21, 899:22, 906:20, 908:14, 908:18, 909:7, 914:22, 914:23, 915:22, 916:17, 924:11, 924:12, 926:9, 929:13, 931:10, 933:2, 962:10, 962:21, 964:3
**Treatment** [7] - 829:9, 838:15, 845:20, 900:24, 918:21, 931:20, 933:16
**tree** [1] - 977:3
**tremendous** [1] - 683:23
**Trial** [1] - 1:15
**trial** [66] - 672:3, 672:12, 685:7, 695:21, 696:23, 731:10, 736:9, 736:11, 738:6, 739:14, 739:16, 739:17, 740:5, 740:6, 740:7, 742:19, 746:21, 769:11, 770:11, 772:5, 772:11, 773:1, 773:2, 778:11, 779:9, 780:15, 783:20, 783:22, 785:9, 785:22, 788:23, 789:12, 789:23, 790:9, 790:17, 790:21, 792:19, 794:15, 797:1, 799:10, 799:13, 806:18, 806:19,

809:4, 811:7, 811:11, 811:16, 815:13, 816:20, 817:4, 817:6, 827:23, 833:5, 845:24, 846:8, 846:12, 878:6, 878:18, 878:25, 879:12, 879:20, 880:5, 885:24, 890:23, 905:3, 912:17
**trial's** [1] - 759:8
**trials** [24] - 761:16, 779:6, 798:4, 799:14, 800:22, 808:6, 813:4, 815:13, 816:8, 816:23, 816:25, 817:25, 818:8, 834:24, 878:3, 879:24, 880:16, 885:12, 885:23, 897:21, 900:1, 904:4, 917:4, 936:17
**tried** [7] - 680:11, 683:8, 728:25, 738:8, 748:15, 853:2, 916:5
**triggered** [1] - 867:24
**trivial** [1] - 966:11
**trouble** [4] - 878:24, 986:22, 995:16, 995:23
**true** [11] - 686:21, 755:21, 757:12, 761:6, 762:23, 776:5, 776:10, 841:10, 903:1, 922:20, 1003:24
**truth** [3] - 731:19, 732:22, 761:1
**try** [13] - 748:16, 769:25, 772:24, 775:20, 848:21, 849:13, 876:3, 892:19, 894:20, 899:7, 913:12, 921:9, 996:8
**trying** [27] - 674:22, 680:1, 687:23, 697:9, 697:13, 708:23, 708:25, 738:16, 748:4, 756:3, 766:21, 790:3, 831:18, 838:3, 884:24, 905:20, 912:7, 915:17, 915:19, 917:1, 949:5, 949:6,

961:6, 964:18, 988:22, 1001:5
**TUNNELL** [1] - 671:12
**turn** [55] - 712:22, 713:25, 714:24, 716:6, 716:14, 716:20, 717:1, 718:25, 720:4, 721:7, 723:14, 724:13, 725:6, 726:13, 728:7, 729:21, 731:1, 754:16, 779:10, 793:23, 797:14, 849:17, 854:8, 859:13, 863:3, 876:20, 877:17, 900:15, 910:20, 917:12, 920:6, 936:4, 942:14, 956:6, 957:13, 959:11, 961:25, 963:11, 964:5, 965:7, 965:8, 966:14, 967:1, 967:7, 969:3, 972:19, 973:15, 974:15, 975:1, 975:17, 976:19, 978:12, 980:10, 983:11, 984:20
**turned** [1] - 944:1
**turning** [1] - 955:14
**turns** [4] - 686:1, 691:20, 746:15, 772:15
**tutelage** [1] - 886:22
**two** [82] - 672:8, 680:24, 681:2, 684:2, 688:5, 690:25, 708:22, 713:20, 713:22, 742:14, 753:25, 754:3, 754:6, 772:21, 780:24, 785:20, 806:25, 808:12, 809:5, 809:6, 811:21, 819:11, 819:13, 819:24, 822:4, 822:14, 823:19, 824:3, 826:12, 829:12, 834:24, 839:6, 839:25, 851:7, 852:7, 857:14, 857:16, 857:25, 858:6, 858:23, 859:15, 860:18, 861:18, 864:20, 866:11,

870:23, 880:23, 886:9, 887:18, 890:17, 891:12, 892:1, 894:24, 895:5, 897:11, 903:8, 906:2, 906:19, 908:23, 916:8, 919:22, 920:1, 939:6, 940:10, 950:19, 952:15, 956:9, 956:16, 957:6, 964:8, 966:7, 970:18, 970:20, 971:3, 971:4, 971:22, 974:16, 987:12, 989:15, 994:12, 998:19
**two-minute** [1] - 895:5
**two-step** [1] - 680:24
**two-thirds** [1] - 780:24
**type** [2] - 783:8, 918:8
**types** [2] - 810:10, 814:15
**typically** [7] - 734:6, 734:7, 867:15, 869:7, 971:20, 990:11, 991:14

## U

**U.S** [3] - 973:20, 975:6, 1004:2
**UK** [1] - 896:13
**ultimate** [1] - 687:19
**ultimately** [1] - 771:16
**unable** [1] - 683:7
**unaware** [1] - 863:1
**unclear** [1] - 946:24
**unconscious** [3] - 889:12, 891:10, 893:6
**unconsciousness** [1] - 891:2
**uncontested** [1] - 694:2
**under** [37] - 687:1, 693:14, 700:22, 705:20, 708:5, 738:5, 742:18, 747:5, 748:9, 749:1, 749:12, 751:4, 759:5, 764:13, 766:2, 766:6, 766:12, 777:23, 784:16, 786:6, 786:12, 838:11, 843:21, 863:7, 875:1, 886:22, 896:14, 897:6,

949:24, 955:12, 956:1, 959:17, 961:20, 962:15, 974:7, 996:8
**undergraduate** [3] - 701:22, 886:17, 955:2
**underlies** [1] - 684:24
**underlying** [2] - 720:1, 931:15
**underneath** [2] - 792:10, 792:14
**understood** [14] - 672:18, 737:8, 737:16, 738:15, 751:20, 755:18, 756:4, 761:25, 802:21, 858:6, 916:12, 917:24, 946:12, 949:16
**undisclosed** [5] - 678:4, 733:15, 742:8, 951:7, 956:19, 958:14, 960:22, 964:13, 972:15
**undone** [1] - 914:5
**unequivocally** [3] - 691:12, 695:2, 695:3
**unfortunate** [1] - 771:16
**unhelpful** [1] - 843:5
**unified** [1] - 1001:24
**unique** [2] - 843:25, 844:6
**United** [2] - 747:12, 798:5
**UNITED** [1] - 1:2
**universities** [1] - 888:2
**University** [4] - 701:16, 701:23, 701:25, 896:13
**unknown** [2] - 950:16, 983:7
**unless** [8] - 679:8, 688:17, 732:10, 732:23, 733:2, 742:11, 748:8, 767:10
**unlike** [1] - 948:15
**unnamed** [1] - 892:2
**unquote** [1] - 761:19
**unresponsive** [1] - 893:6
**untimely** [5] - 759:18, 781:25, 785:1, 785:20, 788:3
**unusual** [2] - 761:4, 796:11

**up** [121] - 672:20, 675:17, 685:24, 688:25, 695:21, 700:9, 700:13, 706:24, 708:24, 709:1, 722:9, 722:20, 733:4, 735:14, 741:17, 744:14, 744:23, 745:11, 745:21, 745:22, 746:6, 750:21, 752:4, 752:24, 757:6, 759:23, 760:17, 761:5, 765:23, 769:10, 770:20, 777:6, 783:2, 783:6, 787:7, 801:23, 802:10, 809:17, 824:3, 826:3, 826:22, 827:13, 829:4, 830:9, 836:23, 841:16, 846:4, 850:11, 852:13, 854:5, 860:1, 864:25, 868:15, 868:17, 868:20, 870:22, 871:5, 872:15, 872:19, 876:3, 876:21, 876:24, 880:10, 882:12, 883:25, 884:12, 888:24, 893:15, 900:11, 904:4, 910:5, 912:15, 914:9, 923:9, 924:19, 925:14, 934:11, 936:19, 939:2, 941:2, 941:15, 950:7, 955:22, 957:23, 958:9, 958:10, 959:16, 959:21, 959:22, 961:19, 962:1, 963:3, 963:12, 964:5, 966:18, 966:23, 967:3, 967:12, 967:22, 968:1, 968:24, 969:4, 972:4, 972:23, 974:6, 974:16, 975:18, 976:1, 976:11, 981:10, 981:23, 986:4, 986:5, 990:20, 994:3, 996:14, 999:11, 1001:6, 1002:23
**update** [5] - 740:20,

745:14, 768:10, 780:25, 791:10
**updated** [6] - 740:14, 763:14, 767:7, 768:3, 770:4, 786:16
**updates** [3] - 740:14, 763:16, 778:10
**upper** [6] - 738:25, 763:21, 846:1, 861:13, 861:16, 994:12
**upset** [1] - 697:6
**upstream** [1] - 942:25
**uptake** [1] - 862:11
**URLs** [1] - 762:25
**US** [8] - 740:11, 745:3, 749:1, 752:2, 795:10, 795:16, 826:25, 885:4
**US20170190683A1** [1] - 982:8
**USA** [1] - 1:7
**usage** [2] - 805:25
**useful** [9] - 675:4, 713:22, 726:9, 730:18, 730:23, 813:25, 814:13, 814:16, 814:25
**uses** [2] - 772:22, 1001:12

## V

**VA** [2] - 701:14, 701:18
**Vachharajani** [2] - 725:11, 725:21
**vaguely** [1] - 775:17
**validity** [9] - 703:16, 703:18, 704:2, 705:9, 800:13, 819:3, 820:15, 822:17, 825:17
**value** [3] - 683:11, 683:23, 877:13
**Vanda** [71] - 671:13, 673:13, 675:17, 676:15, 677:9, 677:12, 681:23, 682:1, 682:13, 683:6, 683:21, 683:25, 684:9, 684:12, 684:25, 685:3, 685:20, 686:2, 687:5, 687:11, 687:13, 688:4, 688:5, 692:12, 692:20, 692:24, 693:4, 693:13, 693:15,

703:4, 726:18, 727:6, 736:9, 739:7, 757:25, 761:11, 765:24, 766:14, 770:2, 770:3, 770:8, 771:14, 775:15, 796:17, 800:21, 825:8, 827:9, 878:10, 895:14, 947:16, 947:24, 950:23, 965:14, 966:5, 968:7, 969:5, 970:14, 970:20, 972:1, 973:12, 973:20, 974:18, 975:6, 975:20, 975:25, 976:3, 985:5, 985:25, 988:23, 989:2, 989:8
**VANDA** [1] - 1:5
**Vanda's** [13] - 692:24, 765:4, 770:6, 772:7, 802:12, 814:4, 848:4, 937:25, 965:7, 966:13, 968:22, 969:1, 974:24
**variability** [5] - 908:10, 910:10, 916:3, 923:17, 924:10
**variation** [1] - 899:21
**varies** [1] - 915:23
**variety** [1] - 706:5
**various** [10] - 767:22, 860:14, 864:4, 864:5, 865:10, 873:19, 916:9, 985:6, 986:8, 987:8
**vary** [2] - 837:10, 857:6
**vast** [1] - 735:6
**vehicle** [1] - 678:25
**verbal** [1] - 991:19
**verity** [1] - 734:13
**version** [32] - 740:15, 740:23, 741:11, 744:14, 745:25, 747:2, 747:6, 747:23, 756:14, 762:12, 765:11, 765:12, 765:14, 765:19, 765:21, 768:23, 769:2, 770:13, 770:14, 777:2, 782:9, 782:16, 787:10, 787:19, 790:17, 790:21, 795:11, 796:25, 874:12,

890:20, 935:2, 935:3
**versions** [5] - 740:16, 767:22, 788:14, 798:4, 934:25
**versus** [8] - 751:24, 825:15, 827:17, 837:13, 844:21, 884:20, 899:9, 971:2
**vertical** [2] - 908:17, 909:2
**View** [1] - 786:12
**view** [19] - 675:21, 676:11, 682:10, 683:8, 683:17, 687:8, 691:17, 691:25, 732:25, 735:17, 786:13, 786:15, 802:19, 819:12, 878:23, 881:21, 894:3, 953:3, 979:16
**viewpoints** [1] - 705:10
**Views** [3] - 784:11, 784:16, 786:6
**views** [1] - 786:15
**visited** [4] - 782:23, 784:3, 787:2, 787:9
**volunteers** [1] - 879:24

# W

**wait** [13] - 672:15, 673:21, 690:11, 698:13, 744:15, 747:20, 752:24, 754:2, 758:22, 772:4, 946:11
**waive** [1] - 776:14
**wake** [12] - 707:13, 708:6, 708:24, 709:1, 802:10, 804:13, 804:16, 805:9, 805:19, 868:15, 868:20, 885:7
**Wake** [9] - 778:19, 783:16, 789:20, 816:11, 818:9, 829:9, 900:23, 918:22, 931:11
**wakefulness** [6] - 706:15, 706:20, 706:21, 707:17, 708:25, 728:23
**walk** [5] - 899:15, 908:7, 923:25, 941:15, 941:16
**wall** [3] - 898:2,

914:23, 915:5
**wants** [5] - 739:21, 767:11, 777:16, 942:9, 942:10
**warranted** [1] - 693:16
**wasted** [1] - 750:11
**Watson** [1] - 980:16
**waves** [3] - 890:7, 891:19, 892:5
**Wayback** [31] - 734:21, 735:1, 735:3, 735:4, 742:24, 742:25, 743:4, 743:12, 743:17, 743:22, 743:25, 744:10, 744:11, 757:12, 758:11, 760:7, 760:8, 762:1, 762:2, 762:8, 763:25, 766:8, 766:20, 766:22, 767:11, 768:6, 768:8, 769:17, 769:19, 776:4, 776:11
**ways** [2] - 891:12, 990:12
**wear** [1] - 887:18
**web** [5] - 731:7, 731:8, 745:22, 762:12, 783:7
**website** [77] - 733:7, 735:6, 740:8, 740:10, 740:11, 741:5, 742:6, 744:22, 744:25, 745:1, 745:2, 745:4, 745:11, 747:4, 747:5, 747:7, 747:10, 747:17, 748:1, 748:14, 748:21, 749:1, 749:6, 749:19, 750:10, 752:2, 752:7, 752:10, 752:19, 752:23, 753:20, 754:10, 754:20, 755:3, 755:7, 755:12, 755:19, 756:1, 757:6, 757:8, 757:19, 760:9, 760:12, 761:4, 763:3, 763:11, 763:13, 767:6, 767:7, 767:9, 767:15, 768:1, 768:24, 770:7, 771:25, 772:15, 772:16, 775:5,

778:12, 781:22, 785:10, 785:12, 785:15, 785:17, 788:10, 788:13, 789:13, 789:15, 790:4, 792:20, 795:10, 795:17, 795:25, 797:19, 797:20, 797:22, 798:2
**website's** [1] - 798:5
**websites** [1] - 744:2
**Wednesday** [1] - 1:14
**week** [3] - 706:1, 741:23, 950:9
**weeks** [8] - 764:8, 789:4, 846:10, 846:13, 847:9, 906:19, 908:22, 927:4
**Weir** [47] - 840:19, 844:24, 846:3, 847:20, 850:10, 851:19, 852:13, 853:8, 855:9, 860:1, 860:18, 861:8, 864:24, 866:12, 870:22, 872:16, 876:24, 902:17, 903:17, 906:6, 907:10, 958:9, 959:16, 959:21, 961:19, 961:25, 963:1, 963:11, 964:5, 966:17, 966:23, 967:3, 967:22, 968:17, 968:25, 969:3, 969:13, 970:6, 974:6, 974:16, 975:17, 975:25, 976:10, 981:2, 981:10, 981:16, 981:23
**WEISS** [1] - 671:8
**welcome** [3] - 865:20, 950:2, 994:4
**well-known** [2] - 829:16, 865:6
**well-respected** [1] - 928:4
**wells** [2] - 946:23, 956:11
**WELLS** [1] - 671:4
**WHARTON** [1] - 671:8
**wheelhouse** [1] - 858:13
**whereas** [2] - 970:13, 995:16
**whereby** [1] - 837:16

**wherewithal** [1] - 775:13
**whichever** [1] - 995:3
**White** [3] - 762:21, 765:17, 767:4
**white** [4] - 829:4, 871:21, 941:6, 999:20
**whoa** [1] - 943:4
**whole** [6] - 680:4, 686:4, 745:20, 750:16, 770:21, 793:20
**wide** [1] - 706:5
**WILLIAM** [1] - 671:5
**willing** [5] - 755:4, 755:12, 767:10, 771:13, 878:24
**Wilmington** [1] - 1:14
**window** [3] - 718:1, 718:6, 854:2
**winning** [1] - 944:11
**Winston** [1] - 741:19
**wish** [1] - 853:21
**wishes** [1] - 841:7
**withdraw** [2] - 831:4, 851:16
**withdrawn** [2] - 917:7, 918:16
**withhold** [2] - 948:8, 956:21
**witness** [40] - 679:14, 679:16, 690:18, 694:17, 694:20, 697:12, 699:6, 699:25, 700:1, 700:12, 700:21, 736:15, 736:17, 736:19, 737:18, 743:8, 749:7, 750:12, 751:6, 768:14, 771:23, 775:6, 777:10, 778:5, 782:13, 790:11, 797:23, 828:5, 828:12, 893:20, 894:15, 905:21, 924:17, 937:25, 938:12, 941:17, 946:18, 1003:13, 1003:16
**WITNESS** [38] - 718:19, 718:22, 777:25, 835:11, 845:5, 886:12, 886:16, 886:21, 886:24, 887:1, 887:6, 887:15, 887:22, 888:4, 888:11, 888:16,

888:19, 888:24, 889:1, 889:10, 889:17, 889:25, 890:24, 891:3, 891:9, 891:22, 892:11, 892:13, 892:17, 892:22, 893:3, 893:11, 893:14, 937:24, 949:25, 956:23, 964:24, 972:17

**witnesses** [3] - 755:20, 845:1, 894:25

**WO** [1] - 814:6

**Women's** [3] - 702:15, 896:3, 897:20

**word** [4] - 760:25, 829:24, 878:5, 940:15

**Word** [2] - 934:25, 935:2

**words** [22] - 676:22, 678:9, 684:11, 685:2, 698:13, 742:17, 749:7, 761:1, 765:2, 773:9, 781:15, 785:5, 789:5, 804:12, 818:1, 824:15, 842:5, 847:1, 853:23, 883:16, 889:21, 918:22

**workings** [1] - 784:25

**works** [12] - 677:9, 695:20, 740:1, 744:1, 755:8, 781:22, 785:14, 788:11, 828:10, 834:15, 875:18, 986:24

**world's** [1] - 841:24

**worry** [1] - 844:19

**worth** [1] - 755:22

**wrap** [1] - 876:3

**write** [1] - 936:24

**writes** [1] - 944:24

**writing** [2] - 759:24, 832:22

**written** [6] - 703:6, 721:13, 824:8, 824:12, 825:20, 838:19

**wrote** [4] - 775:22, 829:3, 829:25, 842:10

**www** [1] - 783:8

## X

**XYZ** [1] - 740:20

## Y

**year** [19] - 684:23, 714:6, 714:16, 715:16, 716:12, 717:7, 719:14, 720:10, 721:14, 730:2, 744:7, 744:8, 764:6, 764:12, 776:2, 903:8, 925:17

**years** [18] - 682:2, 683:7, 702:12, 702:14, 761:8, 769:8, 785:20, 838:2, 838:5, 838:9, 839:1, 840:6, 858:19, 887:24, 932:13, 948:4, 966:7, 985:21

**yellow** [5] - 816:11, 819:8, 821:3, 822:23, 871:22

**yesterday** [10] - 672:19, 674:8, 675:2, 678:21, 683:3, 689:7, 691:1, 697:20, 699:13, 950:12

**yoked** [1] - 851:1

**York** [1] - 885:15

**young** [3] - 697:11, 938:7, 981:17

**YOUNG** [57] - 671:9, 940:25, 941:8, 941:19, 941:24, 942:3, 942:6, 942:10, 942:14, 942:17, 942:24, 943:20, 945:1, 945:4, 946:7, 946:12, 946:20, 947:5, 947:11, 947:16, 948:2, 948:19, 948:22, 949:6, 949:12, 949:14, 950:1, 951:12, 952:6, 952:25, 957:3, 958:8, 959:1, 959:5, 959:6, 961:2, 961:6, 961:14, 964:17, 964:21, 965:3, 965:23, 968:16, 968:19, 972:18, 973:25, 974:5, 975:11, 975:16,

980:21, 981:1, 981:19, 981:21, 983:25, 984:3, 984:5, 984:7

**yourself** [6] - 675:18, 701:1, 771:12, 809:22, 835:4, 896:1

## Z

**zero** [1] - 893:16

**zone** [2] - 853:17, 912:6

**zoom** [3] - 882:16, 884:13, 936:18